No. 25-3000

IN THE U.S. COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

CORNER POST, INC.,

*PLAINTIFF-APPELLEE*,

V.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*DEFENDANT-APPELLANTS*.

*Appeal from the U.S. District Court
for the District of North Dakota*

Case No. 1:21-cv-00095-DMT-CRH
Hon. Daniel M. Traynor

**AMICUS BRIEF OF THE CENTER FOR
AMERICAN RIGHTS, FRONTIERS OF FREEDOM,
AMERICANS FOR LIBERTY AND SECURITY, AND
AMERICANS FOR LIMITED GOVERNMENT
SUPPORTING APPELLANT AND REVERSAL**

Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave.,
Suite 170
Chicago, IL 60614
414.588.1658
December 23, 2025    dsuhr@americanrights.org

# DISCLOSURE STATEMENT

The Center for American Rights, Americans for Limited Government, Americans for Liberty and Security, and Frontiers of Freedom are all nonstock nonprofit corporations. They do not issue stock and do not have any shareholders or owners. *See Fed. R. App. Proc. 26.1.*

# TABLE OF CONTENTS

**DISCLOSURE STATEMENT** ...................... I
**TABLE OF AUTHORITIES** ...................... III
**INTEREST OF THE AMICI CURIAE** ....... 1
**SUMMARY OF ARGUMENT & INTRODUCTION** ......................................... 3
**ARGUMENT** ................................................. 4
   I. THIS CASE IS NOT SUITED TO THE MAJOR QUESTIONS DOCTRINE BECAUSE CONGRESS HAS SPOKEN WITH SPECIFICITY HERE, AND THE AGENCY HAS ACTED APPROPRIATELY WITHIN ITS SCOPE. ..................................................... 4
   II. TEXTUALIST TOOLS OF STATUTORY INTERPRETATION SUPPORT AN INDUSTRY-WIDE APPROACH TO REGULATION. ............................. 8
   III. THE TITLE OF THE SUBSECTION, "CONSIDERATIONS; CONSULTATION," IS A HELPFUL GUIDE TO ITS MEANING. .................. 11
**CONCLUSION** ........................................... 15

# TABLE OF AUTHORITIES

### CASES

*Argus Leader Media v. United States Dep't of Agriculture*, 740 F.3d 1172, 1176 (8th Cir. 2014) ..........................................................10

*Couser v. Shelby Cnty.*, 139 F.4th 664, 671 (8th Cir. 2025) ................................................8

*Couser v. Story Cnty.*, 704 F. Supp. 3d 917, 940 (S.D.Ia. 2023) ..........................................8

*FCC v. Consumers' Rsch.*, 606 U.S. 656, 684 (2025) ............................................................6

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) ..........................4, 5

*Hyuk Kee Yoo v. United States*, 43 F.4th 64, 74 (2d Cir. 2022) .........................................11

*Linney's Pizza, LLC v. Bd. of Governors of the Fed. Rsrv. Sys.*, 2025 U.S. Dist. LEXIS 181314, *22 (E.D.Ky. Sept. 12, 2025) ........12

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ..............................................3

*Nat'l Fed'n of Indep. Bus. (NFIB) v. DOL, OSHA*, 595 U.S. 109, 126 (2022) ...................6

*Nebraska v. Biden*, 600 U.S. 477 (2023) .3, 5, 6

*United States v. Locke*, 529 U.S. 89, 105 (2000) ........................................................10

*United States v. Quality Stores, Inc.*, 134 S. Ct. 1395, 1402 (2014 .................................10

*Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) ..........................................4, 5

*Wayman v. Southard*, 23 U.S. 1, 10 Wheat. 1,
    43 (1825) ........................................................ 6
*West Virginia v. Environmental Protection
    Agency*, 597 U.S. 697 (2022) .......................... 6
*Whitman v. Am. Trucking Ass'ns*, 531 U.S.
    457, 468 (2001) .............................................. 4
*Wis. Cent. Ltd. v. United States*, 585 U.S. 274,
    277 (2018) ...................................................... 7

### STATUTES

15 U.S.C. § 1693o-2 ............................... passim
49 U.S.C. § 60102(a)(2) .................................. 7

### OTHER AUTHORITIES

*Black's Law Dictionary* (11th ed. 2019) .......... 8
Antonin Scalia, *The Rule of Law as a Law of
    Rules*, 56 U. of Chi. L. Rev. 1175 (1989) ...... 8

# INTEREST OF THE AMICI CURIAE[1]

The **Center for American Rights** is a non-profit public-interest law firm dedicated to accountability for powerful interests, such as the media, unions, and government. The Center frequently files amicus briefs in cases related to its core issues. The Center is engaged in this particular case because of its interest in the major questions doctrine and statutory interpretation on questions of agency power. *See, e.g., Nat. Horsemen's Benevolent & Protective Assoc. v. Black,* 53 F.4th 869 (5th Cir. 2022) and 107 F.4th 415 (5th Cir. 2024) (Suhr represents challengers to broad interpretations of agency power).

**Americans for Limited Government** is dedicated to fighting for the survival of America by restoring constitutionally limited government, allowing individuals to pursue life, liberty and happiness. Americans for Limited Government achieves its vision by fighting to reduce the size and scope of government, pro-

---

[1] No counsel for a party authored any part of the brief, and no party or counsel contributed money to prepare or submit the brief. The Center funded the brief through its general revenue. *See* Fed. R. App. Proc. 29.

tecting individuals rights, promoting federalism, and rolling back the tyranny of the administrative state. This will put America first, foster free enterprise, and restore the rule of law.

**Frontiers of Freedom** (FF) is an educational foundation whose mission is to promote freedom and opportunity whenever and wherever it can. FF is dedicated to the principles of individual liberty, peace through strength, limited government, free enterprise, and the values embodied in the Declaration of Independence, Constitution, and Bill of Rights. FF believes freedom is worth preserving, defending and renewing. FF's goal is to build a robust culture of freedom, opportunity, and prosperity through effective education, analysis and advocacy.

**Americans for Liberty and Security** is a conservative 501(c)(4) non-profit organization which focuses on promoting constitutional, small government policies. ALS supports free markets, federalism, a robust national security and related policies that will sustain America for generations to come. Americans for Liberty and Security is interested in this particular case because of its interest in the major questions doctrine and statutory interpretation on questions of agency power as well as promoting the separation of powers.

# SUMMARY OF ARGUMENT & INTRODUCTION

The Federal Reserve's debit card rule is important. It affects major industries, including retailers and financial institutions. It affects millions of customers nationwide who use debit cards. Congress knew this when it wrote the Durbin Amendment. This case is not an appropriate situation for the Major Questions Doctrine because here Congress wrote with sufficient specificity what it wanted. The Fed did not discover newfound powers *ex nihilo*, *deus ex machina*, or *mirabile dictu*—it promptly and thoughtfully exercised the powers that Congress gave it.

The District Court's decision on specific vs. representative issuer standards failed to appreciate the ordinary meaning of the statutory term "standards." Standards are generally applicable rules or baselines against which individual actions or instances are judged. They are not themselves individualized and particularized—that notion is opposite the idea of "standards," which inherently govern multiple individuals and situations.

Finally, the District Court erred in its exclusivist interpretation of Subsection (a)(4),

wherein the Court found the so-called "third category" of factors incompatible with the statute. The section's title and neighboring statute are useful tools to illuminate its meaning, which can include other considerations.

The District Court should be reversed.

## ARGUMENT

I. **This case is not suited to the major questions doctrine because Congress has spoken with specificity here, and the agency has acted appropriately within its scope.**

Over the course of the past year, opponents of the Trump Administration have rushed to declare every administration initiative a major question in an effort to stop, frustrate, and stay each rulemaking and agency action through the courts. Though it's encouraging to see the late and enthusiastic embrace of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), and *Nebraska v. Biden*, 600 U.S. 477 (2023), by some recent adopters, courts should not fall into the trap of declaring everything a major question or soon the doctrine will lose its power. For the doctrine to remain meaningful, courts must insist that Congress legislate on

5

actually major questions, and that it give agencies sufficient clarity that their only job is to "fill in the details."

This case is not an instance of the Fed shoving an elephant into a mousehole. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions -- it does not, one might say, hide elephants in mouseholes."). This is, rather, the Fed putting a dormouse in a mousehole when certain special interests desired a churchmouse. They may not like the Fed's policy choice, but that doesn't make it a major question.

This is not an instance of the Fed using "vague terms or ancillary provisions" to "alter the fundamental details" of the regulatory scheme. Nor is it the case the Fed has suddenly "claim[ed] to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'" *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). Courts appropriately "expect Congress to speak clearly if it wishes to assign to an agency

decisions of vast 'economic and political significance.'" *Util. Air Regulatory Group*, 573 U.S. at 324 (quoting *Brown & Williamson Tobacco*, 529 U.S. at 160).

Here, debit card swipe fees are no doubt big business. *See* D.Ct. Op. ¶ 3. They at minimum facilitate a significant portion of the American economy, even if they do not directly constitute it. And they affect millions of businesses and customers who use debit cards.

The important difference is that the Fed is not discovering an unheralded new power in a long-extant statute. Congress asked the Fed to do this, gave it clear guidance on how to go about its job, and then the Fed acted promptly to implement the congressional directive. This is not, in other words, anything like the U.S. Department of Education waiting two-plus decades to suddenly (conveniently) discover in a post-9/11 emergency responder statute the power to cancel hundreds of billions of dollars in student loan debt. *Nebraska v. Biden*, 600 U.S. 477 (2023).

"There are some 'important subjects, which must be entirely regulated by the legislature itself,' and others 'of less interest, in which a general provision may be made, and power

given to [others] to fill up the details.'" *Nat'l Fed'n of Indep. Bus. (NFIB) v. DOL, OSHA*, 595 U.S. 109, 126 (2022) (Gorsuch, J., concurring (quoting *Wayman v. Southard*, 23 U.S. 1, 10 Wheat. 1, 43 (1825)).

This case falls somewhere in between in Justice Gorsuch's scheme. The major questions doctrine is less of an on-off switch than a spectrum, or really a two-axis chart. This is an important question, for sure, but it is probably not as vital to the nation's economic and political superstructures as student loan cancellation (as in *Nebraska*) or our energy infrastructure (as in *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022)).

On the other axis, Congress made more than general provision. It did not simply empower the Fed to go forth and act in "the public interest" by setting "just and reasonable rates." *See FCC v. Consumers' Rsch.,* 606 U.S. 656, 684 (2025). Rather, Congress in the Durbin Amendment gave the Fed specific considerations and consultations to undertake, ordered it to develop an extensive informational record, and set forth particulars as to fraud prevention and networks. Congress left the Fed to "fill up the details" only after establishing specifying how the agency should go about doing its job.

## II. Textualist tools of statutory interpretation support an industry-wide approach to regulation.

Congress mandated that the Fed should "establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S. Code § 1693o-2(3)(a).

"Standards" are, in their ordinary meaning, generally applicable. *See Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) ("our job is to interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." Cleaned up). This Court was recently called upon to determine the meaning of the term "standards" in the Pipeline Safety Act, which requires that the Secretary of Transportation "shall prescribe minimum safety standards for pipeline transportation and for pipeline facilities." 49 U.S.C. § 60102(a)(2). This Court found a particular local ordinance set a "safety standard" because it had "blanket application" that "appl[ies] alike" to different persons in different circumstances.

*Couser v. Shelby Cnty.*, 139 F.4th 664, 671 (8th Cir. 2025), *rehearing denied*, 2025 U.S. App. LEXIS 18818 (July 28, 2025).

The district court in that case turned to *Black's Law Dictionary*, which defined "Standard" in this context as "[a] model accepted as correct by custom, consent, or authority" or "[a] criterion for measuring acceptability, quality, or accuracy." *Couser v. Story Cnty.*, 704 F. Supp. 3d 917, 940 (S.D.Ia. 2023) (quoting "Standard," *Black's Law Dictionary* (11th ed. 2019)).

Standards, in other words, set a generally applicable model or criteria by which individual actions are judged. They are, by their nature, intended to be a universal baseline against which individual applications are held up. Contrary to the District Court's opinion, D.Ct. Op. ¶ 91, in some sense the whole *point* of establishing standards in a rule is to set a "one-size-fits-all approach." That's a feature, not a bug, of what it means to be "standards." For a standard to make sense, it has to serve as the rule by which to judge all transactions. *See* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. of Chi. L. Rev. 1175 (1989).

That reading is reinforced by the rest of the statutory phrasing: the Fed must "establish

standards *for assessing* whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S. Code § 1693o-2(3)(a) (italics added).

The Fed must set standards that allows the Fed and issuers to assess whether the amount of the fee is reasonable. Again, an assessment in this context is the comparison of an individual situation against the universal norm, *i.e.*, the standards.

Thus, the District Court erred in adopting the "issuer-specific'" and "transaction-specific" model for interpreting this language. D.Ct. Op. at ¶¶ 87-90.

Rather, the language makes clear that the Fed was to set "standards" by which the issuers themselves could "assess" whether their fees were reasonable and proportional. If the issuers assessed incorrectly—if they charged fees that were not reasonable and proportional in light of the universal criteria set by the Fed in the rule—then they would be liable to enforcement for their noncompliance. 15 U.S.C. § 1693o-2(d)(1). But it's not the Fed's job to set a number for every issuer and every transaction.

It's the Fed's job to set generally applicable standards by which issuers can then judge whether their own behavior and their own transactions are compliant with the law. The District Court's adoption of a different interpretation was erroneous.

### III. The title of the subsection, "Considerations; Consultation," is a helpful guide to its meaning.

The correct resolution of the debate over the so-called "third category" of considerations is more easily resolved by reference to the title of the relevant statutory section. *See* D.C. Op. ¶ 57. A statutory section's title or heading "can be a useful aid in resolving a statutory text's ambiguity." *United States v. Quality Stores, Inc.*, 134 S. Ct. 1395, 1402 (2014). As this Court has said before, "statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute." *Argus Leader Media v. United States Dep't of Agriculture*, 740 F.3d 1172, 1176 (8th Cir. 2014). Similarly, "words of a statute should be interpreted consistent with their neighbors." *United States v. Locke*, 529 U.S. 89, 105 (2000).

To the extent this Court has doubt about the statute's meaning here, Amici find the section

heading and neighboring subsection both helpful.

The prior subsection is entitled, "Rulemaking required." 15 U.S.C. § 1693o-2(a)(3). The next subsection, the one at the heart of this debate, is entitled, "Considerations; consultation." *Id.* at (a)(4). In other words, Congress in that subsection tells the Fed what things to ensure it considers and whom it must consult while developing the required rule.

"Considerations" as a word has an open-ended texture to it—it is Congress telling the agency, "When you develop the rule, make sure you consider these things and consult these other impacted agencies."

Put differently, "considerations" is a word that confers discretion. *See Hyuk Kee Yoo v. United States*, 43 F.4th 64, 74 (2d Cir. 2022) (treaty "drafters knew the difference between a mandatory determination and a discretionary consideration"). It empowers the Fed to use its best judgment as it weighs the required considerations, weighs any other considerations, reviews the evidence gathered in the administrative record (*see* 15 U.S.C. § 1693o-2(a)(3)(b)), and hears the feedback of those suggested for consultation (*see id.* at (a)(4)(c)).

Of course, developing a rule has all sorts of considerations from any agency perspective. Administrability is one, as we see from the discussion of the issuer v. representative question above. Cost may be another—can regulated parties afford compliance? The ideological preferences of the political policymakers may be another—do these particular Fed governors lean in a more free-market direction, or are they more comfortable with a heavy hand for the government because they are skeptical of big financial institutions? These are all "considerations" — inputs for the agency as it develops the rule, even if they are not specified in the statute.

Which is to say, the statutory "considerations" are not a complete, exhaustive, and exclusive list of considerations that limits the Fed's discretion. Rather, they indicate particular points that Congress wanted to make sure the Fed addressed while developing the rule, even as Congress left the Fed broad discretion to weigh these and other considerations and consultations. *Linney's Pizza, LLC v. Bd. of Governors of the Fed. Rsrv. Sys.*, 2025 U.S. Dist. LEXIS 181314, *22 (E.D.Ky. Sept. 12, 2025).

Indeed, that principle can be seen from the "consultation" section that immediately follows. Congress specifies a list of officers for "consultation." In developing the rule, the Fed "shall" "consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection." 15 U.S.C. § 1693o-2(a)(4)(c).

No one would say this is an exclusive and exhaustive list of whom the Fed may consult while developing this rule. If the Fed decided to ask the Secretary of the Treasury for his views, or the White House's National Economic Council, no one would say the Fed was breaking the law by doing so. That's because consultations, like considerations, are not ordinarily read as exclusive and exhaustive.

The Durbin Amendment may not be the picture of perspicacity, but that's why we have courts. In instances of ambiguity, headings and neighboring texts provide useful illumination of textual problems. That's the case here.

15

## CONCLUSION

For the above-stated reasons, Amici urges the Court to rule in favor of the Board.

Respectfully submitted,

/s/ Daniel R. Suhr
Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave. Suite 170
Chicago, Illinois 60614
414.588.1658
dsuhr@americanrights.org

December 23, 2025