UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT
**APPEARANCE OF COUNSEL**

Case Title: Corner Post, Inc. _____ vs. Board of Governors of the Federal R

**The Clerk will enter my appearance as Counsel in Appeal No.** 25-3000 _____ for the following party(s): (please specify)

Consumer Action for a Strong Economy, Institute for Policy Innovation,
60 Plus Association, Center for Individual Freedom, Center for a Free Economy

☐ Appellant(s)  ☐ Petitioner(s)  ☐ Appellee(s)  ☐ Respondent(s)  ☑ Amicus Curiae  ☐ Intervenor(s)

**Please compare your information below with your information on PACER. Any updates or changes must be made through PACER's Manage my Account.**

Attorney Name: Shawn T. Sheehy _____ s/: Shawn T. Sheehy

Firm Name: FisherBroyles, LLP

Business Address: 1200 G Street NW, Suite 800

City/State/Zip: Washington, D.C. 20005

Telephone Number (Area Code): 202-258-0741

Email Address: shawn.sheehy@fisherbroyles.com

**CERTIFICATE OF SERVICE**

☑ I hereby certify that on 12/26/2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.

☐ I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

CORNER POST INC.,

*Plaintiff – Appellee,*

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant - Appellant.*

On Appeal from the United States District Court for North Dakota
No. 1:21-cv-00095 (Traynor, J.)

**Motion for Leave to File Brief of Amici Curiae
Consumer Action for a Strong Economy, Institute for Policy
Innovation, 60 Plus Association, Center for Individual Freedom,
and Center for a Free Economy
In Support of Appellant, Board of Governors of the Federal
Reserve System**

December 26, 2025

SHAWN T. SHEEHY
  *Counsel of Record*
FISHERBROYLES, LLP
D.C. Bar Number 90002670
1200 G Street NW.
Suite 800
Washington, D.C. 20005
Direct: 202-258-0741
shawn.sheehy@fisherbroyles.com

*Counsel for Amici Curiae*

Pursuant to Circuit Rule 29A and Federal Rule of Appellate Procedure 29(a)(2), *Amici Curiae*, Consumer Action for a Strong Economy ("CASE"), the Institute for Policy Innovation ("IPI"), the 60 Plus Association ("60 Plus"), the Center for Individual Freedom ("CFIF"), and the Center for a Free Economy ("CFFE"), move this Court for an order permitting *amici curiae* to file the attached brief in support of Appellant.

## ALL PARTIES TO THIS APPEAL CONSENT TO THE FILING OF *AMICI CURIAE*'S BRIEF

1. Initially, undersigned counsel communicated with counsel to the Parties in this appeal concerning the relief sought in this Motion, namely, an order from this Court permitting *Amici Curiae* to file the attached brief.

2. Counsel to Appellant, Appellee, and Proposed Intervenors all consent to the filing of the attached brief.

## INTEREST OF *AMICI CURIAE*

3. *Amici Curiae* are tax-exempt and not-for-profit corporations. CASE, 60 Plus, CFIF, and CFFE are organized under 26 U.S.C. § 501(c)(4) while IPI is organized under 26 U.S.C. § 501(c)(3).

4. CASE advocates on behalf of American consumers by promoting free-market policies, fiscal responsibility, and reasonable consumer protections. CASE is

1

unique among consumer advocacy organizations in that CASE advocates for free market solutions that allow the U.S. economy to innovate and expand. This assists consumers because free market solutions provide consumers with greater choice and therefore greater competition in the marketplace. This helps consumers through lower prices and higher quality goods.

5. IPI is a free market think tank focusing on economic growth, innovation, limited government, and individual liberty. IPI promotes policies that harness the strengths of individual liberty, limited government, and free markets. IPI publishes its public policy studies and books on public policy issues. IPI then disseminates these materials to the press and government officials in the hopes that IPI's ideas may assist in addressing the public policy problems facing our country.

6. 60 Plus advocates on behalf of seniors who believe in free market solutions and limited but effective government. 60 Plus represents the interests of senior citizens by educating the public about issues that impact senior citizens and their families. These issues include protecting Social Security and Medicare, advocating for policies that promote retirement security, and permanently repealing the death tax. Finally, 60 Plus submitted a comment to the Board concerning Regulation II's impact on consumers.

7. CFIF is a non-partisan organization established in 1998 to advance the principles of constitutional fidelity, consumer wellbeing, individual rights, market principles, and the rule of law. In pursuit of those principles, CFIF frequently files amicus briefs before the United States Supreme Court and other federal, state, and local courts throughout the nation.

8. CFFE advocates for free-market policy reforms. CFFE accomplishes this task by educating public policymakers on economic policies and the impact on the economy when policymakers make regulatory changes.

## THE REASON FOR AND THE RELEVANCE OF *AMICI CURIAE*'S BRIEF.

9. *Amici Curiae* are organizations that advocate for free-market solutions and how these free-market policies benefit consumers.

10. The regulation at issue in this appeal, Regulation II, has significant impacts on banks, issuers, merchants and, most importantly, consumers.

11. Prior to 2009, the average fee that banks and issuers charged merchants for processing debit card transactions was 55.5 cents per transaction. *See NACS v. Board of Governors of the Federal Reserve System*, 746 F.3d 474, 479 (D.C. Cir. 2014). The average cost per transaction was between 8 cents and 13 cents.

3

*Linney's Pizza, LLC v. Bd. of Governors of the Federal Reserve System*, No. 22-cv-00071, 2025 LEXIS 181314 *4 (E.D. Ky. Sept. 15, 2025).

12. To address these market dynamics, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. 111-203 (2010), 124 Stat. 1376; *see NACS*, 746 F.3d at 477, 479. The purpose of the Act was, in part, "to protect consumers from abusive financial services practices." 124 Stat. 1376.

13. Part of the Dodd-Frank Act was the Durbin Amendment which vested Appellant, the Board of Governors of the Federal Reserve System ("the Board"), to promulgate a reasonable and proportional interchange fee. *NACS*, 746 F.3d at 479-80. The resulting regulation that the Board promulgated is known as Regulation II.

14. Today, under Regulation II, the interchange fee is 21 cents per transaction plus an *ad valorem* component of 0.05% of the transaction and a fraud-prevention adjustment cap of 1 cent. *See* Regulation II, 76 Fed. Reg. 43,394, 43,404 (July 20, 2011); 12 C.F.R. § 235.5.

15. Regulation II has had significant impacts on consumers.

16. Accordingly, *Amici Curiae* wish to file the attached brief to advise the Court of how Regulation II represents the best compromise between competing

4

interests, namely, banks, merchants, and consumers. As for consumers, Regulation II both benefits and harms consumers. For example, under Regulation II, what merchants now pay in debit card transaction fees is half of what merchants paid in 2009 while consumers use their debit cards three times as frequently as they did prior to Regulation II. Consumers pay for this access, however, through increased bank fees, increased ATM fees, decreased access to free checking accounts, and the elimination of debt card reward programs. The Board, therefore, turned the regulation dial properly to the middle.

17. *Amici Curiae* also wish to advise this Court, however, that if the district court's opinion is affirmed, consumers will experience significant harm. The Board will be required to turn the regulation dial in favor of merchants, lowering the debt card transaction fee even more. Accordingly, this is likely to cause banks to, among other things, raise their fees even higher and increase their checking account minimum balance requirements. Consumers, meanwhile, will be required to pay these increased banking fees without seeing any additional savings or benefits from merchants.

18. Accordingly, *Amici Curiae* submit the attached brief which contends that the Board properly interpreted the Durbin Amendment; properly considered

<div align="center">5</div>

comments from consumers and free-market oriented consumer rights organizations and provide the Court with academic social science studies demonstrating Regulation II's impact on consumers. These academic social science studies also demonstrate that adopting the district court's opinion will cause further harm to consumers without any added benefit. *Amici Curiae*, therefore, urge this Court to reverse the district court's opinion.

19. The Appellant, Appellee, and Proposed Intervenors, do not provide detailed analysis of Regulation II's effects on consumers. The Parties do not provide detailed discussion of how Regulation II represents a compromise between banks, merchants, and consumers, minimizing harm to consumers while providing consumers with some benefits. The Parties do not similarly discuss how vacating Regulation II and upholding the district court's opinion risks harming consumers even more without providing consumers with any added benefit. Accordingly, the brief of *Amici Curiae* will be helpful to the Court.

## <u>CONCLUSION</u>

For the foregoing reasons, *Amici Curiae* respectfully requests that this Court grant their motion for leave to file the attached brief of *Amici Curiae*.

6

Respectfully submitted,

December 26, 2025

SHAWN T. SHEEHY
   *Counsel of Record*
FISHERBROYLES, LLP
D.C. Bar Number 90002670
1200 G Street NW.
Suite 800
Washington, D.C. 20005
Direct: 202-258-0741
shawn.sheehy@fisherbroyles.com

*Counsel for Amici Curiae*

7

## CERTIFICATE OF COMPLIANCE

1. Pursuant to Fed. R. App. P. 32(g), this document complies with the type-volume and word-count limits of Federal Rules of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 1,140 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5-6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

<div style="text-align:right">

/s/ *Shawn T. Sheehy*
SHAWN T. SHEEHY
*Counsel to Amici Curiae*

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 26th day of December, 2025, a true copy of the foregoing Motion for Leave to File Brief of *Amici Curiae* was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to all counsel of record.

/s/ *Shawn T. Sheehy*
SHAWN T. SHEEHY
*Counsel to Amici Curiae*

Appellate Case: 25-3000    Page: 11    Date Filed: 12/26/2025 Entry ID: 5591536

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 28A(H)(2)

Pursuant to this Court's Rule 28A(h), I hereby certify that the electronic version of the foregoing Motion for Leave to File Brief of *Amici Curiae* has been scanned for viruses and is virus-free.

/s/ *Shawn T. Sheehy*
SHAWN T. SHEEHY
*Counsel to Amici Curiae*

10

**No. 25-3000**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

CORNER POST INC.,

*Plaintiff – Appellee,*

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant - Appellant.*

On Appeal from the United States District Court for North Dakota
No. 1:21-cv-00095 (Traynor, J.)

**Brief of Amici Curiae, Consumer Action for a Strong Economy, Institute for Policy Innovation, 60 Plus Association, Center for Individual Freedom, and Center for a Free Economy In Support of Appellant Board of Governors of the Federal Reserve System**

December 26, 2025

<div style="margin-left:40%">

SHAWN T. SHEEHY
    *Counsel of Record*
FISHERBROYLES, LLP
D.C. Bar Number 90002670
1200 G Street NW.
Suite 800
Washington, D.C. 20005
Direct: 202-258-0741
shawn.sheehy@fisherbroyles.com

*Counsel for Amici Curiae*

</div>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

CORPORATE DISCLOSURE STATEMENT ..................................................... 1

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE .......................... 2

INTRODUCTION .............................................................................................. 3

SUMMARY OF THE ARGUMENT .................................................................. 5

ARGUMENT ..................................................................................................... 7

I.     IN CRAFTING REGULATION II THE BOARD OF GOVERNORS
CORRECTLY INTERPRETED THE DURBIN AMENDMENT ........................... 9

A.    THE BOARD CORRECTLY READS THE DURBIN AMENDMENT TO PERMIT
THREE COST BUCKETS TO CONSIDER IN CRAFTING A REASONABLE AND
PROPORTIONAL INTERCHANGE FEE ........................................................ 11

B.    THE BOARD PROPERLY CONSIDERED FOUR COSTS THAT ARE SPECIFIC
TO A PARTICULAR ELECTRONIC DEBIT TRANSACTION ............................ 14

II.    IN CRAFTING REGULATION II, THE BOARD OF GOVERNORS
WEIGHED THE BENEFITS AND HARMS TO CONSUMERS ......................... 16

III.   VACATING REGULATION II WILL HARM CONSUMERS ............................ 20

A.    THE SAVINGS THAT MERCHANTS GAINED FROM REGULATION II DID
NOT TRICKLE DOWN TO CONSUMERS ...................................................... 21

B.    IN THE WAKE OF THE DURBIN AMENDMENT, BANKS RECOUPED THEIR
LOSSES BY RAISING FEES, RASING CHECKING ACCOUNT MINIMUMS,
AND ABANDONING FREE CHECKING ........................................................ 24

CONCLUSION ............................................................................................... 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES**                                                                              **Page(s)**

*Linney's Pizza, LLC v. Bd. of Governors of the Federal Reserve System*,
  No. 22-cv-00071, 2025 LEXIS 181314  (E.D. Ky. Sept. 15, 2025) ............7, 11-16

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)...........................................11, 14

*NACS v. Board of Governors of the Federal Reserve System*, 746 F.3d 474
  (D.C. Cir. 2014).................................................................................7, 8, 11-13, 16

**STATUTES AND REGULATIONS**

15 U.S.C. § 1693b(a)(2-3) ............................................................................... 8, 17

15 U.S.C. § 1693o-2(a)(2-3)................................................................................. 10

15 U.S.C. § 1693o-2(a)(4)(B)............................................................................... 10

15 U.S.C. § 1693o-2(a)(4)(B)(i).......................................................................10-13

15 U.S.C. § 1693o-2(a)(4)(B)(ii)......................................................................10-12, 14

26 U.S.C. § 501(c)(3) ............................................................................................ 1

26 U.S.C. § 501(c)(4) ............................................................................................ 1

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L.
  111-203 (2010), 124 Stat. 1376............................................................................ 7, 8

12 C.F.R. § 235.5.................................................................................................. 17

**RULES**

Fed. R. App. P. 29(a)(2) ......................................................................................... 1

Fed. R. App. P. 29(a)(4)(E)(i-iii)............................................................................. 1

**OTHER AUTHORITIES**

156 Cong. Rec. S4839 (daily ed. June 10, 2010) ................................................. 8

*2023 NPRM, Debit Card Interchange Fees and Routing*, 88 Fed. Reg. 78,100
  (Nov. 14, 2023)..................................................................................................... 20

## TABLE OF AUTHORITIES—Continued

**Page(s)**

Board of Governors of the Federal Reserve System, *Federal Reserve Payment Study: 2022 Triennial Initial Data Release*, *available at* https://www.federalreserve.gov/paymentsystems/2023-April-The-Federal-Reserve-Payments-Study.htm (last visited Dec. 18, 2025).......................... 9

Brad G. Hubbard, *The Durbin Amendment, Two-Sided Markets, and Wealth Transfers: An Examination of Unintended Consequences Three Years Later* (May 20, 2013), *available at* SSRN: https://dx.doi.org/10.2139/ssrn.2285105 (last visited Dec. 16, 2025) ........................................................22-27

Brief of Amicus Curiae United States Senator Richard J. Durbin in Support of Plaintiffs-Appellees, *NACS, et al. v. Board of Governors of the Federal Reserve System*, No. 13-5270, 2013 U.S. D.C. Cir. Briefs LEXIS 151 (D.C. Cir. Nov. 20, 2013) ..................................................................... 8

Comment of Public Interest Groups that Support Consumer Choice and Competition (Feb. 22, 2011), *available at https://cei.org/wp-content/uploads/2024/05/durbin-2011-comment.pdf* (last visited Dec. 16, 2025)............................................................................................................... 18

David S. Evans, Howard Chang, Steven Joyce, *The Impact of the U.S. Debit Card Interchange Fee Regulation on Consumer Welfare: An Event Study Analysis* (Coase-Sandor Institute for Law & Economics Working Paper No. 658) (Oct. 23, 2013), *available at* https://chicago unbound.uchicago.edu/cgi/viewcontent.cgi?article=1651&context=l aw_and_economics (last visited Dec. 17, 2025) ..................................................... 21

*Debit Card Interchange Fees and Routing*, Final Rule, 76 Fed. Reg. 43,394 (July 20, 2011) ("Regulation II) ......................3-9, 11, 12, 14, 16-22, 24, 25, 27-29

*Debit Card Interchange Fees and Routing*, NPRM, 75 Fed. Reg. 81,722 (Dec. 28, 2010) ................................................................................................ 16, 17

Homer, The Odyssey, Translation by A.T. Murray, PH.D. in two volumes. Cambridge, MA., Harvard University Press; London, William Heinemann, Ltd. 1919, *available at* https://www.perseus.tufts.edu/hopper/text?doc=Perseus%3Atext%3A1999.01.0136%3Abook%3D12%3Acard%3D234 (last visited Dec. 17, 2025) ................................................. 3, 4

# TABLE OF AUTHORITIES—Continued

Page(s)

Marshall Lux and Robert Green, *Out of Reach: Regressive Trends in Credit Card Access* (Harvard Kennedy School, Mossavar-Rahmani Center for Business and Government) (April 2016), *available at* https://www.hks.harvard.edu/sites/default/files/centers/mrcbg/files/Out_of_Reach_Lux_Greene_4_7.pdf (last visited Dec. 17, 2025) ...................................... 25, 27

Pl.'s Mem. In Supp. of Mot. for Summ. J., *Corner Post, Inc. v. Board of Governors of the Federal Reserve System,* No. 21-cv-00095, R. Doc. No. 51 (D. N.D. Nov. 15, 2024) ...................................................................17-18

Scott D. Strockoz, *Dodd-Frank and the Durbin Amendment—Is It Working as Intended?,* Capstone Strategic Project for the American Bankers Association Stonier Graduate School of Banking (2012) ...................................... 22

Todd J. Zywicki, Geoffrey Manne, and Julian Morris, *The Effects of Price Controls on Payment-Card Interchange Fees: A Review and Update*, International Center for Law and Economics, (March 4, 2022), *available at* https://laweconcenter.org/wp-content/uploads/2022/03/Payments-2021-Lit-Review.pdf (last visited Dec. 18, 2025) ...................................... 28

Todd J. Zywicki, Geoffrey Manne, and Julian Morris, *Price Controls on Payment Card Interchange Fees: The U.S. Experience* (June 4, 2014), George Mason Law & Economics Research Paper No. 14-18, *available at* SSRN: https://ssrn.com/abstract=2446080 ........................................... 25, 26

Todd J. Zywicki, Geoffrey A. Manne, and Julian Morris, *Unreasonable and Disproportionate: How the Durbin Amendment Harms Poorer Americans and Small Businesses*, International Center for Law & Economics (April 25, 2017), *available at* https://laweconcenter.org/images/articles/icle-durbin_update_2017_final. pdf (last visited December 16, 2025) ........................................................................22-26

Zhu Wang, Scarlett Schwartz, & Neil Mitchell, *The Impact of the Durbin Amendment on Merchants: A Survey Study*, 100 Fed. Reserve Bank of Richmond Econ. Quarterly 183 (2014), *available at https://www.richmondfed.org/-/media/RichmondFedOrg/publications/research/economic_quarterly/2014/q3/pdf/wang.pdf* (last visited Dec. 16, 2025)....................21-22

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Under Rules 26.1(a) and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, Amici Curiae, Consumer Action for a Strong Economy ("CASE"), the Institute for Policy Innovation ("IPI"), the 60 Plus Association ("60 Plus"), the Center for Individual Freedom ("CFIF"), and the Center for a Free Economy ("CFFE") state that they are tax-exempt and not-for-profit corporations. CASE, 60 Plus, CFIF, and CFFE are organized under 26 U.S.C. § 501(c)(4) while IPI is organized under 26 U.S.C § 501(c)(3). None of these Amici have a corporate parent, none of these Amici issue stock, and no publicly held corporation owns 10 percent or more of any of these Amici.

/s/ *Shawn T. Sheehy*
SHAWN T. SHEEHY
*Counsel to Amici Curiae*

1

## <u>STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*[1]</u>

*Amici curiae* are the following organizations: Consumer Action for a Strong Economy ("CASE"), Institute for Policy Innovation ("IPI"), 60 Plus Association ("60 Plus"), Center for Individual Freedom ("CFIF"), and the Center for a Free Economy ("CFFE"). *Amici* state that they are tax-exempt not-for-profit corporations. CASE, 60 Plus, CFIF, CFFE, are organized under 26 U.S.C. § 501(c)(4) while IPI is organized under 26 U.S.C. § 501(c)(3). CASE advocates on behalf of American consumers by promoting free-market policies, fiscal responsibility, and reasonable consumer protections. IPI is a free market think tank focusing on economic growth, limited government, and individual liberty. 60 Plus advocates on behalf of seniors who believe in free market solutions and limited but effective government. CFIF's mission is to, among other things, promote fidelity to the Constitution and advocate for policies that promote consumer well-being and the rule of law. CFFE advocates for free-market policy reforms.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), counsel for Amici Curiae contacted counsel for the Parties seeking their consent to submit this brief for this Court's consideration. Counsel for Appellant, Appellee, and Proposed-Intervenors consent to the filing of this brief. No Party's counsel authored this brief in whole or in part. No Party or Party's counsel contributed money that was intended to fund the preparation or submission of this brief. In fact, no one, besides Amici Curiae, contributed money to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E)(i-iii).

*Amici*'s interest in this appeal is that Regulation II represents the best compromise between competing interests. Regulation II compensates issuers and banks for their efforts in processing debit card transactions. Regulation II imposes a safe harbor thus limiting the costs to merchants and therefore also limiting any pass-through costs to consumers. Regulation II also minimizes harm to consumers—e.g., increased banking fees and the decrease of free-checking accounts—while also availing consumers of the benefits of paying for purchases with debit cards. Thus, Regulation II represents the best compromise between competing interests. Vacating Regulation II and advocating for a lower interchange fee cap, therefore, will cause significant harm to consumers.

## **<u>INTRODUCTION</u>**

In Book 12 of Homer's *Odyssey*, Homer tells the harrowing story of Odysseus and his men sailing between the narrow strait "with wailing.[2]" For on one side of the narrow strait lay the six-headed monster with sharp teeth, Scylla. While on the other side of the narrow strait lay "divine Charybdis" who "sucked down the salt water of the sea.[3]" As Odysseus and his men approached the narrow strait, they looked on

---

[2] Homer, *The Odyssey*, 12:234, Translation by A.T. Murray, PH.D. in two volumes. Cambridge, MA., Harvard University Press; London, William Heinemann, Ltd. 1919, *available at* https://www.perseus.tufts.edu/hopper/text?doc=Perseus%3Atext%3A1999.01.0136%3Abook%3D12%3Acard%3D234 (last visited Dec. 17, 2025).
[3] *See id.* at 12:235-36.

Charybdis and "pale fear seized my men" for they rightly feared that Charybdis could destroy them all.[4] Meanwhile, Scylla with her six heads snatched six of Odysseus's men who were "best in strength and in might," flung them onto the cliffs, and devoured them.[5] Despite this plight, however, Odysseus led his men through the strait, escaping Scylla and Charybdis with painful but minimal losses.[6]

When crafting Regulation II, the Board of Governors of the Federal Reserve Board ("the Board") had a Scylla and Charybdis problem. Turn the regulation dial to the left in favor of merchants and consumers' banking fees and costs substantially increase, free checking accounts become nonexistent, while merchants neglect to pass savings onto consumers. Turn the regulation dial to the right in favor of financial institutions and merchants pass the increased costs onto consumers, making everyday purchases more expensive.

Accordingly, the Board decided to turn the regulation dial to the middle, establishing a safe harbor interchange fee cost at 21 cents per transaction, plus a 0.05% charge based on the transaction's value, and a fraud-prevention adjustment cap of 1 cent. This is known as Regulation II.

Although Regulation II has imposed some harm on consumers, it remains the best arrangement for consumers. Regulation II minimizes costs to consumers while

---

[4] *See id*. at 12:244.
[5] *See id*. at 12:245-58.
[6] *See id*. at 12:260-61.

4

maximizing access to debit card networks. In crafting Regulation II, the Board correctly navigated the narrow straight of interchange fees. The Board chose not to cap interchange fees at a significantly lower amount, resulting in substantially higher bank fees, reduced access to free checking accounts, and a consequent increase in the number of consumers who are unbanked while merchants decline to pass on their savings to consumers. In this, the Board avoided Charybdis. Similarly, in promulgating Regulation II, the Board avoided capping costs at a higher amount, which would result in merchants raising prices and perhaps refusing to accept debit cards. Although consumers suffered the painful but minimal losses of Scylla, the Board's decision avoided the fate of Charybdis.

## <u>SUMMARY OF THE ARGUMENT</u>

The Board correctly interpreted the Durbin Amendment as authorizing the Board to promulgate Regulation II. Compelling the Board to promulgate a rule that permits banks and issuers to only recover authorization, clearing, and settlement ("ACS") costs related to specific transactions would substantially increase banking fees on consumers without seeing any corresponding savings from merchants.

*First*, the Board properly constructed the Durbin Amendment. The Durbin Amendment vests the Board with the authority to promulgate a rule regulating interchange fees that are reasonable and proportional. Congress then required the Board to consider those incremental costs associated with the issuer's role in the

5

ACS process for each specific transaction. By contrast, Congress prohibited the Board from considering those other costs that are not associated with specific transactions. In these mandatory sections, Congress established a floor, allowing the Board to fill in the details in crafting an interchange fee that is reasonable and proportionate.

*Second*, the Board properly calibrated Regulation II in response to concerns raised by individual consumers, consumer rights groups, and other organizations. These pro-consumer comments stated that banks will need to increase their fees to recoup their losses from the reduction in the interchange fee. In response, although the Board did not fully appreciate Regulation II's costs imposed on consumers, the Board minimized these harms.

*Third*, vacating Regulation II and requiring the Board to promulgate a rule that permits banks to receive only those incremental ACS costs identified with each individual transaction, will only exacerbate the costs imposed on consumers. Under Regulation II, consumers have seen their banking fees increase, ATM fees increase, checking account minimums increase, and their free checking accounts and debit card reward programs disappear. Meanwhile, consumers have not received any pass-through savings from merchants. Decreasing the interchange fee will only exacerbate fees the situation for consumers.

6

# **ARGUMENT**

Towards the end of the Great Recession, consumers used their debit cards 37.6 billion times, amounting to $1.4 trillion in transactions, netting $20 billion in fees for both banks and networks. *See NACS v. Board of Governors of the Federal Reserve System*, 746 F.3d 474, 477 (D.C. Cir. 2014). The average cost per transaction was between 8 cents and 13 cents. *Linney's Pizza, LLC v. Bd. of Governors of the Federal Reserve System*, No. 22-cv-00071, 2025 LEXIS 181314 *4 (E.D. Ky. Sept. 15, 2025). But interchange fees charged to merchants were on average 55.5 cents per transaction. *NACS*, 746 F.3d at 479. Additionally, networks and issuers sought to exclude market competition by limiting payment processing to one network, setting the level of interchange and network processing fees, and imposing Honor All Card rules requiring merchants to pay whatever fees issuers chose to establish. *NACS*, 746 F.3d at 479. These policies put consumers and merchants at a disadvantage because they were unable to negotiate these fees. *See id*; *see also Debit Card Interchange Fees and Routing,* Final Rule, 76 Fed. Reg. 43,394, 43,396-97, 43,441 (July 20, 2011) ("Regulation II).

To address these market dynamics, Congress acted. *See NACS*, 746 F.3d at 477, 479. Accordingly, in the wake of the Great Recession, on July 21, 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act.

7

Pub. L. 111-203 (2010), 124 Stat. 1376. The purpose of the Act was, in part, "to protect consumers from abusive financial services practices." *Id*.

To further this purpose in addressing interchange fees, Senator Durbin offered his eponymous amendment to the Dodd-Frank Act of 2010. Senator Durbin asserted that the purpose of his amendment was, in part, to help consumers. Senator Durbin envisioned that by capping interchange fees at a rate lower than $0.555 per transaction, merchants would then pass on their savings to consumers.[7]

The Durbin Amendment vested the Board with the authority to promulgate a regulation setting a reasonable and proportional interchange fee. *NACS*, 746 F.3d at 479-80. In furtherance of this purpose, Congress commanded the Board to analyze the regulation's impact on both financial institutions and consumers. Additionally, and to the extent practical, the Board must demonstrate that the regulation's benefits to consumers outweighs the costs to financial institutions. *See* 15 U.S.C. § 1693b(a)(2-3); *see also* Regulation II, 76 Fed. Reg. at 43,464.

In promulgating Regulation II, the Board acted appropriately. The Board correctly interpreted the Durbin Amendment to fulfill the Board's statutory duty of setting a reasonable and proportional interchange fee. Then, the Board promulgated

---

[7]Brief of Amicus Curiae United States Senator Richard J. Durbin in Support of Plaintiffs-Appellees, *NACS, et al. v. Board of Governors of the Federal Reserve System*, No. 13-5270, 2013 U.S. D.C. Cir. Briefs LEXIS 151 *23 (D.C. Cir. Nov. 20, 2013) (quoting 156 Cong. Rec. S4839) (daily ed. June 10, 2010) (statement of Sen. Richard Durbin).

a regulation that caused minimum harm to consumers. If the Board decreased its interchange fee cap even further, then the harms to consumers would have exacerbated.

The proof that the Board minimized harms to consumers and maximized consumers' ability to use debit cards is in the data. Ten years after Regulation II's promulgation, the number of annual debit card transactions tripled. In 2021, consumers used their debit cards in 106 billion transactions, amounting to $4.55 trillion.[8]

This Court should therefore uphold Regulation II. The Board properly constructed the statute. Then, the Board carefully calibrated Regulation II to minimize harm to everyone involved in the interchange fees process. To vacate Regulation II on the grounds that the Board considered too many costs, therefore compelling the Board to lower the cap on interchange fees, would result in greater harm to consumers.

## I.   IN CRAFTING REGULATION II THE BOARD OF GOVERNORS CORRECTLY INTERPRETED THE DURBIN AMENDMENT.

Congress commanded that the Board promulgate a regulation setting the interchange transaction fee that is "reasonable and proportional to the cost incurred

---

[8] *See* Board of Governors of the Federal Reserve System, *Federal Reserve Payment Study: 2022 Triennial Initial Data Release*, tbl. 1 *available at* https://www.federalreserve.gov/paymentsystems/2023-April-The-Federal-Reserve-Payments-Study.htm (last visited Dec. 18, 2025).

9

by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2-3). To determine what is reasonable and proportional, Congress provided the Board with some guidance, namely, that in crafting a reasonable and proportional fee the Board must distinguish between those costs it must consider and those costs it cannot consider. 15 U.S.C. § 1693o-2(a)(4)(B). The Board must consider an issuer's "incremental costs" for services provided in "the authorization, clearance, or settlement of a particular electronic debit transaction…". *Id.* § 1693o-2(a)(4)(B)(i). By contrast, Congress prohibited the Board from considering "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* § 1693o-2(a)(4)(B)(ii). Importantly, Congress said nothing about what the Board *may* consider.

The district court below reads these two subsections not as a mandatory floor but as restrictive boundaries that the Board cannot traverse. *See* Add. 017-018; R. Doc. No. 79 at 17-18. Those two narrow and precise boundaries are: the incremental authorization, clearing, and settlement ("ACS") costs that are specific to a transaction and those other costs not specific to a transaction. *See* Add. 018; R. Doc. No. 79 at 18.

The proper reading of the statute, however, is that subsections (i) and (ii) establish a floor of what must and must not be considered in crafting a reasonable

10

and proportional interchange fee. These two subsections do not establish a ceiling demarking the entire universe of costs that the Board is permitted to consider.

Of course, as the D.C. Circuit noted, because the Durbin Amendment was "crafted in conference committee at the eleventh hour, its language is confusing and its structure convoluted[], resulting in a legislation that was "poorly drafted…". *NACS*, 746 F.3d at 483. Even still, the Supreme Court exhorts courts to determine "the best reading of the statute and resolve the ambiguity." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

### A. The Board Correctly Reads the Durbin Amendment to Permit Three Cost Buckets to Consider in Crafting a Reasonable and Proportional Interchange Fee.

The Board correctly interprets the "must" and "must not" consider subsections to permit three cost buckets. *First*, those incremental ACS costs related to the particular transaction; *Second*, those other costs incurred by the issuers that are not specific to the transaction and therefore cannot be considered; and *Three*, those "non-incremental-ACS costs which are still related to a particular debit card transaction which *may or may not* be considered." *Linney's Pizza, LLC*, 2025 LEXIS 181314 *19 (citing Regulation II, 76 Fed. Reg. at 43,426-27) (emphasis in the original). In this third bucket, the Board included the following costs: "(1) fixed ACS costs; (2) transaction-monitoring costs; (3) network processing fees; and (4) a fraud-loss

11

adjustment based on the value of the transaction." *Linney's Pizza, LLC*, 2025 LEXIS 181314 *19 (citing Regulation II, 76 Fed. Reg. at 43,429-31).

*First*, Congress's command that the Board "distinguish between" the must and must not consider subsections does not limit the Board to only those two categories. *Linney's Pizza*, 2025 U.S. Dist. LEXIS 181314 at *21. This is so because the two categories create "a gray area for the existence of a third." *Id*. This is so because Congress's overall command was that the Board create an interchange fee standard that is reasonable and proportionate to the costs incurred by the issuer. *Id*. at *22. The two categories were not a ceiling for all that the Board could consider but instead established a floor for what Congress must and must not consider. *Id*. Stated differently, Congress "did not speak to the array of other possible costs relevant to determining a reasonable and proportional fee." *Id*. Although the presence of "shall" means a command, Add. 018; R. Doc. No. 79 at 18, the command is limited by its language: incremental costs particular to a transaction in the ACS process which says nothing about other non-incremental costs incurred that are specific to a transaction. *NACS*, 746 F.3d at 487-88.

As the D.C. Circuit explained, assume that a baseball card collector entered into an agreement with a baseball fan. Assume that the agreement stipulated that the collector must distinguish between rookie cards, which the collector must give the fan, and "other cards less than five years old," which the collector must not give the

12

fan. This agreement does not prevent the collector from giving the fan a 1960 Harmon Killebrew baseball card, a card issued five years after his rookie year. *See NACS*, 746 F.3d at 488.

Ultimately, if Congress wanted to limit the Board to recovering only incremental ACS costs, it could have done so explicitly. *NACS*, 746 F.3d at 485. And if the district court is correct, then the reasonable and proportional fee standard "would merely equal the incremental ACS costs required to be considered under (a)(4)(B)(i)." *Linney's Pizza*, 2025 U.S. Dist. LEXIS 181314 at *26. Such a reading would compel the Board to turn the regulation dial in favor of merchants, lowering the interchange fees but causing banks to correspondingly raise their fees, harming consumers.

*Second*, the term "incremental" modifies cost in the "must consider" category. The term "incremental" cannot "encompass all costs that are specific to a particular electronic debit transaction." *NACS*, 746 F.3d at 484. Additionally, Congress did not address those incremental costs that are not incremental ACS costs. *See id*. at 484-85. Thus, the Board can consider additional costs that are particular to a transaction that are not ACS costs. *See id*. at 485.

Congress did not limit the Board to only considering incremental ACS costs particular to a transaction. To do so would make surplusage of Congress's command that the Board must not consider those costs which are not specific to a debit card

transaction. *See Linney's Pizza*, 2025 U.S. Dist. LEXIS 181314 at *23-25. Instead, although Congress prohibited the Board from considering "other costs incurred by an issuer which are not specific to a particular electronic debit transaction[]" 15 U.S.C. § 1693o-2(a)(4)(B)(ii), this does not prohibit the Board from considering other costs that are specific to a particular electronic debit transaction. *See Loper Bright*, 603 U.S. 394-96 (recognizing that sometimes Congress vests an agency with discretion by implicitly delegating to an agency the authority to "fill up the details" or where Congress gives agencies the flexibility to craft a regulation that is "appropriate" or "reasonable"). This is so because if the Board were only considering the incremental ACS costs for each transaction, then all the Board was required to do was mechanically apply the ACS cost, making that cost the standard. *Linney's Pizza*, 2025 U.S. Dist. LEXIS 181314 at *26. Instead, Congress wanted a reasonable and proportional standard, a standard giving the Board flexibility. *Loper Bright*, 603 U.S. at 395. This permits the Board to consider other costs except those prohibited under (a)(4)(B)(ii).

## B. <u>The Board Properly Considered Four Costs That are Specific to a Particular Electronic Debit Transaction.</u>

Accordingly, the Board properly considered Fixed ACS costs which covers network connectivity costs. These include: "software, hardware, equipment, and associated labor." Regulation II, 76 Fed. Reg. at 43,404. The Board considered these costs because these costs are not "attenuated or unconnected costs" but are instead

14

costs incurred with each ACS transaction. *Linney's Pizza*, 2025 U.S. Dist. LEXIS 181314 at *31. Accordingly, the Board, acting under its mandate to craft a reasonable and proportionate interchange fee, sought to "allow issuers to recover costs they must incur in order to effectuate particular electronic debit card transactions…" while precluding those costs that are attenuated from a specific transaction. *Id*. at *30.

Next, the Board properly considered transaction-monitoring costs. These are costs incurred "such as neural networks and fraud-risk scoring systems which assist in the authorization process by providing information needed by the issuer in deciding whether the issuer should authorize the transaction…". *Id*. at *31. Transaction monitoring costs are "integral to an issuer's decision to authorize a specific transaction." *Id*. at *32. Accordingly, this cost is specific to particular transactions.

Furthermore, the Board properly considered fraud losses, which are those losses "incurred by the issuer, other than losses related to nonsufficient funds, that are not recovered through chargebacks to merchants or debits to or collections from customers." *Id*. at *34. Losses are included in the definition of "cost" as cost is defined as "the loss or penalty involved in gaining something." *Id*. at *35. Thus, fraud losses are costs. And these fraud losses are "specific to a particular transaction

15

because they result from the settlement of a particular fraudulent transactions" and are not ACS costs. *NACS*, 746 F.3d at 485.

Finally, the Board properly considered network processing fees, which are those fees "that the networks charge banks to process a debit-card transaction." *Linney's Pizza*, 2025 U.S. Dist. LEXIS 181314 at *38. These fees are "both specific to a particular transaction and incurred for the issuer's role" in the ACS process. *Id*. at *39. All transactions require these networks, and thus no transaction can be completed with these networks. *Id*.

Accordingly, in crafting Regulation II, the Board properly interpreted the statute authorizing it to promulgate Regulation II.

## II.  IN CRAFTING REGULATION II, THE BOARD OF GOVERNORS WEIGHED THE BENEFITS AND HARMS TO CONSUMERS.

Permitting issuers to recover the four costs identified above was a result of the Board's notice and comment process that included individual consumers, consumer advocacy organizations, and other non-profits advocating for pro-consumer policies.

On December 28, 2010, the Board of Governors issued its Notice of Public Rulemaking. *See Debit Card Interchange Fees and Routing*, NPRM, 75 Fed. Reg. 81,722 (Dec. 28, 2010). Here, the Federal Reserve Board initially proposed a cap at 12 cents per transaction. *See id*. at 81726, 81737. Included in cap was any *ad valorem* fee such that no matter how large or how small the transaction, 12 cents per

16

transaction was the ceiling. *See id* at 81737. Thus, the proposed rule reduced the fee per transaction cost to one-fifth of the average cost of $0.555 per transaction.

In response to this proposal, over the intervening eight months, the Board received more than 11,500 comments in total. Regulation II, 76 Fed. Reg. at 43395 (July 20, 2011). Included in this number were individual consumers and consumer rights organizations, which accounted for 1,340 of the comments. *Id*. at 43,402. Other organizations also voiced concerns that adopting the proposed rule would harm consumers. *See id*. In response to these comments, the Board promulgated its final rule that caps interchange fees at a base of 21 cents per transaction plus an *ad valorem* component of 0.05% of the transaction and a fraud-prevention adjustment cap of 1 cent. *See* Regulation II, 76 Fed. Reg. at 43,404; 12 C.F.R. § 235.5.

In promulgating this Rule, the Board was required to weigh the consumer protections of Regulation II to ensure that they outweigh the compliance costs imposed on consumers and financial institutions. *See* 15 U.S.C. § 1693b(a)(2-3); *see also* 76 Fed. Reg. at 43,464. The Board was also required to analyze the costs and benefits of Regulation II for both financial institutions and consumers. *See id*.; *see also* 76 Fed. Reg. at 43,462-63. In weighing the costs and benefits to both consumers and financial institutions, the Board promulgated the Final Rule. *But see* Pl.'s Mem. In Supp. of Mot. for Summ. J. at 8, *Corner Post, Inc. v. Board of Governors of the Federal Reserve System,* No. 21-cv-00095, R. Doc. No. 51 at 15 (D. N.D. Nov. 15,

17

2024) (stating that in promulgating Regulation II, the Board bent to pressure from issuers and networks).

Americans for Tax Reform, the Competitive Enterprise Institute, 60 Plus Association, and the Minnesota Free Market Institute submitted a joint comment stating that the imposition of a 12 cent fee would drastically shift the cost burden from some of the wealthiest retailers to middle and low income consumers.[9] One of these costs was the fear that American consumers would lose the ability to obtain free checking accounts.[10]

Other commenters voiced similar concerns. Some commenters stated that a decrease in fees to 12 cents per transaction would result in an increase in cardholder fees, decrease in the availability of debit card services, and inhibit innovation in payment systems. 76 Fed. Reg. at 43,402. Other commenters stated that, contrary to statutory intent, the 12 cent per transaction cap would harm consumers due to an increase in checking account fees, decrease in free checking accounts, reduce debit card rewards programs, and reduce the issuance of debit cards. *See id.* at 43,459. Commenters were especially concerned for low-income consumers because, due to the increase in checking-account fees, these consumers may be "forced out of the

_____

[9] *See* Comment of Public Interest Groups that Support Consumer Choice and Competition at 2 (Feb. 22, 2011), *available at* https://cei.org/wp-content/uploads/2024/05/durbin-2011-comment.pdf (last visited Dec. 16, 2025).
[10] *See id.* at 7.

18

banking system." *Id*. These commenters stated that these harms would befall consumers without the benefit of merchants passing along savings to consumers. *See id*. These commenters, which included consumers, cited studies from Canada and Australia where regulation of interchange fees did not result in merchants passing on savings to consumers. *See id*. at n.176.[11]

The Board concluded that the net effect of the final rule on consumers "will depend on the behavior of various participants in the debit card networks." *Id*. at 43,460. The Board did "expect the final rule to result in some reduction in prices for goods and services faced by consumers." *Id*. The Board cautioned, however, that it is difficult to measure whether lower interchange fees lead to lower merchant prices "because of the many other factors that also influence those prices." *Id*. at 43,460 n.177.

The Final Rule is approximately half of what the interchange fee was before the Durbin Amendment and double what the Board first proposed. In arriving at the Final Rule, although the Board considered Regulation II's impact on consumers, the

---

[11] Some consumer groups took the opposite position. They contended that merchants would have no choice but to pass on savings to consumers. Additionally, these consumer groups contended that low-income consumers would benefit the most from a decrease in prices due to merchants passing on the savings to their customers after the implementation of the 12 cent per transaction cap. *See* Regulation II, 76 Fed. Reg. 43394, 43460 (July 20, 2011). As will be shown *infra* at Section III, these predictions proved inaccurate.

19

Board did not fully appreciate universe of costs Regulation II would impose on consumers.

As will be demonstrated further *infra* at Section III, the Final Rule's cap, however, marks a compromise between all parties to the transaction. Although merchants received a substantial reduction in interchange fees, they did not receive the full reduction to 8 cents per transaction; although consumers received broader access to merchants accepting debit card payments, consumers paid for this access through increased bank fees, increased ATM fees, decreased access to free checking accounts, and elimination of debt card rewards; and while banks could recover some allowable costs, banks could not recover all of their costs, resulting in substantial losses annually. *See* 2023 NPRM, *Debit Card Interchange Fees and Routing*, 88 Fed. Reg. 78,100, 78,105 (Nov. 14, 2023). Vacating Regulation II and allowing banks to recover only those ACS costs related to a particular transaction will only exacerbate the harm to consumers.

## III.   VACATING REGULATION II WILL HARM CONSUMERS.

Affirming the district court's opinion will result in issuers only recovering those ACS costs for each particular transaction. Add. 038-040; R. Doc. No. 79 at 38-40. (holding that the Board improperly considered the four additional costs in addition to those ACS costs particular to a transaction). Given past experience, however, lowering the interchange fee cap will not increase savings for consumers

20

but will result in an increase in banking fees. Accordingly, vacating Regulation II will harm consumers.

**A. <u>The Savings That Merchants Gained from Regulation II did not Trickle Down to Consumers.</u>**

In 2011, some consumer advocacy commenters contended that the original proposed rule, the 12 cent cap per transaction, would benefit consumers because merchants would share the savings with consumers. 76 Fed. Reg. at 43,460. Even under the Final Rule, however, which is half of what was paid in 2009, merchants have not shared their savings with customers. Some merchants have even increased prices despite the cost for merchants accepting debit card payments decreasing by more than $7 billion annually. This decrease in debit card payment costs is projected to increase as the volume of debit card transactions increases.[12] In a 2014 study published by the Federal Reserve Bank of Richmond Economic Quarterly that surveyed 420 merchants across 26 sectors, the authors found that the majority of merchants—77.2%—"did not change prices post-regulation."[13] A paltry 1.2%

---

[12] David S. Evans, Howard Chang, Steven Joyce, *The Impact of the U.S. Debit Card Interchange Fee Regulation on Consumer Welfare: An Event Study Analysis* at 2 (Coase-Sandor Institute for Law & Economics Working Paper No. 658) (Oct. 23, 2013), *available at* https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1651&context=law_and_economics (last visited Dec. 17, 2025).

[13] Zhu Wang, Scarlett Schwartz, & Neil Mitchell, *The Impact of the Durbin Amendment on Merchants: A Survey Study*, 100 Fed. Reserve Bank of Richmond Econ. Quarterly 183, 184, 194 (2014), *available at https://www.richmondfed.org/-*

reduced their prices while 21.6% of merchants *increased* their prices.[14] Even in competitive markets, where the Board thought merchants were more likely to pass-through savings to consumers, Regulation II, 76 Fed. Reg. at 43,460, "cost induced price reductions are unlikely to materialize if they aren't actually discernable by consumers.[15]" Accordingly, within a year of Regulation II's implementation, "in many cases, consumers [saw] higher prices for low cost items or no savings at all.[16]"

This data is consistent across other studies. Within one year of Regulation II's promulgation, "research show[ed] that retailers continue to hold on to the $8 billion windfall they received from Congress, without passing those savings along to consumers.[17]" In 2012, only 3% of retailers intended to pass any savings on to consumers, 41% of retailers said they would not pass on any savings to consumers,

---

/media/RichmondFedOrg/publications/research/economic_quarterly/2014/q3/pdf/wang.pdf (last visited Dec. 16, 2025).

[14] *See id*. at 194.

[15] Todd J. Zywicki, Geoffrey A. Manne, and Julian Morris, *Unreasonable and Disproportionate: How the Durbin Amendment Harms Poorer Americans and Small Businesses*, International Center for Law & Economics at 31 (April 25, 2017), *available at* https://laweconcenter.org/images/articles/icle-durbin_update_2017_final.pdf (last visited December 16, 2025).

[16] Scott D. Strockoz, *Dodd-Frank and the Durbin Amendment—Is It Working as Intended?,* at ii Capstone Strategic Project for the American Bankers Association Stonier Graduate School of Banking (2012).

[17] Brad G. Hubbard, *The Durbin Amendment, Two-Sided Markets, and Wealth Transfers: An Examination of Unintended Consequences Three Years Later* at 37 (May 20, 2013), *available at* SSRN: https://dx.doi.org/10.2139/ssrn.2285105 (last visited Dec. 16, 2025).

22

and 56% of retailers said they were unsure.[18] Accordingly, the effect of the Durbin Amendment was to "merely transfer[] the cost of items from retailers to consumers[]" making merchants the "main beneficiaries of the interchange cap.[19]"

This is not surprising. Despite the decrease in cost to merchants amounting to more than $7 billion annually, this has only minimal potential impact on consumers, less than 5 cents on an average transaction. And this assumes merchants pass through 100% of the savings.[20] Accordingly, even if the Board were to reduce the interchange fee to 12 cents per transaction, and even assuming that merchants pass through 100% of the savings, this will have only a minimal impact on how much consumers pay for goods. Ultimately, however, as is demonstrated by a "wealth of economic studies," consumers "have no reason to believe that merchants would give this [$7 billion annual] windfall back to consumers…".[21] And while consumers would not benefit from a decrease in the interchange fee in the form of lower prices, consumers would be greatly harmed by the increase in banking fees, the increase in checking account minimum balances, and the elimination of free checking accounts.

---

[18] *See id.*
[19] *See id.* at 33, 37.
[20] *See* Evans *et al.*, *supra n.* 12 at 23.
[21] *See id.* at 49; *see also* Zywicki, et al., *supra n.* 15 at 30 (stating that "even if merchants did pass on their entire cost to consumers, the savings would be small…a maximum retail price reduction of only $0.07 on a $40 purchase.")

23

**B. In the Wake of the Durbin Amendment, Banks Recouped Their Losses by Raising Fees, Rasing Checking Account Minimums, and Abandoning Free Checking.**

Just as merchants gained between $7 and 8 billion annually from the reduction in interchange fees, banks lost between $6.6 billion and $8 billion annually "as a direct result of the interchange fee cap.[22]" Banks did not absorb these costs but instead passed those costs on to consumers. Banks did so by "raising the amount of existing fees, eliminating free checking, and reducing rewards programs.[23]" This makes sense because banks used revenues from interchange fees to cover "maintenance of deposit accounts, investment in fraud prevention and mitigation, and making loans.[24]"

*First*, after Regulation II was promulgated, banks eliminated free checking.[25] "One of the great pro-consumer developments of the 2000s was the rapid growth of consumer access to free checking accounts and a general reduction in bank fees, which in turn enabled millions of consumers to gain access to bank accounts."[26] At its height in 2006, 76% of banks offered free checking. That number decreased to

---

[22] *See* Hubbard *supra n.* 17 at 29.
[23] *See id.* at 39.
[24] *See* Zywicki, et al. *supra n.* 15 at 7.
[25] *See* Hubbard *supra n.* 17 at 39; *see also* Zywicki, et al., *supra n.* 15, at 9 (agreeing that free checking has been reduced dramatically while bank fees have proliferated).
[26] Zywicki, et al., *supra* n. 15 at 10.

24

45% in 2011 and decreased further to 39% in 2012. By 2014, only 38% of banks offered free checking accounts.[27]

Similarly, in 2011, only 21% of the largest banks—those with $25 million in assets— offered free checking.[28] This is a substantial decline amongst the largest banks because just two years earlier, 96% of the largest banks offered free checking. After the Durbin Amendment was enacted, there was a 60% increase in the number of noninterest checking accounts that "carried fee and minimum balance requirements."[29] Overall, after the Durbin Amendment passed, among those banks that the Durbin Amendment covered,[30] the number of free checking accounts decreased from 51% in 2011 to 27% in 2012.[31]

Richard Sullivan, a Federal Reserve economist, demonstrated that Regulation II and the Durbin Amendment led to covered banks eliminating free checking

---

[27] Marshall Lux and Robert Green, *Out of Reach: Regressive Trends in Credit Card Access*, at 20 and Figure 11 (Harvard Kennedy School, Mossavar-Rahmani Center for Business and Government) (April 2016), *available at* https://www.hks.harvard.edu/sites/default/files/centers/mrcbg/files/Out_of_Reach_Lux_Greene_4_7.pdf (last visited Dec. 17, 2025); *see also* Zywicki, et al., *supra n*. 15 at 10. (noting that by 2009, the proportion of banks offering free checking accounts was over 75%).

[28] *See* Hubbard *supra n*. 17 at 39.

[29] *See id*. at 39-40.

[30] Covered issuers are defined as those banks and financial institutions that have assets of $10 billion or more. Regulation II, 76 Fed. Reg. at 43,395 n. 11.

[31] Todd J. Zywicki, Geoffrey Manne, and Julian Morris, *Price Controls on Payment Card Interchange Fees: The U.S. Experience* at 9-10 (June 4, 2014) (emphasis in the original). George Mason Law & Economics Research Paper No. 14-18, *available at* SSRN: https://ssrn.com/abstract=2446080.

Appellate Case: 25-3000    Page: 42    Date Filed: 12/26/2025 Entry ID: 5591536

accounts. Mr. Sullivan observed that during the same period that covered banks were reducing or eliminating free checking accounts, those banks that were exempt from the Durbin Amendment "actually *increased* access for free current accounts over the same period."[32] Mr. Sullivan concluded that "Regulated banks were more likely to raise current account fees, but exempt banks were more likely to reduce or eliminate fees.[33]"

*Second*, banks have increased their fees. For example, checking account fees increased by 25% to $5.48 a month, a record high.[34] Overdraft fees also increased. SunTrust Bank increased overdraft fees from $25 to $36.[35] Additionally, for a consumer to avoid monthly checking account fees, SunTrust bank increased its minimum balance from $500 to $1,500. Wells Fargo also increased its minimum balance to $1,500.[36] Similarly, ATM fees increased by 4% for in-network ATMs and by 11% for out-of-network ATMs.[37] Overall, banks increased their average monthly fees for a noninterest checking account from $1.77 per month in 2009 to $5.26 per

---

[32] *See id.* at 9.
[33] *See id.* at 10; *see also* Zywicki et al., *supra n.* 15 at 13 (concluding that the decline in free access to checking and an increase in bank fees is apparently primarily attributable to the Durbin Amendment).
[34] *See* Hubbard *supra n.* 17 at 39; *see also* Zywicki *et al., supra n.* 15 at 8 (observing that a typical bank customer who previously had a checking account is now paying approximately $12 in monthly fees plus $1 or more in ATM fees at an annual cost of $160).
[35] *See id.*
[36] *See id.*
[37] *See id.*

Appellate Case: 25-3000      Page: 43      Date Filed: 12/26/2025 Entry ID: 5591536

month in 2014. Banks also increased their minimum balance requirements to avoid monthly service fees from $186 in 2009 to $661 in 2014.[38]

*Third*, in 2011, 54% banks either "drastically reduced and/or eliminated their debit-based rewards programs.[39]" Within this 54%, 50% eliminated their rewards programs in 2011 and an additional 18% did the same in 2012.[40] Major banks such as Chase, Wells Fargo, SunTrust, PNC, and USAA all eliminated their debit card rewards programs, costing consumers "an average of $84 per year.[41]"

*Fourth*, the decrease in free checking accounts and the increase in fees and account balance minimums have negatively impacted consumers. For example, prior to promulgation of Regulation II, 8% of the population lacked a checking account. After promulgation, that number increased to 12%.[42] The number of unbanked households increased by one million and the number of underbanked households increased by three million.[43] According to a 2019 study, 29% of unbanked households stated that "minimum balance requirements [were] too high" as the main reason for not having a bank account, while 48.9% stated that high minimum balance

---

[38] *See* Lux, et al., *supra n*. 27 at 20 Figure 11.

[39] *See* Hubbard *supra n*. 17 at 40.

[40] *See id*. at 40-41.

[41] *See id*. at 41.

[42] *See id*. at 40.

[43] *See id*.

requirements were an obstacle to opening an account.[44] Similarly, 34% of unbanked households stated that they remained unbanked in part because bank account fees were too high while, 7.3% stated that bank account fees were the main reason for remaining unbanked.[45]

These were the harms imposed on consumers by Regulation II. Banks increased their fees, increased checking account minimums, decreased access to free checking, and all but eliminated debit card rewards programs. This resulted in millions of consumers exiting the banking system. This occurred without the benefit of obtaining decreases in prices from merchants who benefited from Regulation II's interchange fee safe harbor. If the district court's opinion is upheld and the Board is confined to considering only issuers' ACS costs particular to each transaction, such a regulation will impose substantial harms to consumers in increased bank fees, increased ATM fees, and increased checking account minimums. Further, as the evidence shows, merchants are unlikely to pass any savings onto consumers.

---

[44] Todd J. Zywicki, Geoffrey Manne, and Julian Morris, *The Effects of Price Controls on Payment-Card Interchange Fees: A Review and Update*, at 34 International Center for Law and Economics (March 4, 2022) (emphasis in the original), *available at* https://laweconcenter.org/wp-content/uploads/2022/03/Payments-2021-Lit-Review.pdf (last visited Dec. 18, 2025).

## **CONCLUSION**

In promulgating Regulation II, the Board calibrated the regulation dial in a manner that navigated the regulatory strait. In doing so, the Board minimized harm to consumers. This Court should reverse the district court and uphold Regulation II.

Respectfully submitted,

DATED: December 26, 2025

/s/ Shawn T. Sheehy
Shawn T. Sheehy
FisherBroyles, LLP
D.C. Bar Number 90002670
1200 G Street NW.
Suite 800
Washington, D.C. 20005
Direct: 202-258-0741
shawn.sheehy@fisherbroyles.com

*Counsel to Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. Pursuant to Fed. R. App. P. 32(g), this document complies with the type-volume and word-count limits of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,387 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5-6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

<div align="right">

/s/ *Shawn T. Sheehy*
SHAWN T. SHEEHY
*Counsel to Amici Curiae*

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 26th day of December, 2025, a true copy of the foregoing Brief of Amici Curiae was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to all counsel of record.

/s/ *Shawn T. Sheehy*
SHAWN T. SHEEHY
*Counsel to Amici Curiae*

Appellate Case: 25-3000    Page: 48    Date Filed: 12/26/2025 Entry ID: 5591536

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 28A(H)(2)</u>

Pursuant to this Court's Rule 28A(h), I hereby certify that the electronic version of the foregoing Brief of Amici Curiae has been scanned for viruses and is virus-free.

<div align="right">

<u>/s/ <i>Shawn T. Sheehy</i></u>
SHAWN T. SHEEHY
*Counsel to Amici Curiae*

</div>

Appellate Case: 25-3000    Page: 49    Date Filed: 12/26/2025 Entry ID: 5591536