No. 25-3000

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

---

CORNER POST, INC.,

*Plaintiff-Appellee,*

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellant.*

---

On Appeal from the United States District Court for
the District of North Dakota
No. 1:21-cv-00095-DMT-CRH

---

## BRIEF FOR APPELLANT
## FEDERAL RESERVE BOARD

---

Joshua P. Chadwick
Assistant General Counsel
Yvonne F. Mizusawa
Yonatan Gelblum
Monika Moore
Senior Counsels
Board of Governors of the
  Federal Reserve System
20th Street & Constitution
  Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835

*Attorneys for Defendant-Appellant*

# SUMMARY OF THE CASE AND REQUEST FOR ARGUMENT

This case involves Appellant Federal Reserve Board's regulations regarding debit card interchange fees, 12 C.F.R. § 235.3(b), which were promulgated as required by the Durbin Amendment to the Dodd-Frank Act, 15 U.S.C. § 1693*o*-2. Appellee Corner Post, Inc. challenged the regulations under the Administrative Procedure Act, 5 U.S.C. § 702.

In granting summary judgment to Corner Post, the district court held—in conflict with a D.C. Circuit decision upholding the same regulations against the same challenge—that the Board's interpretation of the statute had allowed debit card issuers to recover certain impermissible costs. The district court further found that the Board had virtually no latitude in implementing its regulations. In reaching these conclusions, the district court adopted an unduly narrow reading of the statute that ignores its text, grammar, and punctuation, and fails to account for Congress's principal directives.

Because the Board has the best reading of the statute, which allows it to both consider costs that were neither expressly required nor prohibited and to draw reasonable lines, the district court's decision should be reversed. The Board requests 20 minutes for argument.

i

# TABLE OF CONTENTS

Page

SUMMARY OF THE CASE AND REQUEST FOR ARGUMENT ........... i

TABLE OF AUTHORITIES ................................................................. v

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE ............................................................ 3

    A.    The Durbin Amendment ........................................... 3

    B.    The Board's December 2010 Notice of Proposed Rulemaking and July 2011 Final Rule ................................. 5

    C.    The First Challenge to Regulation II and the D.C. Circuit's Decision ........................................................ 9

    D.    Corner Post's Complaint ....................................... 13

    E.    The District Court's August 6, 2025 Opinion and the Conflicting Eastern District of Kentucky Decision ............. 15

SUMMARY OF THE ARGUMENT ...................................................... 17

STANDARD OF REVIEW .................................................................. 19

ARGUMENT ...................................................................................... 20

I.    The Best Reading of the Durbin Amendment Is That It Delegated Substantial Discretion to the Board ........................... 20

II.   The Board Properly Included the Costs at Issue ........................... 25

Appellate Case: 25-3000    Page: 3    Date Filed: 12/30/2025   Entry ID: 5592396

A.    The Statutory Text Permits the Board to Include Costs That Were Neither Expressly Required nor Prohibited from Consideration .................................................. 25

    1.    The Board's Reading Gives Meaning to All of the Statute's Terms, While the District Court's Reading Renders Important Statutory Language Superfluous .................................................................. 26

    2.    Contrary to the District Court's Conclusion, the Board Correctly Interpreted Section 920(a)(4)(B) as Permitting Consideration of Costs That Are Not Prohibited by Section 920(a)(4)(B)(ii) .................. 29

        a.    The District Court Ignored the Statute's Non-Interlocking Language ................................ 29

        b.    The District Court Erroneously Failed to Give Meaning to the Restrictive "Which" Clause in Section 920(a)(4)(B)(ii) ........................ 35

B.    The Statute Permitted the Board to Include the Costs That the District Court Found to Be Prohibited ................. 40

    1.    The Board Properly Considered and Included Fixed ACS Costs, Which Are Specific to Particular Electronic Debit Transactions and Would Be Practically Impossible to Separate From Those ACS Costs That Must Be Considered ..... 40

    2.    The Board Properly Considered and Included Transaction-Monitoring Costs, Which Are Incurred in the Authorization of Specific Electronic Debit Transactions and Are Not Precluded by the Separate Fraud-Prevention Adjustment .................................................................. 43

Appellate Case: 25-3000    Page: 4    Date Filed: 12/30/2025    Entry ID: 5592396

3. The Board Properly Considered and Included Issuer Fraud Losses, Which Are Costs Resulting from the Authorization, Clearance, and Settlement of a Specific, Apparently Valid Transaction That Is Later Identified as Fraudulent ................................................................ 47

4. The Board Properly Considered and Included Network Processing Fees, Which Are Incurred by Issuers for Their Role in ACS and Are Not Barred by a Separate Provision Concerning Network Fees .................................................................. 51

III. The Board Properly Adopted Uniform Fee Standards ................. 54

A. The Board Reasonably Exercised Line-Drawing Discretion In Adopting Fee Standards Based on the Cost of a Representative Transaction ................................... 55

B. The District Court's Determination That the Statute Requires Some Greater Level of Granularity Rests on Incorrect Factual and Legal Premises ................................... 60

CONCLUSION ................................................................ 66

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

iv

# TABLE OF AUTHORITIES

Page

## Cases

*Barnhart v. Thomas,*
    540 U.S. 20 (2003) ....................................................................36

*Barr v. United States,*
    324 U.S. 83 (1945) ....................................................................64

*Batterton v. Francis,*
    432 U.S. 416 (1977) ............................................................22, 23

*Cleveland-Cliffs Iron Co. v. ICC,*
    664 F.2d 568 (6th Cir. 1981) ...................................................56

*Consolidated Rail Corp. v. United States,*
    619 F.2d 988 (3d Cir. 1980) ....................................................56

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System,*
    603 U.S. 799 (2024) .................................................................15

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System,*
    2022 WL 909317 (D.N.D. Mar. 11, 2022) ...............................14

*Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.,*
    9 F.4th 803 (8th Cir. 2021)....................................19, 30, 31, 46

*EPA v. Calumet Shreveport Refining, LLC,*
    605 U.S. 6 (2025) ................................................................2, 65

*Georgetown University Hospital v. Sullivan,*
    934 F.2d 1280 (D.C. Cir. 1991) ...............................................64

*Geston v. Anderson,*
    729 F.3d 1077 (8th Cir. 2012) .................................................30

Appellate Case: 25-3000    Page: 6    Date Filed: 12/30/2025 Entry ID: 5592396

*Iowa v. Wright,*
    154 F.4th 918 (8th Cir. 2025)........................2, 19, 20, 21, 24, 27, 30

*Iowa Public Service Co. v. ICC,*
    643 F.2d 542 (8th Cir. 1981) ..........................................2, 55, 56, 65

*Linney's Pizza, LLC v. Board of Governors of the Federal
Reserve System*, No. 22-71, 2025 WL 2645489
    (E.D. Ky. Sept. 15, 2025).......................................16, 17, 22, 28, 32

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024) ............................2, 19, 20, 21, 22, 24, 35, 55, 56

*Loughrin v. United States,*
    573 U.S. 351 (2014) ..........................................................29, 31, 39

*NACS v. Board of Governors of the Federal Reserve System,*
    574 U.S. 1121 (2015) ...............................................................10, 13

*NACS v. Board of Governors of the Federal Reserve System,*
    746 F.3d 474 (D.C. Cir. 2014) ..........2, 10, 11, 12, 30, 32, 33, 34, 37,
    ...........................................................38, 41, 42, 45, 50, 52, 53, 54

*NACS v. Board of Governors of the Federal Reserve System,*
    958 F. Supp. 2d 85 (D.D.C. 2013) ....................................................10

*North Dakota Retail Association v. Board of Governors of the
Federal Reserve System,*
    55 F.4th 634 (8th Cir. 2022)...........................................................14

*Owner-Operator Independent Drivers Association v. United Van Lines,*
    556 F.3d 690 (8th Cir. 2009) ..........................................................35

*Pharmaceutical Care Management Association v. Gerhart,*
    852 F.3d 722 (8th Cir. 2017) ..........................................................28

*Public Water Supply District No. 3 of Laclede County v. City of Lebanon,*
    605 F.3d 511 (8th Cir. 2010) .................................................28, 39, 40

Appellate Case: 25-3000    Page: 7    Date Filed: 12/30/2025 Entry ID: 5592396

*Pulsifer v. United States,*
    601 U.S. 124 (2024) ......................................................28

*Reno v. Bossier Parish School Board,*
    528 U.S. 320 (2000) .......................................................58

*Russello v. United States,*
    464 U.S. 16 (1983) ...................................................29, 31

*San Antonio, Texas By & Through City Public Service Board v. United States,* 631 F.2d 831 (D.C. Cir. 1980), *decision clarified on other grounds,* 655 F.2d 1341 (D.C. Cir. 1981), *rev'd on other grounds sub nom. Burlington N., Inc. v. United States,*
    459 U.S. 131 (1982) .......................................................56

*Schaffner v. Monsanto Corp.,*
    113 F.4th 364 (3d Cir. 2024) ........................................21

*Schweiker v. Gray Panthers,*
    453 U.S. 34 (1981) ........................................................23

*Seven County Infrastructure Coal v. Eagle County,*
    605 U.S. 168 (2025) ................................................20, 55

*Union Pacific R.R. Co. v. Surface Transportation Board,*
    113 F.4th 823 (8th Cir. 2024)...................................20, 38

*United States v. Lester,*
    92 F.4th 740 (8th Cir. 2024)....................................25, 39

*United States v. Pritchett,*
    470 F.2d 455 (D.C. Cir. 1972) .......................................36

*United States v. Ron Pair Enterprises, Inc.,*
    489 U.S. 235 (1989) ................................................35, 37

*Zimmer Radio of Mid-Missouri, Inc. v. FCC,*
    145 F.4th 828 (8th Cir. 2025).........................2, 20, 55, 66

Appellate Case: 25-3000   Page: 8   Date Filed: 12/30/2025 Entry ID: 5592396

**Statutes**

1 U.S.C. § 1 .................................................................. 2, 64

5 U.S.C. § 702 ................................................................... 1

5 U.S.C. § 706 .................................................................. 19

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 1331 ................................................................. 1

28 U.S.C. § 2201 ................................................................. 1

28 U.S.C. § 2401(a) ............................................................ 14

42 U.S.C. § 607(a) (1976) ..................................................... 23

49 U.S.C. § 10704(a)(2) (1982) ............................................... 65

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) ..................... 3
    § 1084(3), 124 Stat. 1376, 2082
        (codified at 15 U.S.C. § 1693b(e)(2)) ............................... 23, 24

Electronic Fund Transfer Act of 1978 (as amended) § 920,
    (codified at 15 U.S.C. § 1693*o*-2) .......................................... *passim*

**Regulations**

12 C.F.R. § 235.3(b) ............................................................. 1

12 C.F.R. § 235.4 ............................................................... 45

12 C.F.R. § 235.6(a) ........................................................... 53

12 C.F.R. § 235.6(b) ........................................................... 53

Appellate Case: 25-3000    Page: 9    Date Filed: 12/30/2025    Entry ID: 5592396

## Regulatory Materials

Debit Card Interchange Fees and Routing,
  88 Fed. Reg. 78,100 (Nov. 14, 2023) ..................................................9

Debit Card Interchange Fees and Routing (Clarification),
  80 Fed. Reg. 48,684 (Aug. 14, 2015) ...........................13, 43, 44, 46

Debit Card Interchange Fees and Routing,
  77 Fed. Reg. 46,258 (Aug. 3, 2012) ..................................................9

Debit Card Interchange Fees and Routing,
  76 Fed. Reg. 43,478 (July 20, 2011).............................................9, 45

Debit Card Interchange Fees and Routing (Final Rule),
  76 Fed. Reg. 43,394 (July 20, 2011)........................................*passim*

Debit Card Interchange Fees and Routing (NPRM),
  75 Fed. Reg. 81,722 (Dec. 28, 2010)......................................6, 24, 31

## Other Authorities

A. Scalia & B. Garner, *Reading Law:*
  *The Interpretation of Legal Texts* (2012) ...................................37, 39

Board of Governors of the Federal Reserve System, *Federal Reserve*
*Board Debit Card Issuer Survey for 2023*,
  https://www.federalreserve.gov/paymentsystems/files/2023Debit
  CardIssuersurvey.pdf.......................................................................34

H.W. Fowler, *A Dictionary of Modern English Usage* (2d ed. 1965) ......36

*The Chicago Manual of Style* (16th ed. 2010) .........................................36

*The Merriam Webster Dictionary* (2009) .................................................64

William Strunk Jr. and E.B. White,
  *The Elements of Style* (4th ed. 2000) ...............................................36

Appellate Case: 25-3000     Page: 10     Date Filed: 12/30/2025 Entry ID: 5592396

# JURISDICTIONAL STATEMENT

This case is before the Court on appeal from the August 6, 2025 Order of the United States District Court for the District of North Dakota, Judge Daniel M. Traynor, granting summary judgment for Appellee Corner Post, Inc. ("Corner Post") and denying the cross motion of Appellant Board of Governors of the Federal Reserve System ("Board"). Corner Post challenged the Board's regulations regarding debit interchange fees, 12 C.F.R. § 235.3(b), the promulgation of which was mandated by 15 U.S.C. § 1693*o*-2. Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and the Declaratory Judgment Act, 28 U.S.C. § 2201, Corner Post sought a declaration that the Board's regulations were arbitrary, capricious, and contrary to law. The district court had jurisdiction pursuant to 28 U.S.C. § 1331.

After the district court issued its Order, the Board filed a motion to amend the judgment on September 3, 2025. On October 6, 2025, the Board timely filed its Notice of Appeal. The district court granted the Board's motion to amend on October 27, 2025, and the Board filed an Amended Notice of Appeal on October 28, 2025. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

1

# STATEMENT OF THE ISSUES

1. The Durbin Amendment, 15 U.S.C. § 1693*o*-2, requires the Board to establish "standards for assessing whether" interchange transaction fees received by debit card issuers are "reasonable and proportional to" issuer costs. The statute also identifies certain costs that the Board must consider while prohibiting the Board from considering costs "not specific to a particular" debit card transaction. Was the Board prohibited from considering issuer costs specific to a particular debit card transaction that are not directly addressed by the statute?

   15 U.S.C. § 1693*o*-2(a)(2), (3)(A), (4)(B); *NACS v. Bd. of Governors of the Fed. Res. Sys.*, 746 F.3d 474 (D.C. Cir. 2014); *Iowa v. Wright*, 154 F.4th 918 (8th Cir. 2025); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)

2. Did the District Court err by holding that the statute does not permit the Board to adopt interchange fee standards that apply uniformly across covered transactions?

   *Iowa Pub. Serv. Co. v. ICC*, 643 F.2d 542 (8th Cir. 1981); *Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 145 F.4th 828 (8th Cir. 2025); *EPA v. Calumet Shreveport Ref., LLC*, 605 U.S. 627 (2025); 1 U.S.C. § 1; 15 U.S.C. § 1693*o*-2(a)(2)

## STATEMENT OF THE CASE

### A.    The Durbin Amendment

Section 1075 of the Dodd-Frank Act amended the Electronic Fund

Transfer Act ("EFTA") by adding a new section 920, codified at 15

U.S.C. § 1693*o*-2 ("section 920" or "Durbin Amendment"), regarding

debit card transactions.[1] Among other things, section 920(a) gives the

Board direction and authority to prescribe regulations establishing

standards for assessing interchange fees for debit cards. Specifically,

section 920(a)(2) provides that "[t]he amount of any interchange

transaction fee that an issuer may receive or charge with respect to an

electronic debit transaction shall be reasonable and proportional to the

cost incurred by the issuer with respect to the transaction."[2] 15 U.S.C.

---

[1] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1075, 124 Stat. 1376 (July 21, 2010) (codified at 15 U.S.C. § 1693*o*-2).

[2] The Durbin Amendment defines "electronic debit transaction" as "a transaction in which a person uses a debit card." 15 U.S.C. § 1693*o*-2(c)(5). "[I]nterchange transaction fee" is defined as "any fee established, charged or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic debit transaction." *Id.* § 1693*o*-2(c)(8). An "issuer" is "any person who issues a debit card, or credit card, or the agent of such person with respect to such card." *Id.* § 1693*o*-2(c)(9).

3

§ 1693*o*-2(a)(2). Section 920(a)(3)(A) requires the Board to prescribe regulations "to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(3)(A).

In prescribing regulations under paragraph (3)(A), the statute states that the Board shall "(A) consider the functional similarity between – (i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par." 15 U.S.C. § 1693*o*-2(a)(4)(A). Section 920(a)(4)(B) further provides that the Board shall "distinguish between – (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement ['ACS'] of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)." *Id.* § 1693*o*-2(a)(4)(B). The statute provides no other factors that the Board should take into account in establishing standards for assessing whether interchange fees are

4

"reasonable" and "proportional" to issuer costs. *See Debit Card Interchange Fees and Routing*, *Final Rule*, 76 Fed. Reg. 43,394, 43,426 (July 20, 2011) ("Rule" or "Final Rule"); *see also id.* at 43,424. A separate provision of the statute, section 920(a)(5)(A), provides that "[t]he Board may allow for an adjustment to the fee amount" permitted by the Board's interchange fee standards if "reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions." *Id.* § 1693*o*-2(a)(5)(A)(i).

## B. The Board's December 2010 Notice of Proposed Rulemaking and July 2011 Final Rule

Shortly after the enactment of the Dodd-Frank Act, Board staff began meeting with parties interested in the interchange fee rulemaking, including representatives of merchants, card-issuing banks, networks, and others, to discuss the provisions of the Durbin Amendment. The Board distributed surveys to debit card issuers, acquirers,[3] and networks requesting information on, among other things, the costs associated with debit card transactions. *See Debit Card*

---

[3] An acquirer is the merchant's bank, which pays the interchange fee to the issuing bank. 76 Fed. Reg. at 43,396.

5

*Interchange Fees and Routing, Notice of Proposed Rulemaking*, 75 Fed. Reg. 81,722, 81,724-25 (Dec. 28, 2010) ("NPRM").

On December 28, 2010, the Board published its NPRM requesting public comment on a proposed rule implementing the Durbin Amendment. *Id.* The Board received comments from more than 11,500 commenters, including issuers, payment card networks, merchants, consumers, trade associations, and members of Congress. 76 Fed. Reg. at 43,394. The Board thoroughly reviewed all comments, survey data, and other relevant information in promulgating the Rule. *Id.*

The Rule, published July 20, 2011 as the Board's Regulation II,[4] establishes standards for assessing whether the amount of any interchange fee is reasonable and proportional to the cost incurred by the issuer with respect to the transaction, as directed by Congress. *See* Rule, 76 Fed. Reg. at 43,420. Specifically, it permits each issuer to receive, for a transaction subject to the interchange fee standards, an interchange fee that does not exceed 21 cents (the "base component") plus 5 basis points multiplied by the value of the transaction (the "*ad valorem* component"), cutting roughly in half the pre-Rule average of 44

---

[4] Pronounced "eye eye."

Appellate Case: 25-3000     Page: 16     Date Filed: 12/30/2025 Entry ID: 5592396

cents per transaction. *Id*. at 43,422; *see also id*. at 43,397.

In establishing the interchange fee standards, the Board determined, based on the language of the Durbin Amendment, that it could permissibly take into account costs in addition to incremental ACS costs (which the Board is required to consider under section 920(a)(4)(B)(i)), as long as those additional costs are specific to a particular debit card transaction and thus not excluded from consideration by section 920(a)(4)(B)(ii). 76 Fed. Reg. at 43,426-427. As a result, the Rule's interchange fee standards are based on certain costs incurred by issuers in effecting a debit card transaction: both "fixed" and "variable" ACS costs (such as network connectivity, software, hardware, equipment, and associated labor), network processing fees, the costs of processing chargebacks and other non-routine transactions, transaction-monitoring costs, and issuer fraud losses. *Id*. at 43,429-431. Several other costs that issuers may incur in connection with their debit card programs were excluded for the reasons described in the Rule. *Id*. at 43,404, 43,427-429. For example, the Board excluded corporate overhead (such as senior executive compensation), costs associated with establishing the account relationship, card production and delivery

7

costs, marketing costs, research and development costs, and network membership fees, because these costs are not specific to particular debit card transactions. *Id.* at 43,404, 43,427-428.

The values of the base component and the *ad valorem* component in the Rule were determined using the data reported on the Board's 2010 survey of covered[5] debit card issuers. These values reflect the costs incurred by a "representative issuer in a representative transaction," *id.* at 43,423, and, as such, the interchange fee standards apply uniformly to all issuers and transactions subject to the standards. The Board initially considered a fee cap that could vary for each individual issuer, but rejected it based on "the language and purpose of the statute and the practical results of various interpretations," including avoiding a reading of the statute "that is virtually impossible to implement" and that "would introduce tremendous complexity and administrative costs for issuers, networks, acquirers, and merchants, as well as difficulty in

---

[5] The Durbin Amendment exempts certain transactions and issuers from the interchange fee standards, including issuers with less than $10 billion in consolidated assets. *See* 15 U.S.C. § 1693*o*-2(a)(6)(A).

Appellate Case: 25-3000    Page: 18    Date Filed: 12/30/2025 Entry ID: 5592396

monitoring and enforcing compliance." *Id.* at 43,422.[6],[7]

### C. The First Challenge to Regulation II and the D.C. Circuit's Decision

Shortly after publication of the Rule in July 2011, a group of trade

associations representing merchants, including the National

Association of Convenience Stores ("NACS"), the National Retail

Federation, the Food Marketing Institute, and the National Restaurant

---

[6] In a separate interim final rule issued simultaneously with the Rule, the Board adopted a fraud-prevention adjustment of 1 cent per transaction for eligible issuers, consistent with section 920(a)(5) of EFTA. *See* 76 Fed. Reg. 43,478 (July 20, 2011); *see also* 77 Fed. Reg. 46,258 (Aug. 3, 2012) (finalizing this interim final rule). The fraud-prevention adjustment is in addition to the amount permitted under the interchange fee standards (i.e., the base component and *ad valorem* component). The base component, *ad valorem* component, and fraud-prevention adjustment are collectively referred to as the "interchange fee cap."

[7] On November 14, 2023, the Board published a Notice of Proposed Rulemaking seeking comment on whether to update all three components of the interchange fee cap (base, *ad valorem*, and fraud-prevention adjustment) based on the then-latest cost data reported to the Board, and to "update[e] the three components . . . every other year going forward." *See Debit Card Interchange Fees and Routing, Notice of Proposed Rulemaking*, 88 Fed. Reg. 78,100, 78,101 (Nov. 14, 2023). Under the proposal, the base component would initially be lowered from 21 cents to 14.4 cents, the *ad valorem* component would decrease from 5 to 4 basis points (multiplied by the value of the transaction), and the fraud-prevention adjustment would increase from 1 cent to 1.3 cents. *Id.*

9

Association, as well as two individual merchants, sued the Board seeking a declaration that the Rule was arbitrary and capricious and exceeded the Board's statutory authority. *See NACS v. Bd. of Governors of the Fed. Res. Sys.*, No. 1:11-cv-02075 (D.D.C., filed Nov. 22, 2011) (the "*NACS*" litigation). Among other things, the first amended *NACS* Complaint—which Corner Post's complaint largely parallels— challenged the portion of the Rule establishing interchange fee standards. First Amended Complaint (*NACS* Dkt. 18), filed March 2, 2012 ("*NACS* Compl."). Like Corner Post here, the *NACS* plaintiffs claimed that, in promulgating the interchange fee standards, the Board "vastly expand[ed] the categories of recoverable costs and thus the allowable debit interchange transaction fee." *NACS* Compl. ¶ 5.

On July 31, 2013, the district judge found that the interchange fee provisions of the Rule violated the APA, *NACS v. Bd. of Governors of the Fed. Res. Sys.*, 958 F. Supp. 2d 85 (D.D.C. 2013), but the D.C. Circuit reversed on appeal. *NACS v. Bd. of Governors of the Fed. Res. Sys.*, 746 F.3d 474 (D.C. Cir. 2014), *cert. denied*, 574 U.S. 1121 (2015) ("*NACS*"). The D.C. Circuit held that "section 920(a)(4)(B)(i) *requires* the Board to include 'incremental cost[s] incurred by an issuer for the

10

role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction,' and that section 920(a)(4)(B)(ii) *prohibits* the Board from including 'other costs incurred by an issuer which are not specific to a particular electronic debit transaction.'" *Id.* at 483 (quoting 15 U.S.C. § 1693*o*-2(a)(4)(B)(i) and (ii)). It further held that the Board had appropriately determined, based on the statutory language, "that the statute splits costs into three categories: (1) incremental ACS costs, which the Board must allow issuers to recover; (2) costs specific to a particular transaction, other than incremental ACS costs, which the Board may, but need not, allow issuers to recover; and (3) costs not specific to a particular transaction, which the Board may not allow issuers to recover." *Id.* at 488.

The court next turned to a determination of whether the Board properly included "the four specific types of costs the merchants challenge: 'fixed' ACS costs, network processing fees, [issuer] fraud losses, and transactions-monitoring costs." *Id.* at 489. Those four categories are identical to the costs Corner Post challenges here. *See* App. 39, 46; R. Doc. 19, at 26, 33, ¶¶ 68, 88. The D.C. Circuit carefully

11

considered each and determined that the statute permitted the Board to consider all four. 746 F.3d at 489-92.

With regard to transaction-monitoring costs, the court "agree[d] with the Board that transactions-monitoring costs can reasonably qualify both as costs 'specific to a particular . . . transaction' (section 920(a)(4)(B)) [considered within the interchange fee standards] and as fraud-prevention costs (section 920(a)(5)) [considered within the fraud-prevention adjustment]." *Id.* at 492 (quoting section 920). However, the court held that, while "the Board may well be able to articulate a reasonable justification for determining that transactions-monitoring costs properly fall outside the fraud-prevention adjustment" but within the interchange fee standards (and specifically the base component), "the Board has yet to do so." *Id.* at 493. Accordingly, without vacating the Rule, the court remanded to the Board for additional explanation of its inclusion of transaction-monitoring costs in the base component, rather than in the separate fraud-prevention adjustment, and reversed the district court's grant of summary judgment to the *NACS* plaintiffs. *Id.* at 493, 496; *see also id.* at 477 ("we remand one minor issue—the

12

Board's treatment of so-called transactions-monitoring costs—to the Board for further explanation").

The Supreme Court subsequently denied the *NACS* plaintiffs' petition for writ of certiorari. *NACS v. Bd. of Governors of the Fed. Res. Sys.*, 574 U.S. 1121 (2015). On August 14, 2015, the Board published a clarification of its rationale with respect to transaction-monitoring costs as required by the D.C. Circuit, which did not require any amendment of the Rule. *See Debit Card Interchange Fees and Routing, Clarification*, 80 Fed. Reg. 48,684 (Aug. 14, 2015) ("Clarification"). The *NACS* plaintiffs did not challenge the Board's Clarification and consented to entry of judgment for the Board. *See NACS* Dkt. 53, at 3, ¶¶ 5, 6.

## D.    Corner Post's Complaint

The initial plaintiffs in this action, North Dakota Retail Association ("NDRA") and North Dakota Petroleum Marketers Association ("NDPMA"), filed their complaint on April 29, 2021. Following the Board's motion to dismiss for untimeliness, NDRA and NDPMA[8] filed an Amended Complaint on July 23, 2021, adding Corner Post, Inc., a truck stop and convenience store member of NDRA and

---

[8] NDRA and NDPMA were later terminated from the case.

Appellate Case: 25-3000     Page: 23     Date Filed: 12/30/2025 Entry ID: 5592396

NDPMA. App. 22, 25-26; R. Doc. 19, at 9, 12-13, ¶¶ 19, 32. The Amended Complaint sought a declaration that the interchange fee standards in Regulation II are arbitrary, capricious, contrary to law, and beyond the Board's authority under section 920(a) of EFTA. App. 45-50; R. Doc. 19, at 32-37, ¶¶ 84-95. Like the *NACS* plaintiffs, Corner Post contends that Regulation II must be vacated because the Board considered certain costs it claims are prohibited under the statute. *Compare* App. 21-22, 46-47; R. Doc. 19, at 8-9, 33-34, ¶¶ 18, 88, *with NACS* Compl. ¶ 5.

By Opinion and Order of March 11, 2022, the district court granted the Board's motion to dismiss, holding that plaintiffs' claims were time-barred. *Corner Post, Inc. v. Bd. of Governors of the Fed. Res. Sys.*, 2022 WL 909317 (D.N.D. Mar. 11, 2022). This Court affirmed. *North Dakota Retail Ass'n v. Bd. of Governors of the Fed. Res. Sys.*, 55 F.4th 634, 641 (8th Cir. 2022). Corner Post filed a petition for writ of certiorari to the U.S. Supreme Court, which reversed, holding that an APA claim does not accrue for purposes of 28 U.S.C. § 2401(a)'s six-year statute of limitations until the plaintiff is injured by final agency action. *Corner Post, Inc. v. Bd. of Governors of the Fed. Res. Sys.*, 603 U.S. 799,

14

825 (2024). On August 21, 2024, this Court vacated its opinion and remanded to the district court for further proceedings.

### E. The District Court's August 6, 2025 Opinion and the Conflicting Eastern District of Kentucky Decision

On November 15, 2024, Corner Post moved for summary judgment and the Board cross-moved on January 10, 2025. The Board argued that it correctly interpreted the statute as permitting consideration of costs other than incremental ACS costs and—addressing a new merchant claim not raised in the prior *NACS* litigation—that the statute permits the establishment of an interchange fee cap that applies uniformly across issuers and transactions subject to the cap. *See* R. Doc. 58, at 12-30. Corner Post argued that the statute precludes the Board's interpretation. *See* R. Doc. 51, at 13-34.

In its August 6, 2025 Opinion, the district court found that the Durbin Amendment does not permit the Board to consider any costs other than "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement [ACS] of" debit card transactions. App. 76-83; R. Doc. 79, at 25-32 (citing 15 U.S.C. § 1693*o*-2(a)(4)). The court further concluded that four categories of costs that Regulation II's interchange fee standards take into account—"fixed"

15

ACS costs, transaction-monitoring costs, issuer fraud losses, and network processing fees—should not have been considered. *Id.* at 32-40. The court also held that the uniform interchange fee cap violates the Durbin Amendment's requirement that any interchange fee be reasonable and proportional to "the cost incurred by the issuer with the respect to the transaction." *Id.* at 40-43 (citing 15 U.S.C. § 1693*o*-2(a)(3)(A) (emphasis omitted). The court agreed with Corner Post's argument that this language requires standards that account for variations in costs among issuers and transactions without specifying the degree to which it must do so. *See id.* at 42-43. The Court stayed its ruling pending the outcome of this appeal. *Id.* at 44.

Shortly after the district court's decision, a district court in the Eastern District of Kentucky considered the same questions and reached the opposite result. *Linney's Pizza, LLC v. Bd. of Governors of the Fed. Res. Sys.*, No. 22-71, 2025 WL 2645489 (E.D. Ky. Sept. 15, 2025). In *Linney's*, the district court concluded that the Board acted within the scope of authority granted to it by the Durbin Amendment and that Regulation II faithfully implements the statute. *See id.* at *7-9. The court further determined that it was appropriate for the Board to

16

include all ACS costs, transaction-monitoring costs, issuer fraud losses, and network processing fees when setting the interchange fee cap. *Id.* at \*9-13. Finally, the court held that the statute permits the Board to set a uniform fee cap for covered debit card issuers. *Id.* at \*15.[9]

## SUMMARY OF THE ARGUMENT

**1.** Subject to certain guardrails set forth in the statute, Congress granted the Board substantial discretion to implement the requirements of the Durbin Amendment by directing that the Board prescribe regulations to "*establish standards*" for "*assessing*" whether the interchange fee received by a debit card issuer is "*reasonable and proportional*" to the cost incurred by the issuer with respect to the transaction.

The district court's determination that the Board's role in implementing the Durbin Amendment is functionally ministerial would render Congress's directives a nullity and is not the best reading of the statute.

**2.** The district court's interpretation of the Durbin Amendment's separate cost consideration provisions is likewise not the

---

[9] The plaintiff in that case has appealed. *See* No. 25-6038 (6th Cir.).

17

best reading. The district court's construction erroneously dismisses the statute's grammar and punctuation and would render *yet more* of Congress's instructions surplusage. The Board's reading, by contrast, gives meaning to all of the statute's text, heeds its grammar and punctuation, and accounts for costs "incurred by the issuer with respect to the transaction"—as the Durbin Amendment instructs—that are not directly addressed by the statute.

The district court's reading also erroneously concludes that the Board was precluded from considering four categories of costs incurred by issuers with respect to debit card transactions. The district court reached this conclusion even though these costs are not among those that Congress prohibited as "not specific to a particular" transaction. The Board properly determined that these costs are specific to particular transactions and, for certain of the costs, no transaction could occur without them. Once again, the Board's reading is the best one, and its determinations with respect to these cost categories are entirely consistent with the statute.

**3.** Finally, the district court's determination that the Board was precluded from adopting uniform standards based on industry-wide

18

data is erroneous. The district court posited that the Board should have adopted a more granular approach, but fails to identify what that approach should have been or to establish how the Board could have fully implemented the court's unduly narrow reading of the statute given real-world limitations. The Board drew reasonable lines in establishing its interchange fee standards and, unlike the district court's interpretation, its approach is both faithful to the statute's text and avoids the absurdity of a reading that would be impossible to implement in practice.

## STANDARD OF REVIEW

The Court reviews the district court's grant or denial of summary judgment, and underlying questions of statutory interpretation, *de novo*. *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 806 (8th Cir. 2021). In reviewing agency action under the APA, this Court must "'decide all relevant questions of law' and 'interpret . . . statutory provisions.'" *Iowa v. Wright*, 154 F.4th 918, 942 (8th Cir. 2025) (quoting 5 U.S.C. § 706). "'Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires,'" *id.* (quoting *Loper Bright*

19

*Enters. v. Raimondo*, 603 U.S. 369, 412, (2024)), but "when an agency exercises discretion granted by a statute, judicial review is typically conducted under the [APA]'s deferential arbitrary-and-capricious standard." *Seven Cty. Infrastructure Coal v. Eagle Cty.,* 605 U.S. 168, 179-80 (2025) (cited in *Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 145 F.4th 828, 846-47 (8th Cir. 2025)). In determining whether a statute authorizes an agency action, the Court "begins 'with the statute's plain language, giving words the meaning that proper grammar and usage would assign them.'" *Wright*, 154 F.4th at 942 (quoting *Union Pac. R.R. Co. v. Surface Transp. Bd.*, 113 F.4th 823, 833 (8th Cir. 2024)).

## ARGUMENT

### I. The Best Reading of the Durbin Amendment Is That It Delegated Substantial Discretion to the Board

As discussed in Sections II and III below, the Board has the best reading of the Durbin Amendment's cost provisions even if those provisions are read in isolation. But they are not read in isolation. Rather, as the Supreme Court made clear when it overruled the *Chevron* doctrine in *Loper Bright*, "the best reading of a statute" may be that it "delegates discretionary authority to an agency" such that "the agency is authorized to exercise a degree of discretion." 603 U.S. at 394.

20

In such instances, courts "fix the boundaries of the delegated authority and ensure the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* at 395 (cleaned up); *Wright*, 154 F.4th at 947.

Here, the statute authorizes the Board to "prescribe regulations . . . regarding any interchange transaction fee . . . to implement this subsection (including related definitions) . . . ." 15 U.S.C. § 1693*o*-2(a)(1). This language expresses an intent to "empower an agency to . . . 'fill up the details' of [the] statutory scheme" consistent with Congress's direction elsewhere in the statute. *Schaffner v. Monsanto Corp.*, 113 F.4th 364, 382 (3d Cir. 2024) (construing a statute authorizing an agency "to prescribe regulations to carry out the provisions" of the statute as empowering the agency to "fill up the details") (quoting *Loper Bright*, 603 U.S. at 395).

The Durbin Amendment further instructs the Board "to establish standards for assessing whether the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer," 15 U.S.C. § 1693*o*-2(a)(3)(A), which underscores Congress's expectation and makes the fact of its delegation clear. Although the result of the district court's analysis is that a single, fixed

21

meaning of "standards," "reasonable," and "proportional" flows mechanically from the statute's separate cost consideration provisions, Congress's command for the Board to "establish standards" for "assessing" whether interchange fees are "reasonable and proportional" would make little sense if the Board's role was purely ministerial. *See Batterton v. Francis*, 432 U.S. 416, 428 (1977) ("Congress itself must have appreciated that the meaning of the statutory term was not self-evident, or it would not have given the Secretary the power to prescribe standards."); *accord Linney's Pizza*, 2025 WL 2645489, at *8 (the merchants' "reading reduces the Board to a mere calculator, sifting costs into one bucket or the other," and this "mechanical" role is inconsistent with the statutory text "which provides the Board with a broad mandate regarding fees").

Notably, in *Batterton*, a pre-*Chevron* decision that *Loper Bright* cited as an example of a delegation to an agency, the Court held that similar language instructing an agency to adopt "standards" to implement a statutory provision effected a broad delegation. *Batterton*, which applied a law basing eligibility for public benefits on "unemployment (as determined in accordance with *standards prescribed*

22

*by the Secretary*),” 42 U.S.C. § 607(a) (1976) (emphasis added), held that

when Congress:

> delegated . . . power to prescribe standards for determining what constitutes “unemployment” [it] entrust[ed] to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term. . . . The regulation at issue . . . is therefore entitled to more than mere deference or weight. It can be set aside only if the Secretary exceeded his statutory authority or if [it] is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.”

432 U.S. at 425-26 (citations omitted); *see also Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981) (describing the delegation at issue in *Batterton* as “exceptionally broad”).

Moreover, in enacting the Durbin Amendment, Congress expressly stated that it viewed that provision as granting discretion to the Board. The Dodd-Frank Act specifically provides that “[n]o provision of this title may be construed as altering, limiting, or otherwise affecting the deference that a court affords to . . . the Board in making determinations regarding the meaning or interpretation of section 920.” Dodd-Frank Act § 1084(3), 124 Stat. 1376, 2082 (codified at 15 U.S.C. § 1693b(e)(2)). This provision confirms that, when it enacted the Durbin Amendment, Congress understood that it was granting the Board

23

discretionary authority to give "meaning" to the terms in section 920.

Given the Durbin Amendment's language, the Board enjoys substantial discretion so long as it conforms to any express limits in the statute's text, *Wright*, 154 F.4th at 947, which it did. And although in no way controlling, in construing these limits, the Board's position, adopted "roughly contemporaneously with enactment of the statute" is entitled to "very great respect," particularly because it has "remained consistent over time." *Loper Bright*, 603 U.S. at 385-86 (citations omitted). Here, the Board's longstanding and consistent construction of the Durbin Amendment is that it provides substantial discretion to (1) consider "costs that are specific to a particular transaction other than incremental [ACS] costs," NPRM, 75 Fed. Reg. at 81,734-735; and (2) to adopt uniform fee standards based on industry-wide data, *id.* at 81,726-727. That is the best reading of the statute, and is a longstanding, consistent interpretation that should not be lightly discarded.

24

## II. The Board Properly Included the Costs at Issue

### A. The Statutory Text Permits the Board to Include Costs That Were Neither Expressly Required nor Prohibited from Consideration

As mandated by Congress, Regulation II establishes standards for assessing whether the amount of any interchange fee is reasonable and proportional to the cost incurred by the issuer with respect to the transaction, reducing interchange fees by approximately half compared to the pre-Rule level. In so doing, the Board properly: (1) considered issuers' incremental ACS costs, as directed by Congress in section 920(a)(4)(B)(i); and (2) excluded "other costs incurred by an issuer which are not specific to a particular electronic debit transaction" as directed by section 920(a)(4)(B)(ii). The Board reasonably concluded, based on the statute's text, grammar, and structure, that, while the statute prohibited consideration of costs not specific to a particular transaction, it did not bar consideration of costs "that are specific to a particular electronic debit transaction but that are not incremental [ACS] costs." 76 Fed. Reg. at 43,426. The Board properly exercised its discretion to consider four such specific categories of costs—"fixed" ACS costs, transaction-monitoring costs, issuer fraud losses, and network

25

processing fees—which it concluded, after detailed analysis, are specific to particular transactions.

The district court erred in concluding that "the Durbin Amendment prohibits the inclusion of any cost in the interchange fee standards other than the incremental ACS cost of a transaction." App. 72; R. Doc. 79, at 21 (citing 15 U.S.C. § 1693*o*-2(a)(B)(i)). The district court eschewed the Board's straightforward reading of the statutory text on the grounds that Congress inconsistently used 'which,' 'that,' and commas throughout the Durbin Amendment." *Id.* at 21. But the district court fails to show any such material inconsistencies in Congress's grammar or usage or that the specific language and punctuation chosen by Congress were mere "blunders." *See id.* at 23-24.

### 1. The Board's Reading Gives Meaning to All of the Statute's Terms, While the District Court's Reading Renders Important Statutory Language Superfluous

Section 920(a)(2) broadly instructs the Board that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(2). In mandating in section

26

920(a)(3)(A) that the Board prescribe regulations "to establish standards for assessing" interchange fees, Congress specifically referred back to section 920(a)(2)'s directive that fees be "reasonable" and "proportional" to issuers' costs. *See* 15 U.S.C. § 1693*o*-2(a)(3)(A). The Board's Rule gives meaning to all of these and other relevant statutory terms: it considers only costs that are required or permitted to be considered, and creates standards that distinguish a reasonable interchange fee from an unreasonable one, which is set by reference to issuers' costs—thereby ensuring that interchange fees are proportional to those costs—and is the best reading of the statute. 76 Fed. Reg. at 43,423.

Because the district court's reading treats Congress's overall mandate that interchange fees be "reasonable and proportional" to issuer costs—which was sufficiently important that Congress repeated it twice in separate subsections *and* referred back to it in the costs considerations—as mere surplusage, simply anticipatory of section 15 U.S.C. § 1693*o*-2(a)(4)(B)'s cost considerations, and having no independent significance, *see* App. 77-79; R. Doc. 79, at 26-28, it is not the best reading of the statute. *Wright*, 154 F.4th at 943 ("When a

27

statutory construction thus renders an entire subparagraph meaningless . . . the canon against surplusage applies with special force.") (quoting *Pulsifer v. United States*, 601 U.S. 124, 143 (2024)); *Pharm. Care Mgmt. Ass'n v. Gerhart*, 852 F.3d 722, 728 (8th Cir. 2017) ("we must construe a statute so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant" (internal quotations omitted)); *Pub. Water Supply District No. 3 of Laclede County v. City of Lebanon*, 605 F.3d 511, 517 (8th Cir. 2010) ("the well-established principle[] of statutory interpretation . . . require[s] statutes to be construed in a manner that gives effect to all of their provisions" (internal quotations omitted)).

As the *Linney's* court correctly observed, under the district court's reading "there would be no need to require the fee standard to be 'reasonable and proportional.' Instead, the fee standard would merely equal the incremental ACS costs required to be considered under (a)(4)(B)(i)." 2025 WL 2645489, at *9.

2.  **Contrary to the District Court's Conclusion, the Board Correctly Interpreted Section 920(a)(4)(B) as Permitting Consideration of Costs That Are Not Prohibited by Section 920(a)(4)(B)(ii)**

a.  **The District Court Ignored the Statute's Non-Interlocking Language**

Section 920(a)(4)(B)(i) requires the Board to consider "the incremental cost incurred by the issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(4)(B)(i). But the counterpart provision, identifying costs "which . . . shall not be considered," expressly employs different language: "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* § 1693*o*-2(a)(4)(B)(ii). Under ordinary rules of statutory construction, Congress's use of different words in the prohibited costs clause is presumed to mean that Congress intended a different meaning than the preceding clause. *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (inclusion of particular language in one section but not another raises a presumption that Congress "intended a difference in meaning"); *Russello v. United States,* 464 U.S. 16, 23 (1983) (if "Congress includes particular language in one section of a statute but omits it in another

29

section of the same Act, it is generally presumed that Congress acts intentionally and purposely" (internal quotation omitted)); *Wright*, 154 F.4th at 944 ("The different language in [two statutory] sections . . . shows that they have different meanings."); *Designworks*, 9 F.4th at 807; *Geston v. Anderson*, 729 F.3d 1077, 1082 (8th Cir. 2012) (same).

Had Congress meant that the *only* costs that could be considered in determining what is "reasonable" and "proportional" are incremental ACS costs identified in section 920(a)(4)(B)(i), as the district court erroneously concluded, App. 75-82; R. Doc. 79, at 24-31, there are numerous straightforward ways it could have made that clear. It could have written section 920(a)(4)(B)(ii) as simply excluding "all other costs"; it could have written section 920(a)(4)(B)(i) to say "consider *only*" incremental ACS costs incurred" for authorization, clearance, or settlement, and eliminated section 920(a)(4)(B)(ii) altogether; it could have provided in sections 920(a)(2) and (a)(3)(A) that issuers were limited to costs that were "reasonable and proportional to the incremental cost incurred by the issuer in authorization, clearance, or settlement of a transaction"; or it could have used interlocking language by stating that the Board must consider incremental ACS costs but may

30

not consider any cost that is not an incremental ACS cost, to name just a few obvious possibilities. *See* 76 Fed. Reg. at 43,426 ("Had Congress intended otherwise, it would have prohibited consideration of all costs other than those required to be considered, rather than simply prohibiting consideration of a particular set of costs.").

Congress chose none of these obvious options, however, and instead described the costs the Board *may not* consider using *different language* than that used to describe costs that the Board *must* consider. In so doing, under ordinary principles of statutory construction, Congress did not limit the Board to considering only incremental ACS costs. Rather, Congress permitted the Board to consider any other costs specific to a particular transaction. *See Loughrin*, 573 U.S. at 358; *Russello*, 464 U.S. at 23; *Designworks*, 9 F.4th at 807.[10]

---

[10] Contrary to the district court's assertion that the Board initially interpreted the Durbin Amendment as only permitting recovery of costs specifically listed in section 920(a)(4)(B)(i), App. 57-58; R. Doc. 79, at 6-7, the Board consistently recognized that the Durbin Amendment's cost provisions do not cover the entire universe of issuer costs. *See* NPRM, 75 Fed. Reg. at 81,735 (requesting comment on "whether [to] allow recovery through interchange fees of other costs"); Rule, 76 Fed. Reg. at 43,426 ("the requirement that one set of costs be considered and another set of costs be excluded suggests that Congress left to the implementing agency discretion to consider costs that fall into neither category to the extent necessary and appropriate to fulfill the purposes

31

The D.C. Circuit in *NACS* concluded as much, holding that "nothing in the statute's language compel[s]" the Board to bifurcate costs into two categories and to include only incremental ACS costs. 746 F.3d at 484. Rather, using ordinary principles of statutory construction, the D.C. Circuit determined that Congress neither required nor prohibited the inclusion of costs specific to a particular electronic debit transaction that were not incremental ACS costs, and therefore that the Board was not barred from considering them. *Id.* at 485 ("had Congress wanted to allow issuers to recover only incremental ACS costs, it could have done so directly"); *accord Linney's Pizza*, 2025 WL 2645489, at *9 (if "the statute were as restrictive and mechanical as" the merchant reading suggests, "the fee standard would merely equal the incremental ACS costs").

The district court disregarded Congress's non-interlocking language, and instead took a circuitous path to reach the conclusion that § 1693*o*-2(a)(4)(B)(ii) prohibits the Board from considering *all* "other costs" even though that is not what the statute says. App. 77-79; R. Doc. 79, at 26-28. In support of its reading, the district court cites a

_____

of the statute").

32

recent Supreme Court decision for the uncontroversial proposition that the word "'shall' imposes a mandatory command." App. 80, R. Doc. 79, at 29. But the Board followed Congress's mandatory commands in its cost consideration decisions, so it is not at all clear how this is relevant. Nor does a direction to "distinguish" between the two identified cost categories in any way negate the existence of one or more additional categories, as the district court suggests without any persuasive support, and the Board's reading *does* distinguish the identified categories. *See id.*; *NACS*, 746 F.3d at 488.

The district court's observation that "Congress demanded the Board issue regular public reports only about 'costs incurred' in relation to ACS processing," App. 76; R. Doc. 79, at 25, likewise does not suggest that the Board was limited to considering only incremental ACS. Not only does the Durbin Amendment's information collection and reporting provision, 15 U.S.C. § 1693*o*-2(a)(3)(B), *not* contain the term "incremental," but it uses different language from section 920(a)(4)(B)(i) ("disclose such aggregate or summary information concerning the costs incurred . . . in connection with the authorization, clearance or settlement of electronic debit transactions"), and broadly empowers the

33

Board to "require any issuer . . . or payment card network to provide the Board with *such information as may be necessary* to carry out the provisions of this subsection" and to disclose such data "as the Board considers appropriate and in the public interest." *Id.* (emphasis added); *see also NACS*, 746 F.3d at 488 (rejecting district court's reliance on the data collection provision to limit the Board's consideration to incremental ACS costs).[11]

Unlike the district court's reading, the Board's interpretation, which both considers and includes required costs and excludes prohibited costs as required by 15 U.S.C. § 1693*o*-2(a)(4)(B)(i) and (ii), and sets an interchange transaction fee cap that is reasonable and proportional to cost, as required by § 1693*o*-2(a)(2) and (3)(A), gives effect to all of the statutory provisions and is the best interpretation.[12]

_____

[11] Consistent with this broad Congressional authorization, the Board requires covered issuers to file on a biennial basis reports including their costs incurred in ACS of electronic debit transactions, other costs incurred in connection with particular debit card transactions, and fraud-prevention costs, and is not limited to "incremental ACS." *See* Federal Reserve Board Debit Card Issuer Survey for 2023, *available at* https://www.federalreserve.gov/paymentsystems/files/ 2023DebitCardIssuersurvey.pdf.

[12] Nor can indeterminate floor statements of the legislation's sponsor trump this plain language of the statute, as the district court incorrectly

34

### b. The District Court Erroneously Failed to Give Meaning to the Restrictive "Which" Clause in Section 920(a)(4)(B)(ii)

The district court's conclusion that the Board is limited to considering *only* incremental ACS costs in establishing standards for reasonable and proportional interchange fees is erroneous for another important reason. Rather than remaining true to the text, grammar, and punctuation of section 920(a)(4)(B)(ii), the district court ignored the limiting language of the "which" clause in that section because "Congress's inconsistencies [in drafting the Durbin Amendment] make restrictive and descriptive grammar an unreliable interpretive tool for the Durbin Amendment's interpretation." App. 81; R. Doc. 79, at 30. But the district court provides no compelling support for this conclusion, and there is a far better interpretation of section 920(a)(4)(B)(ii) that gives effect to the statute's grammar and all of its text.

Under ordinary principles of statutory construction, had Congress

suggested, App. 82; R. Doc. 79, at 31. *See Owner-Operator Indep. Drivers Ass'n v. United Van Lines*, 556 F.3d 690, 693 (8th Cir. 2009) ("if 'the statute's language is plain, the sole function of the courts is to enforce it according to its terms,' without reference to its legislative history" (quoting *United States v. Ron Pair Enters.*, Inc., 489 U.S. 235, 241 (1989)).

Appellate Case: 25-3000     Page: 45     Date Filed: 12/30/2025 Entry ID: 5592396

intended "which are not specific to a particular electronic debit transaction" merely to describe—but not restrict—"other costs," it would have set the "which" clause off with a comma or parentheses. *See* H.W. Fowler, *A Dictionary of Modern English Usage* 698 (2d ed. 1965) ("A comma preceding *which* shows that the *which*-clause is nondefining, and the absence of such a comma shows that it is defining."); William Strunk Jr. and E.B. White, *The Elements of Style* 4 (4th ed. 2000) ("[r]estrictive clauses, by contrast [to non-restrictive clauses], are not parenthetic and are not set off by commas"); *The Chicago Manual of Style* 314 (16th ed. 2010) (same); *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (in the statutory phrase "any other kind of substantial gainful work which exists in the national economy," the "which" phrase qualifies "substantial gainful work"); *United States v. Pritchett*, 470 F.2d 455, 459 (D.C. Cir. 1972) (interpreting a statutory phrase not set off by commas as modifying the immediately preceding phrase).

The district court rightly observed that it is generally preferable to use "that" instead of "which" for restrictive clauses. But as the D.C. Circuit correctly held in *NACS*, "the absence of commas matters far more than Congress's use of the word 'which' rather than 'that'" because

36

which versus that is "a style preference rather than an ironclad grammatical rule." 746 F.3d at 487. Indeed, "elsewhere in the Durbin Amendment Congress demonstrated that it is among those writers who ignore the distinction between descriptive 'which' and restrictive 'that,'" and "in the Durbin Amendment Congress set aside *every* clearly descriptive clause with commas." *Id.* (emphasis added).[13] The absence of commas in the "which" clause therefore dictates Congress's restrictive meaning, and where a "reading is . . . mandated by the grammatical structure of the statute," it is the duty of the court to give effect to the statute as written. *Ron Pair,* 489 U.S. at 241.

Although the district court attempts to sidestep this straightforward textual analysis by suggesting Congress acted haphazardly, it fails to identify any relevant inconsistencies in the Durbin Amendment. The examples the district court provided in fact

---

[13] Some notable commentators have observed that legislatures can be inconsistent in this area and that the grammar cannon can therefore be "a weak basis for deciding statutory meaning" in this context. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 142-43 (2012). But Congress was *not* inconsistent about the use of commas with descriptive clauses in the Durbin Amendment, and the Board and the D.C. Circuit had every reason to adopt its consistent usage in this case. *See also id.* at 161 ("No intelligent construction of a statute can ignore its punctuation.").

Appellate Case: 25-3000     Page: 47     Date Filed: 12/30/2025 Entry ID: 5592396

underscore the D.C. Circuit's observation regarding Congress's consistent usage. Though the district court refers to Congress's use of the "unfortunately . . . descriptive 'which'" without a comma in § 1693*o*-2(b)(1)(A)(i)-(ii)'s prohibition on network exclusivity, App. 74; R. Doc. 79, at 23, this just confirms the point. As the *NACS* court observed (and the district court appears to concede), Congress's consistent use of "which" without a comma in that provision is "clearly restrictive." 746 F.3d at 487. The district court's additional "counterexample" of Congress's use of "a descriptive 'which' with no commas in [] what should be a restrictive phrase," *see* App. 75; R. Doc. 79, at 24, likewise supports the conclusion that Congress consistently used "which" without commas as restrictive and provides further support for the Board's straightforward reading.[14]

The district court erred in dismissing the statutory language as mere "blunder" and failing to properly consider Congress's word choice and grammar elsewhere in the statute. App. 74; R. Doc. 79, at 23; *see*

---

[14] The district court's third example, involving Congress's use of "that" in a different grammatical context, *see id.*, has no obvious bearing on the analysis.

38

*Union Pac. R.R.*, 113 F.4th at 833 ("When interpreting a statute, we begin with the statute's plain language, giving words the meaning that proper grammar and usage would assign them.") (quoting *United States v. Lester*, 92 F.4th 740, 742 (8th Cir. 2024)). As the Board determined and is the best reading of the statute, Congress's use of the phrase "which are not specific to a particular electronic debit transaction" in section 920(a)(4)(B)(ii) restricts the meaning of "other costs incurred by the issuer" to only non-transaction-specific costs, and not to all costs other than incremental ACS costs.

And of course the district court's reading of the section 920(a)(4)(B)(ii) "which" clause renders it mere surplusage—along with the other important statutory language discussed above[15]—compounding its error. *Loughrin*, 573 U.S. at 358; *Pub. Water Supply*, 605 F.3d at 517 & n.5.

---

[15] The district court observed that "the canon against surplusage is not an absolute rule," App. 82, R. Doc. 79, at 31, which is a correct statement so far as it goes and true of canons generally. But "[l]awyers rarely argue that an entire provision should be ignored," Scalia & Garner, *supra*, at 175, and its adoption of Corner Post's interpretation would unreasonably negate full swaths of the statute.

39

**B.  The Statute Permitted the Board to Include the Costs That the District Court Found to Be Prohibited**

Contrary to the district court's conclusions, App. 83-91; R. Doc. 79, at 32-40, the Board properly included four specific costs in establishing interchange fee standards. As shown below and in the Rule, all four—"fixed" ACS costs, transaction-monitoring costs, issuer fraud losses, and network processing fees—are specific to particular electronic debit transactions and, for that reason, are not prohibited by section 920(a)(4)(B)(ii).

**1.  The Board Properly Considered and Included Fixed ACS Costs, Which Are Specific to Particular Electronic Debit Transactions and Would Be Practically Impossible to Separate From Those ACS Costs That Must Be Considered**

In establishing interchange fee standards, the Board properly considered—and included—all ACS costs incurred by an issuer in effecting an electronic debit transaction, including both "fixed" and "variable" ACS costs. *See* 76 Fed. Reg. at 43,404, 43,429. The district court concluded that "[f]ixed ACS costs . . . are not . . . 'incremental [ACS] cost[s]' associated with 'a particular electronic debit transaction,' . . . so their inclusion is plainly contrary to the Durbin Amendment's mandate." App. 84; R. Doc. 79, at 33 (quoting 15 U.S.C. § 1693*o*-

40

2(a)(4)(B)(i)). But the Board properly determined based on the statutory language that "fixed" ACS costs are specific to a particular debit card transaction and may properly be considered because, without these costs, no transaction could occur. 76 Fed. Reg. at 43,427 ("no electronic debit transaction can occur without incurring [ACS] costs, making them costs specific to each and every electronic debit transaction").

Although the district court suggests that the Board needed to define "fixed" costs, App. 84; R. Doc. 79, at 33 (suggesting a dictionary definition),[16] the Durbin Amendment notably does not use the terms "fixed" or "variable." Nor does the Durbin Amendment require exclusion of fixed ACS costs. As the Board noted, "[u]nder the framework established by the statute, all costs related to a particular transaction may be considered, and some—the incremental costs incurred by the issuer for its role in authorization, clearance, and settlement—must be

---

[16] Nor did the Board define "incremental cost." As the Board explained, not only was there "no single generally-accepted definition of . . . 'incremental cost,'" 76 Fed. Reg. at 43,426, but the possible definitions did "not correspond to a per-transaction measure of incremental cost that could be applied to any particular transaction." *Id*. at 43,427; *see also NACS*, 746 F.3d at 484 ("the phrase 'incremental cost' has several possible definitions . . . [that] would not necessarily encompass all costs that are 'specific to a particular electronic debit transaction'").

41

considered." 76 Fed. Reg. at 43,427. As the Board explained, the concepts of fixed versus variable costs are not readily severable in practice for a variety of reasons, notably including "the relevant time horizon and volume range" of the costs as well as the fact that "issuers' cost-accounting systems are not generally set up to differentiate between fixed and variable costs" and differing cost accounting systems are used when an issuer outsources debit card operations. *Id*. Accordingly, as the D.C. Circuit recognized in *NACS*, throughout the rulemaking process the merchants themselves "never argued that issuers should be allowed to recover only costs incurred as a result of processing individual, isolated transactions," and "any distinction between fixed and variable costs would prove artificial and unworkable" in practice. 746 F.3d at 489-90.

As the Board properly found, "[b]y considering all costs [including both fixed and variable ACS costs] for which it had data other than prohibited costs, the Board has complied with the statutory mandate not to consider costs identified in section 920(a)(4)(B)(ii), has fulfilled the statutory mandate requiring consideration of the costs identified in section 920(a)(4)(B)(i), and has chosen to consider other costs specific to

42

particular electronic debit transactions to the extent consistent with the purpose of the statute." 76 Fed. Reg. at 43,427.

> 2. **The Board Properly Considered and Included Transaction-Monitoring Costs, Which Are Incurred in the Authorization of Specific Electronic Debit Transactions and Are Not Precluded by the Separate Fraud-Prevention Adjustment**

Second, the Board properly considered and included in the interchange fee standards transaction-monitoring costs, which are pre-authorization activities "integral to transaction authorization." 76 Fed. Reg. at 43,430. As the Board explained, "[t]ransactions monitoring systems assist in the authorization process by providing information to the issuer before the issuer decides to approve or decline the transaction." *Id*. As part of this process, the issuer may use transaction-monitoring programs such as neural network and fraud-risk scoring systems to assist in the authorization process by providing information to the issuer before it decides whether to approve or decline the transaction. *Id*. at 43,430-431; Clarification, 80 Fed. Reg. at 48,685. While these transaction-monitoring activities inherently include a fraud-prevention component, they are part and parcel of the authorization process for a particular transaction, and therefore were

43

properly includable in the interchange fee standards. *See* 80 Fed. Reg. at 48,685 ("Transactions-monitoring systems, such as neural networks and fraud-risk scoring systems, assist in the authorization process by providing information needed by the issuer in deciding whether the issuer should authorize the transaction before the issuer decides to approve or decline the transaction. . . . [T]ransactions-monitoring is integral to an issuer's decision to authorize a specific transaction.").

The district court failed to appreciate this distinction, erroneously concluding that "'[t]ransaction-monitoring costs' is essentially another name for fraud prevention costs." App. 84; R. Doc. 79, at 33. The district court mistakenly reasoned that "Congress dedicated several subsections to regulating interchange fees and then, in a separate provision, tacked on a bonus 'adjustment to the [interchange] fee amount received or charged by an issuer' only if the issuer complied with certain fraud prevention measures." *Id.* (comparing 15 U.S.C. § 1693*o*-2(a)(1)-(4), with *id.* § 1693*o*-2(a)(5)). Thus, in the district court's view, the Board was simply engaging in "semantic gymnastics," *id.* at 34, by distinguishing, and including in the interchange fee standards, *pre-authorization* activities integral to the authorization process, from fraud-prevention

44

costs incurred *over a broad spectrum of transactions*, which costs are separately addressed by section 920(a)(5)(A) and accounted for in the fraud-prevention adjustment, which was the subject of a separate rulemaking. *See* 76 Fed. Reg. at 43,478 (July 20, 2021); *see also* 12 C.F.R. § 235.4 (permitting a 1 cent per transaction fraud-prevention adjustment "in addition to any interchange transaction fee" for eligible issuers).

Not only are transaction-monitoring costs integral to authorization of specific electronic debit transactions, and therefore appropriately includable in the interchange fee standards, but the Board appropriately concluded that it was permissible to include transaction-monitoring costs in the interchange fee standards because the language of section 920(a)(5)(A) differs significantly from section 920(a)(4)(B), indicating that these provisions refer to different (although potentially overlapping) categories of costs. Specifically, the costs considered in section 920(a)(5)(A)(i) are those for preventing fraud "in relation to electronic debit transactions involving that issuer," rather than the costs "specific to a particular electronic debit transaction" to which section 920(a)(4)(B) refers. *Compare* 15 U.S.C. § 1693*o*-

2(a)(5)(A)(i), *with id.* § 1693*o*-2(a)(4)(B).

As the Board explained in its Clarification, in contrast to transaction-monitoring costs, which are inextricably linked to the authorization of specific electronic debit transactions and included in the interchange fee standards, "fraud-prevention costs that the Board used to calculate the separate fraud-prevention adjustment authorized under section 920(a)(5) were not necessary to effect a particular transaction and were not part of the authorization, clearing, or settlement process, and thus a particular electronic debit transaction could occur without the issuer incurring these costs." 80 Fed. Reg. at 48,685. Indeed, Congress's omission of the word "particular" and its use of the more general phrase "in relation to," along with its use of the plural "transactions" in section 920(a)(5)(A)(i), indicates that the fraud-prevention adjustment may take into account an issuer's fraud-prevention costs over a broad spectrum of transactions not linked to a particular transaction. *Designworks*, 9 F.4th at 807 ("it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" of particular language in different parts of a statute (internal quotation omitted)). Thus, contrary to the

46

district court's conclusion, by its plain terms section 920(a)(5)(A) does not bar the Board from considering transaction-monitoring costs.

### 3. The Board Properly Considered and Included Issuer Fraud Losses, Which Are Costs Resulting from the Authorization, Clearance, and Settlement of a Specific, Apparently Valid Transaction That Is Later Identified as Fraudulent

The third cost category, issuer fraud losses, are "losses incurred by the issuer, other than losses related to nonsufficient funds, that are not recovered through chargebacks to merchants or debits to or collections from customers." 76 Fed. Reg. at 43,431. As explained in the Rule, fraud losses are squarely "specific to a particular transaction" and were properly included in the interchange fee standards because they are "generally the result of the authorization, clearance, and settlement of an apparently valid transaction that the cardholder later identifies as fraudulent," most commonly because of "counterfeit card fraud, lost and stolen card fraud, and card-not-present fraud." *Id.* In other words, fraud losses are quintessentially specific to a particular transaction because the issuer would not have incurred the fraud loss but for its authorization, clearance, and settlement of a particular transaction. *Id.*

Having determined that issuer fraud losses are specific to a

47

particular transaction, and therefore permissible to include in the interchange fee standards, the Board found that "[p]ermitting issuers to recover at least some fraud losses through interchange fees is reasonable given that the source of fraud could be any participant in an electronic debit transaction and that the exact source of fraud often is unknown." *Id.* The Board also appropriately determined that, because the "cost of a fraud loss varies with the amount of the transaction," the allowance for fraud losses is "best assessed through an *ad valorem* [or percentage of the value of the transaction] component." *Id.* Thus, issuers "continue to bear the cost of some fraud losses." *Id.*

The district court erroneously determined that "fraud losses are not 'cost[s]'" and were therefore improperly included in the interchange fee standards. App. 87; R. Doc. 79, at 36 (quoting 15 U.S.C. § 1693*o*-2(a)(4)(B)(i)). The district court reasoned that, "even the Board's definition that a cost may be a '*loss* or penalty involved in gaining something' acknowledges [that] 'cost' is the *certain* or agreed-upon up-front loss you accept to gain something . . . not an insurance policy to compensate for *potential* after-the-fact losses." *Id.* (emphasis in original). But the district court failed to account for the fact that

48

interchange fee rates are established by a network well in advance of any transaction, before the cost of a particular transaction is known (if such a cost can ever be determined at all), and that the full cost of a transaction is not necessarily borne by the issuer at the time the interchange fee is charged, as in the case of fraud losses, which may be incurred weeks or even months after a specific transaction is authorized, cleared, and settled.

Further, the district court erroneously reasoned that fraud losses "are not 'cost[s] *incurred by an issuer* for the *role of the issuer* in the [ACS] of a particular electronic debit transaction' . . . [because] 'the exact source of fraud often is unknown'" and networks may determine that merchants, not issuers, should bear the cost of some fraud losses. App. 87-88; R. Doc. 79, at 36-37 (quoting 15 U.S.C. § 1693*o*-2(a)(4)(B)(i) (emphases added)). However, it is undisputed that some fraud losses are borne by issuers because *that issuer* authorized, cleared, and settled a particular transaction that was later identified as fraudulent (making such fraud losses costs incurred by the issuer for *its role* in that particular transaction).

49

Nor does "including fraud losses in the interchange fee standard undermine[] the efficacy and purpose of the fraud prevention adjustment in § 1693*o*-2(a)(5)," as the district court determined. App. 88; R. Doc. 79, at 37. That section concerns costs incurred in relation to fraud *prevention* rather than allocating *losses* from specific debit card transactions that are later determined to be fraudulent. 15 U.S.C. § 1693*o*–2(a)(5)(A)(i). As the D.C. Circuit observed, "fraud losses result from the *failure* of fraud-prevention," and nothing about the text or structure of the Durbin Amendment demands that they be included in the separate fraud-prevention adjustment rather than in the interchange fee. *NACS*, 746 F.3d at 491. Moreover, as stated in the Rule, "[t]he amount of the fraud-prevention adjustment permitted under the accompanying interim final rule published separately in the Federal Register does not include consideration of fraud losses. The adjustment amount is based on fraud-prevention costs, rather than fraud losses." 76 Fed. Reg. at 43,431 at n.127. The *ad valorem* component for fraud losses was therefore properly included in the interchange fee standards.

50

### 4. The Board Properly Considered and Included Network Processing Fees, Which Are Incurred by Issuers for Their Role in ACS and Are Not Barred by a Separate Provision Concerning Network Fees

Fourth, the Board properly included in the interchange fee standards network processing fees, which are fees networks charge issuers to process a debit card transaction (such as per-transaction "switch fees"). 76 Fed. Reg. at 43,430. The total amount of network processing fees charged to an issuer "is determined by the amount of electronic debit transactions processed for that issuer." *Id*. Thus, the Board reasoned that these fees are "both specific to a particular transaction and incurred for the issuer's role in authorization, clearance, and settlement." *Id*. They vary with the number of transactions processed and no particular electronic debit transaction can authorize, clear, or settle without them. *Id*. Moreover, network processing fees, although paid by issuers to networks, are incurred "for the role of the issuer" in ACS. 15 U.S.C. § 1693*o*-2(a)(4)(B)(i). Issuers play a role in receiving authorization requests from networks, communicating approval or denial back to the networks, and receiving settlement information from the network. 76 Fed. Reg. at 43,396. This

51

would not be possible if an issuer did not participate in the network, a necessary condition of which is that it pay network processing fees.

The district court erroneously concluded that network processing fees were wrongly included because they "are not 'incurred by an issuer *for the role of the issuer*' in the ACS process," App. 89; R. Doc. 79, at 38 (quoting 15 U.S.C. § 1693*o*-2(a)(4)(B)(i)), but rather "'compensate the network for its role in processing the transaction.'" *Id.* at 38-39 (quoting *NACS*, 746 F.3d at 479). But, as explained above and in the Rule, 76 Fed. Reg. at 43,396, 43,430, network processing fees are paid *by an issuer* to the network for each transaction, and thus they are necessarily incurred "for the role of the issuer" regardless of the fact that they flow to the network. Moreover, the district court mistakenly cited *NACS* as supporting this proposition, *id.*, but that background portion of the *NACS* decision generally listed "various fees" that "the parties [to a debit card transaction] charge each other." 746 F.3d at 478-79. In expressly upholding the Board's inclusion of network processing fees, "which issuers pay on a per-transaction basis," in the interchange fee standards, the *NACS* court found that these fees are "*obviously* specific to particular transactions." *Id.* at 490 (emphasis added).

52

Moreover, the district court erroneously concluded that "Congress excluded network fees from being part of the calculation of interchange fees by narrowly defining 'network fee' and dedicating an entire section to regulating said fees." App. 90; R. Doc. 79, at 39 (citing 15 U.S.C. § 1693*o*-2(c)(10)). The district court found that "Congress . . . commanded [the Board] to 'ensure that' network fees were 'not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction,'" or to circumvent or evade regulations under the Durbin Amendment. *Id*. at 39-40 (quoting 15 U.S.C. § 1693*o*-2(a)(8)(B)(i)).

The *NACS* court appropriately rejected this reasoning, however, stating that "the merchants should have left [this argument] out entirely." *NACS*, 746 F.3d at 491. This is because the separate provision permitting the Board to prescribe rules concerning network fees, which the Board implemented at 12 C.F.R. § 235.6(a) and (b), is distinct from the interchange fee standards. In particular, the fees or other amounts "received by an issuer from a payment card network," *id*. § 235.6(b), which are the subject in part of section 920(a)(8), are different from network processing fees an issuer pays to a network as part of ACS. *See,*

53

*e.g.*, 76 Fed. Reg. at 43,430. As the D.C. Circuit held, "section 920(a)(8)(B) is designed to prevent issuers and networks from circumventing the Board's interchange fee rules, not to prevent issuers from recovering reasonable network processing fees through the interchange fee." *NACS*, 746 F.3d at 491. Accordingly, contrary to the district court's conclusion, nothing in section 920(a)(8), or elsewhere, prohibits the Board from taking network processing fees into account in setting the interchange fee standards.

## III. The Board Properly Adopted Uniform Fee Standards

The Board reasonably exercised its line-drawing authority in adopting fee standards applicable to all subject transactions based on the cost of a representative transaction, rather than standards that vary the permissible interchange fee rate based on the cost of individual transactions as Corner Post urges.[17] The Board's reading is entirely consistent with the statute's text and the district court's holding that the statute compels some more granular approach rests on several erroneous legal and factual premises.

---

[17] *See* R. Doc. 62, at 19 (Corner Post's assertion that "the Durbin Amendment requires that the fee standard be transaction-specific").

54

### A. The Board Reasonably Exercised Line-Drawing Discretion In Adopting Fee Standards Based on the Cost of a Representative Transaction

The Board's approach was a permissible exercise of the broad line-drawing authority that courts typically find inherent when Congress delegates to agencies, *Zimmer Radio*, 145 F.4th at 846 (citations omitted), which can allow them to use a uniform rate as a proxy when required to account for the costs incurred by an individual business. *See Iowa Pub. Serv. Co. v. ICC*, 643 F.2d 542, 547 (8th Cir. 1981). Not only is the Durbin Amendment's text appropriately read to permit this approach, but an alternative construction requiring the permissible interchange fee rate to vary based on the cost of each individual transaction would be absurd because it would be a practical impossibility to implement.

This Court and the Supreme Court have recently reaffirmed that, even after *Loper Bright*, an agency's line-drawing decisions when exercising delegated authority ordinarily fall within the agency's discretion. *Seven Cty.*, 605 U.S. at 182 ("as this Court has often said, agencies possess discretion and must have broad latitude to draw a 'manageable line'"); *Zimmer Radio*, 145 F.4th at 846 (distinguishing "a

55

question . . . of line drawing" from "the type of 'legal interpretation' that "has been, 'emphatically,' 'the province and duty of the judicial department' for at least 221 years" (quoting *Loper Bright*, 603 U.S. at 412)). Thus, for example, this Court previously upheld an agency's use of a common statutory tax rate, rather than the effective tax burden calculated for a specific business, to approximate an individual business' tax costs, *Iowa Pub. Serv.*, 643 F.2d at 547, as have other courts, *see, e.g., Cleveland-Cliffs Iron Co. v. ICC*, 664 F.2d 568, 586 (6th Cir. 1981); *Consol. Rail Corp. v. United States*, 619 F.2d 988, 1000 (3d Cir. 1980); *San Antonio, Tex. By & Through City Pub. Serv. Bd. v. United States*, 631 F.2d 831, 847 (D.C. Cir. 1980), *decision clarified on other grounds*, 655 F.2d 1341 (D.C. Cir. 1981), *rev'd on other grounds sub nom. Burlington N., Inc. v. United States*, 459 U.S. 131 (1982).

In exercising its line-drawing discretion, the Board adopted fee standards that both fully comply with the statute's mandates and account for practical realities. In particular, the Board adopted a uniform permissible interchange fee rate based on industrywide data, rather than varying the allowed rate for each transaction based on the costs of that transaction. As the Board explained, transaction-specific

56

interchange fee standards that would vary the permissible interchange fee based on the cost of each specific transaction would be "virtually impossible" to implement. 76 Fed. Reg. at 43,422. This is because, among other reasons, some transaction-specific cost data *is not available* at the time the transaction (and associated interchange fee) is processed. *Id.* And due to the tens of billions of debit card transactions each year, and "an exceedingly complex matrix of interchange fees," extensive information exchanges between issuers and networks would be required to determine individual transaction costs, adding substantial costs to be passed on to merchants and interfering with the ability to monitor and enforce the Rule against issuers. *Id.*

Notably, the record provided substantial support for the Board's conclusion that interchange fee standards that varied the permissible rate for each transaction could not be implemented: although the level of granularity at which the permissible rate should be set was of interest to commenters, even those objecting to an industry-wide approach argued for use of a representative transaction to set the permissible interchange fee rate at the issuer level, rather than for a true transaction-specific approach. 76 Fed. Reg. at 43,423. As the

57

comment letter of Visa Inc., one of the two main networks processing debit transactions, explained, for multiple reasons, a true transaction-specific approach would in fact be impossible.[18]

In drawing the line at the industry level rather than the issuer level as some commenters requested, the Board explained that reading the definite article before "issuer" and "transaction" to require an issuer-specific but not a transaction-specific standard did not comport with the parallel use of both terms with the same definite article in the same sentence. *Id.* ("If 'the issuer' . . . is interpreted not as a reference to the original representative issuer, but instead as a reference to a specific issuer, then the same interpretation would seem to be required by the identical and parallel references to 'a transaction' and 'the transaction' in that same sentence."); *cf. Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 329 (2000) ("we refuse to adopt a construction that would attribute different meanings to the same phrase in the same sentence").

---

[18] *See* Letter from Visa Inc. to Louise L. Roseman, Director, Div. of Res. Bank Operations & Payment Sys., Bd. of Governors of the Fed. Res. Sys., at 9–10 (Nov. 8, 2010) *available at* https://www.federalreserve.gov/newsevents/rr-commpublic/ visa_comment_letter_20101108.pdf (noting the impossibility of monitoring or proving compliance under a true transaction-specific approach or knowing the costs at the time a transaction is settled).

58

However, as the Board explained, construing "issuer" and "transaction" in subsection (a)(2) of the statute as encompassing both a representative issuer and transaction was both a permissible construction and one necessary to avoid a reading requiring a transaction-specific approach that would be absurd because it would be impossible to implement. 76 Fed. Reg. at 43,423. The Board noted that the use of the indefinite article in the first portion of section 1693*o*-2(a)(2), which addresses the "fee that an issuer may receive or charge with respect to an electronic debit transaction," is appropriately read to refer to "a representative issuer and transaction." 76 Fed. Reg. at 43,422. And the use of the definite article in the remainder of the sentence, which mandates that this fee "shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction," is "reasonably read as a reference back to the original representative use of each term (i.e., an issuer receiving an interchange fee and a transaction for which a fee is received)." *Id.* The Board thus reasoned that such a construction is both permissible and necessary to avoid an absurd result.

Appellate Case: 25-3000     Page: 69     Date Filed: 12/30/2025 Entry ID: 5592396

**B.    The District Court's Determination That the Statute Requires Some Greater Level of Granularity Rests on Incorrect Factual and Legal Premises**

In setting aside the Board's uniform approach, the district court erroneously gave no weight to the Board's factual finding that transaction-specific standards would be impossible to implement, which underlay the Board's conclusion that reading the statute in this manner would be absurd. The district court also incorrectly held that the statute's language precluded the construction given to it by the Board.

The district court incorrectly disregarded the Board's finding that transaction-specific standards would be "impossible" to implement based on the hypothetical *legal* possibility of getting information that the Board had explained did not exist, and theorizing about a possible workaround that the district court itself described as "speculative." App. 94; R. Doc. 79, at 43. In rejecting the Board's finding of impossibility due to the unavailability of certain data at the time a transaction is processed, the district court relied on "the fact that Congress empowered the Board to access 'such information as may be necessary to carry out the [Durbin Amendment's] provisions.'" App. 93; R. Doc. 79, at 42. But the Board based its finding not on a *legal* inability to obtain

60

necessary information, but on the *fact* that the information at issue *is unavailable* at the time a transaction is processed and the fee is assessed. 76 Fed. Reg. at 43,422. And the Board's conclusion that as a *practical matter* (rather than a legal matter) it would be impossible to adopt standards that would allow the fee to vary based on the price of each individual transaction was both supported by feedback from one of the two main networks processing debit transactions and not contested by any other commenters. The fact that the Durbin Amendment gave the Board legal authority to compel production of relevant information was of no help when the information simply did not exist, and the district court erred in relying on this authority to reject the Board's finding of impossibility and resulting invocation of the absurdity canon.

Given this finding of impossibility, the absurdity canon counsels for the Board's reading of the statute, and the district court's legal conclusion that the statute's language precluded such a construction was based on three erroneous premises.

First, the district court asserted that "Congress directed the Board to issue 'standards'—not just one." App. 92; R. Doc. 79, at 41 (citing 15 U.S.C. § 1693*o*-2(a)(3)(A)). This reasoning implicitly assumes that

61

"standard" is synonymous with "permissible rate" or "permissible amount charged" and thus the use of the plural "standards" necessarily requires multiple permissible rates, presumably based on the differing costs of different individual transactions. But the manner in which the word "standard" is used throughout the Durbin Amendment indicates that it refers to rules or principles for assessing what amount can be charged, rather than to the rate or amount itself. Thus, for example, the subsection cited by the district court required the Board to "establish *standards for assessing* whether *the amount* of any interchange transaction fee described in paragraph (2) is reasonable and proportional," clearly distinguishing (1) "standards for assessing" the amount charged from (2) *the amount itself*. 15 U.S.C. § 1693*o*-2(a)(3)(A); *accord id.* § 1693*o*-2(a)(5)(A)(ii)(II) (instructing the Board to promulgate "fraud-related standards" that, *inter alia*, require issuers to take certain preventative measures). The district court's implicit conflation of "standards" with "rates" or "amounts" therefore contradicts the statute's plain text.

Second, the district court reasoned that the statute's provision concerning what costs must be considered, which references the costs of

62

"a particular transaction," *id.* § 1693*o*-2(a)(4)(B)(i), implies a requirement for a fee that varies by transaction. App. 92; R. Doc. 79, at 41. But the prefatory language preceding this subsection makes clear that its purpose is to require the Board to "distinguish" between two sets of costs, 15 U.S.C. § 1693*o*-2(a)(4)(B), those that *may* be included and those that *may not*. *Id.* § 1693*o*-2(a)(4)(B)(i)-(ii). As explained above, the use of "particular" in this context served to exclude costs such as general corporate overhead that are not incurred in order to effect a "particular" transaction while requiring that the incremental ACS costs of effecting a "particular" transaction be considered. In this context, "particular" serves the purpose of defining *what* costs to consider or exclude, rather than the degree of granularity with which such costs must be measured.

Lastly, the district court appeared to assert that use of the definite article in the requirement that costs be reasonable and proportional "to the cost incurred by the issuer with respect to the transaction" necessarily referenced a specific issuer and transaction. App. 92; R. Doc. 79, at 41 (quoting § 1693*o*-2(a)(3)(A)). It therefore reasoned that uniform fee standards computed using industrywide data were

63

impermissible because the resulting permissible interchange fee rate would not be "proportional" to every individual issuer's costs viewed in isolation. *Id.*

But as a matter of usage, a definite article can indicate "any one typical of or standing for the entire class named." *The Merriam Webster Dictionary* 414 (2009). And as a matter of *law*, Congress has expressly adopted a rebuttable presumption that use of the singular in the United States Code also refers to the plural, 1 U.S.C. § 1, which would comport with the Board's fee standards, which measure proportionality based on the collective industrywide cost of *transactions. Cf. Georgetown U. Hosp. v. Sullivan*, 934 F.2d 1280, 1284 n.4 (D.C. Cir. 1991) (citing *Barr v. United States*, 324 U.S. 83, 90-92 (1945)) (rejecting an assertion that use of "the" made 1 U.S.C. § 1 inapplicable as "overly formalistic and inconsistent with Supreme Court case law"). Thus, as the Supreme Court recently reaffirmed, "in the absence of other evidence . . . use of the definite article 'the' is too thin a reed to support" an assertion that what follows refers to an individual entity. *EPA v. Calumet Shreveport Ref., LLC*, 605 U.S. 627, 641-42 (2025) (applying 1 U.S.C. § 1). And as

64

explained above, the two items of "other evidence" cited by the district court do not actually support this assertion.

Notably, the statute under which the agency in *Iowa Public Service Commission* acted charged it with maintaining "*standards*" that would allow carriers "to cover total operating expenses . . . plus a reasonable and economic profit or return (or both) . . . on capital employed in *the business*." 49 U.S.C. § 10704(a)(2) (1982) (emphases added).[19] Yet this Court did not appear to view the use of the plural "standards" or definite article before "the business" as precluding the agency from using a single statutory tax rate as "a reasonable substitute for computation of actual taxes" and declined to "second-guess the [agency]'s approach in this regard," which comports with the principle, recently reaffirmed by this Court in *Zimmer Radio*, that agencies have broad discretion when engaging in line-drawing. The

---

[19] Unlike the statute at issue in *Iowa Public Service Commission*, the Durbin Amendment expressly requires consideration of costs but makes no reference to "profit" or "return." 15 U.S.C. § 1693*o*-2(a)(2), (a)(3)(A), (a)(4)(B). This distinction does not change the fact that, as with the Durbin Amendment, an argument could be made that language in the older statute *could* be read to require that the relevant determinations be made at the individual business level, but this Court declined to adopt such a reading, and should similarly decline to do so here.

65

Board properly exercised this discretion in adopting the representative-transaction standard, which was not precluded by the statutory language and which avoided an absurd result.

## CONCLUSION

For all of the foregoing reasons, the judgment of the district court should be reversed.

Dated: December 23, 2025

Respectfully submitted,

/s/ Joshua P. Chadwick
Joshua P. Chadwick
Assistant General Counsel
Yvonne F. Mizusawa
Yonatan Gelblum
Monika Moore
Senior Counsels
Board of Governors of the
    Federal Reserve System
20th Street & Constitution
    Avenue, N.W.
Washington, D.C. 20551
joshua.p.chadwick@frb.gov
(202) 263-4835

*Attorneys for Defendant-Appellant Board of Governors of the Federal Reserve System*

66

# CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,998 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

3. This brief has been scanned for viruses using FireEye EX 5600, version 11.0.0, content release 1631.180, and is virus free.

<u>/s/ Joshua P. Chadwick</u>
Joshua P. Chadwick

*Attorney for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2025, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Joshua P. Chadwick
Joshua P. Chadwick

*Attorney for Defendant-Appellant*