**Case No. 25-3000**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

_____

**CORNER POST, INC.,**
Plaintiff-Appellee,

v.

**BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,**
Defendant-Appellant.

_____

On appeal from the United States District Court for the
District of North Dakota
(Case No. 1:21-cv-00095)
(Judge Daniel M. Traynor)

_____

**ELECTRONIC PAYMENTS COALITION'S *AMICUS CURIAE* BRIEF IN
SUPPORT OF REVERSAL**

_____

Kwaku A. Akowuah
Christopher A. Eiswerth
Bianca M. Corgan
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Tel. (202) 736-8000
kakowuah@sidley.com

*Counsel for Electronic Payments Coalition*

**CERTIFICATE OF DISCLOSURE**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), *amicus curiae* Electronic Payments Coalition (EPC) states that it is a non-profit, tax-exempt organization. EPC has no parent corporation, and no publicly held company has a 10-percent or greater ownership interest.

Appellate Case: 25-3000    Page: 2    Date Filed: 12/31/2025 Entry ID: 5592542

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* .................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 2

ARGUMENT ........................................................................ 4

    I.    Under The Durbin Amendment, Interchange Fees Must Be Reasonable And Proportional To Issuers' Actual Transaction-Related Costs. ............................................. 4

    II.   Legislative History Cannot Upset The Balance That Congress Struck In The Durbin Amendment. ............................... 10

CONCLUSION ................................................................... 15

Appellate Case: 25-3000    Page: 3    Date Filed: 12/31/2025 Entry ID: 5592542

# TABLE OF AUTHORITIES

**Cases**

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) ................................................................................ 11

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ................................................................................ 12

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
794 F. Supp. 3d 610 (D.N.D. 2025) ................................ 4, 5, 6, 8, 9, 10, 14

*INS v. Chadha*,
462 U.S. 919 (1983) .................................................................................. 2

*Linney's Pizza, LLC v. Bd. of Governors of Fed. Rsrv. Sys.*,
--- F. Supp. 3d ---, 2025 WL 2645489 (E.D. Ky. Sep. 15, 2025) .............. 5, 7

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.*,
746 F.3d 474 (D.C. Cir. 2014) ................................................. 3, 5, 6, 7, 8

*Pulsifer v. United States*,
601 U.S. 124 (2024) ................................................................................... 7

*Rodriguez v. United States*,
480 U.S. 522 (1987) ................................................................................ 11

*Schwegmann Bros. v. Calvert Distillers Corp.*,
341 U.S. 384 (1951) ................................................................................ 14

**Consitution, Statutes, and Regulations**

U.S. Const. art. I, § 7, cls. 2–3 ................................................................... 2

15 U.S.C. § 1693o-2(a)(2) ...................................................................... 3, 4

15 U.S.C. § 1693o-2(a)(3)(A) ...................................................................... 3

15 U.S.C. § 1693o-2(a)(3)(B) ...................................................................... 8

15 U.S.C. § 1693o-2(a)(4)(B) ...................................................................... 5

15 U.S.C. § 1693o-2(c)(8) ................................................................... 7

15 U.S.C. § 1693o-2(c)(10) ................................................................. 7

Pub. L. No. 111-203, § 1075 (July 21, 2010), 124 Stat. 2068 ......................... 2

76 Fed. Reg. 43,394 (July 20, 2011) ....................................................... 3

88 Fed. Reg. 78,100 (Nov. 14, 2023) ...................................................... 3

**Legistlative History**

*Hearing on Credit Card Interchange Rates: Antitrust Concerns? Before the
    S. Comm. on the Judiciary*, 109th Cong. (2006) ........................................ 12

156 Cong. Rec. S3569 (May 12, 2010) ................................................... 12

156 Cong. Rec. S3663 (May 13, 2010) ................................................... 12

156 Cong. Rec. S4895 (June 15, 2010) .................................................. 13

156 Cong. Rec. S5869 (July 15, 2010) ................................................... 13

156 Cong. Rec. H4679 (June 23, 2010) .................................................. 13

**Scholarly Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ................................ 6

Frank H. Easterbrook, *The Role of Original Intent in Statutory
    Construction*, 11 Harv. J. L. & Pub. Pol'y 59 (1988) ................................ 11

John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387
    (2003) .................................................................................. 11

Appellate Case: 25-3000     Page: 5     Date Filed: 12/31/2025 Entry ID: 5592542

# INTEREST OF *AMICUS CURIAE*[1]

Electronic Payments Coalition (EPC) is a coalition of payments industry stakeholders, including credit unions, payment card networks, banks, and trade associations. Its members collectively operate, maintain, and secure the electronic payment systems on which millions of consumers and merchants rely each day.

The reliability and security of those systems depend on sustained investment by all participants in the payments ecosystem. Interchange fees—the modest sums paid by merchants for credit and debit card transactions—help defray the costs of operating and protecting the systems. Regulations promulgated under the Durbin Amendment significantly limit the ability of financial institutions to recover those costs from merchants, shifting them instead to cardholders and constraining the availability of affordable credit, particularly for lower-income consumers. EPC's members thus have a direct and substantial interest in the correct interpretation of the statute Congress enacted and the regulations the Federal Reserve Board promulgated pursuant to it.

---

[1] Consistent with Federal Rule of Appellate Procedure 29(a)(2), EPC states that counsel conferred with counsel for the parties, and all parties have consented to the filing of this brief. Further, EPC states that no party's counsel authored this brief in whole or in part, and no person—other than *amicus* EPC or its counsel—contributed money that was intended to fund preparing or submitting this brief.

1

If the district court's decision were allowed to stand, the Board would be compelled to revise its regulations in a manner that further departs from the statutory text and further reallocates costs within the payments system. That outcome would exacerbate existing distortions, undermine investment in payment-system security, and increase risks to a critical component of modern commerce. EPC submits this brief to explain why the statute does not compel that result and why neither legislative history nor policy considerations justify overriding the text Congress adopted.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Federal statutes are enacted through a constitutionally prescribed process that requires agreement from both Houses of Congress and the President. U.S. Const. art. I, § 7, cls. 2–3. Because "[c]onvenience and efficiency" are not this process's "primary objectives," *INS v. Chadha*, 462 U.S. 919, 944 (1983), legislation necessarily reflects compromise among competing interests. The statutory text that emerges from that process embodies those compromises and defines the law Congress enacted.

The Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 is no exception. *See* Pub. L. No. 111-203, § 1075 (July 21, 2010), 124 Stat. 2068 (codified at 15 U.S.C. § 1693o-2). Before its enactment, Congress had not regulated debit card interchange fees, reflecting

2

the competing interests of consumers, merchants, financial institutions, and payment networks. In the wake of the financial crisis, however, Congress agreed to impose a constraint: interchange transaction fees must be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2).

Congress did not enumerate every cost that must be included in the calculation or prescribe the precise level at which fees must be set. Instead, it identified factors for consideration and delegated implementation to the Board. *See id.* § 1693o-2(a)(3)(A), (4). In 2011, the Board exercised that delegated authority by promulgating Regulation II, which capped debit card interchange fees while recognizing that four categories of costs—certain costs associated with authorizing, clearing, and settling transactions (ACS costs), transaction-monitoring costs, fraud losses, and network-processing fees—are transaction-related costs that may be recovered through the fee. *See* Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394, 43,430–31, 43,434–35 (July 20, 2011) (2011 Final Rule) (codified at 12 C.F.R. Part 235).

The 2011 Final Rule is not perfect. Nearly a quarter of covered issuers cannot fully recover their allowable costs. *See* Debit Card Interchange Fees and Routing, 88 Fed. Reg. 78,100, 78,105 (Nov. 14, 2023) (2023 NPRM). A decade ago, however, the D.C. Circuit rejected the challenge that merchants brought to

3

the rule. *See NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 483–93 (D.C. Cir. 2014). And Regulation II has since governed debit card interchange fees—until the district court's decision in this case. *See Corner Post, Inc. v. Bd. of Governors. of Fed. Rsrv. Sys.*, 794 F. Supp. 3d 610 (D.N.D. 2025).

That decision—holding that the Board's inclusion of these transaction-related costs in the fee standard conflicts with the Durbin Amendment—misreads the statute. The Durbin Amendment's text and structure permit, and indeed require, consideration of such costs in determining a "reasonable and proportional" fee. The Board's treatment of those costs faithfully implements the statutory framework that Congress adopted. Legislative history, particularly statements of a single Senator, cannot be used to override the statutory text or unsettle the congressional compromise it reflects. The Court should reverse the district court's grant of summary judgment.

## ARGUMENT

### I.    Under The Durbin Amendment, Interchange Fees Must Be Reasonable And Proportional To Issuers' Actual Transaction-Related Costs.

Section 1075 of Dodd-Frank—the Durbin Amendment—contains a single governing command: debit card interchange fees must be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). That language speaks broadly, referring to the "cost[s] incurred" by the issuer in connection with a transaction, not to a narrow

4

or preselected subset of such costs. Regulation II's inclusion of transaction-related issuer costs thus flows directly from the statutory text and falls squarely within the authority Congress delegated to the Board. The district court's contrary conclusion—that the considerations identified in § 1693o-2(a)(4)(B) and the information-collection provision in § 1693o-2(a)(3)(B) silently narrow "cost[s] incurred" to "certain costs incurred"—rests on three analytic errors.

*First*, subsection (a)(4)(B) does not limit allowable costs to incremental ACS costs alone. *See Corner Post*, 794 F. Supp. 3d at 629. That provision directs the Board, in promulgating its regulations, to "distinguish between":

(i)    the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

(ii)    other costs incurred by an issuer *which are not specific to a particular electronic debit transaction*, <u>which costs shall not be considered under paragraph (2).</u>

15 U.S.C. § 1693o-2(a)(4)(B) (emphases added). The district court read this language to "bifurcate[] the entire universe of costs": incremental ACS costs (included) and everything else (excluded). *Corner Post*, 794 F. Supp. 3d at 631. But that is not what the statute says.

The italicized language in (a)(4)(B)(ii) limits the excluded category to non-transaction-specific costs. *See NACS*, 746 F.3d at 485–86; *Linney's Pizza, LLC v. Bd. of Governors of Fed. Rrsv. Sys.*, --- F. Supp. 3d ---, 2025 WL 2645489, at *8–9

5

(E.D. Ky. Sep. 15, 2025). Grammatically, the absence of a comma before that clause indicates that it is restrictive and limits the "other costs incurred by an issuer" to which the exclusion applies. By contrast, the following clause—set off by a comma and thus descriptive—explains the consequence of that limitation: those non-transaction-specific costs "shall not be considered" under subsection (a)(2). Transaction-specific issuer costs other than incremental ACS costs therefore fall outside subsection (a)(4)(B)(ii)'s exclusion and remain governed by the statute's operative standard in subsection (a)(2).

The district court discounted this reading on the ground that Congress used "which" rather than "that" and was not always punctilious in its drafting. *See Corner Post*, 794 F. Supp. 3d at 627–28. Neither point undermines the text. As Scalia and Garner explain, the preference for "that" in restrictive clauses is "a weak basis for deciding statutory meaning" because grammarians have never treated it as an inflexible rule. Antonin Scalia & Bryan A. Garner, *Reading Law* 142 (2012); *see NACS*, 746 F.3d at 487 ("Widely-respected style guides … refer to descriptive 'which' and restrictive 'that' as a style preference rather than an ironclad grammatical rule."). The absence of a comma before the italicized text (but not before the underlined clause) therefore "matters far more" given Congress's use of "which" to introduce a restrictive relative clause elsewhere in the Durbin Amendment. *NACS*, 746 F.3d at 487. Contrary to the district court's

6

analysis, *Corner Post*, 794 F. Supp. 3d at 628, one stray counterexample cannot outweigh Congress's otherwise consistent practice of omitting commas before restrictive clauses—using both "which" and "that"—throughout § 1693o-2. *See id.* at 487–88; *Linney's*, 2025 WL 2645489, at *8.

Even apart from punctuation, statutory context confirms that the italicized language is restrictive. If subsection (a)(4)(B) truly divided the universe of costs into two exhaustive categories, Congress could have accomplished that task without the italicized limitation—just as it did elsewhere in the statute when it drew binary distinctions. *Compare* 15 U.S.C. § 1693o-2(c)(8) (defining "interchange transaction fee" as charge for "compensating an issuer for its involvement in an electronic debit transaction") *with id.* § 1693o-2(c)(10) (defining "network fee" as charge "other than an interchange transaction fee"). Under the Board's interpretation, by contrast, the italicized language does real work, identifying a specific subset of costs that must be excluded while leaving transaction-specific issuer costs to be evaluated under the "reasonable and proportional" standard Congress adopted. *See Pulsifer v. United States*, 601 U.S. 124, 142–43 (2024) (applying canon against surplusage).

*Second*, subsection (a)(3)(B)—the Durbin Amendment's information-collection provision—also does not limit allowable costs to incremental ACS

costs. This provision authorizes the Board to obtain information from issuers and payment card networks and, on a bi-annual basis, to—

> disclose such aggregate or summary information concerning the costs incurred, and interchange transaction fees charged or received, by issuers or payment card networks **in connection with the authorization, clearance or settlement of electronic debit transactions** as the Board considers appropriate and in the public interest.

15 U.S.C. § 1693o-2(a)(3)(B) (emphasis added). The district court read the bolded text to indicate that "Congress plainly wanted the Board to establish interchange fees reasonable and proportional to one particular set of costs: ACS costs." *Corner Post*, 794 F. Supp. 3d at 629. But that conclusion does not follow from the text.

As the district court itself acknowledged, subsection (a)(3)(B) "does not dictate which costs the Board must include or exclude when calculating an interchange fee." *Id*. Nor does it distinguish between incremental and other ACS costs. *See NACS*, 746 F.3d at 488. The bolded phrase merely defines the universe of transactions fees about which the Board should disclose collected information; it does not purport to define the subset of costs that may be reflected in the fee itself.

The district court assumed that the scope of information Congress authorized the Board to publish necessarily mirrors the scope of costs the Board may consider when setting interchange fees. The statute makes no such claim.

8

Because the Board's interpretation gives full effect to subsection (a)(3)(B) without generating inconsistency or surplusage, that provision provides no basis for narrowing the operative fee standard in subsection (a)(2) or for excluding transaction-related issuer costs beyond incremental ACS costs.

*Third*, stepping back confirms that the district court's interpretation—not the Board's, the D.C. Circuit's, or the Proposed Intervenors'—produces the stranger statute. The district court criticized the Board for elevating statutory purpose over text and for effectively suggesting that Congress hid an elephant in a mousehole. *See Corner Post*, 794 F. Supp. 3d at 631. But that critique fits the district court's own reading of the statute.

Under the district court's interpretation, Congress announced in subsection (a)(2) a broad fee standard requiring interchange transaction fees to be "reasonable and proportional to the cost[s] incurred," directed the Board in subsection (a)(3)(A) to promulgate standards for assessing proportionality to those "costs incurred," and then—without clear signal—used a later "considerations" provision to narrow the operative standard to incremental ACS costs alone. *See id.* at 631–32. Nothing in the text of subsections (a)(2) or (a)(3)(A) suggests such a sharp contraction of the governing standard.

9

If Congress had intended to limit allowable costs to incremental ACS costs, it could have done so directly in the provisions that establish and implement the fee standard. Instead, subsection (a)(4) performs a different and more modest function: it requires the Board to consider functional similarities with checks, distinguish between incremental ACS costs and a defined subset of non-transaction-specific costs when formulating regulations, and consult with various agencies. Reading that provision to silently rewrite the governing standard announced elsewhere is far more implausible than the Board's and Proposed Intervenors' interpretation, which gives each subsection a distinct and coherent role.

In short, Regulation II's treatment of the four transaction-related costs is consistent with the statute as written; the district court's view rewrites what Congress actually enacted.

## II. Legislative History Cannot Upset The Balance That Congress Struck In The Durbin Amendment.

Even if it were plausible that some legislators hoped to limit interchange fees to incremental ACS costs, the district court's reliance on unenacted statutory purpose—the premise that "[t]he Durbin Amendment was enacted to rein-in big banks"—and on isolated statements from Senator Durbin to narrow the statute's text is highly problematic. *Corner Post*, 794 F. Supp. 3d at 631–32. The Supreme Court has long recognized that "no legislation pursues its purposes

10

at all costs" and that "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). The legislative history of the Durbin Amendment confirms that Congress made precisely such a choice with respect to debit card interchange fees, and the contours of that compromise are reflected in the statutory text that survived bicameralism and presentment. Properly understood, that history does not justify narrowing the statute beyond the limits Congress enacted.

Statutes reflect legislative compromise. Bills must "run the gamut of the [legislative] process"—"committees, fighting for time on the floor, compromise because other members want some unrelated objective, passage, exposure to veto, and so on." Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv. J. L. & Pub. Pol'y 59, 64 (1988). For that reason, "legislators may sometimes craft statutory language very broadly or very narrowly to elide or avoid disagreements over specific applications," so "one cannot take for granted that the legislature would be able to enact a more precise statement of the majority's aims, even if those aims could be known." John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2409 (2003). As the Supreme Court has observed, "a change in any individual provision could have unraveled the whole." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461 (2002).

11

Statements in committee reports or from individual legislators—no matter how prominent—therefore do not necessarily reflect the terms of the legislative compromise. Courts must instead "presume that a legislature says in a statute what it means and means in a statute what it says there" to respect the legislative process. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

The Durbin Amendment's legislative history illustrates this phenomenon. Senator Durbin sought for years prior to 2010 to regulate interchange fees without success. *See, e.g.*, *Hearing on Credit Card Interchange Rates: Antitrust Concerns?* Before the S. Comm. on the Judiciary 4, 109th Cong. (2006). During the 111th Congress, he offered an amendment to the Credit Card Reform Act, Pub. L. No. 111-24, 123 Stat. 1734, but that effort was rebuffed, 156 Cong. Rec. S3569, S3589 (May 12, 2010) (Sen. Durbin). The proposal was "controversial," *id.*; *see* 156 Cong. Rec. S3663, S3696 (May 13, 2010) (Sen. Durbin) (describing interchange fee-related issues as "controversial and complex"), and some legislators did not "want to touch it" because of its disparate effects on major constituencies. 156 Cong. Rec. at S3588–89 (Sen. Durbin).

Shortly before the Senate passed its version of Dodd-Frank, however, Senator Durbin introduced Amendment 3989—what would become the Durbin Amendment—to regulate debit card interchange fees. *See id.* at S3588. This amendment borrowed the "reasonable and proportional" formulation from the

12

Credit Card Reform Act and made key concessions, including to exclude certain banks. *Id.* at S3589. As Senator Durbin explained at the time, the amendment did "not pick a number" or "set a fee," but charged the Board with ensuring that fees were "proportional and reasonable *to the cost incurred* in processing the transaction." 156 Cong. Rec. at S3696 (emphasis added); *accord id.* at S3704–05. The amendment passed in the Senate with 64 votes in favor to 33 opposed. *See id.* at S3703–04. And in the ensuing weeks, as Dodd-Frank proceeded to conference, supporters of the amendment consistently emphasized the same themes: interchange fees should be reasonable and proportional to costs; the Board would be responsible for implementation; and the statute sought to balance the interests of consumers, merchants, and banks.[2]

Only after the conference process concluded did Senator Durbin articulate a different—and far more prescriptive—view of the statute's reach. On the day Dodd-Frank passed the Senate for the final time, he stated for the first and only

---

[2] *See, e.g.*, 156 Cong. Rec. S4895, S4929 (June 15, 2010) (Sen. Durbin) ("the regular proportional cost of a transaction of using the card is certainly fair"); 156 Cong. Rec. H4679, H4680 (June 23, 2010) (Rep. Shuster) ("The compromise reached in the conference committee does not eliminate the interchange fee or allow the Federal Government to set the interchange fee. The amendment simply creates a level playing field for banks and small businesses to negotiate interchange fees like any other business contract."); 156 Cong. Rec. S5869, S5927 (July 15, 2010) (Sen. Dodd) (describing interchange fees as "a very complicated subject involving many different stakeholders, including payment networks, issuing banks, acquiring banks, merchants, and, of course, consumers").

Appellate Case: 25-3000    Page: 18    Date Filed: 12/31/2025 Entry ID: 5592542

time that subsection (a)(4) "makes clear" that the costs to be considered are limited to incremental ACS costs. 156 Cong. Rec. S5869, S5925 (July 15, 2010) (Sen. Durbin). That post-hoc characterization goes well beyond the statutory text Congress enacted, and it appears to be the sole substantive discussion of subsection (a)(4) on the Senate floor prior to final passage.

The district court's reliance on statutory purpose unmoored from the text and on a statement offered "[f]rom the lips of the statute's principal sponsor" was misplaced. *Corner Post*, 794 F. Supp. 3d at 632–33. Senator Durbin's statement did not satisfy bicameralism and presentment, and it illustrates the dangers of elevating individual legislative commentary over enacted law: if Senator Durbin could have secured passage of a statute tracking that statement, he presumably would have done so. But the statutory text does not go so far. And so placing the statute's text and the Senator's statement side by side, the most plausible inference by far is that the statute, as enacted by both Houses of Congress and signed into law by the President, does *not* encompass or reflect Senator Durbin's solo characterization of its terms.

Rather than deferring to one Senator's post hoc account of what Congress supposedly intended, the Court must apply the law Congress actually enacted. *See Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 397 (1951) (Jackson, J., concurring) ("We do not inquire what the legislature meant; we ask only what

14

the statute means." (quoting O.W. Holmes, *Collected Legal Papers* 207 (1920)). Allowing a single legislator's explanation to narrow statutory text replaces lawmaking by Congress with lawmaking by quotation. Because the Durbin Amendment requires interchange fees to be "reasonable and proportional" to the issuer's costs—not merely a subset of transaction-related costs selected after the fact—the district court erred in concluding that Regulation II's inclusion of additional transaction-related costs exceeded the statute's limits.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Dated: December 23, 2025     Respectfully submitted,

/s/ *Kwaku A. Akowuah*
Kwaku A. Akowuah
Christopher A. Eiswerth
Bianca M. Corgan
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Tel. (202) 736-8000
kakowuah@sidley.com

*Counsel for Electronic Payments Coalition*

15

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B)(i) and 29(a)(5) because it contains 3,278 words.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Calisto MT font.

3.     This brief has been scanned with antivirus software and is virus-free.

Dated: December 23, 2025          Respectfully submitted,

                                     */s/ Kwaku A. Akowuah*
                                     Kwaku A. Akowuah

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Kwaku A. Akowuah
Kwaku A. Akowuah