## UNITED STATES DISTRICT COURT
## FOR THE EIGHTH CIRCUIT

**CORNER POST, INC.,**
*Plaintiff-Appellee,*

v.

**BOARD OF GOVERNORS OF THE**
**FEDERAL RESERVE SYSTEM,**
*Defendant- Appellant.*

*On Appeal from the United States District Court for the District of North Dakota*
*Case No. 1:21-cv-00095-DMT-CRH*

## BRIEF OF AMICI CURIAE SOUTHWEST PUBLIC POLICY INSTITUTE AND JAMES MADISON INSTITUTE IN SUPPORT OF THE BRIEF OF BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Sarah J. Auchterlonie, Bar No. 50932
sauchterlonie@bhfs.com
675 Fifteenth Street
Suite 2900
Denver, CO  80202
Telephone:  303.223.1100
Facsimile:   303.223.1111

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Civil Procedure, *Amici Curiae* ("*Amici*") Southwest Public Policy Institute and James Madison Institute state that neither *Amici* have a parent corporation and that no publicly held company owns 10% or more of the stock of any *Amicus*.

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ...................................................................... i

CORPORATE DISCLOSURE STATEMENT ........................................ i

STATUTORY TEXT ................................................................................3

SUMMARY OF THE ARGUMENT ..........................................................5

ARGUMENT .............................................................................................7

    I.      THE PLAIN TEXT AND PURPOSE OF THE DURBIN AMENDMENT PERMIT THE INCLUSION OF NON-INCREMENTAL "ACS" COSTS IN INTERCHANGE TRANSACTION FEES ......................................................................7

           A.     The Durbin Amendment Creates Three Broad Categories of Costs ...............................................................................................7

           B.     Non-Incremental ACS Costs Are Not Prohibited for Inclusion in the Interchange Transaction Fee ...........................................10

           C.     The Plain Meaning Of The Durbin Amendment Gives Proper Effect to the Provision and Allows the Board to Calculate "Reasonable and Proportional" Costs ......................................13

           D.     Even If Non-Incremental ACS Costs Were Prohibited, the Proper Definition of Incremental Costs Itself Includes Product-Specific Variable and Fixed Costs of Production ....................15

    II.     THE DISTRICT COURT'S READING OF THE DURBIN AMENDMENT VIOLATES THE FIFTH AMENDMENT'S TAKINGS CLAUSE ...........................................................................17

           A.     Courts Should Presume Congress Does Not Intend to Violate the Constitution When It Legislates ...........................................18

           B.     The District Court's Interpretation of the Durbin Amendment Would Constitute a Regulatory Taking and Terminate Private Entities' Economic Property Rights ..........................................20

           C.     Any Government Price Setting Action That Prohibits Private Entities From Recouping Invested Capital Is Likely A Violation of the Fifth Amendment's Takings Clause ...............................24

Appellate Case: 25-3000    Page: 3    Date Filed: 01/02/2026    Entry ID: 5592878

CONCLUSION ...................................................................................................26

CERTIFICATE OF SERVICE ..........................................................................27

CERTIFICATE OF COMPLIANCE ..................................................................28

iii

# <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Armstrong v. United States*,
364 U.S. 40 (1960) ...................................................................17

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003)......................................... 25, 26

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, No. 1:21-cv-
00095, slip op. (D.N.D. Aug. 6, 2025)........................................5

*Covington & Lexington Turnpike Road Co. v. Sandford*,
164 U.S. 578 (1896) ...................................................................24

*Duquesne Light v. Barasch*,
488 U.S. 299 (1989) ...................................................................24

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
485 U.S. 568 (1988) ...................................................................19

*Hooper v. California*,
155 U.S. 648 (1895) ...................................................................19

*Kelo v. City of New London*,
545 U.S. 469 (2005) ...................................................................18

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) ...................................................................21

*Linney's Pizza, LLC v. Board of Governors of the Federal Reserve
System*, No. 3:22-cv-00071-GFV (E.D. Ky. May 1, 2025) .................11, 15

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ...................................................................10

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ...................................................................20

i

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ...................................................................20

*Marx v. General Revenue Corp.*,
568 U.S. 371 (2013) ............................................................... 12, 14

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.*,
746 F.3d 474 (D.C. Cir. 2014) ......................................................8

*NACS v. Bd. Of Governors of Fed. Rsrv. Sys.*,
958 F. Supp. 2d 85 (D.D.C. 2013) ...............................................12

*NLRB v. Catholic Bishop of Chi.*,
440 U.S. 490 (1979) ...................................................................19

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001) ...................................................................21

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) ........................................ 18, 20, 21, 22, 23, 24

*Rust v. Sullivan*,
500 U.S. 173 (1991) ...................................................................19

*United States v. Carmack*,
329 U.S. 230 (1946) ...................................................................17

*United States v. Knight*,
2023 WL 5338637 (6th Cir. Aug. 18, 2023) ...............................14

*Wayman v. Southard*,
10 Wheat. 1, 6 L.Ed.253 (1825) .................................................10

Statutes

15 U.S. Code § 1693o-2 .............................................................1, 3

15 U.S. Code § 1693o-2(a)(4)(B)(i) .......................................6, 8, 11

15 U.S. Code § 1693o-2(a)(4)(B)(ii) ....................................6, 8, 9, 11

15 U.S.C. § 1693o–2(a)(3)(A) ..............................................4, 11

Appellate Case: 25-3000    Page: 6    Date Filed: 01/02/2026 Entry ID: 5592878

U.S. Const. amend. V ............................................................................14

<u>Regulations</u>

88 Fed. Reg. 78100 (Nov. 14, 2023) ................................................ 13, 19

76 Fed. Reg. 43,394 (July 20, 2011) .......................... 3, 5, 6, 7, 13, 19, 20

<u>Other Authorities</u>

The Accounting Review, Vol. 49, No. 1 (January 1974), p. 119 ..........................13

The Durbin Amendment, Two-Sided Markets, and Wealth Transfers: An
  Examination of Unintended Consequences Three Years Later ....................20

Zhu Wang et al., The Impact of the Durbin Amendment on Merchants: A Survey
  Study, Fed. Reserve Bank of Richmond Economic Quarterly (2014) ..........20

Appellate Case: 25-3000     Page: 7     Date Filed: 01/02/2026 Entry ID: 5592878

## INTEREST OF AMICI CURIAE

The Southwest Public Policy Institute (SPPI) is a 501(c)(3) non-profit research institute built to explore and build on sound, data-driven policies regarding education, crime, and economics that will encourage positive change in America, particularly in the Southwest. SPPI advances better living through better policy by defending human dignity and promoting financial inclusion, fair credit, affordable housing, and economic opportunity. SPPI's research has consistently found that free-market forces ensure access to economic opportunity at all ends of the wealth spectrum, whereas government-imposed price controls impede rational economic decisions.

The James Madison Institute (JMI) is a 501(c)(3) non-profit devoted to advancing the principles that represent the north star of what has made this country the greatest prosperity engine in the history of mankind – free markets, limited government, and economic liberty. For close to 40 years, JMI has championed these principles in important issues such as keeping the economy open, education reform, the future of technology and innovation, and healthcare.

Both organizations seek to advance their missions by working with governments, business leaders, and citizens to be the conscience of wise policymaking – through solid research, engaged outreach, and compelling thought-leadership.

1

SPPI and JMI submit this brief in support of the Appellant, the Federal Reserve Board of Governors, because the outcome of this litigation is germane to both non-profits' missions: ensuring that the government does not manipulate markets in a manner that reduces incentive for private capital investment. When price controls strip companies of the incentive to invest, everyone loses.

Appellate Case: 25-3000    Page: 9    Date Filed: 01/02/2026 Entry ID: 5592878

<u>**STATUTORY TEXT**</u>

**15 U.S. Code § 1693o-2 - Reasonable fees and rules for payment card transactions**

(a) Reasonable interchange transaction fees for electronic debit transactions

(1) Regulatory authority over interchange transaction fees

The Board may prescribe regulations, pursuant to section 553 of title 5, regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction, to implement this subsection (including related definitions), and to prevent circumvention or evasion of this subsection.

(2) Reasonable interchange transaction fees

The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

(3) Rulemaking required

(A) In general

The Board shall prescribe regulations in final form not later than 9 months after July 21, 2010, to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

…

(4) Considerations; consultation

In prescribing regulations under paragraph (3)(A), the Board shall—

(A) consider the functional similarity between—

(i) electronic debit transactions; and

(ii) checking transactions that are required within the Federal Reserve bank system to clear at par;

3

(B) distinguish between—

    (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

    (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2); and

(C) consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection.

Appellate Case: 25-3000   Page: 11   Date Filed: 01/02/2026 Entry ID: 5592878

## SUMMARY OF THE ARGUMENT

This case concerns the Board of Governors of the Federal Reserve System's ("Board") Regulation II, which was promulgated in 2011 pursuant to the Durbin Amendment of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 1693o-2 (the "Durbin Amendment" or "Amendment").[1] Regulation II regulates, among other things, the interchange fees that debit card issuers may receive for debit card transactions to compensate them for the costs of processing such transactions. *See* Regulation II, Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011).

The District Court in *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, No. 1:21-cv-00095, slip op. (D.N.D. Aug. 6, 2025), wrongfully concluded that the Durbin Amendment prohibits the inclusion of certain fixed, transaction-specific costs in the setting of interchange transaction fees. In doing so, the District Court held that the text of the Durbin Amendment creates only two categories of costs, one marked for inclusion in the fee and one marked for exclusion. *Id*. at 21. This reading of the Durbin Amendment betrays the Amendment's plain text and violates the Fifth Amendment's Takings Clause.

---

[1] All parties have consented to the filing of this *amici curiae* brief. No party's counsel authored this brief in whole or in part, and no person or entity other than *amici*, their counsel, or their members made a monetary contribution intended to fund the brief's preparation or submission.

Appellate Case: 25-3000    Page: 12    Date Filed: 01/02/2026 Entry ID: 5592878

The Durbin Amendment establishes three categories of costs relevant to interchange fees: (1) incremental ACS costs tied to a specific transaction, which **must** be considered; (2) non-specific costs, which **must not** be considered; and (3) non-incremental but transaction-specific ACS costs, which the statute mandates must be "reasonable and proportional" under 15 U.S.C. § 1693o–2(a)(3)(A). In Regulation II, the Board was lawfully compelled to consider fixed transaction costs, fraud adjustments, and network fees. Opponents' textual arguments for a two-category-only interpretation that excludes the third, implied category fail under the canon against surplusage and ignore Congress's clear delegation of authority.

Beyond these textual arguments, the District Court's position violates the Fifth Amendment's Takings Clause. By prohibiting recovery of transaction-specific investments, the decision effectively terminates economic property rights in invested capital and forces issuers to operate at a loss. This loss is substantial, interferes with reasonable investment-backed expectations, and operates as a government-sponsored transfer of wealth from one class (debit card issuers) to another (merchants). The decision creates a regulatory taking for which issuers receive no compensation and that achieves no Fifth Amendment permissible purpose.

6

Because the District Court's interpretation presents these fatal constitutional flaws, and the Board's interpretation is more faithful to the plain text of the Durbin Amendment, this Court should reverse the District Court's decision. This Court should clarify that the Durbin Amendment creates three, not two, categories of costs, and that the third, unenumerated category of reasonable and proportional costs can lawfully be included in the Board's determination of the interchange transaction fee lest a 5th Amendment taking occur.

## ARGUMENT

## I. THE PLAIN TEXT AND PURPOSE OF THE DURBIN AMENDMENT PERMIT THE INCLUSION OF NON-INCREMENTAL "ACS" COSTS IN INTERCHANGE TRANSACTION FEES

### A. The Durbin Amendment Creates Three Broad Categories of Costs

Of critical importance to the issues in this matter are costs incurred by the card issuer during the Authorization, Clearance, and Settlement (known as ACS) stages of a debit card transaction. The Durbin Amendment effectively creates three broad categories of costs: (1) incremental ACS costs related to a particular debit card transaction, which must be considered; (2) other costs incurred by issuers which are not specific to a particular debit card transaction, which must not be considered; (3) and a third, category of non-incremental-ACS costs which are still related to a particular debit card transaction, which may or may not be considered –

but which must be reasonable and proportional. Regulation II, 76 Fed. Reg. at 43,426-27. These are three separate, distinct categories of costs.

The first category of costs – incremental ACS costs related to a particular debit card transaction – are the marginal costs incurred by the card issuer during ACS. A debit card transaction has three steps: authorization, clearance, and settlement. Authorization "begins when the cardholder swipes her debit card, which sends an electronic 'authorization request' to the acquirer conveying the cardholder's account information and the transaction's value," and is followed by checks concerning the sufficiency of funds and whether the transaction appears fraudulent. *NACS v. Bd. of Governors of Fed. Rsrv. Sys*., 746 F.3d 474, 478 (D.C. Cir. 2014) ("NACS II"). Clearance is "a formal request for payment sent from the merchant on the network to the issuer" and settlement "involves the actual transfer of funds from the issuer to the acquirer," (*i.e.* the merchant's bank) after which "the transaction has concluded." *Id*. Typically, PIN debit transactions are authorized and cleared simultaneously, while signature debit transactions require separate clearance. *Id.* The delay for signature transactions is effectively what allows some businesses—such as restaurants or hotels—to account for additional expenses like room service or a tip. *Id*.

Incremental ACS costs are simply the direct costs associated with the three stages described above, and the Durbin Amendment names them specifically. The

Durbin Amendment is clear – these ACS costs *must* be considered. 15 U.S. Code § 1693o-2(a)(4)(B)(i) ("which cost **shall** be considered"). Regulation II satisfies that command. 76 Fed. Reg. at 43,426.

The second category of costs explicitly created by the Durbin Amendment is those costs "incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S. Code § 1693o-2(a)(4)(B)(ii). These non-specific costs may *not* be considered. *Id.* ("which costs **shall not** be considered"). These costs would be those perhaps loosely associated with transactions that are not tied to a specific transaction itself. Regulation II lawfully excluded these costs from consideration in the interchange fee. 76 Fed. Reg. at 43,426.

The third category of costs – though not specifically named by the Durbin Amendment – is as real and operative as the first two. Given that the text specifically *includes* incremental-ACS costs, and specifically *excludes* non-specific costs, the text creates a third category: non-incremental, but still transaction-specific, ACS costs. The Durbin Amendment is silent on how the Board should approach this third category of costs. In other words, the Board can either choose to consider, or not consider, those costs in the calculation of the interchange fee.

In Regulation II, the Board chooses to consider those costs in the calculation. The Board does so by considering a number of costs in setting the fee, including: (1) fixed costs related to processing a particular transaction, such as

9

network connectivity and software, hardware, equipment, and labor; (2) transaction monitoring costs; (3) an allowance for fraud costs; and (4) network processing fees. 76 Fed. Reg. at 43,404, 43,429-31.

### B. Non-Incremental ACS Costs Are Not Prohibited for Inclusion in the Interchange Transaction Fee

To begin, nothing in the Durbin Amendment forecloses the inclusion of non-incremental ACS costs in the interchange transaction fee. The Durbin Amendment is clear on what to do with incremental ACS costs (include them), and what to do with costs not specific to a particular debit card transaction (not include them), but says nothing about the third category of costs. This silence on how the Board should handle the third category is notable for two reasons.

*First*, the Durbin Amendment's clear delegation to the Board, coupled with the Amendment's silence on the third category, directly implies that Congress intended to "empower [the Board] to prescribe rules to fill up the details" of the Amendment's statutory scheme. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 395 (2024), *quoting Wayman v. Southard*, 10 Wheat. 1, 43, 6 L.Ed.253 (1825) (internal quotations omitted). If a statute is clearly intended to so empower an agency (here, the Board), a court properly fulfills its role by "recognizing constitutional delegations" and "ensuring the agency has engaged in reasoned decision making." *Loper Bright*, 603 U.S. at 395 (internal citations omitted).

10

**Second**, this Court would be reasonable to conclude that the Durbin Amendment's silence on category three is intended because the Amendment chose to *exclude* certain costs. Clearly, the Amendment's drafters knew how to both require and prohibit the Board from considering different categories of costs. *See* 15 U.S. Code § 1693o-2(a)(4)(B)(i) ("which cost **shall** be considered"); *but see* (a)(4)(B)(ii) ("costs which costs **shall not** be considered"). The silence on the third category compels the Board to apply the "reasonable and proportional" standard; something the Board lawfully did in the drafting of Regulation II.

Textual arguments to the contrary – that the third category either does not exist or must be excluded – are unconvincing. Opponents of Regulation II argue that the Durbin Amendment's command that the Board "distinguish between" the two enumerated categories bifurcates the entire world of costs into only two categories – the must-considers and the must-not-considers. *See Linney's Pizza, LLC v. Board of Governors of the Federal Reserve System*, No. 3:22-cv-00071-GFVT, at *14 (E.D. Ky. May 1, 2025) (mem. op. & order). Further, opponents claim that the use of the word "other" before "costs" in section (a)(4)(B)(ii) further implies that the Durbin Amendment creates only two categories of costs. *Id.*

These textual arguments are faulty. The term "to distinguish" does not inherently limit the distinguishing being done to only two entities. Surely, one can

11

distinguish between two, three, or even ten different entities. *See id.*; *see also NACS v. Bd. Of Governors of Fed. Rsrv. Sys.*, 958 F. Supp. 2d 85, 100 (D.D.C. 2013) (stating that to "distinguish" means to "separate into different categories or to make a distinction"). There is simply no evidence for a reading of "distinguish" that would limit the universe to only two categories; the word is far broader.

On the other hand, the word "other" – as in "other costs incurred by an issuer which are not specific to a particular electronic debit transaction" – is bounded in its application. The word "other" ties to the phrase that immediately follows: "costs incurred by an issuer which are not specific to a particular electronic debit transaction."

In other words, the prohibition on "other" costs refers *only* to other non-specific costs, not *all* costs separate from incremental ACS costs. Corner Post's argument effectively reads the phrase "which are not specific to a particular electronic debit transaction" entirely out of the statute by prohibiting every "other" charge (regardless of whether or not that "other" charge is specific or not). The canon against surplusage counsels against such a reading. *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013) (stating that courts prefer an "interpretation [that] gives effect to every clause and word of a statute").

The text provides no support to a reading of the text that creates only two categories of costs. And if three categories of costs do exist, and only one category

12

of costs is excluded from consideration (non-specific transaction costs), this Court must conclude that non-incremental, but still specific ACS costs may lawfully be included in the interchange transaction fee calculation.

### C. The Plain Meaning Of The Durbin Amendment Gives Proper Effect to the Provision and Allows the Board to Calculate "Reasonable and Proportional" Costs

If the Durbin Amendment were as restrictive and mechanical as a bifurcated structure suggests (where there are only two categories of costs), then there would be no need to require that the fee standard be "reasonable and proportional." Indeed, the fee standard would merely equal the incremental ACS costs required to be considered under (a)(4)B)(i). No further analysis or calculation would be necessary.

But the Durbin Amendment's clear, plain text contemplates – and *requires* – that reasonability analysis. The Amendment directs the Board to promulgate regulations ensuring that "the amount of any interchange transaction fee ... is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o–2(a)(3)(A). This delegation implies that the Board *must* possess some kind of authority to determine what is reasonable and proportional. If the determination is handled by the Durbin Amendment, and only includes incremental ACS costs, why include a responsibility requirement? Worse yet – why delegate any authority to the Board at all?

13

Arguments to the contrary suffer death by surplusage. Surely, one can acknowledge that the "canon against surplusage is not an absolute rule," *United States v. Knight*, 2023 WL 5338637, at *5 (6th Cir. Aug. 18, 2023), *citing Marx*, 568 U.S. at 385, (quotations omitted), without disregarding most of what Congress said. Proponents of the two-category-only approach would read out of the statute at least three operative phrases or sections: (1) section (a)(4)(B)(ii)'s phrase "which are not specific to a particular electronic debit transaction"; (2) the requirement that the fee standard be "reasonable and proportional"; and (3) the Board's delegated authority to promulgate regulations implementing the reasonability and proportionality requirement. That approach would leave meaningless far too much of the Durbin Amendment's clear text.

Further, since this approach was first launched over a decade ago, Congress has chosen *not* to step in and overrule the Board's decision finding three – rather than two – categories of costs. Taken as a whole, the Durbin Amendment clearly allows the Board to consider costs it is not mandated to consider, so long as those costs are not those that the Amendment expressly prohibits it from considering. The Amendment specifically names both incremental ACS costs (for inclusion) and non-specific costs (for exclusion). In doing so, the text creates a third category – non-incremental, but still transaction-specific, ACS costs. The Amendment's silence on how to treat those costs creates the legal authority for the Board to

14

decide. This reading of the Durbin Amendment gives full effect to all of its operative terms, and further reflects the Board's clearly established role in developing the regulatory regime. *See Linney's Pizza*, No. 3:22-cv-00071-GFVT, at \*18.

### D. Even If Non-Incremental ACS Costs Were Prohibited, the Proper Definition of Incremental Costs Itself Includes Product-Specific Variable and Fixed Costs of Production

Even if the Durbin Amendment did bifurcate the world of costs into two categories, the costs challenged in this case should be read as "incremental" for the purposes of this case. To review, these challenged costs include (1) fixed costs related to processing a particular transaction, such as network connectivity and software, hardware, equipment, and labor; (2) transaction monitoring costs; (3) an allowance for fraud costs; and (4) network processing fees. 76 Fed. Reg. at 43,404, 43,429-31. As the Board itself has rightfully acknowledged, these costs fit into the common economic definition of "incremental cost." 88 Fed. Reg. 78100, 78104 (Nov. 14, 2023).

This conclusion is supported by several prominent economists and management professors. For example, distinguished economist William Baumol, a professor at Princeton and New York Universities, wrote in the Yale Journal of Regulation that "incremental cost" means "***total costs***" per additional unit produced, and noted that "marginal cost and incremental cost can differ

15

substantially." Wiliam J Baumol and J. Gregory Sidak, "The Pricing of Inputs Sold to Competitors," Yale Journal of Regulation, Vol. 11, No. 1 (Winter 1994), p. 176, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=289386 (emphasis added). Similarly, management professors E. Earl Burch and William R. Henry wrote in *The Accounting Review* that "incremental cost is the change in ***total cost***." E Earl Burch and William R. Henry, "Opportunity and Incremental Cost: Attempt to Define in Systems Terms: A Comment," The Accounting Review, Vol. 49, No. 1 (January 1974), p. 119, https://www.jstor.org/stable/244804 (emphasis added).

The academic work on the "incremental cost" definition matches common sense. A business – whether it is a small retailer or a bank – would not engage in any transactions if such transactions did not help defray operational costs. For example, a retailer would go under if she could not rely on her sales to pay for costs like rent, insurance, or software to manage sales. These types of costs are rightfully included in the definition of "total costs," which is rightfully included in the definition of "incremental costs." *See* Comment Letter, Debit Card Interchange Fees and Routing, Docket No. R—1818, RIN 7100-AG67, Competitive Enterprise Institute (May 12, 2024).

Rational actors are unlikely to invest capital in a regime where their pricing and profit structure do not allow it to charge fees to cover the basic operational expenses that must be recouped in increments through its sales transactions.

16

Amicus in this matter are especially concerned when government price controls operate to limit the incentive to invest in new products and services or for investments to improve existing systems.

## II. THE DISTRICT COURT'S READING OF THE DURBIN AMENDMENT VIOLATES THE FIFTH AMENDMENT'S TAKINGS CLAUSE

The Fifth Amendment's Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause ensures that when the government takes property for public use – through direct seizure, condemnation actions, or permanent physical occupation – it must pay fair market value to the owner. *See United States v. Carmack*, 329 U.S. 230, 241–42 (1946). In *Armstrong v. United States*, the Supreme Court explained that the Takings Clause protects individuals from bearing public burdens alone by requiring compensation when the government appropriates private property for public benefit, regardless of the form the taking takes. 364 U.S. 40, 49 (1960).

Beyond physical appropriation, the Clause also prohibits regulatory takings. These are governmental restrictions so severe that they effectively deprive owners of their property's economic use. The leading case is *Penn Cent. Transp. Co. v. City of New York*, where the Court established a multi-factor test considering (1) economic impact, (2) investment-backed expectations, and (3) the nature of the

regulation when landmark protections prevented a high-rise addition over Grand Central Terminal. 438 U.S. 104 (1978). Beyond *Penn Central's* multi-factor test, a court must also assess whether the governmental restriction is a "permissible purpose." This purpose consideration was once limited to roads and parks, but was broadened by the Supreme Court in *Kelo v. City of New London*, which upheld takings for economic development, holding that "public use" need only mean "public purpose." 545 U.S. 469, 480–81 (2005). The Takings Clause thus prohibits the government from (1) taking private property without compensation and (2) abusing its condemnation power by appropriating property under the guise of public use when the real purpose is private benefit. The District Court's interpretation of the Durbin Amendment fails on both principles. Given that fact, this Court should not read the Amendment in a way that so clearly violates the Constitution.

### A.    Courts Should Presume Congress Does Not Intend to Violate the Constitution When It Legislates

The constitutional avoidance canon instructs federal courts to resolve cases on non-constitutional grounds whenever reasonably possible, ensuring they only address constitutional issues as a strict necessity. As the Court has said, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such

18

construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).

The constitutional avoidance canon is particularly enduring because it instructs courts to apply a strong presumption that Congress does not intend to legislate in a manner that violates the Constitution. This principle is rooted in the idea that "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 500 (1979). Similarly, the Court in *Rust v. Sullivan* reaffirmed that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." 500 U.S. 173, 190 (1991), *quoting Hooper v. California*, 155 U.S. 648, 657 (1895).

This presumption reflects judicial respect for the coordinate branches and the principle that Congress is presumed to legislate within constitutional bounds unless its intent to do otherwise is unmistakably clear. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[t]his approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution). Because the District Court's reading of the Durbin Amendment unlawfully terminates the economic property rights of private entities without compensation, it violates the

Takings Clause of the Constitution. Another reading – the one advanced by the Board – better fits the plain text of the Amendment, presumes Congress intended to adhere to the Constitution, and thus avoids constitutional concerns. This Court should adopt that reading out of fidelity to the Amendment's text and the Constitution.

### B. The District Court's Interpretation of the Durbin Amendment Would Constitute a Regulatory Taking and Terminate Private Entities' Economic Property Rights

When a government regulation does not amount to a *per se* taking, such as a total deprivation of economic use, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992), or a permanent physical occupation, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), the *Penn Central* test described above governs. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 136–37 (1978). This inquiry balances three factors: (1) the regulation's economic impact on the property owner, particularly whether it deprives the owner of a reasonable return; (2) the extent to which the regulation interferes with distinct investment-backed expectations; and (3) the character of the governmental action. *Id.*

Courts applying this standard have found takings where regulations impose severe economic burdens and frustrate reasonable expectations. For example, in *Palazzolo v. Rhode Island*, the Court found that a wetlands regulation that reduced development potential to six percent per parcel may violate the *Penn Central* test.

20

533 U.S. 606, 631–32 (2001) (remanding the case for further proceedings applying the *Penn Central* test); *see also Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 540 (2005) ("[a]nd the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests").

The District Court's reading of the Durbin Amendment violates each of *Penn Central*'s three factors. To begin, the economic impact of the District Court's reading would be substantial. Under the District Court's interpretation, the Durbin Amendment does not permit entities to recover a host of costs that are specific to each and every transaction that occurs, including (1) fixed ACS costs, (2) transaction monitoring costs, (3) network processing fees, and (4) a fraud-loss adjustment based on the value of the transaction. The funds required to pay for these costs come from invested capital or retained earnings. The District Court's decision extinguishes private entities' right to recover and obtain a reasonable profit from this investment.

Indeed, the decision below would effectively require debit card issuers to provide electronic transactions at a loss. As it stands now, only 77 percent of debit card issuers recover the full subset of costs that the Board deemed allowable to be considered in Regulation II. *Debit Card Interchange Fees & Routing*, Notice of Proposed Rulemaking, 88 Fed. Reg. 78,100, 78, 113 (Nov. 14, 2023). The District

21

Court's reading would cause that number to drop further. As the number drops, more and more entities are forced to surrender their investments in electronic transfers. Any reasonable observer would call this termination of property rights "substantial." *See Penn Central*, 634 F.3d at 1178. Because of this "substantial" loss of property, this factor favors reversing the District Court's decision.

The next *Penn Central* factor considers the investor's expectations when the capital was invested. The Board released its interpretation of the Durbin Amendment over a decade ago. *See* Regulation II, Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011). That interpretation, of course, permits the recovery of the costs outlined previously, but even so, the caps significantly lowered the fees previously charged. The District Court's decision now prohibits recovery of even more costs. Entities' reasonable, investment-backed expectations are thus reduced even further. This factor also heavily favors overturning the District Court's decision.

Finally, the character of regulatory taking here is particularly offensive. This is, simply put, a transfer of wealth from one party to another with little justification in law or policy. There is no evidence to suggest that this taking will result in lower costs for consumers. A recent study found that most merchants – 77 percent of them – did not adjust their prices after the Durbin Amendment capped interchange fees. Zhu Wang *et al.*, *The Impact of the Durbin Amendment on Merchants: A*

22

*Survey Study*, Fed. Reserve Bank of Richmond Economic Quarterly (2014).

Indeed, the same study found that 22 percent of merchants actually ***raised*** their prices in the wake of the Durbin Amendment's passage. *Id*. Moreover, a 2013 study by Mastercard found that only 3 percent of merchants intended to pass on savings to consumers. MasterCard Worldwide, "Interchange and Durbin Amendment" at 2, as cited in Bradley Hubbard, "The Durbin Amendment, Two-Sided Markets, and Wealth Transfers: An Examination of Unintended Consequences Three Years Later" at 37, Univ. of Chi. L. Sch. (2013), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2285105.

      Even if the District Court's opinion survived the three *Penn Central* factors (it does not), the opinion has one final flaw: the government action at issue is not a permissible purpose under the Fifth Amendment. *Penn Central*, 438 U.S. at 125. Because the District Court's opinion creates a regime that merely enriches one class at the expense of another, there is no generally applicable purpose advanced, and the action cannot be considered a permissible purpose under the Fifth Amendment. *Id*. at 125 (explaining that land-use regulations are generally upheld when they reflect a legitimate governmental objective, such as promoting the general welfare, preserving historic resources, or preventing harmful uses, because these actions constitute "adjustments of the benefits and burdens of economic life" rather than appropriations of private property for private gain).

The District Court's opinion does not create a curated, targeted regulatory regime that would balance costs between private entities and consumers. Instead, the opinion is a categorical taking from one class (debit card issuers), handed to another (merchants). The cost is substantial and directly conflicts with the investment-backed expectations of private parties. If the Fifth Amendment's Taking Clause is to have any meaning at all, the District Court's reading of the Durbin Amendment must be disregarded.

C.   **Any Government Price Setting Action That Prohibits Private Entities From Recouping Invested Capital Is Likely A Violation of the Fifth Amendment's Takings Clause**

In *Duquesne Light v. Barasch*, the Supreme Court affirmed the principle that a government-set "rate is too low if it is so unjust as to destroy the value of [the] property for all the purposes for which it was acquired, and in so doing practically . . . deprive[s] the owner of property without due process of law." 488 U.S. 299, 307 (1989), quoting *Covington & Lexington Turnpike Road Co. v. Sandford*, 164 U.S. 578, 597 (1896) (quotations omitted). Here, the District Court's reading would set the price-cap so low that the property is deprived of any meaningful value.

The Federal Circuit confronted a similar set of facts in *Cienega Gardens v. United States*. There, the Federal Circuit held that rent-control restrictions imposed on owners of federally subsidized housing constituted a compensable taking under the *Penn Central* framework because the regulation inflicted severe economic

24

harm and frustrated reasonable investment-backed expectations. 331 F.3d 1319,

1330–31 (Fed. Cir. 2003). The court emphasized that the economic impact was

"extraordinary," reducing the properties' value by over 90 percent and eliminating

any possibility of earning a reasonable return. *Id*. at 1332–33, 1343. It further

found that the owners had distinct investment-backed expectations based on

statutory provisions allowing prepayment of mortgages and exit from the program,

which the regulation effectively nullified. *Id*. at 1344–45. Finally, the character of

the government action weighed toward a taking because the regulation imposed a

disproportionate burden on a small group of property owners to achieve broad

social goals, rather than reflecting a general adjustment of economic benefits and

burdens. *Id*. at 1350. Taken together, these factors led the court to conclude that the

rent-control scheme violated the Takings Clause by appropriating economic value

without just compensation.

The rent-control scheme at issue in *Cienega Gardens* is functionally

equivalent to the scheme at issue here. Both are government-mandated price caps,

one for rent and the other for interchange fees. Both impose "extraordinary"

economic impacts by reducing the value of already-invested capital. *Id*. at 1332–

33. Both violate reasonable investment-backed expectations by extinguishing value

that is statutorily protected. *See* Supra Section I.B. And both impose unreasonable,

25

unnecessary burdens on private parties in a way that is divorced from any specific economic balancing.

When the government sets prices, as it does in *Cienega Gardens* or as the Durbin Amendment does here, it must be careful to ensure that it does not deprive investors of their protected property rights. The District Court's interpretation fails to do that. Fixed ACS costs, transaction monitoring costs, network processing fees, and fraud-loss adjustments are all reasonable, necessary costs that private entities are entitled to recover. Through its price-setting action, the District Court impermissibly prohibits that recovery.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully urge this court to reverse the District Court's decision.

Dated: December 26, 2025     **BROWNSTEIN HYATT FARBER SCHRECK, LLP**

By: */s/Sarah J. Auchterlonie*
Sarah J. Auchterlonie, Bar No. 50932
sauchterlonie@bhfs.com
675 Fifteenth Street
Suite 2900
Denver, CO 80202
Telephone: 303.223.1100
Facsimile: 303.223.1111

## CERTIFICATE OF SERVICE

I hereby certify that on December 26, 2026, a true and accurate copy of the foregoing was served via the Courts ECFS system via electronic filing.

Dated: December 26, 2025 **BROWNSTEIN HYATT FARBER SCHRECK, LLP**

By: */s/Sarah J. Auchterlonie*
Sarah J. Auchterlonie, Bar No. 50932
sauchterlonie@bhfs.com
675 Fifteenth Street
Suite 2900
Denver, CO  80202
Telephone:  303.223.1100
Facsimile:    303.223.1111

# CERTIFICATE OF COMPLIANCE

I, Sarah Auchterlonie, attorney for *Amici Curai*, SPPI and JMI, certify that:

1.  This brief complies with the word limit for a principal brief under Fed. R. App. P. 32(a)(7)(B) and Eighth Circuit Local Rule 32(a).

2.  This brief contains fewer than 4,900 words, excluding the items exempted by Fed. R. App. P. 32(f) (e.g., corporate disclosure statement, table of contents, table of authorities, caption, etc.).

3.  The typeface and type size used in this brief comply with Fed. R. App. P. 32(a)(5) and (6).

4.  This version of the amicus brief has been scanned for viruses and is virus-free.


Dated: December 26, 2025      **BROWNSTEIN HYATT FARBER SCHRECK, LLP**

By: */s/Sarah J. Auchterlonie*
Sarah J. Auchterlonie, Bar No. 50932
sauchterlonie@bhfs.com
675 Fifteenth Street
Suite 2900
Denver, CO 80202
Telephone: 303.223.1100
Facsimile: 303.223.1111

28