# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

CORNER POST, INC.,

*Plaintiff-Appellee*,

*v.*

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellant.*

On Appeal from the U.S. District Court
for the District of North Dakota

Case No. 1:21-cv-00095-DMT-CRH
Hon. Daniel M. Traynor

## BRIEF OF *AMICUS CURIAE*
## PROFESSOR HAL S. SCOTT
## IN SUPPORT OF APPELLANT AND REVERSAL

Joseph Henchman (No. 25-0574)
NATIONAL TAXPAYERS UNION FOUNDATION
122 C Street N.W., Suite #700
Washington, D.C. 20001
202-766-5019
jbh@ntu.org
*Counsel for* Amicus Curiae

January 6, 2026

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amicus Curiae* certifies that Professor Hal S. Scott is a private individual. *Amicus* further certifies that National Taxpayers Union Foundation is a nonprofit, tax-exempt organization under Internal Revenue Code §501(c)(3), is incorporated in the District of Columbia, and has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

s/ Joseph Henchman
Joseph Henchman

Dated: January 6, 2026                              *Counsel for* Amicus Curiae

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS............................................................................ ii

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF *AMICUS CURIAE*.............................................................1

SUMMARY OF ARGUMENT ..................................................................4

ARGUMENT ......................................................................................5

   I.   THE VITAL ROLE OF MARKET-DETERMINED DEBIT
      INTERCHANGE FEES AND REGULATION II'S INTERVENTION IN
      THIS MARKET. ........................................................................5

      A. The Role of Interchange Fees in the Debit Card Payment System...........5

      B. The Regulation of Debit Card Interchange Fees by the Durbin
         Amendment and Regulation II. .................................................8

      C. The Dispute Over Regulation II's Cost Metrics. ....................................12

   II.   REGULATION II HAS CAUSED ISSUING BANKS TO INCREASE
      OTHER FEES FOR BASIC ACCOUNT SERVICES. ..............................13

   III.   THE INCREASE IN OTHER FEES FOR BASIC ACCOUNT SERVICES
      THAT STEMS FROM REGULATION II HAS RESULTED IN HIGHER
      NET COSTS FOR CONSUMERS. ...........................................................18

   IV.   APPELLEE'S INTERPRETATION OF THE DURBIN AMENDMENT
      WILL REDUCE THE REGULATION II INTERCHANGE FEE CAP
      AND PRODUCE EVEN HIGHER COSTS FOR CONSUMERS..............20

CONCLUSION ..................................................................................24

CERTIFICATE OF COMPLIANCE ................................................................26

CERTIFICATE OF SERVICE..........................................................................27

# TABLE OF AUTHORITIES

**Cases**

Brief of Defendant-Appellant, *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, No. 25-3000 (8th Cir. Dec. 30, 2025) ...........................................................10

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
794 F. Supp.3d 610 (D.N.D. 2025) ....................................................... 11, 12, 13

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016) ...................................................................12

In *re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*,
729 F. Supp.3d 298 (E.D.N.Y. 2024) ...................................................12

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .................................................................................12

*United States v. Visa U.S.A., Inc.*,
344 F.3d 229 (2d Cir. 2003) ....................................................................12

**Statutes**

15 U.S.C. § 1693o-2................................................................................9, 10

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. 111-2013 (2010) ..........................................................................8

**Regulations**

Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,393 (Jul. 20, 2011)
(codified at 12 CFR part 235)................................................................10

**Other Authorities**

Benjamin S. Kay, Mark D. Manuszak, & Cindy M. Vojtech, *Competition and Complementarities in Retail Banking: Evidence from Debit Card Interchange Regulation*, 34 J. FIN. INTERMEDIATION 91 (2018) ................................. 14, 15, 22

Appellate Case: 25-3000    Page: 4    Date Filed: 01/06/2026 Entry ID: 5593739

Eliana Garcés & Brent Lutes, *Regulatory Intervention in Card Payment Systems: An Analysis of Regulatory Goals and Impact*, SSRN (Apr. 4, 2019), https://tinyurl.com/2ccjhnu5................................................................21

Fred H. Miller & Hal S. Scott, *Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*, 38 BUS. LAW. 1129 (1983)............2

Hal S. Scott & Anna Gelpern, *International Finance, Transactions, Policy, and Regulation* (24th ed. 2023).................................................................1

Hal S. Scott et al., *Mandatory Central Clearing for U.S. Treasuries and U.S. Treasury Repos*, SSRN (Nov. 11, 2021)*,* https://tinyurl.com/2s3st8kw................2

Hal S. Scott, *Commentary on Legal and Regulatory Reform in Electronic Payments: An Evaluation of Payment Finality Rules,* in *The U.S. Payment System: Efficiency, Risk, and the Role of the Federal Reserve—Proceedings of a Symposium on the U.S. Payment System* 181 (David B. Humphrey ed., 1990) ....2

Hal S. Scott, *Connectedness and Contagion: Protecting the Financial System from Panics* (2022)................................................................2

Hal S. Scott, *Corporate Wire Transfers and the Uniform New Payments Code*, 83 Colum. L. Rev. 1664 (1983).................................................................2

Hal S. Scott, *Deregulation and Access to the Payment System*, 23 HARV. J. LEGIS. 331 (1986) .................................................................2

Hal S. Scott, *The Importance of the Retail Payment System*, SSRN (Dec. 19, 2014), https://tinyurl.com/bzf3433m.................................................................3

Hal S. Scott, *The Risk Fixers*, 91 HARV. L. REV. 737 (1978)...................................2

Hal S. Scott, *The Role of the European System of Central Banks in the Payment System,* in *The Economic and Monetary Union: The Political Dimension* 101 (Comm. for the Monetary Union of Eur. 1991).................................................2

*High Frequency Trading's Impact on the Economy: Hearing Before the Subcomm. on Sec., Ins. & Inv. of the S. Comm. on Banking, Hous. & Urb. Affs.,* 113th Cong. 5 (2014) (statement of Hal S. Scott, Nomura Professor and Director, Program on International Financial Systems).................................................3

Appellate Case: 25-3000      Page: 5      Date Filed: 01/06/2026 Entry ID: 5593739

Julian Wright, *One-Sided Logic in Two-Sided Markets*,
3 REV. NETWORK ECON. 1 (2004)..........................................................................21

Marc Rysman & Julian Wright, *The Economics of Payment Cards*, 13 REV.
NETWORK ECON. 303 (2014) ................................................................................8

Mark D. Manuszak & Krzysztof Wozniak, *The Impact of Price Controls in Two-Sided Markets: Evidence from US Debit Card Interchange Fee Regulation* (Fed.
Reserve Fin. & Econ. Discussion Series Paper 2017-074, 2017),
https://tinyurl.com/ka8f4n4p ...............................................................................15

Mastercard International, Inc., Mastercard Rules 193, Jun. 2025,
https://tinyurl.com/2xm528a5 .................................................................................6

Richard Durbin, Durbin Statement on His Debit Card Swipe Fee Amendment, May
13, 2010, https://tinyurl.com/csshj5cc....................................................................11

Richard Schmalensee & David S. Evans, *The Economics of Interchange Fees and
Their Regulation: An Overview* (MIT Sloan Working Paper No. 4548-05, 2005),
https://tinyurl.com/55y5dvvy ..................................................................................7

*The Nilson Report*, *U.S. Card Network Results and Top 50 Debit Card Issuers—
2024*, Issue Nos. 1279/1290 (2025).........................................................................5

Todd J. Zywicki, Geoffrey A. Manne, & Julian Morris, *Price Controls on Payment
Card Interchange Fees: The U.S. Experience* (Geo. Mason Law & Econ. Paper
No. 14-18, 2014), https://tinyurl.com/mwxf4nej .................................................15

Todd J. Zywicki, Julian Morris, & Geoffrey A. Manne, *The Effects of Price
Controls on Payment-Card Interchange Fees: A Review and Update*, ICLE
White Paper (Mar. 4, 2022), https://tinyurl.com/2nds2tmw ................................22

U.S. Gov't Accountability Off., *Banking Services: Regulators Have Taken Actions
to Increase Access, but Measurement of Actions' Effectiveness Could Be
Improved* (Feb. 14, 2022), https://tinyurl.com/mshnyjxz ....................................16

U.S. Gov't Accountability Off., *Financial Technology: Products Have Benefits
and Risks to Underserved Consumers, and Regulatory Clarity Is Needed* (Mar. 8,
2023), https://tinyurl.com/2p9rwskf.......................................................................22

Appellate Case: 25-3000     Page: 6     Date Filed: 01/06/2026 Entry ID: 5593739

U.S. Gov't Accountability Off., *Payment Cards: Costs and Benefits for Federal Entities* (Apr. 30, 2025), https://tinyurl.com/3hxjjcde ..........................................23

Vladimir Mukharlyamov & Natasha Sarin, *Price Regulation in Two-Sided Markets: Empirical Evidence from Debit Cards*, 172 J. Fin. Econ. 1 (2025)................................................................ 16, 17, 18, 21

William F. Baxter, *Bank Interchange of Transactional Paper: Legal and Economic Perspectives*, 26 J. L. & Econ. 541 (1983)............................................................7

Zennon Kapron, *U.S. Fintech IPOs Surge, Then Fizzle*, Forbes (Dec. 21, 2025), https://tinyurl.com/2remtnva ..................................................................................23

Zhu Wang, Scarlett Schwartz, & Neil Mitchell, *The Impact of the Durbin Amendment on Merchants: A Survey Study*, 100(3) Fed. Reserve Bank of Richmond Econ. Q. 183 (2014) ........................................................................19

Appellate Case: 25-3000    Page: 7    Date Filed: 01/06/2026 Entry ID: 5593739

## INTEREST OF *AMICUS CURIAE*[1]

I am the Emeritus Nomura Professor of International Financial Systems at Harvard Law School, where for several decades I taught courses on payment systems, international finance, and capital markets regulation. I am also an Adjunct Professor of Public Policy at the Harvard Kennedy School of Government, where I currently teach the course on Capital Market Regulation.

My academic work has focused extensively on the structure, regulation, and systemic importance of payment systems, including both wholesale and retail payments. I created the first course at Harvard Law School on the payment system, which spanned traditional payments such as checks and newer electronic systems. I am the author or coauthor of leading books in the field, including INTERNATIONAL FINANCE: TRANSACTIONS, POLICY AND REGULATION, a principal textbook on international financial regulation, *see* Hal S. Scott & Anna Gelpern, INTERNATIONAL FINANCE, TRANSACTIONS, POLICY, AND REGULATION (24th ed. 2023), as well as CONNECTEDNESS AND CONTAGION AND THE GLOBAL FINANCIAL CRISIS, which examine financial stability and systemic risk, *see* Hal S. Scott, CONNECTEDNESS AND

[1] In accordance with Fed. R. App. P. 29(a)(2), *Amicus* states that Appellant and Appellee received notice and consent to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of the brief. In accordance with Fed. R. App. P. 29(a)(4)(E), *Amicus* states that the National Taxpayers Union Foundation provided funding to support this brief.

1

CONTAGION: PROTECTING THE FINANCIAL SYSTEM FROM PANICS (2022). I have published more than thirty scholarly articles addressing payment systems, *see, e.g.* Hal S. Scott, *Deregulation and Access to the Payment System*, 23 HARV. J. LEGIS. 331 (1986), electronic funds transfers, *see, e.g.,* Hal S. Scott, *Corporate Wire Transfers and the Uniform New Payments Code*, 83 COLUM. L. REV. 1664 (1983); Fred H. Miller & Hal S. Scott, *Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*, 38 BUS. LAW. 1129 (1983), clearing and settlement, *see, e.g.,* Hal S. Scott et al., *Mandatory Central Clearing for U.S. Treasuries and U.S. Treasury Repos*, SSRN (Nov. 11, 2021)*,* https://tinyurl.com/2s3st8kw, and the legal powers of central banks in payment systems, *see, e.g.*, Hal S. Scott, *The Role of the European System of Central Banks in the Payment System,* in *The Economic and Monetary Union: The Political Dimension* 101 (Comm. for the Monetary Union of Eur. 1991); Hal S. Scott, *Commentary on Legal and Regulatory Reform in Electronic Payments: An Evaluation of Payment Finality Rules,* in *The U.S. Payment System: Efficiency, Risk, and the Role of the Federal Reserve—Proceedings of a Symposium on the U.S. Payment System* 181 (David B. Humphrey ed., 1990), beginning with foundational work on new payment systems in the 1970s, *see* Hal S. Scott, *The Risk Fixers*, 91 HARV. L. REV. 737 (1978), and continuing through more recent research on retail

2

payment systems, *see* Hal S. Scott, *The Importance of the Retail Payment System*, SSRN (Dec. 19, 2014), https://tinyurl.com/bzf3433m.

I also founded and direct the Program on International Financial Systems, which has engaged extensively with regulators, central banks, and market participants worldwide on issues of financial regulation and payment system design. In addition, I have served as a reporter to the Permanent Editorial Board of the Uniform Commercial Code on amendments addressing electronic funds transfers and other payment mechanisms, testified before Congress on matters of financial regulation, *see, e.g., High Frequency Trading's Impact on the Economy: Hearing Before the Subcomm. on Sec., Ins. & Inv. of the S. Comm. on Banking, Hous. & Urb. Affs.,* 113th Cong. 5 (2014) (statement of Hal S. Scott, Nomura Professor and Director, Program on International Financial Systems), and acted as an expert witness in numerous cases involving payment systems and banking practices. These experiences collectively inform my views on the legal and regulatory issues presented in this matter, and may prove helpful to this Court.

3

## SUMMARY OF ARGUMENT

Adopting Appellee's reading of the Durbin Amendment by narrowing the range of issuing bank costs that the interchange fee cap is permitted to consider would increase the substantial economic harm that Regulation II causes to U.S. consumers.

Section I overviews the critical role of market-determined interchange fees in the debit card payment system and background of the government's intervention in this market through the Durbin Amendment and Regulation II. Section II presents evidence from the empirical economic literature on the effects of Regulation II showing that Regulation II has over time caused issuing banks to charge their customers more for basic banking services, due to lower earnings from interchange fees. Section III presents evidence that these banking service cost increases have resulted in net economic harm to U.S. consumers, because merchants have not lowered their prices to offset the increase in the cost of banking services. These net costs have been borne disproportionately by lower-income consumers. Section IV illustrates why narrowing the range of costs that banks are permitted to recover through interchange fees would further increase the net economic costs that Regulation II imposes on U.S. consumers. Appellees' proposed interpretation of the Durbin Amendment would significantly worsen these outcomes.

4

**ARGUMENT**

## I. THE VITAL ROLE OF MARKET-DETERMINED DEBIT INTERCHANGE FEES AND REGULATION II'S INTERVENTION IN THIS MARKET.

### A. The Role of Interchange Fees in the Debit Card Payment System.

When a bank customer uses a debit card to make a purchase, the transaction is processed through a payment network administered by a card network operator and settled between the customer's bank, which issued the debit card and is known as the "issuing bank," and the merchant's bank, known as the "acquiring bank." The largest debit card network operators in the United States by transaction volume are Visa and Mastercard, which comprise hundreds of participating issuing and acquiring banks. *See The Nilson Report*, *U.S. Card Network Results and Top 50 Debit Card Issuers—2024*, Issue Nos. 1279/1290 (2025).

The acquiring bank deducts from the sale price an amount known as the "merchant discount rate" before crediting the merchant's account with the remainder of the sale price. The merchant discount rate typically consists of three components: (1) the network fee, which the acquiring bank remits to the card network operator in compensation for its role in operating the payment system, (2) the acquirer fee, which the acquiring bank retains and which compensates the acquiring bank for its role in processing the payment, and (3) the interchange fee, which the acquiring bank remits to the issuing bank. A small percentage of U.S. debit card transactions occur

5

on "closed loop" networks, such as the American Express network, where the card network operator assumes the role of both the acquiring and issuing bank in the settlement process. In these cases, no explicit interchange fee is assessed. However, the merchant discount rate charged by the network incorporates the economic value of services that interchange would otherwise cover in an open-loop system.

Interchange fees are set by the card network operator according to a fee schedule that applies to transactions conducted over its platform, except where the issuing bank and acquiring bank have bilaterally agreed to a different interchange fee rate. *See, e.g.,* Mastercard International, Inc., Mastercard Rules 193, Jun. 2025, https://tinyurl.com/2xm528a5. Interchange fees compensate the issuing bank for costs that the issuing bank incurs in connection with authorizing, clearing, and settling debit transactions, monitoring and preventing fraud, maintaining customer accounts, and providing additional services such as debit card reward programs that incentivize card holders to transact with merchants using their debit cards.

However, market-determined interchange fees are not solely a function of issuers' costs. Like other payment systems, the benefits of debit card systems stem from broad acceptance of the payment method by merchants, and broad use of the payment method by consumers. This system relies on a complex system of interoperability across thousands of banks and merchants. *See generally* Richard Schmalensee & David S. Evans*, The Economics of Interchange Fees and Their*

*Regulation: An Overview* (MIT Sloan Working Paper No. 4548-05, 2005)*,* https://tinyurl.com/55y5dvvy. This benefits merchants by allowing their customers to purchase goods and services using a more convenient and secure method than cash, which may be more costly for consumers and merchants due to the risks of theft and fraud and the loss in interest paid on deposits that must be withdrawn to obtain it. Checks in lieu of cash may also be open to more fraud. *See* William F. Baxter, *Bank Interchange of Transactional Paper: Legal and Economic Perspectives*, 26 J. L. & ECON. 541, 564 n.34 (1983). A merchant's willingness to accept debit cards depends on how many consumers carry and use them, while a consumer's willingness to carry and use debit cards depends on how many merchants accept them. Interchange fees are thus more than a cost recovery mechanism; they are a mechanism that helps the debit card system choose a set of prices charged to merchants and cardholders that makes the platform viable and maximizes the network value.

In establishing interchange fees, card network operators, as well as issuing and acquiring banks that negotiate bilateral interchange fee agreements, must weigh the need to promote broad merchant acceptance of debit transactions against the need to provide sufficient incentives for banks to issue and support cards on those networks, interests that often point in opposite directions. Interchange fees are also limited by competition among card network operators and issuing banks. *See* Marc

Appellate Case: 25-3000    Page: 14    Date Filed: 01/06/2026 Entry ID: 5593739

Rysman & Julian Wright, *The Economics of Payment Cards*, 13 REV. NETWORK ECON. 303 (2014). The presence of common acquiring and issuing bank participants among different networks does not eliminate network-level competition, because the networks continue to compete on terms, rules, and pricing structures offered to participating banks.

A network that raises interchange fees may become less attractive to merchants, who will tend to prefer networks that charge lower fees. On the other hand, a network with broader usage among consumers may be more attractive to merchants because of the increased sales volume that participation in that network may drive. Increasing interchange fees may be necessary to attract the issuing banks necessary to build such a network.

Market-determined interchange fees are thus a product of a complex array of interacting economic factors and a crucial component of efficient debit card payment systems. Higher interchange fees do not indicate that merchants are being harmed or that debit card networks are uncompetitive.

### B. The Regulation of Debit Card Interchange Fees by the Durbin Amendment and Regulation II.

Following the 2008 global financial crisis, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-2013 (2010) ("Dodd-Frank"). Among its many amendments and additions to the U.S. financial regulatory structure, Dodd-Frank created a new provision – commonly known as the "Durbin

8

Amendment" – regulating debit card interchange fees for issuing banks with more than $10 billion in assets.

Dodd-Frank did not impose equivalent restrictions on credit card interchange fees. The policy rationale for the disparate treatment of debit and credit cards remains unclear. Rather than reflecting a coherent approach, the distinction resulted in a fragmented approach where only debit card interchange fees are capped.

The Durbin Amendment requires that any interchange fee that an issuing bank receives or charges with respect to an electronic debit transaction be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). It also requires the Board of Governors of the Federal Reserve System (the "Board") to issue a rule to "establish standards for assessing whether the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* at § 1693o-2(a)(3)(A).

Critically, the Durbin Amendment does not explicitly require the Board to limit interchange fees to a level less than or equal to issuing banks' costs. It only requires the Board to assess whether interchange fees are "reasonable and proportional" to those costs.

In establishing those standards, the Durbin Amendment directs the Board to "distinguish between" (i) the "incremental cost incurred by an issuer for the role of

9

the issuer in the authorization, clearance, or settlement ["<u>ACS</u>"] of a particular electronic debit transaction," which the statute instructs the Board to consider in establishing regulatory standards for interchange fees and (ii) "other costs incurred by an issuer which are not specific to a particular electronic debit transaction," which the statute requires the Board to ignore. 15 U.S.C. § 1693o-2(a)(4)(B). ACS costs include authorization and network fees, fraud monitoring and scoring costs, and other settlement and clearing costs. However, the statute provides no guidance on when these costs are "incremental" and when they are not. Indeed, as the Board notes in its brief, there is no coherent method of drawing this distinction. *See* Brief of Defendant-Appellant at 41-42, 41 n. 16, *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, No. 25-3000 (8th Cir. Dec. 30, 2025).

In response to the Durbin Amendment's statutory directive, the Board finalized a rule in 2011 known as "Regulation II." Regulation II limits the interchange fee that a bank with at least $10 billion in assets may receive or charge with respect to a debit card transaction to a 21-cent base component plus 0.05% of the transaction value, *see* Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,393 (Jul. 20, 2011) (codified at 12 CFR part 235). Banks with less than $10 billion assets were exempted from the rule. The 21-cent base component is increased by a 1-cent "fraud-prevention adjustment" to 22 cents per transaction for banks that

10

adhere to the fraud prevention standards that Regulation II specifies. 12 CFR § 235.4.

In setting the amount of this cap, the Board interpreted the Durbin Amendment to permit the Board to consider any issuer costs that are "specific" to a particular debit card transaction, including both incremental and non-incremental ACS costs, because, as noted above, there is no coherent method of distinguishing between incremental and non-incremental costs, and the statute provides no definition of either category.

Proponents of the Durbin Amendment claimed that limiting debit interchange fees was necessary because debit interchange fees had become excessive. *See* Sen. Richard Durbin, Durbin Statement on His Debit Card Swipe Fee Amendment (May 13, 2010), https://tinyurl.com/csshj5cc. The District Court adopted this characterization by describing pre–Durbin Amendment interchange fees as a "race to the top," noting that average fees were 44 cents per debit transaction in 2009, or about 1.15 percent of the average purchase. It treated this level as evidence that issuing banks benefited at the expense of merchants and consumers. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 794 F. Supp.3d 610, 616 (D.N.D. 2025). This framing, however, overlooks the competitive market forces that limit interchange fees.

11

This framing also overlooks the role of antitrust law: Interchange fees have been subject to extensive antitrust litigation and enforcement, including large private actions and government cases against the major card networks, and including with respect to periods after the implementation of Regulation II. *See, e.g.*, In re *Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 729 F. Supp.3d 298 (E.D.N.Y. 2024); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016); *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003)). It is therefore untrue that debit interchange fees are unchecked by market regulators in the absence of Regulation II or that lowering the cap is necessary to guard against anticompetitive debit interchange practices.

### C. The Dispute Over Regulation II's Cost Metrics.

In 2021, this lawsuit was filed in the North Dakota U.S. District Court, to which Corner Post, a North Dakota-based retailer, was ultimately added as a plaintiff. The suit alleged that Regulation II is unlawful. One of its principal allegations is that the Regulation II interchange fee cap reflects the inclusion of issuing bank costs that the Durbin Amendment required the Board to ignore. In particular, Corner Post alleged that Regulation II's consideration of fixed ACS costs, network processing fees, transaction-monitoring costs, and fraud losses is precluded by the Durbin Amendment because the statute only explicitly commands the Board

12

to consider "incremental" ACS costs. Corner Post argued that Congress intended to prohibit the Board from considering these non-incremental ACS and other costs. Corner Post also argues that the Durbin Amendment's instructions to consider incremental costs that are specific to debit transactions and ignore costs that are not specific to debit transactions overrides the statute's general directive to ensure that interchanges fees are "reasonable and proportional" to the issuer's costs to the extent that general directive would otherwise permit consideration of non-incremental costs. *Corner Post,* 794 F. Supp.3d at 621.

In August 2025, the District Court ruled in favor of Corner Post and required the Board to redesign Regulation II to exclude any costs other than incremental ACS costs from the revised fee cap. *See id.* Redesigning Regulation II in accordance with this ruling would almost certainly result in a substantially lower interchange fee cap because the revised cap would limit issuing banks to recovering a narrower subset of their costs. The Board has appealed this judgment to this Court.

## II. REGULATION II HAS CAUSED ISSUING BANKS TO INCREASE OTHER FEES FOR BASIC ACCOUNT SERVICES.

Since Regulation II was implemented in 2011, there have been numerous empirical studies of its economic effects. In summary, these studies find that Regulation II has caused issuing banks to increase the fees they charge customers to maintain demand deposit accounts, to reduce the number of accounts that they provide to customers free of charge, and to reduce their offerings of debit card

13

reward programs. This has occurred because Regulation II does not allow issuing banks to recover the full economic costs incurred in connection with their role in the debit card payment system. Banks therefore charge their customers more for other services to recoup the costs that Regulation II now prevents them from recovering via interchange fees. These costs have been borne disproportionately by lower-income consumers and have caused many such consumers to lose access to the banking system.

A study by the Board staff published in 2018 analyzed changes in account fees and the availability of free bank accounts across U.S. banks for the period from 2009:Q1 through 2014:Q4, thus covering the years both immediately before and after Regulation II. *See* Benjamin S. Kay, Mark D. Manuszak, & Cindy M. Vojtech, *Competition and Complementarities in Retail Banking: Evidence from Debit Card Interchange Regulation*, 34 J. FIN. INTERMEDIATION 91 (2018). The analysis found that checking account fees at banks subject to Regulation II increased by 15% on average over the two years after Regulation II was implemented. *See id.* at 92. This increase corresponded to a $4 billion aggregate fee increase and represented an offset of more than 90 percent of the interchange revenue that these banks lost as a result of Regulation II. *See id.* at 91-92.

The study also found that consumers were unable to offset the effect of account fee increases by switching their accounts from banks subject to Regulation

14

II to banks not subject to Regulation II (i.e., banks with less than $10 billion in assets). This is due to the transaction costs that consumers incur for switching banks, *see id.* at 92, which implies that these effects have disproportionately affected low- and middle-income individuals, for whom transaction costs represent a relatively greater burden given smaller deposit balances. The authors thus concluded that "almost all of the burden of reduced interchange fees was borne by bank customers through higher account fees." *Id.*

Another Board staff study analyzing deposit account pricing at 5,500 U.S. banks over the period from 2009:Q1 through 2014:Q2 found that banks subject to the Regulation II interchange fee cap "increase[d] checking account prices by decreasing the availability of free accounts, raising monthly fees, and increasing minimum balance requirements." Mark D. Manuszak & Krzysztof Wozniak, *The Impact of Price Controls in Two-Sided Markets: Evidence from US Debit Card Interchange Fee Regulation* (Fed. Reserve Fin. & Econ. Discussion Series Paper 2017-074, 2017), https://tinyurl.com/ka8f4n4p.

Furthermore, legal scholars report that the account fee increases and loss of access to free checking that stemmed from Regulation II "contributed to an increase in the unbanked population of approximately 1 million people, mainly among low-income families." *See* Todd J. Zywicki, Geoffrey A. Manne, & Julian Morris, *Price*

15

*Controls on Payment Card Interchange Fees: The U.S. Experience* (Geo. Mason Law & Econ. Paper No. 14-18, 2014), https://tinyurl.com/mwxf4nej.

In 2022, the Government Accountability Office published the results of a survey of twenty-five market participants and observers, consisting of 13 banks, six industry groups, five consumer groups, and four credit unions, on Regulation II's effects. *See* U.S. Gov't Accountability Off., *Banking Services: Regulators Have Taken Actions to Increase Access, but Measurement of Actions' Effectiveness Could Be Improved* (Feb. 14, 2022), https://tinyurl.com/mshnyjxz. The results of their survey also indicate that Regulation II is "associated with increases in the costs of checking accounts." *Id*. at 22. In particular, survey respondents reported that Regulation II limited banks' ability to offer free checking accounts and caused banks to charge higher account fees. *See id.* at 24-25.

Another study analyzed quarterly data on assets, deposits, interchange income and services charges on deposit accounts, including monthly maintenance fees, overdraft charges, check-cashing fees, and ATM fees, for all bank holding companies with asset of more than $500 million from 2009 through 2013. *See* Vladimir Mukharlyamov & Natasha Sarin, *Price Regulation in Two-Sided Markets: Empirical Evidence from Debit Cards*, 172 J. Fin. Econ. 1 (2025). This analysis concludes that banks subject to Regulation II recouped their reduced interchange fee revenue by charging consumers higher account fees and charging fees for more

16

accounts that they previously provided for free. Specifically, the analysis finds that by the end of 2011, Regulation II had caused subject banks to increase average monthly account fees from $4.30 to $7.62, reduce by around 35% the availability of free checking accounts, and increase by more than 25% the average minimum account balance required to waive monthly fees. *See id*. at 2. Lower income consumers "are disproportionately subject to these higher fees." *Id*. The authors interpret these results as showing that banks "adjusted each aspect of basic checking accounts' price to recover the revenue that was previously generated by interchange from debit cards linked to such accounts." *Id*. at 5. Furthermore, Regulation II likely "accelerated adoption of credit cards with higher interchange fees" which "diminished—if not eliminated—merchants' savings." *Id.* at 2. The study summarizes that these effects "impede [Regulation II's] stated objective of enhancing consumers' welfare through lower retail prices." *Id.* at 1.

The study also notes that in the four years following the implementation of Regulation II the Federal Deposit Insurance Corporation's National Survey of Unbanked and Underbanked Households records "a notable increase in the proportion of the unbanked population that cited high account fees as the primary reason for not having a bank account . . . from 5.4 percent in 2011 to 9.7 percent in 2015." *Id.* at 7. This trend is "[c]onsistent with the idea that a Durbin-induced increase in checking account fees can partially explain why some households do not

have a banking relationship," *id*. at 7, and is a potential factor contributing to declining trust in banks, *see id.* at 9.

### III. THE INCREASE IN OTHER FEES FOR BASIC ACCOUNT SERVICES THAT STEMS FROM REGULATION II HAS RESULTED IN HIGHER NET COSTS FOR CONSUMERS.

Empirical studies of Regulation II's economic effects also indicate that merchants have not reduced prices to offset the higher fees that consumers now pay for basic account services, and that Regulation II has thus resulted in higher net costs for consumers.

Mukharlyamov and Sarin tested whether merchants lowered their prices to reflect lower interchange fees from Regulation II. *See* Mukharlyamov & Sarin, 172 J. FIN. ECON. 1. The analysis did not identify any statistically significant evidence that merchants passed through savings from lower interchange fees to consumers by lowering prices. *See id.* at 10. In fact, the study found evidence indicating that Regulation II "inadvertently increased merchants' total interchange fees" because it incentivized banks to offer more credit cards, which have higher fees than debit cards. *Id*.

The finding that Regulation II has precipitated the growth of other payment methods, particularly credit cards, where fees are unregulated, underscores the highly competitive nature of the market for payment methods and how disallowing

18

banks from recovering their economic costs for facilitating one payment method can lead to higher cost payment methods.

Two years after the implementation of Regulation II, the staff of the Federal Reserve Bank of Richmond surveyed merchants to determine how their pricing practices changed in response to Regulation II. *See* Zhu Wang, Scarlett Schwartz, & Neil Mitchell, *The Impact of the Durbin Amendment on Merchants: A Survey Study*, 100(3) FED. RESERVE BANK OF RICHMOND ECON. Q. 183 (2014). The results also indicate that interchange fee savings did not cause merchants to lower their prices. Seventy-five percent of survey respondents reported "no price change" in response to Regulation II. *Id.* at 189. Twenty-three percent of respondents reported that they had *increased* prices following Regulation II. *See id*. Only 2% of respondents indicated that they had reduced prices. *See id*.

The results also indicate that lower interchange fees failed to cause merchants to increase their acceptance of debit cards as a means of payment. If a merchant imposed restrictions on customers' debit card use such as a minimum amount requirement or a surcharge for debit usage before Regulation II, it is "likely the merchant would continue to do so" after Regulation II was implemented. *Id*. at 202. The authors summarize that "few merchants in our sample are found to reduce prices or debit restrictions as their debit costs decrease." *Id.* at 205.

19

## IV. APPELLEE'S INTERPRETATION OF THE DURBIN AMENDMENT WILL REDUCE THE REGULATION II INTERCHANGE FEE CAP AND PRODUCE EVEN HIGHER COSTS FOR CONSUMERS.

Limiting the Regulation II interchange fee cap to issuing banks' incremental ACS costs, as Appellees urge, will result in a lower cap that would prohibit banks from recovering any fixed costs.

This lower interchange fee cap will increase the economic costs that Regulation II imposes on U.S. consumers. This conclusion is supported by the empirical findings described above and the extensive body of economic literature on network-based payment systems and the critical role of market-determined interchange fees within them. That literature makes clear that interchange fees do more than recover costs and that pure cost-based caps inherently distort these markets and generate negative economic effects. As discussed in Section I, the empirical evidence on Regulation II confirms that such distortions have already occurred. It also shows that these distortions intensify as the gap widens between banks' actual costs and the capped interchange fee, so that prohibiting recovery of fixed costs and limiting the cap to incremental costs will further exacerbate consumer harm.

These effects arise because payment card networks are complex two-sided markets that must simultaneously attract cardholders and merchants, whose participation decisions are interdependent. Debit cards are also bundled with other

20

services, most notably checking accounts, which allows issuers to respond to interchange constraints by adjusting the pricing and availability of other cardholder-facing products. Consistent with this structure, when interchange revenue was limited, issuers sought to recover lost revenue through higher fees or reduced benefits elsewhere. *See* Mukharlyamov & Sarin, 172 J. FIN. ECON. at 5. Policy measures that cap interchange by tying it narrowly to issuers' costs therefore rest on an erroneous model of the payment card industry. Interchange fees reflect not only costs, but also demand elasticities, competition, and network effects, and cost-based caps are built on a simplified view of the market and should not be expected to reduce consumer costs. *See* Julian Wright, *One-Sided Logic in Two-Sided Markets*, 3 REV. NETWORK ECON. 1 (2004).

The economic inefficiency of an interchange fee cap rises as the gap widens between banks' actual costs and the narrower set of costs regulators allow to be recovered. *See* Eliana Garcés & Brent Lutes, *Regulatory Intervention in Card Payment Systems: An Analysis of Regulatory Goals and Impact*, SSRN (Apr. 4, 2019), https://tinyurl.com/2ccjhnu5. Reducing the Regulation II interchange fee cap so that it covers only incremental costs will have this effect.

Prohibiting the recovery of any fixed costs would discourage banks from maintaining and developing their current systems and would also threaten competition by discouraging new banks from entering the market. To the extent

21

banks' fixed costs increase, they will pass these costs through to consumers through even higher account fees, as has already occurred. *See* Kay, et al., 34 J. FIN. INTERMEDIATION at 92.

Further reducing banks' interchange revenue and prohibiting fixed cost recovery will also discourage the development of faster and more innovative payment systems. *See* Todd J. Zywicki, Julian Morris, & Geoffrey A. Manne, *The Effects of Price Controls on Payment-Card Interchange Fees: A Review and Update*, ICLE White Paper (Mar. 4, 2022), https://tinyurl.com/2nds2tmw. Jurisdictions that impose price controls on interchange fees often experience reduced investment incentives and slower payment system innovation relative to less regulated markets. *See id.* Capping interchange fees at issuing banks' incremental costs exacerbates this problem by preventing interchange revenues from supporting investments in fraud prevention, network security, product design, and technological upgrades that are essential to innovation in payment services.

These effects are especially salient for fintech firms and neobanks, which have driven many recent consumer-facing innovations such as fee-free checking accounts, reduced overdraft fees, early direct deposit, and real-time transaction tools. These features disproportionately benefit lower-income and liquidity-constrained consumers, *see* U.S. Gov't Accountability Off., *Financial Technology: Products Have Benefits and Risks to Underserved Consumers, and Regulatory Clarity Is*

*Needed* (Mar. 8, 2023), https://tinyurl.com/2p9rwskf (discussing the important role of fintech companies in expanding access to financial services for unbanked and underbanked consumers), and have increasingly been adopted by incumbent banks in response to competitive pressure. Unlike large, diversified banks, many fintech firms and neobanks rely heavily on interchange revenue as a primary or dominant funding source. *See, e.g.,* Zennon Kapron, *U.S. Fintech IPOs Surge, Then Fizzle*, Forbes (Dec. 21, 2025), https://tinyurl.com/2remtnva. A tighter interchange cap therefore threatens the sustainability of these business models, both for existing firms and for prospective entrants.

By weakening fintech firms' ability to compete and innovate, a lower interchange cap would reduce competitive pressure on incumbent banks, slowing the diffusion of consumer-friendly innovations and ultimately harming consumers.

The U.S. government also benefits from the development and maintenance of secure and efficient payment card networks to receive and distribute funds. *See* U.S. Gov't Accountability Off., *Payment Cards: Costs and Benefits for Federal Entities* (Apr. 30, 2025), https://tinyurl.com/3hxjjcde (noting that the use of payment cards by U.S. government entities reduces "administrative burden" and that in 2023 U.S. government entities earned rebates from the use of payment cards totaling $488 million). These systems are also vital in reducing the risk of fraud and improper payments. Discouraging the maintenance and development of payment systems by

23

further limiting cost recovery would thus also increase government costs and negatively impact U.S. taxpayers.

## CONCLUSION

Empirical evidence of Regulation II's economic effects demonstrates that by reducing banks' ability to recover their costs through interchange fees, banks must now charge customers more for basic account services that they previously provided at low- or no cost to their customers. These increases in other fees have not been offset by merchants reducing their prices to reflect lower interchange fees that they must now pay. Regulation II has thus resulted in net economic harm to U.S. consumers, by preventing issuing banks from recovering the full economic costs of their role in operating the debit card payment system. These harms have fallen disproportionately on lower-income households and have undermined financial inclusion.

Appellees' proposed interpretation of the Durbin Amendment would significantly worsen these outcomes. By restricting the interchange fee cap to "incremental" costs, a category that defies any coherent definition, it would further widen the gap between banks' actual costs and allowable cost recovery, amplifying the distortions already observed under Regulation II. It also disregards how market competition and potential antirust liability already constrain interchange fees, independent of regulatory intervention. Appellees' interpretation would thus

24

exacerbate consumer and taxpayer harm and further impair the efficiency, innovation, and competitiveness of the U.S. payment system.

Respectfully submitted,

/s/ Joseph Henchman
Joseph Henchman (No. 25-0574)
NATIONAL TAXPAYERS UNION FOUNDATION
122 C St. N.W., Suite 700
Washington, D.C. 20001
(202) 766-5019
jbh@ntu.org

Dated: January 6, 2026

*Counsel for* Amicus Curiae

25

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because this brief contains 5,309 words, as counted by Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman 14-point font.

Pursuant to 8th Cir. R. 28A(h)(2), *Amicus* states that the brief has been scanned for viruses using Norton Antivirus (version 25.12.10659.961), and it is virus-free. Pursuant to 8th Cir. R. 28A(h)(3), *Amicus* also states that the electronic copy of this brief was "generated by printing to PDF from the original word processing file."

/s/ Joseph Henchman
Joseph Henchman

*Counsel for* Amicus Curiae

Dated: January 6, 2026

26

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Joseph Henchman

Joseph Henchman
NATIONAL TAXPAYERS UNION FOUNDATION

Dated: January 6, 2026                    *Counsel for* Amicus Curiae