# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

CORNER POST, INC., *Plaintiff-Appellee*,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, *Defendant-Appellant*.

Appeal from the U.S. District Court for the District of North Dakota,
No. 1:21-cv-00095-DMT, Hon. Daniel Mack Traynor

## BRIEF FOR *AMICI CURIAE* AMERICAN BANKERS ASSOCIATION, AMERICA'S CREDIT UNIONS, ASSOCIATION OF MILITARY BANKS OF AMERICA, CONSUMER BANKERS ASSOCIATION, DEFENSE CREDIT UNION COUNCIL, INDEPENDENT COMMUNITY BANKERS OF AMERICA, AND NATIONAL BANKERS ASSOCIATION IN SUPPORT OF DEFENDANT-APPELLANT & REVERSAL

THOMAS PINDER
ANDREW DOERSAM
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Avenue NW
Washington, DC 20036

JOSEPH R. PALMORE
NATALIE A. FLEMING NOLEN
JEREMY MANDELL
ALISON H. HUNG*
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-6940
JPalmore@mofo.com

*Admitted only in New York; practicing
under the supervision of attorneys admitted
in the District of Columbia*

*Counsel for* Amici Curiae

JANUARY 6, 2026

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure and 8th Circuit Rule 26.1, *amici curiae* American Bankers Association, America's Credit Unions, Association of Military Banks of America, Consumer Bankers Association, Defense Credit Union Council, Independent Community Bankers of America, and National Bankers Association certify that none has a parent corporation, and no publicly held corporation owns 10% or more of *amici*'s stock.

Dated: January 6, 2026

/s/ Joseph R. Palmore
Joseph R. Palmore

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ........................................................................ iv

INTEREST OF *AMICI CURIAE* ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 5

ARGUMENT ...................................................................................... 7

I.  THE INCLUSION OF CERTAIN CATEGORIES OF COSTS IN THE INTERCHANGE FEE CAP IS CONSISTENT WITH THE TEXT AND PURPOSE OF THE DURBIN AMENDMENT ................................................. 7

    A.  The District Court Misinterpreted The Reasonable And Proportional To Costs Mandate ................................................. 7

    B.  The Statute Requires Inclusion of All Four Categories of Costs That The District Court Disallowed .......................................... 10

    C.  The Adoption Of A Uniform Standard Applicable To All Issuers And Transactions Was Permissible .......................................... 13

II.  SLASHING THE INTERCHANGE FEE CAP WOULD NOT HELP CONSUMERS AND WOULD HARM THE DEBIT CARD MARKET ....... 14

    A.  Merchants Have Not Passed On Savings to Consumers ......................... 14

    B.  Regulation II Has Not Enabled Banks And Credit Unions To Incur Excess Profits ................................................................... 17

    C.  Including Actual Costs Ensures That Debit Cards Remain A Safe, Efficient, And Effective Payment Method ................................... 17

    D.  Substantially Reducing The Interchange Fee Cap Would Hurt Community Banks And Credit Unions ........................................ 21

Appellate Case: 25-3000     Page: 3     Date Filed: 01/09/2026 Entry ID: 5595717

III.  AFFIRMING THE DISTRICT COURT'S ERRONEOUS INTERPRETATION OF THE STATUTE WOULD CREATE A CIRCUIT SPLIT AND DISTURB RELIANCE INTERESTS.........................22

    A.  Upholding The District Court's Decision Would Create A Split With the D.C. Circuit, Fostering Increased Uncertainty .........................23

    B.  The District Court's Flawed Reading Would Upend The Interests Of Parties That Have Long Relied On Regulation II...............................25

CONCLUSION ...........................................................................................27

Appellate Case: 25-3000    Page: 4    Date Filed: 01/09/2026 Entry ID: 5595717

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. Dir., Div. of Tax'n*,
   504 U.S. 768 (1992) ........................................................................26

*Bastias v. U.S. Att'y Gen.*,
   158 F.4th 1188 (11th Cir. 2025) ....................................................24

*CBOCS W., Inc. v. Humphries*,
   553 U.S. 442 (2008) ........................................................................25

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ..................................................................23, 24

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   603 U.S. 799 (2024) ..................................................................23, 24

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   794 F. Supp. 3d 610 (D.N.D. 2025) ........................................6, 9, 13

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
   320 U.S. 591 (1944) ........................................................................13

*Fed. Power Comm'n v. Texaco Inc.*,
   417 U.S. 380 (1974) ........................................................................13

*Kimble v. Marvel Ent., LLC*,
   576 U.S. 446 (2015) ........................................................................25

*Linney's Pizza, LLC v. Bd. of Governors of Fed. Rsrv. Sys.*,
   --- F. Supp. 3d ----, 2025 WL 2645489 (E.D. Ky. Sept. 15, 2025) ....................23

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ..................................................................23, 24

*Michigan v. Bay Mills Indian Cmty.*,
   572 U.S. 782 (2014) ..................................................................25, 27

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.*,
   746 F.3d 474 (D.C. Cir. 2014) ....................... 5, 6, 8, 11, 22, 23, 24, 25

Appellate Case: 25-3000      Page: 5      Date Filed: 01/09/2026 Entry ID: 5595717

*Payne v. Tennessee*,
    501 U.S. 808 (1991)..................................................................26

*In re Permian Basin Area Rate Cases*,
    390 U.S. 747 (1968)..................................................................12

*Sports v. Top Rank, Inc.*,
    954 F.3d 1142 (8th Cir. 2020) ..................................................13

*United States v. E.T.H.*,
    833 F.3d 931 (8th Cir. 2016) ....................................................14

*Watson v. United States*,
    552 U.S. 74 (2007)....................................................................25

*Yates v. United States*,
    574 U.S. 528 (2015)....................................................................9

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)..............................................................12, 13

## Statutes, Rules, & Regulations

12 C.F.R. pt. 235 (2025) ..................................................................3

1 U.S.C. § 1 ....................................................................................13

15 U.S.C. § 1693b......................................................................14, 16

15 U.S.C. § 1693*o*-2.................................. 3, 7, 8, 9, 10, 13, 17, 20, 21, 23

Debit Card Interchange Fees & Routing, Final Rule,
    76 Fed. Reg. 43,394 (July 20, 2011).......................10, 11, 14, 17, 21

Debit Card Interchange Fees & Routing, Notice of Proposed
    Rulemaking, 75 Fed. Reg. 81,722 (Dec. 28, 2010) .........................11

Debit Card Interchange Fees & Routing, Notice of Proposed
    Rulemaking, 88 Fed. Reg. 78,100 (Nov. 14, 2023)....................12, 17

Fed. R. App. P. 29 ............................................................................1

Appellate Case: 25-3000    Page: 6    Date Filed: 01/09/2026 Entry ID: 5595717

# Other Authorities

Addy Bink, *Nearly $22M in Counterfeit Currency Was Seized Last Year: How to Tell If Your Cash Is Fake* (Mar. 12, 2024), The Hill, https://thehill.com/homenews/nexstar_media_wire/4527330-nearly-22m-in-counterfeit-currency-was-seized-last-year-how-to-tell-if-your-cash-is-fake ...................................................................19

Alloy, *2026 State of Fraud Report*, https://use.alloy.co/rs/915-RMN-264/images/2026-State-of-Fraud-Report_alloy.pdf ...........................................26

Board of Governors of the Federal Reserve System, *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* (Dec. 2025), https://www.federalreserve.gov/paymentsystems/files/debitfees_costs_2023.pdf ...................................................................18

Bradley Hubbard, *The Durbin Amendment, Two-Sided Markets, and Wealth Transfers: An Examination of Unintended Consequences Three Years Later*, Univ. of Chi. L. Sch. (2013), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2285105 .........................16

Clearing House Association LLC et al., *Comment Letter on Proposed Modifications to Regulation II* (May 10, 2024), https://consumerbankers.com/wp-content/uploads/2024/05/Joint-Trades-Reg-II-Comment-Letter-2024.05.10.pdf ................................................26

David S. Evans, Howard H. Chang & Steven Joyce, *The Impact of the U.S. Debit Card Interchange Fee Regulation on Consumer Welfare: An Event Study Analysis* (Coase-Sandor Inst. For L. & Econ., Working Paper No. 658, 2013), https://chicagounbound.uchicago.edu/law_and_economics/652/ ......................15

Electronic Payments Coalition, *What Exemption? Community Banks and Credit Unions Lose Under the Durbin Amendment* (Oct. 30, 2023), https://electronicpaymentscoalition.org/resources/what-exemption-community-banks-credit-unions-lose-under-the-durbin-amendment/ ...........................................................................................21

Appellate Case: 25-3000     Page: 7     Date Filed: 01/09/2026 Entry ID: 5595717

Federal Reserve Bank of Atlanta, *Checks Processed by the Federal Reserve in 2021: Report of the Check Sample Survey* (Apr. 25, 2023), https://www.atlantafed.org/-/media/documents/payments-forum/publications/check-sample-survey/2023/05/05/2021-survey/report.pdf ....................................................................................20

Federal Reserve Bank of Kansas City, *The Critical Role of Community Banks* (Aug. 20, 2024), https://www.kansascityfed.org/banking/community-banking-bulletins/the-critical-role-of-community-banks/ ....................................................................................21

Julian Morris & Ben Sperry, *The Cost of Payments: A Review*, Int'l Ctr. for L. & Econ. (Aug. 28, 2024), https://laweconcenter.org/resources/the-cost-of-payments-a-review ................20

NACS, *The Hidden Costs of Cash Management* (Mar. 26, 2024), https://www.convenience.org/Media/Daily/2024/March/26/2-The-Hidden-Costs-of-Cash-Management_Payments ................................19

NACS, *Is Your Cash Management System Costing More?* (Feb. 6, 2024), https://www.convenience.org/Media/Daily/2024/Feb/6/2-Is-Cash-Management-System-Costing-More_Payments.........................19

NACS, *Safe and Secure* (Oct. 2021), https://www.nacsmagazine.com/Issues/October-2021/safe-and-secure ............19

Natasha Sarin, *Making Consumer Finance Work*, 119 Colum. L. Rev. 1519 (2019) ...........................................................15

Progressive Policy Institute, *The Unanticipated Costs and Consequences of Federal Reserve Regulation of Debit Card Interchange Fees* (Dec. 2025), https://www.progressivepolicy.org/wp-content/uploads/2025/12/PPI_The-Unanticipated-Costs-and-Consequences-of-Federal-Reserve-Regulation-of-Debit-Card-Interchange-Fees_V3.pdf .........................18

Seeking Alpha, *The Home Depot's CEO Discusses Q4 2010 Results – Earnings Call Transcript* (Feb. 22, 2011), https://seekingalpha.com/article/254224-the-home-depots-ceo-discusses-q4-2010-results-earnings-call-transcript ............................................16

Appellate Case: 25-3000     Page: 8     Date Filed: 01/09/2026 Entry ID: 5595717

Testimony of Charles G. Kim before the S. Comm. on the Judiciary
(May 3, 2022), https://www.judiciary.senate.gov/imo/media/doc
/Kim%20Testimony.pdf ....................................................................................21

Zhu Wang et al., *The Impact of the Durbin Amendment on Merchants:
A Survey Study*, Fed. Reserve Bank of Richmond, 100 Econ Q. 183
(2014) ................................................................................................................15

Appellate Case: 25-3000     Page: 9     Date Filed: 01/09/2026 Entry ID: 5595717

## INTEREST OF *AMICI CURIAE*[1]

The American Bankers Association ("ABA") is the principal national trade association of the $23.7 trillion banking industry. Founded in 1875, the ABA is composed of local, regional, and national banks that together employ approximately 2.1 million people. Members of the ABA are located in each of the fifty States and the District of Columbia, and include debit card issuing financial institutions of all sizes and types.

America's Credit Unions represents our nation's nearly 5,000 federally and state-chartered credit unions that collectively serve over 144 million consumers with personal and small business financial service products. America's Credit Unions delivers strong advocacy, resources, and services to protect, empower, and advance credit unions and the people they serve. The organization advocates for responsible legislative policies and regulations so credit unions can efficiently meet the needs of their members and communities.

For more than six decades, the Association of Military Banks of America ("AMBA") has stood at the intersection of service, banking, and national commitment. Established in 1959, AMBA was created to serve as a liaison between

---

[1] No person other than *amici curiae* or their counsel authored this brief in whole or in part or made a monetary contribution to its preparation or submission. Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this *amicus* brief. Fed. R. App. P. 29(a)(2).

banks serving on military installations and the Department of Defense and the Military Services. Today, AMBA remains the only national trade association dedicated exclusively to banks that serve the military and veteran communities. AMBA advocates for the needs of its members in the halls of government, serves as a strategic partner to the Department of Defense and other federal agencies, and brings together and supports financial institutions committed to the well-being of military service members, veterans, and their families.

The Consumer Bankers Association ("CBA") is a member-driven trade association, and the only national financial trade group focused exclusively on retail banking—banking services geared toward consumers and small businesses. As the recognized voice on retail banking issues, CBA provides leadership, education, research, and federal representation for its members. CBA members operate in all 50 states. They include the nation's largest bank holding companies as well as regional and super-community banks. 83 percent of CBA's members are financial institutions holding more than $10 billion in assets.

The Defense Credit Union Council represents more than 200 defense-affiliated credit unions and over 40 million members—including active-duty servicemembers, Guard and Reserve personnel, veterans, Department of War civilians, and military families.

Independent Community Bankers of America ("ICBA") is a national association with one mission: to create and promote an environment where community banks flourish. ICBA powers the potential of the nation's community banks through effective advocacy, education, and innovation. ICBA's membership consists of thousands of community banks located throughout the United States— more than half of the total depository institutions in the country. ICBA's members collectively operate nearly 50,000 locations nationwide, employ nearly 700,000 Americans, hold $5.8 trillion in assets, hold $4.8 trillion in deposits, and make $3.8 trillion in loans to consumers, small businesses and the agricultural community.

Founded in 1927, the National Bankers Association ("NBA") is the leading voice for minority depository institutions, advocating on behalf of mission-driven banks that serve underserved, low- and moderate-income, urban, rural, and Tribal communities. Representing community banks across 43 states and territories, NBA advances economic empowerment, expands access to capital, and promotes financial inclusion nationwide.

This appeal concerns the Federal Reserve Board's Regulation II, 12 C.F.R. pt. 235, which was promulgated in 2011 pursuant to the Durbin Amendment of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 1693*o*-2. Regulation II regulates, among other things, the interchange fees that

debit card issuers may receive for debit card transactions to compensate them for the costs of processing such transactions.

The district court's decision, which would require the Board to issue a new rule capping interchange fees far below most issuers' transaction costs, puts *amici*'s members at significant risk. *Amici*'s members have collectively invested billions of dollars to develop and maintain an efficient, convenient, and secure debit card payments system. The debit cards that *amici*'s members issue are crucial to American consumers, the payments system, and the U.S. economy. Consumers and merchants alike benefit from debit cards, which provide an efficient, secure, and widely accepted method of payment. Merchants also benefit from debit card payments in the form of increased sales and profits. To facilitate debit card services, however, *amici*'s members rely on interchange revenue to recoup (some of) their significant costs. As such, *amici*, through their members, have a direct and vital stake in this litigation.

4

## INTRODUCTION AND SUMMARY OF ARGUMENT

Debit cards are crucial to the U.S. economy. They give consumers a secure and convenient payment option and enable merchants to efficiently serve more customers. But debit card transactions and their benefits are not free. They are possible only because of the central role card issuers play in authorizing, clearing, and settling transactions and issuers' substantial investments in supporting and maintaining the debit card payments system.

Congress thus directed the Board to issue regulations ensuring that interchange fees for debit card transactions would be "reasonable and proportional" to issuers' costs. Following that directive, and after an extensive rulemaking process, the Board issued Regulation II in 2011. The rule was promptly challenged by a merchant trade association making many of the same statutory interpretation arguments raised here, but the D.C. Circuit upheld the regulation and the Board's statutory interpretation on which it is based. *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474 (D.C. Cir. 2014). In the decade-plus since, issuers have relied on Regulation II and the understanding it reflects that the interchange fee cap should be "reasonable and proportional" to their costs, subject to one express textual exception but no extra-textual ones. They have thus continued to invest heavily in maintaining and improving the debit card payments system for consumers and merchants alike.

5

Yet almost 15 years after Regulation II issued and 11 years after *NACS*, Corner Post and the merchant trade associations seek to blow up that settled understanding. Raising many of the same statutory interpretation arguments that the D.C. Circuit considered and correctly rejected in 2014, Corner Post challenges Regulation II on the ground that the Board improperly included certain costs in the interchange fee cap calculation. The district court agreed with Corner Post's arguments, concluding that Regulation II's fee cap contravened the statute. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 794 F. Supp. 3d 610 (D.N.D. 2025).

The district court's construction of the statute cannot be squared with its text, structure, and purpose, nor with well-established constitutional and statutory interpretation principles. And the court's interpretation would produce absurd results, requiring issuers to facilitate debit transactions at a substantial loss—a result that is neither "reasonable" nor "proportional." Indeed, many issuers are already unable to recover the full costs of providing debit cards. Slashing the interchange fee cap would further impede issuers' continued ability to facilitate safe and efficient transactions, hurting consumers. And doing so would grant merchants a windfall, as they have demonstrated that they will not pass on any savings to consumers.

The Board complied with the statute when it included the categories of actual costs that the district court deemed prohibited. And imposing a brand-new interpretation now would be extraordinarily harmful and needlessly disruptive to the

6

diverse set of stakeholders in the debit card market—including consumers and merchants—that have relied on Regulation II and long-settled law upholding it. This Court should reverse.

**ARGUMENT**

## I. THE INCLUSION OF CERTAIN CATEGORIES OF COSTS IN THE INTERCHANGE FEE CAP IS CONSISTENT WITH THE TEXT AND PURPOSE OF THE DURBIN AMENDMENT

### A. The District Court Misinterpreted The Reasonable And Proportional To Costs Mandate

The Durbin Amendment directs that "[t]he amount of any interchange transaction fee … shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(2). The statute then directs the Board to promulgate regulations establishing "standards for assessing whether the amount of any interchange transaction fee" meets that mandate. *Id.* § 1693*o*-2(a)(3)(A).

In developing these standards, the Board is directed to "consider[]" certain costs, such as "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." *Id.* § 1693*o*-2(a)(4)(B)(i). Congress also instructed that the Board must not consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* § 1693*o*-2(a)(4)(B)(ii). Congress thus directed the Board to "distinguish" between certain costs that had to be considered

7

and certain other costs that could not be. *Id.* § 1693*o*-2(a)(4)(B). But its overarching mandate remained that the interchange fee be "reasonable and proportional to *the cost incurred by the issuer with respect to the transaction*." *Id.* § 1693*o*-2(a)(3)(A) (emphasis added).

Issuers incur costs with respect to electronic debit transactions that are not listed in Subsection (a)(4)(B)'s mandatory inclusion or exclusion categories. The plain terms of Subsection (a)(3)(A) require that this third category of costs be considered. Again, the statute's foundational direction is that the fee "be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* § 1693*o*-2(a)(2). Had Congress intended that issuers recover only *part* of that cost, it would have said so directly. *See, e.g.*, *NACS*, 746 F.3d at 485. But Congress did not do so. To the contrary, the statute uses mandatory language requiring that interchange fees be based on "the cost" of the transactions, full stop. 15 U.S.C. § 1693*o*-2(a)(2).

While Subsection (a)(4)(B)(i) required the Board to consider certain costs in setting the fee, the statute did not preclude consideration of other, unenumerated costs. Had Congress intended to do so, it would have made such a limitation express. For example, it could have written Subsection (a)(4)(B)(ii) to exclude "*all* other costs" or Subsection (a)(4)(B)(i) to allow for consideration of "*only*" the

8

"authorization, clearance, or settlement" costs listed there. But Congress did none of that.

The district court's view that Subsection (a)(4)(B)(i) defines the universe of costs the Board can consider (*Corner Post*, 794 F. Supp. 3d at 626-27) is also inconsistent with the existence of Subsection (a)(4)(B)(ii), in which Congress directed the Board to disregard costs "not specific" to a debit card transaction. There would have been no reason for Congress to expressly exclude any particular cost if *only* the "authorization, clearance, or settlement" costs identified just before could be considered. The district court's reading would render the express prohibition in Subsection (a)(4)(B)(ii) superfluous in violation of a fundamental rule of statutory interpretation. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 543 (2015) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." (citation omitted)).

In sum, the statute requires the Board to establish "standards for assessing whether the amount of any interchange transaction fee … is *reasonable and proportional* to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(3)(A) (emphasis added). Other than one express carve-out, the statute does not limit the fees the Board may consider in fulfilling this mandate.

9

**B.    The Statute Requires Inclusion of All Four Categories of Costs That The District Court Disallowed**

The Board correctly concluded that the interchange fee must reflect at least the four categories of costs that Corner Post challenges, namely, (1) so-called "fixed" "authorization, clearance, or settlement" ("ACS") costs, (2) transaction-monitoring costs, (3) network processing fees, and (4) a fraud-loss adjustment based on the value of the transaction.  Contrary to the district court's conclusions, each must be reflected in the interchange fee because it is a "cost incurred by the issuer with respect to the transaction."  *Id.* § 1693*o*-2(a)(2).

1. So-called "fixed ACS costs."  What the district court characterized as "fixed ACS costs" are allowable.  ACS costs include all costs related to authorizing, clearing, or settling a transaction—whether fixed or variable—that an issuer would not have incurred but for the provision of debit card transaction services.  It is often difficult to determine which ACS costs are "fixed" and which are "variable," but the relevant statutory language uses neither word, instead saying "incremental."  *Id.* § 1693*o*-2(a)(4)(B)(i).  "[I]ncremental" ACS costs therefore include what the district court labels "fixed" ACS costs because such costs, divided and allocated to each individual transaction, are incremental and transaction-specific.

2. Transaction monitoring costs.  Transaction monitoring permits an issuer authorizing a particular transaction to confirm that a card is valid and to authenticate the cardholder.  *See* Debit Card Interchange Fees & Routing, Final Rule, 76 Fed.

10

Reg. 43,394, 43,430-31 (July 20, 2011). This function is integral to each debit card transaction, during which, for example, an issuer "may flag a transaction as suspicious and decline the authorization request or require the merchant to verify the transaction with the issuer before deciding whether to approve or deny the transaction." *Id.* at 43,431. The cost of this function is indisputably transaction-specific and related to authorization.

3. <u>Network processing fees.</u> Network fees "are obviously specific to particular transactions." *NACS*, 746 F.3d at 490-91. Issuers pay a network processing fee for each electronic debit transaction processed for the issuer by that network. Indeed, issuers cannot process a transaction without using the networks and paying their required fees. Debit Card Interchange Fees & Routing, Notice of Proposed Rulemaking, 75 Fed. Reg. 81,722, 81,735 (Dec. 28, 2010); *see NACS*, 746 F.3d at 490-91.

4. <u>Fraud-loss adjustment.</u> Fraud losses include "those losses incurred by the issuer, other than losses related to nonsufficient funds, that are not recovered through chargebacks to merchants or debits to or collections from customers." Final Rule, 76 Fed. Reg. at 43,431. These losses, as the Board recognized, arise from the authorization, clearing, or settlement of particular transactions. *See id.* They most commonly result from fraud related to a counterfeit card, a lost or stolen card, or a card not present. *See id.* Such fraud loss, too, is transaction-specific.

11

* * *

Far from taking into account too many cost categories, the Board's consideration of costs was actually *underinclusive*. There are other costs actually incurred and specific to a transaction that the Board should have considered. The Board itself has acknowledged that as of 2021, only 77 percent of issuers recover their full base component costs under Regulation II. Debit Card Interchange Fees & Routing, Notice of Proposed Rulemaking, 88 Fed. Reg. 78,100, 78,113 (Nov. 14, 2023). The district court's edict to the Board would only exacerbate that problem.

Indeed, the district court's interpretation of the statute would raise "a serious doubt as to its constitutionality." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (internal quotation marks omitted). Although the government may limit returns when regulating prices, it is "plain that the 'power to regulate is not a power to destroy.'" *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 769 (1968) (citation omitted). The district court's reading of the statute violates that principle by directing the Board to cap interchange fees at far less than the cost incurred by an issuer with respect to an electronic debit transaction. When the government regulates prices, it must enable a company to "maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed." *Id.* at 792. And "just and reasonable" rates must allow an issuer the opportunity to recover its costs and earn a return "commensurate with returns on investments in

12

other enterprises having corresponding risks." *Fed. Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 399 (1974); *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944). Interpreting the Durbin Amendment to require a rate cap so far below issuer costs would thus present grave constitutional questions about the statute. That is reason enough to reject such an interpretation. *See Zadvydas*, 533 U.S. at 689.

## C. The Adoption Of A Uniform Standard Applicable To All Issuers And Transactions Was Permissible

The district court separately erred in concluding that the Durbin Amendment requires different interchange fee caps for different issuers. *Corner Post*, 794 F. Supp. 3d at 637-39. Contrary to the court's analysis, that reading is far from compelled: the statute's references to "the transaction," "an electronic debit transaction," and "the issuer" are most naturally read to mean a representative (rather than singular) issuer and transaction. 15 U.S.C. § 1693*o*-2(a)(1)-(3); *see Sports v. Top Rank, Inc.*, 954 F.3d 1142, 1147-48 (8th Cir. 2020) ("[T]he word 'a' is often used to mean 'any.'"); *accord* 1 U.S.C. § 1 ("words importing the singular include and apply to several … things"). If Subsection (a)(3)(A) required an "issuer" by "issuer" approach, parallelism would presumably require a "transaction" by "transaction" approach as well. But as the Board has explained, varying the interchange fee by transaction would be "virtually impossible to implement" and thus "absurd." Board Br. at 56-57, 59 (internal quotation marks omitted). It is a foundational principle of statutory interpretation that Congress does not intend to

13

enact statutes that would produce "absurd results." *United States v. E.T.H.*, 833 F.3d 931, 938 (8th Cir. 2016). This Court should reject such an unworkable interpretation.

## II. SLASHING THE INTERCHANGE FEE CAP WOULD NOT HELP CONSUMERS AND WOULD HARM THE DEBIT CARD MARKET

The district court's interpretation of the Durbin Amendment would give merchants—and only merchants—a windfall, while hurting other participants in the debit card market. Consumers would not benefit from a reduced interchange fee cap as merchants have demonstrated that they would not pass along any savings. At the same time, reducing fees below issuer costs would limit issuers' ability to facilitate secure and efficient debit transactions. That would damage an important part of the U.S. economy's payment infrastructure—debit cards provide significant value to consumers, merchants, banks of all sizes, including community banks, and credit unions.

### A. Merchants Have Not Passed On Savings to Consumers

The Board was statutorily required to consider consumer and economic impact when drafting Regulation II. 15 U.S.C. § 1693b(a)(2)-(3). When Regulation II was promulgated, many commenters predicted—and the Board acknowledged—that the rule might bring limited benefits to consumers and might even harm them. Final Rule, 76 Fed. Reg. at 43,462; *see id.* at 43,464 (observing that Regulation II

14

might cause "fees and other account terms" to become "less attractive" to low-income consumers, rendering them "unwilling or unable to obtain debit cards").

Those commenters were correct. There is no credible evidence that the Durbin Amendment has resulted in any benefit to the American consumer. A 2013 study estimated that the present discounted value of consumer losses resulting from the Durbin Amendment could total between $22 billion and $25 billion.[2] And in fact, empirical evidence demonstrates that the interchange fee cap has forced issuers to recover costs by increasing other consumer fees, such as those for checking accounts, and reducing the availability of free checking accounts.[3] Adopting the district court's interpretation of the statute would exacerbate the overall harm. *Infra* pp. 18-19.

The only beneficiaries of Regulation II have been merchants, who receive an unjustified windfall because they have not passed along savings from reduced interchange fees. For example, the Federal Reserve Bank of Richmond found most merchants—77 percent—did not adjust prices at all after Regulation II's

---

[2] David S. Evans, Howard H. Chang & Steven Joyce, *The Impact of the U.S. Debit Card Interchange Fee Regulation on Consumer Welfare: An Event Study Analysis*, at 6 (Coase-Sandor Inst. For L. & Econ., Working Paper No. 658, 2013), https://chicagounbound.uchicago.edu/law_and_economics/652/.

[3] Natasha Sarin, *Making Consumer Finance Work*, 119 Colum. L. Rev. 1519, 1536-37 (2019).

15

implementation, and 22 percent actually raised them.[4]  A 2013 survey found that only 3 percent of merchants intended to pass on such savings.[5]  Indeed, there is evidence that merchants never saw reduced interchange fees as anything other than a tool for increased profits.  In a 2010 earnings conference, for example, Home Depot's then-Chief Financial Officer stated that, "[b]ased on the Fed's draft regulation, we think the benefit to The Home Depot could be $35 million a year."[6]

The statute requires the Board to consider "the costs and benefits to financial institutions, consumers, and other users of electronic fund transfers" and to show, to the extent practicable, "that the consumer protections of [Regulation II] outweigh the compliance costs imposed upon consumers and financial institutions."  15 U.S.C. § 1693b(a)(3).  The district court's directive to the Board, which would harm issuers and the entire debit card system without benefiting consumers, transgresses these principles.

---

[4] Zhu Wang et al., *The Impact of the Durbin Amendment on Merchants: A Survey Study*, Fed. Reserve Bank of Richmond, 100 Econ Q. 183, 194-95 (2014).

[5] MasterCard Worldwide, *Interchange and Durbin Amendment*, at 2, *as cited in* Bradley Hubbard, *The Durbin Amendment, Two-Sided Markets, and Wealth Transfers: An Examination of Unintended Consequences Three Years Later*, at 37, Univ. of Chi. L. Sch. (2013), https://papers.ssrn.com/sol3/papers.cfm?abstract_id =2285105.

[6] Seeking Alpha, *The Home Depot's CEO Discusses Q4 2010 Results – Earnings Call Transcript* (Feb. 22, 2011), https://seekingalpha.com/article/254224-the-home-depots-ceo-discusses-q4-2010-results-earnings-call-transcript.

**B.**     **Regulation II Has Not Enabled Banks And Credit Unions To Incur Excess Profits**

Similarly, any suggestion that the Board's interpretation of the Durbin Amendment has led to excess issuer profits is unfounded.  By the Board's own admission, only 77 percent of issuers currently recover their "allowable" base component costs under Regulation II.  Notice of Proposed Rulemaking, 88 Fed. Reg. at 78,113.  And, as explained above, those base component costs are only a subset of the full costs associated with debit transactions.  *Supra* pp. 8-9, 12.

Both the Durbin Amendment itself and the Board acknowledge that there are costs that are actually incurred by debit card issuers but that are not included in the Regulation II fee cap.  *See* 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii) (prohibiting the Board from considering "other costs incurred by an issuer which are not specific to a particular electronic debit transaction"); Final Rule, 76 Fed. Reg. at 43,427-29 (providing examples of costs not included in the cap, such as corporate overhead). Issuers are obviously not earning exorbitant profits from debit card transactions while operating under a regulatory regime that does not even allow all issuers to recover all of their costs.

**C.**     **Including Actual Costs Ensures That Debit Cards Remain A Safe, Efficient, And Effective Payment Method**

Consumers derive substantial benefits from debit cards, including convenience, safety, and efficiency.  Merchants, too, benefit from this payment

method, which allows them to attract customers who want to use debit cards and gain additional sales from customers who do not carry cash or checks. More concretely, using debit cards instead of cash saves merchants and consumers 16.5 seconds per purchase.[7] Debit transactions also enable both consumers and merchants to limit the safety and security risks associated with cash or check transactions.

Unreasonably low interchange fees have already hurt this ecosystem, and the district court's interpretation of the statute would do further damage if implemented. As explained above, revenues from interchange fees fail to reflect true costs. That means issuers have been forced to make difficult decisions about where to spend their capital—required to choose, for example, between innovating in the debit card payments system and offering free or low-cost consumer banking services.

Exclusion of costs targeted by the district court would aggravate this problem. Fraud incidence nearly tripled from 2011 to 2023.[8] Forbidding issuers from recovering fraud costs would reduce the available funds to combat fraud by billions

---

[7] Progressive Policy Institute, *The Unanticipated Costs and Consequences of Federal Reserve Regulation of Debit Card Interchange Fees*, at 7 (Dec. 2025), https://www.progressivepolicy.org/wp-content/uploads/2025/12/PPI_The-Unanticipated-Costs-and-Consequences-of-Federal-Reserve-Regulation-of-Debit-Card-Interchange-Fees_V3.pdf.

[8] Board of Governors of the Federal Reserve System, *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions*, at 20-21 (Dec. 2025), https://www.federalreserve.gov/paymentsystems/files/debitfees_costs_2023.pdf.

of dollars. Fraud prevention is vitally important to the safety, security, and efficiency of the entire debit card ecosystem—to consumers, issuers, and merchants alike.

Implicit in complaints about debit card fees and claims that they drive up the price of goods is the assumption that there is a lower cost, comparable alternative, such as cash or checks. That assumption is incorrect.

Handling cash is cumbersome and labor intensive. It presents safety issues and is more vulnerable to fraud. Investing in security measures to ensure cash is kept and deposited safely is expensive. NACS, a merchant trade organization, recently estimated that convenience store staff spend as many as 20 paid labor hours a week just counting cash.[9] Unlike card processing fees, these activities typically do not show up as line items on a business's financial statement, masking their significant costs. Counting is just the beginning—managing the physical exchange and movement of cash imposes additional costs on merchants.[10] In particular, there are significant expenses related to preparing cash to be picked up by armored

---

[9] NACS, *The Hidden Costs of Cash Management* (Mar. 26, 2024), https://www.convenience.org/Media/Daily/2024/March/26/2-The-Hidden-Costs-of-Cash-Management_Payments.

[10] NACS, *Is Your Cash Management System Costing More?* (Feb. 6, 2024), https://www.convenience.org/Media/Daily/2024/Feb/6/2-Is-Cash-Management-System-Costing-More_Payments.

19

couriers[11] and guarding it against internal theft.[12]  Counterfeiting imposes ongoing

risks.[13]  According to research conducted on behalf of the retail industry, the cost of

accepting cash ranges from 4.7 percent to 15.5 percent of the value of the

transaction.[14]  That dwarfs the cost of debit card acceptance.

There is also a cost disparity for check processing.  Indeed, the number of

merchants accepting check payments is declining, in no small part due to the expense

of accepting checks and the risk of such payments bouncing for insufficient funds.[15]

"In both 2018 and 2021, average and median values of returned checks consistently

exceeded those of checks collected," and the value of returned checks processed

through the Board was $57 billion in 2018 and increased to $62 billion in 2021.[16]

While Congress instructed the Board to consider the functional similarity between

debit and checking transactions, 15 U.S.C. § 1693*o*-2(a)(4)(A), it did not purport to

---

[11] *See id.* (reporting that armored carriers cost about $60 per pick up).

[12] NACS, *Safe and Secure* (Oct. 2021), https://www.nacsmagazine.com/Issues/October-2021/safe-and-secure.

[13] Addy Bink, *Nearly $22M in Counterfeit Currency Was Seized Last Year: How to Tell If Your Cash Is Fake* (Mar. 12, 2024), The Hill, https://thehill.com/homenews/nexstar_media_wire/4527330-nearly-22m-in-counterfeit-currency-was-seized-last-year-how-to-tell-if-your-cash-is-fake.

[14] Julian Morris & Ben Sperry, *The Cost of Payments: A Review*, Int'l Ctr. for L. & Econ. (Aug. 28, 2024), https://laweconcenter.org/resources/the-cost-of-payments-a-review.

[15] *Id.*

[16] Federal Reserve Bank of Atlanta, *Checks Processed by the Federal Reserve in 2021: Report of the Check Sample Survey*, at 12-13 (Apr. 25, 2023), https://www.atlantafed.org/-/media/documents/payments-forum/publications/check-sample-survey/2023/05/05/2021-survey/report.pdf.

Appellate Case: 25-3000     Page: 29     Date Filed: 01/09/2026 Entry ID: 5595717

require the Board to make debit transactions equivalent to checking transactions in all respects. And the Board did consider "similarities and differences" between check and debit transactions "in establishing standards for assessing whether interchange fees are reasonable and proportional to cost." Final Rule, 76 Fed. Reg. at 43,398-401. That is all the statute required.

### D. Substantially Reducing The Interchange Fee Cap Would Hurt Community Banks And Credit Unions

Slashing the interchange fee cap would also hurt community banks and credit unions, which are vital to the U.S. economy. The approximately 4,000 community banks across the country provide "personalized service and maintain greater connection to their customers."[17]

Community banks, which generally have less than $10 billion in assets, are expressly exempt from Regulation II's coverage. 15 U.S.C. § 1693*o*-2(a)(6)(A). But following enactment of the Durbin Amendment, community banks and credit unions saw "their interchange revenue drop 30% per swipe on PIN debit transactions."[18] The average inflation-adjusted interchange fee for "exempt" issuers

---

[17] Federal Reserve Bank of Kansas City, *The Critical Role of Community Banks* (Aug. 20, 2024), https://www.kansascityfed.org/banking/community-banking-bulletins/the-critical-role-of-community-banks/.

[18] Testimony of Charles G. Kim before the S. Comm. on the Judiciary (May 3, 2022), https://www.judiciary.senate.gov/imo/media/doc/Kim%20Testimony.pdf.

21

dropped by more than 35 percent for single-message (i.e., PIN) transactions and 8 percent for dual-message (i.e., signature) transactions.[19]

Interchange fees plummeted for expressly exempt community banks and credit unions because they do not operate in a vacuum. As covered issuers were forced to reduce interchange fees, exempt issuers faced downward market pressure from payment card networks and other market participants, resulting in fewer routing options and lower interchange fees. That means Regulation II has had substantial and negative downstream impacts on these "exempt" issuers—impacts that will grow far worse if the district court's decision is implemented.

## III. AFFIRMING THE DISTRICT COURT'S ERRONEOUS INTERPRETATION OF THE STATUTE WOULD CREATE A CIRCUIT SPLIT AND DISTURB RELIANCE INTERESTS

Regulation II has been in effect since 2011, and in 2014 it withstood a challenge in the D.C. Circuit advancing many of the same arguments raised here. *See NACS*, 746 F.3d 474. Now, almost 15 years after Regulation II issued and 11 years after the D.C. Circuit affirmed it, Corner Post asks this Court to throw the regulation out, on the theory that it has been unlawful all this time. A decision by

---

[19] Electronic Payments Coalition, *What Exemption? Community Banks and Credit Unions Lose Under the Durbin Amendment* (Oct. 30, 2023), https://electronicpaymentscoalition.org/resources/what-exemption-community-banks-credit-unions-lose-under-the-durbin-amendment/.

this Court adopting that view would be extraordinarily disruptive, upending years of settled expectations and undermining the country's payments ecosystem.

### A. Upholding The District Court's Decision Would Create A Split With the D.C. Circuit, Fostering Increased Uncertainty

This Court does not paint on a blank canvas. In 2014, the D.C. Circuit considered and rejected challenges to Regulation II nearly identical to those raised by Corner Post here. *See NACS*, 746 F.3d at 488-89 (upholding the Board's determination that the Durbin Amendment allows the Board to consider costs that fall outside the two categories of costs specifically listed). Although the D.C. Circuit upheld the Board's interpretation of the statute in part by applying the now-overruled *Chevron* framework, it also relied on "traditional tools of statutory interpretation" to construe the statute. *Id.* at 477. In doing so, it analyzed the same statutory phrases at issue here. *See, e.g.*, *id.* at 485-87 (assessing thoroughly whether section 1693*o*-2(a)(4)(B)(ii)'s "which" clause should be read restrictively or descriptively). Because those interpretative tools are no less useful in a post-*Chevron* world, the D.C. Circuit's analysis of the statute—and whether Regulation II comports with it— remains compelling.

As the Supreme Court recognized in allowing this case to proceed to the merits, "[i]f neither [the Supreme] Court nor the relevant court of appeals has weighed in, a court may be able to look to other circuits for persuasive authority." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 823-24

23

(2024).  *NACS* is exactly that kind of persuasive authority.  As explained above, *NACS* addressed the statutory interpretation questions presented here.  The D.C. Circuit's statutory analysis was thorough and well-reasoned.  Indeed, after *Loper Bright*, the only other district court to have addressed the same challenges to Regulation II upheld the regulation, referencing the D.C. Circuit's statutory interpretation in conducting its own robust analysis.  *See Linney's Pizza, LLC v. Bd. of Governors of Fed. Rsrv. Sys.*, --- F. Supp. 3d ----, 2025 WL 2645489, at *8-10, *12-13 (E.D. Ky. Sept. 15, 2025), *appeal docketed*, No. 25-6038 (6th Cir. Nov. 13, 2025).  This Court thus need not "expend significant resources" to address Corner Post's recycled and meritless contentions.  *Corner Post*, 603 U.S. at 823-24.

That *Chevron* has been overruled in the intervening period does not weaken *NACS*'s precedential value in the D.C. Circuit—or its persuasive value here.  Indeed, the Supreme Court stressed that, by overruling *Chevron*, it "d[id] not call into question prior cases that relied on the *Chevron* framework," and that "[t]he holdings of those cases that specific agency actions are lawful … are still subject to statutory *stare decisis* despite [the] change in interpretive methodology."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); *see Bastias v. U.S. Att'y Gen.*, 158 F.4th 1188, 1195-96 (11th Cir. 2025) (Newsom, J., concurring) (taking the *Loper Bright* Court's "reference to 'statutory *stare decisis*' to indicate an intent to preserve

24

*Chevron*-era courts' interpretations").  The D.C. Circuit's holding in *NACS* thus remains good law.

The continuing vitality of *NACS* is bolstered by congressional acquiescence. If Congress believed that Regulation II contravened the Durbin Amendment, it could have amended the statute after *NACS*.  But in the almost 15 years since the regulation has been on the books, and the 11 years since *NACS* was decided, Congress has left the statute alone.  As the Supreme Court has repeatedly explained, "*stare decisis* carries enhanced force when a decision … interprets a statute," because "Congress can correct any mistake it sees."  *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015); *see, e.g.*, *Watson v. United States*, 552 U.S. 74, 82-83 (2007) ("long congressional acquiescence" over 14 years "enhanced even the usual precedential force" accorded to interpretations of statutes (internal quotation marks omitted)).

### B.  The District Court's Flawed Reading Would Upend The Interests Of Parties That Have Long Relied On Regulation II

Even though *NACS* is not binding on this Court, the values underlying statutory *stare decisis* counsel against departing from its holdings.  A "foundation stone of the rule of law," *stare decisis* "promotes the evenhanded, predictable, and consistent development of legal principles" and "fosters reliance on judicial decisions."  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798 (2014).  The principles animating *stare decisis* "demand respect for precedent," regardless of "whether judicial methods of interpretation change or stay the same."  *CBOCS W.,*

25

*Inc. v. Humphries*, 553 U.S. 442, 457 (2008). Failure to adhere to those principles threatens "the legal stability that they seek and upon which the rule of law depends." *Id.*

If upheld, the district court's decision would generate legal instability that would harm a cross section of participants in the debit card market and the broader U.S. economy. Relying on Regulation II and its validation by the D.C. Circuit, issuers and other players in the market have collectively invested billions of dollars into developing, maintaining, and innovating the complex debit card payments system. For example, during the COVID-19 pandemic, financial institutions' significant investments in new technologies made possible the rapid adoption of contactless payments.[20] And as bad actors have grown ever more sophisticated, issuers have had to invest heavily in fraud prevention and detection, with over a quarter of financial organizations recently surveyed now reportedly spending between 15 and 25 percent of their annual budget on fraud prevention efforts.[21] Consumers and merchants alike have reaped the benefits of a safe and efficient debit card market. *Supra* pp. 17-19.

---

[20] Clearing House Association LLC et al., *Comment Letter on Proposed Modifications to Regulation II*, at 31 (May 10, 2024), https://consumerbankers.com/wp-content/uploads/2024/05/Joint-Trades-Reg-II-Comment-Letter-2024.05.10.pdf.

[21] Alloy, *2026 State of Fraud Report*, at 38, https://use.alloy.co/rs/915-RMN-264/images/2026-State-of-Fraud-Report_alloy.pdf.

26

The concerns underpinning *stare decisis* are "at their acme" in cases, like this one, "involving … contract rights, where reliance interests are involved." *Payne v. Tennessee*, 501 U.S. 808, 828 (1991). In the commercial context, the Supreme Court has declined to depart from well-established rules when doing so "would disrupt settled expectations in an area of the law in which the demands of the national economy require stability." *Allied-Signal, Inc. v. Dir., Div. of Tax'n*, 504 U.S. 768, 785-86 (1992). Issuers and countless others "have for many years relied on" Regulation II, "negotiating their contracts and structuring their transactions" against the "backdrop" of what—until now—has properly been understood as the settled interpretation of the Durbin Amendment. *Bay Mills*, 572 U.S. at 798-99. There is no basis to disturb these substantial reliance interests.

## CONCLUSION

This Court should reverse.

27

Dated:  January 6, 2026

Respectfully submitted,

/s/ Joseph R. Palmore

THOMAS PINDER
ANDREW DOERSAM
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Avenue NW
Washington, DC 20036

JOSEPH R. PALMORE
NATALIE A. FLEMING NOLEN
JEREMY MANDELL
ALISON H. HUNG*
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
(202) 887-6940
JPalmore@mofo.com

*Admitted only in New York; practicing
under the supervision of attorneys admitted
in the District of Columbia

Counsel for Amici Curiae

28

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitations and typeface and type style requirements of the Federal Rules of Appellate Procedure and Local Rules because it has been prepared using a proportionally spaced typeface, including serifs, in 14-point Times New Roman font using Microsoft Word and includes 5,870 words, excluding the parts exempted by the Rules.

The electronic version of this filing was scanned for viruses and is virus-free. *See* 8th Cir. R. 28A(h).

Dated:  January 6, 2026

/s/ Joseph R. Palmore
Joseph R. Palmore

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system on January 6, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: January 6, 2026

/s/ Joseph R. Palmore
Joseph R. Palmore

MF-364737630