No. 25-3000

---

## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

---

CORNER POST, INC., *Plaintiff/Appellee*,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,
*Defendant/Appellant*,

---

On Appeal from the United States District Court for the District of North Dakota,
Case No. 1:21-cv-00095-DMT-CRH, Honorable Daniel M. Traynor

---

## BRIEF OF *AMICI CURIAE* MISSOURI BANKERS ASSOCIATION AND SIX ADDITIONAL STATE BANKING ASSOCIATIONS IN SUPPORT OF DEFENDANT/APPELLANT AND URGING REVERSAL

**[Additional amici listed on inside cover]**

---

George F. Verschelden
STINSON LLP
1201 Walnut, Suite 2900
Kansas City, Missouri 64106
816-842-8600
816-691-3495 Facsimile
george.verschelden@stinson.com

*Counsel for Amici Curiae*

## Additional *Amici Curiae*

Arkansas Bankers Association, Iowa Bankers Association, Minnesota Bankers Association, Nebraska Bankers Association, North Dakota Bankers Association, and South Dakota Bankers Association.

Appellate Case: 25-3000    Page: 2    Date Filed: 01/09/2026 Entry ID: 5595724

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 29(a)(4)(A), Fed. R. App. P. 26.1, and 8th Cir. R. 26.1A, the Arkansas Bankers Association ("ABA"), Iowa Bankers Association ("IBA"), Minnesota Bankers Association ("MBA (Minnesota)"), Missouri Bankers Association ("MBA"), Nebraska Bankers Association ("NBA"), North Dakota Bankers Association ("NDBA"), and South Dakota Bankers Association ("SDBA"), who are *amici curiae,* state as follows:

ABA, IBA, MBA (Minnesota), MBA, NBA, NDBA, and SDBA are non-profit corporations, do not have parent corporations, and have not issued stock.

*/s/ George F. Verschelden*
George F. Verschelden

Appellate Case: 25-3000     Page: 3     Date Filed: 01/09/2026 Entry ID: 5595724

# TABLE OF CONTENTS

Additional *Amici Curiae* ........................................................................... i

CORPORATE DISCLOSURE STATEMENT ...................................... ii

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF INTEREST OF *AMICI CURIAE* ...........................1

INTRODUCTION AND SUMMARY ...................................................4

ARGUMENT ........................................................................................6

I.     Congress charged the Board with issuing regulations for an interchange transaction fee that is reasonable and proportional to the costs incurred by the issuer bank. ......................................................................................6

     A.    The District Court's interpretation negates the process Congress established for determining an appropriate interchange transaction fee. ...................................................................................9

     B.    The District Court's interpretation of the Durbin Amendment ignores statutory language to invalidate Regulation II. ..................................12

          i.    The District Court ignored essential language in Section 1693o-2(a)(4)(B)(ii) ...............................................................12

          ii.    The District Court manufactured Congressional intent with its interpretation of Section 1693o-2(a)(3)(B)...............................15

          iii.   The District Court created new statutory interpretation rules for the word "distinguish." ...........................................................16

     C.    The impact of the District Court's decision would be catastrophic for banks...................................................................................17

II.    The District Court should have applied an arbitrary-and-capricious standard of review when addressing the components of the Board's interchange transaction fee cap. ........................................................................25

CONCLUSION....................................................................................28

CERTIFICATE OF COMPLIANCE....................................................30

CERTIFICATE OF SERVICE .............................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)........................................................................2

*Corner Post, Inc. v. Board of Governors of the Fed. Res. System*,
    794 F. Supp. 3d 610 (D. N.D. 2025)............................................*passim*

*Linney's Pizza, LLC v. Board of Governors of the Fed. Res. Sys.*,
    No. 3:22-cv-00071-GFVT, 2025 WL 2645489 (E.D. Ky. Sept. 15,
    2025) ........................................................................................17

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)..........................................................7, 25, 26

*Marx v. General Revenue Corp.*,
    568 U.S. 371 (2013)..................................................................14

*NACS v. Board of Governors of Federal Reserve System*,
    746 F.3d 474 (D.C. Cir. 2014), *cert. denied*, 574 U.S. 1121 (2015)..............2, 14

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997)....................................................................9

*Seven County Infrastructure Coal. v. Eagle County*,
    605 U.S. 168 (2025)..............................................................11, 26

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 551–559 (1946)................................26

15 U.S.C. § 1693o-2..........................................................................1

15 U.S.C. § 1693o-2(a)(2) ............................................................*passim*

15 U.S.C. § 1693o-2(a)(2)-(3) ........................................................8, 11

15 U.S.C. § 1693o-2(a)(3)(A)............................................................6, 9

15 U.S.C. § 1693o-2(a)(3)(B) ....................................................6, 9, 15, 16

iv

15 U.S.C. § 1693o-2(a)(4)(B) ............................................................*passim*

15 U.S.C. § 1693o-2(a)(6) ...............................................................4, 22

**Other Authorities**

12 C.F.R. § 235.3 ...........................................................................18

12 C.F.R. § 235.7(b) ......................................................................22

Board of Governors of the Federal Reserve System, 2023 Interchange
    Fee Revenue, Covered Issuer Costs, and Covered Issuer and
    Merchant Fraud Losses Related to Debit Card Transactions
    (December 2025),
    https://www.federalreserve.gov/paymentsystems/files/debitfees_co
    sts_2023.pdf. ..........................................................................18

Board of Governors of the Federal Reserve System, Average Debit
    Card Interchange Fee by Payment Card Network (December 19,
    2025),  https://www.federalreserve.gov/paymentsystems/regii-
    average-interchange-fee.htm ....................................................20

Debit Card Interchange Fees and Routing, 87 Fed. Reg. 61,217,
    61,2226 (Oct. 11, 2022) ......................................................22, 23

Debit Card Interchange Fees and Routing (Clarification), 80 Fed. Reg.
    48,684 (August 14, 2015) ..........................................................2

Debit Card Interchange Fees and Routing (Final Rule), 76 Fed. Reg.
    43,394 (July 20, 2011) ......................................................*passim*

Debit Card Interchange Fees and Routing (Proposed Rule), 75 Fed.
    Reg. 81,722 (Dec. 28, 2010) ...................................................7, 19

"Statement on Proposed Revisions to Regulation II's Interchange Fee
    Cap by Governor Michelle W. Bowman," (October 25, 2023),
    https://www.federalreserve.gov/newsevents/pressreleases/bowman
    -statement-20231025.htm .........................................................24

Webster's Third New International Dictionary (2002) ..........................15

Appellate Case: 25-3000    Page: 6    Date Filed: 01/09/2026 Entry ID: 5595724

Zhu Wang, *Price Cap Regulation in a Two-sided Market: Intended and Unintended Consequences* (The Federal Reserve Bank of Richmond, Working Paper No. 13-06R, 2013), https://www.richmondfed.org/publications/research/working_papers/2013/wp_13-06r .............................................................21

Appellate Case: 25-3000    Page: 7    Date Filed: 01/09/2026 Entry ID: 5595724

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

Missouri Bankers Association ("MBA") is a Missouri non-profit corporation and trade association, founded in 1891, that represents more than 220 banks and savings and loan institutions that collectively have more than 2,000 locations in Missouri and employ over 30,000 Missouri residents. Its members serve hundreds of communities, thousands of businesses, and hundreds of thousands of individuals. Also appearing as *amici* are the bankers' associations from the States of Arkansas, Iowa, Minnesota, Nebraska, North Dakota, and South Dakota. Collectively, these seven associations represent all seven states in the Eighth Circuit. These associations represent and are advocates for the interests of their members which include more than 1,000 state and federally chartered banks, as well as savings and loan associations, which collectively serve thousands of communities, tens of thousands of businesses, and millions of individuals.

This case implicates important interests of the MBA and other bankers' association members. In 2010, Congress passed the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, which is codified at 15 U.S.C. § 1693o-2, directing the Board of Governors of the Federal

---

[1] As required by Fed. R. App. P. 29(a)(2), *amici* have obtained all parties' consent to the filing of this brief. Also, as required by Fed. R. App. P. 29(a)(4)(E), *amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici,* their members, or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

Reserve System (the "Board") to prescribe regulations regarding any interchange transaction fee received or charged by an issuer with respect to an electronic debit transaction. Congress directed that this interchange transaction fee "shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). The Board issued its final rule, titled Regulation II, on July 20, 2011. *See* Debit Card Interchange Fees and Routing (Final Rule), 76 Fed. Reg. 43,394 (July 20, 2011). Regulation II capped the interchange transaction fee at 21 cents per transaction plus an 0.05% *ad valorem* adjustment.

Regulation II was challenged in court, and in 2014 the United States Court of Appeals for the District of Columbia largely upheld Regulation II. *See NACS v. Board of Governors of Federal Reserve System,* 746 F.3d 474 (D.C. Cir. 2014), *cert. denied*, 574 U.S. 1121 (2015).[2] Members of each of the *amici* have abided by Regulation II for over a decade.

Because *NACS* was decided using the standard expressed in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), Plaintiff/Appellee Corner Post, Inc. reasserted the same challenges that were rejected over a decade ago, and

---

[2] The DC Circuit remanded a "minor issue" and directed the Board to clarify why it chose to include transaction-monitoring costs under Regulation II. *NACS*, 746 F.3d at 492-93. On August 14, 2015, the Board issued this clarification. Debit Card Interchange Fees and Routing (Clarification), 80 Fed. Reg. 48,684 (August 14, 2015). This clarification was not challenged in court, nor has Congress taken any action to limit the Board's authority under the Durbin Amendment.

Appellate Case: 25-3000     Page: 9     Date Filed: 01/09/2026 Entry ID: 5595724

asks this Court to affirm the District Court's ruling that the Durbin Amendment only allows the Board to consider a specific category of costs in setting an interchange transaction fee. If upheld, the Board would be precluded from considering relevant facts in an inherently policy-implicating decision and could never set an interchange transaction fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." This would be highly detrimental to banks. As the Board acknowledged, the cap in Regulation II already "result[ed] in some issuers not fully recovering their average per-transaction cost through interchange fees."[3] The Board previously found that Regulation II would allow only 80 percent of covered issuers to recover the costs for transactions processing, chargebacks and other non-routine transactions, network processing fees, transactions monitoring, and fraud losses.[4] In setting the fee cap in Regulation II, the Board declined to consider all eligible costs and "did not include a level of profit or a rate of return."[5] The District Court's decision—which further limits the relevant factors the Board can consider in setting the interchange transaction fee—would force the Board to set an interchange transaction fee that will cause more banks to lose even more money or force banks to raise consumer checking fees to recover costs for processing electronic debit transactions. This is why *amici* request that the Court vacate the

---

[3] Regulation II, 76 Fed. Reg. at 43,434.
[4] Regulation II, 76 Fed. Reg. at 43,434.
[5] Regulation II, 76 Fed. Reg. at 43,420, 43,427, 43,427 n.119.

3

District Court's decision and allow Regulation II to stand.

## INTRODUCTION AND SUMMARY

Congress passed the Durbin Amendment to regulate interchange transaction fees. Congress did not directly regulate these fees; instead, it directed the Board to issue regulations that would set a fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). Congress made it clear that the costs considered should be costs particular to an electronic debit transaction.

To fulfill this directive, the Board had to (1) determine what costs are incurred by an issuer with respect to an electronic debit transaction and (2) set a fee that was reasonable and proportional to those costs. To do so, Congress authorized the Board to gather whatever information it needed from issuers and networks. Armed with this information, the Board in Regulation II capped the fee at 21 cents per transaction plus an 0.05% *ad valorem* adjustment.

To be clear, *amici* contend that the fee cap in Regulation II is too low as the Board failed to include all costs which are incurred by issuers.[6] Indeed, the Board acknowledged that the fee established in Regulation II would cover costs for only eighty percent of covered issuers. While issuers with under $10 billion in assets were excluded from Regulation II, *see* 15 U.S.C. § 1693o-2(a)(6), these banks are

---

[6] Regulation II, 76 Fed. Reg. at 43,427.

effectively subject to Regulation II due to market competition and because the same payment card networks serve both covered and exempt issuers. To remain competitive, community banks must give their customers the ability to use a debit card that is widely accepted, forcing them to absorb the losses for debit card accounts. While not ideal, community banks have dealt with the impact of Regulation II since 2011.

The District Court's interpretation of the Durbin Amendment, and the invalidation of Regulation II, would be devastating to community banks. Under the District Court's interpretation of the Durbin Amendment, the Board cannot determine "the cost incurred by the issuer with respect to the transaction," and instead the Board is restricted to considering only the incremental cost incurred by an issuer for the authorization, clearance, or settlement of a particular electronic debit transaction ("incremental ACS costs") in setting the interchange transaction fee. This interpretation would require the Board to materially decrease the interchange transaction fee, which would lead to devastating results for community banks and be detrimental and costly to their customers. Many community banks would either have to stop offering debit cards to their customers or would have to increase revenues from other sources such as account fees or establishing minimum account balance requirements – both of which would be detrimental to their

5

customers.  Additionally, if debit card payment volumes fall, then unit costs for all debit card payment network participants would increase.

This Court should reverse the District Court's decision.

## ARGUMENT

I. **CONGRESS CHARGED THE BOARD WITH ISSUING REGULATIONS FOR AN INTERCHANGE TRANSACTION FEE THAT IS REASONABLE AND PROPORTIONAL TO THE COSTS INCURRED BY THE ISSUER BANK.**

In the Durbin Amendment, Congress directed the Board to issue regulations setting a debit card interchange transaction fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2), (a)(3)(A).  To do so, the Board was granted authority to "obtain such information as may be necessary to carry out the provisions of this subsection" from any issuer or payment card network.  15 U.S.C. § 1693o-2(a)(3)(B).

The Durbin Amendment made it clear that the Board's analysis must focus on the costs incurred by an issuer for an electronic debit transaction.  Thus, Congress stated that the Board shall consider "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction," but the Board shall not consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction."  15 U.S.C. § 1693o-2(a)(4)(B)(i)-(ii).  The District Court correctly observed that Congress "was obviously focused on tethering issuers' interchange fees to costs

6

associated with 'particular electronic debit transactions.'" *Corner Post, Inc. v. Board of Governors of the Fed. Res. System*, 794 F. Supp. 3d 610, 632 (D. N.D. 2025).

While establishing a fee that is "reasonable and proportional" to costs incurred is inherently discretionary, *see Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394-395 (2024), the Board was directed to consider all costs incurred by the issuer with respect to an electronic debit transaction. As part of its decision-making process, the Board was expressly directed to gather information from networks and issuers. In 2010, the Board issued a proposed rule that contemplated a 12 cent cap. *See* Debit Card Interchange Fees and Routing (Proposed Rule), 75 Fed. Reg. 81,722 (Dec. 28, 2010). The Board then received and considered public comments on its Proposed Rule. It was clear that issuers incurred costs with respect to debit transactions that did not fit neatly within the cost categories of 15 U.S.C. § 1693o-2(a)(4)(B)(i)-(ii). Based on the public comments and mandated information gathering, the Board determined that certain additional costs must be considered so that the interchange transaction fee would be reasonable and proportional to the "*cost incurred by the issuer* with respect to the transaction." (emphasis added). The Board considered the facts and data it received and made policy decisions based on its expert knowledge of interchange and networks to consider the following four additional costs: 1) non-incremental ACS costs; 2) transaction-monitoring costs; 3)

7

fraud losses; and 4) networking processing fees.  *See* Debit Card Interchange Fees and Routing (Final Rule), 76 Fed. Reg. 43,394 (July 20, 2011) (codified at 12 C.F.R. §§ 235.1-235.10) ("Regulation II"). The Board set a fee cap that it acknowledged "will result in some issuers not fully recovering their average per-transaction cost through interchange fees."[7]  While this may reflect a reallocation of costs between banks, consumers and merchants, *amici* believe that the Board's fee cap failed the Durbin Amendment's directive, repeated twice by Congress, that the fee shall be "reasonable and proportional to *the cost incurred by the issuer with respect to the transaction*." 15 U.S.C. § 1693o-2(a)(2)-(3) (emphasis added).  The District Court's decision compounds the harm to banks and consumers and completely discounts the mandate stated by Congress.  The Board issued its final rule and established the interchange transaction fee with a cap of 21 cents per transaction plus an 0.05% *ad valorem* adjustment.   Regulation II, 76 Fed. Reg. at 43,404.

The District Court invalidated Regulation II due to the consideration of the four costs the Board found issuers incurred through its data collection.  The District Court ruled that the Board exceeded its authority because the District Court interpreted the Durbin Amendment to allow the consideration of only a single type of cost incurred by issuers—incremental ACS costs under Section 1693o-2(a)(4)(B)(i).  *Corner Post*, 794 F. Supp. 3d at 627. The District Court's ruling is

---

[7] Regulation II, 76 Fed. Reg. at 43,434.

Appellate Case: 25-3000     Page: 15     Date Filed: 01/09/2026 Entry ID: 5595724

contrary to the express directives of Congress in the Durbin Amendment and to the core objective to determine a debit card interchange transaction fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2), (a)(3)(A).

## A. The District Court's interpretation negates the process Congress established for determining an appropriate interchange transaction fee.

In invalidating Regulation II, the District Court lost the forest for the trees. It is axiomatic that in interpreting a statute one must consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The District Court's decision violated this principle.

In the Durbin Amendment, Congress gave the Board authority to issue regulations setting an interchange transaction fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). Thus, the Board must determine "the cost incurred by the issuer with respect to the transaction" to set the fee. This clear directive must drive the reading and implementation of the Durbin Amendment.

To allow the Board to make a fully informed decision, Congress expressly tasked the Board with fact finding and required that the Board gather "such information as may be necessary to carry out the provisions of this subsection." 15

9

U.S.C. § 1693o-2(a)(3)(B). Congress stated that the Board must consider incremental ACS costs, and the Board may not consider costs which are not specific to a debit transaction. 15 U.S.C. § 1693o-2(a)(4)(B)(i)-(ii). Congress also vested the Board with discretion to assure a fee that is "reasonable and proportional" to costs incurred by the card issuer.

Based on the information gathered from issuers, networks, and public comments, the Board determined that there were "costs incurred by the issuer with respect to the transaction" other than incremental ACS costs, and that these costs must be considered to set a fee "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). In doing so, the Board followed the Congressional mandate and statutory framework created in the Durbin Amendment to determine a cap of the fee at an amount "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2).

The District Court's interpretation of the Durbin Amendment nullifies the Congressional mandate and effectively eliminates the statutory framework. The District Court refused to acknowledge that the Board was given authority to determine the costs incurred by an issuer and instead concluded that Congress's directive and vesting of discretion to the Board was just a "generalized purpose statement[]" in "introductory paragraphs" that are then "narrowed and made

10

precise." *Corner Post*, 794 F. Supp. 3d at 625. Congress used the same language in two separate places in the Durbin Amendment – the fee shall be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2)-(3). The District Court erred in nullifying this precise language by labeling it an "introductory" paragraph.

By interpreting the Durbin Amendment to limit consideration to incremental ACS costs, the District Court improperly narrowed the Board's Congressional mandate to find facts and gather "such information as may be necessary to carry out the provisions of this subsection," precluded the Board from using its expertise to make policy decisions as to an appropriate interchange transaction fee, and prevented the Board from establishing a reasonable and proportional fee, and instead required the Board to set a fee that would result in increased losses for card issuers and higher costs for customers.

Under the District Court's interpretation, the only costs to be considered were incremental ACS costs. If that was Congress's intent, then Congress could have simply said that the Board will set an interchange transaction fee based only on the incremental ACS costs incurred by the issuer. But Congress did not, and instead delegated such a "fact-dependent, context-specific, and policy-laden choice" to the Board. *Seven County Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 182-83 (2025). The District Court erred in interpreting the Durbin Amendment in a manner

11

that discounted the Congressional mandate and negated the Board's express authority and discretion.

## B. The District Court's interpretation of the Durbin Amendment ignores statutory language to invalidate Regulation II.

The District Court's interpretation of the Durbin Amendment is riddled with legal errors. Several of the most glaring legal errors are highlighted below.

### i. The District Court ignored essential language in Section 1693o-2(a)(4)(B)(ii)

Section 1693o-2(a)(4)(B)(ii) provides that the Board shall not consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." The Board argued that the phrase "which are not specific to a particular electronic debit transaction" is "restrictive" defining a certain category of costs that cannot be considered by the Board. Corner Post argued that this phrase is "descriptive," and describes a non-exhaustive example of excluded costs.

The District Court acknowledged that a "descriptive" clause typically begins with the word "which" and is set apart with commas, while "restrictive" clauses typically start with "that" and are not sandwiched by commas. *Corner Post*, 794 F. Supp. 3d at 627. The District Court opined that the language in subparagraph (B)(ii) was "unorthodox" because it started with "which" but lacked commas. *Id.* at 628. Based on this "unorthodox" language, the District Court declared that the Durbin Amendment's "commas and articles are not reliable tools" and thus felt entitled to

12

exclude the phrase "which are not specific to a particular electronic debit transaction" from its interpretation of Section 1693o-2(a)(4)(B)(ii). *Id.* As a result, the District Court interpreted the Durbin Amendment to require the Board to consider only incremental ACS costs under subparagraph (a)(4)(B)(i), and treated Section 1693o-2(a)(4)(B)(ii) as if it directed the Board to not consider *any* "other costs incurred by an issuer."

The District Court erred in concluding that subparagraph (a)(4)(B)(ii)'s imprecise grammar justifies bifurcating costs in the Durbin Amendment as either incremental ACS costs (relevant) or other costs (irrelevant). If that were its intent, Congress could have simply stated that the Board shall not consider any costs other than "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction" as identified in (B)(i). Congress would have no need to "describe" one category of excluded costs in (B)(ii) if it was excluding *all* costs other than incremental ACS costs in (B)(i).

The District Court's analysis errs in other respects. First, the District Court used the "unorthodox" grammar to write out a key section of (B)(ii), yet in doing so ignored well-settled grammar rules. As the D.C. Circuit explained, "[w]idely-respected style guides expressly require that commas set off descriptive clauses, but

refer to descriptive 'which' and restrictive 'that' as a style preference rather than an ironclad grammatical rule." *NACS*, 746 F.3d at 487.

Second, the District Court's ruling is contrary to the canon against surplusage, which prefers an "interpretation [that] gives effect to every clause and word of a statute." *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013). The District Court rendered superfluous the phrase "which are not specific to a particular electronic debit transaction" in (B)(ii). Further, the District Court's interpretation essentially renders subparagraphs (a)(2), (a)(3), and (a)(4) unnecessary. If the Board can only consider incremental ACS costs, then there is no reason for (a)(2) and (a)(3) to refer to a broader category of "cost[s] incurred by the issuer with respect to the transaction," and (a)(4) is completely unnecessary as there is no reason to have a subparagraph addressing what can be considered and who can be consulted if the only consideration is incremental ACS costs.

The District Court admitted that Congress "was obviously focused on tethering issuers' interchange fees to costs associated with 'particular electronic debit transactions.'" *Corner Post*, 794 F. Supp. 3d at 632. Yet the District Court interpreted subparagraph (a)(4)(B)(ii) to prohibit the consideration of *all* other costs, regardless of whether they are tethered to a particular electronic debit transaction. The District Court's interpretation of subparagraph (a)(4)(B)(ii) is contrary to its own acknowledgement of Congress's intent.

14

The District Court's interpretation of subparagraph (a)(4)(B) also erred in that the District Court improperly ignored Congress's directive that the Board "consider" certain costs but not "consider" other costs. "Consider" is defined as "to reflect on" or to "think about with a degree of care or caution." Webster's Third New International Dictionary (2002). Congress's use of the term "consider" indicates that incremental ACS costs must be reflected on under (b)(i), not that incremental ACS costs are the only basis on which to set the fee. Congress's express directive to the Board to "consider" incremental ACS costs requires the consideration of other costs. If Congress wanted the fee to be based solely on incremental ACS costs, it would have been simple to say so. Congress did not.

### ii. The District Court manufactured Congressional intent with its interpretation of Section 1693o-2(a)(3)(B).

The District Court engaged in a tortured reading of subparagraph (a)(3)(B) to support its interpretation of the Durbin Amendment. Subparagraph (a)(3)(B) allows the Board to collect "such information as may be necessary to carry out the provisions of this subsection." Subparagraph (a)(3)(B) also instructs the Board to publish aggregate or summary information on ACS costs. While the District Court acknowledged that the Board was directed to gather "immense data" under subparagraph (a)(3)(B), it concluded that this subparagraph demonstrates Congress's intent to limit consideration to incremental ACS costs because only ACS

15

costs were to be published. *Corner Post*, 794 F. Supp. 3d at 629. The District Court's interpretation is legally flawed.

Subparagraph (a)(3)(B) does not by its terms purport to identify what costs should be considered by the Board when setting the interchange transaction fee – such terms are in a different subsection of the Durbin Amendment. The District Court failed to identify any basis to conclude the costs that the Board was instructed to publish are the only costs that the Board was authorized to consider when setting an interchange transaction fee.

Further, the District Court's interpretation of subparagraph (a)(3)(B) is inconsistent with its ultimate decision. The District Court concluded that only incremental ACS costs can be considered in setting the fee, and ruled that the Board erred by considering certain non-incremental ACS costs. *Corner Post*, 794 F. Supp. 3d at 633-34. Subparagraph (a)(3)(B) requires the Board to publish a summary of all ACS costs, not incremental ACS costs. Thus, the District Court's use of subparagraph (a)(3)(B) to support its conclusion that the Board may only consider *incremental* ACS costs is unfounded.

### iii. The District Court created new statutory interpretation rules for the word "distinguish."

The District Court placed great emphasis on the Durbin Amendment's command that the Board "distinguish between" incremental ACS costs (which shall be considered) and other costs which are not specific to a particular debit card

16

transaction (which shall not be considered). *Corner Post*, 794 F. Supp. 3d at 631. But the District Court presented no legal support for its conclusion that a direction to "distinguish" between two different cost categories means that they are the only possible cost categories to consider. As explained by Eastern District of Kentucky when rejecting this same argument:

> True, Congress enumerated only two categories, but the very nature of those categories creates a gray area for the existence of a third. The inclusion of those categories does not imply the exclusion of the third in context because the statute also requires that the fee standard promulgated by the Board be 'reasonable and proportionate' to the costs incurred by issuers, a command that Linney's Pizza simply glosses over. The distinguishing Congress required the Board to engage in merely staked out what Congress considered essential to include and essential to exclude – it did not speak to the array of other possible costs relevant to determining a reasonable and proportional fee.

*Linney's Pizza, LLC v. Board of Governors of the Fed. Res. Sys.*, No. 3:22-cv-00071-GFVT, 2025 WL 2645489, at \*8 (E.D. Ky. Sept. 15, 2025).

## C. The impact of the District Court's decision would be catastrophic for banks.

The Durbin Amendment made two main changes to the law governing debit card processing. In addition to giving the Board authority to establish standards for the amount of interchange transaction fees, the Durbin Amendment requires that issuers give merchants the choice of at least two payment card networks for processing debit card transactions. Both changes have reduced the amount of debit card interchange fees earned by debit card issuers – the Board used its rulemaking

17

authority to set a cap on interchange transaction fee amounts,[8] and merchants have chosen to use cheaper networks for processing electronic debit transactions.[9]

The MBA represents more than 220 banks and savings and loan institutions, nearly all of which have less than $10 billion in assets and are exempt from Regulation II. This exemption has not protected small issuers from the interchange transaction fee cap. The spillover effect from the interchange transaction fee cap has harmed community banks by reducing their single-message-network interchange fee revenue.[10] The District Court's decision to prohibit consideration of the additional costs incurred by issuers would further harm community banks. Such prohibited additional costs include transactions processing, chargebacks and other non-routine transactions, network processing fees, transactions monitoring, and fraud losses.[11] If the Board cannot consider such additional costs, it will be forced to reduce debit card interchange fee amounts in consideration of only per-transaction incremental ACS costs.

---

[8] 12 C.F.R. § 235.3.

[9] *See* notes 26–28 *infra*.

[10] Board of Governors of the Federal Reserve System, 2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions (hereafter, "2025 Federal Reserve Report") at 2, 15 (December 2025), available at https://www.federalreserve.gov/paymentsystems/files/debitfees_costs_2023.pdf.

[11] *Corner Post*, 794 F. Supp. 3d at 633–37. The District Court appears to refer to "transaction processing" costs and "costs of chargebacks and other non-routine transactions" as "fixed ACS costs." *Cf.* Regulation II, 76 Fed. Reg. at 43,429–30 *with Corner Post*, 794 F. Supp. 3d at 633–34.

Appellate Case: 25-3000     Page: 25     Date Filed: 01/09/2026 Entry ID: 5595724

That more limited scope of costs necessarily will reduce the Board's cap on the amount of per-transaction debit card interchange fees. When Regulation II was initially proposed, the Board did not consider these additional costs.[12] With such costs excluded, the Board considered setting the interchange transaction fee cap at 12 cents.[13] Capping the fee at 12 cents meant that 20 percent of covered issuers would not be able to recover their per-transaction costs.[14] In response to industry feedback that issuers would be unable even to recover all their costs, the Board increased the cap to 21 cents (plus five basis points of the transaction's value) in the final rule.[15] The Board concluded that this increase would allow 80 percent of covered issuers to recover, in addition to per-transaction costs, the additional costs for transactions processing, chargebacks and other non-routine transactions, network processing fees, transactions monitoring, and fraud losses.[16] In reaching this decision, the Board acknowledged that it did not consider all recoverable costs, that some issuers would not fully recover their average per-transaction cost, and that there would be no profit for issuers. The District Court's prohibition on considering

---

[12] *Cf.* Proposed Rule, 75 Fed. Reg. at 81,737, *with* Regulation II, 76 Fed. Reg. at 43,429–43,431.

[13] Proposed Rule, 75 Fed. Reg. at 81,737.

[14] Proposed Rule, 75 Fed. Reg. at 81,737.

[15] Regulation II, 76 Fed. Reg. at 43,434.

[16] Regulation II, 76 Fed. Reg. at 43,434.

such additional costs actually incurred by issuers necessarily will decrease the cap on interchange transaction fees.

Given the current impact of the cap on small issuers' single-message-network interchange fee revenue,[17] any reduction of the cap would further impact community banks' ability to offer minimum-viable deposit account products with debit cards. In its most recent report on the impacts of Regulation II, the Board found that "for exempt transactions processed over single-message networks, the average interchange fee gradually fell after Regulation II took effect, from $0.31 in the fourth quarter of 2011 to $0.25 in 2017, and has since gradually increased to $0.27 in 2023."[18] Since 2023, data published by the Board shows that the average interchange fee for exempt transactions processed over single-message networks has continued to slightly decline.[19] While community banks are exempt from Regulation II's cap on debit card interchange fees, their single-message-network fees nevertheless have fallen with the implementation of Regulation II. If the Board is forced to reduce the cap on interchange transaction fees from 21 cents (plus five basis points) because it cannot consider anything other than incremental ACS costs,

---

[17] 2025 Federal Reserve Report at 2, 15.
[18] 2025 Federal Reserve Report at 2, 15.
[19] Board of Governors of the Federal Reserve System, Average Debit Card Interchange Fee by Payment Card Network (December 19, 2025), *available at* https://www.federalreserve.gov/paymentsystems/regii-average-interchange-fee.htm.

community bank checking and debit card programs will suffer, and bank debit card account holders will face increased account fees and higher minimum balance requirements.

The foregoing is borne out by the results of Regulation II. In response to decreased interchange fee revenues, community banks have passed at least some of the unrecouped costs of their debit card programs to consumers in the form of higher-priced financial products. The availability of free, non-interest-bearing deposit accounts offered by exempt financial institutions declined by 15.5 percent following initial imposition of the interchange fee cap under Regulation II.[20] Similarly, a Federal Reserve Bank of Richmond study found that both large and small debit card issuers substantially reduced free deposit account products and services in the aftermath of Regulation II's interchange fee cap.[21]

While the average interchange fee for exempt transactions processed over *dual-message* networks has increased since Regulation II took effect,[22] card issuers

---

[20] Mark D. Manuszak and Krzysztof Wozniak, The Impact of Price Controls in Two-sided Markets: Evidence from US Debit Card Interchange Fee Regulation, Finance and Economics Discussion Series 2017-074, Washington: Board of Governors of the Federal Reserve System (2017), at 5-6, htsps://doi.org/10.17016/FEDS.2017.074.
[21] Zhu Wang, Price Cap Regulation in a Two-sided Market: Intended and Unintended Consequences (The Federal Reserve Bank of Richmond, Working Paper No. 13-06R, 2013), https://www.richmondfed.org/publications/research/working_papers/2013/wp_13-06r.
[22] 2025 Federal Reserve Report at 2, 15.

Appellate Case: 25-3000     Page: 28     Date Filed: 01/09/2026 Entry ID: 5595724

do not control whether a transaction runs on a single-message network (where fees have decreased for small exempt issuers) or dual-message network (where fees have increased). Regulation II gives merchants the right "to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions."[23] Small issuers, while exempt from the cap on interchange transaction fees, are subject to the right of merchants to choose the payment card network.[24]

The Board has acknowledged that "increased routing choice" for merchants allows them to route transactions over networks "with lower interchange fees," which "suggest[s] that community bank issuers exempt from Regulation II's interchange fee standards that are not already compliant with the rule in particular may experience lower interchange fee revenues."[25] Since implementation of that final rule on July 1, 2023, merchants have increasingly used single-message networks to route card-not-present transactions.[26] That trend will further decrease debit card interchange fee revenue for community banks to the extent merchants choose to process card-not-present transactions on single-message networks because

---

[23] 12 C.F.R. § 235.7(b).
[24] 15 U.S.C.A. § 1693o-2(a)(6).
[25] Debit Card Interchange Fees and Routing, 87 Fed. Reg. 61,217, 61,2226 (Oct. 11, 2022).
[26] 2025 Federal Reserve Report at 20.

small issuers' per-transaction fees on single-message networks have declined since implementation of Regulation II.[27]

Stagnating or declining community bank revenue from debit card interchange transaction fees by means of a regulatory price cap is particularly harmful because small community banks' per-transaction debit card processing costs are significantly higher than for high-volume issuers. In a report released in December 2025, the Board found that average per-transaction ACS cost precipitously increases for issuers to the extent they have lower transaction volume.[28] Specifically, "the average per-transaction ACS cost for mid-volume issuers [] was over three times higher than the cost for high-volume issuers [], whereas the cost for low-volume issuers [] was 30 times higher than the cost for high-volume issuers."[29] For low-volume issuers, "the cost nearly doubled from 2021 to 2023.[30] Clearly, the *current* average per-transaction fee will result in most small community bank issuers suffering losses from debit card programs because their costs are far higher than the costs incurred by larger issuers.

---

[27] 2025 Federal Reserve Report at 2, 15.

[28] 2025 Federal Reserve Report at 24–25. High-volume issuers are defined as those that process more than 100 million debit card transactions annually, mid-volume issuers as those that process between 1 million and 100 million debit card transactions, and low-volume issuers as those that process fewer than 1 million debit card transactions. *See id.*

[29] 2025 Federal Reserve Report at 24–25.

[30] *Id.*

Appellate Case: 25-3000     Page: 30     Date Filed: 01/09/2026 Entry ID: 5595724

The concerns of *amici* about the impact of reduced debit card interchange fees were raised by Federal Reserve Board Governor Michelle Bowman in her statement on the Board's recent proposed rule to further reduce interchange fees:

> . . . [S]maller issuers subject to the cap—those with smaller transaction volumes, less negotiating power, and fewer efficiencies in scale—may be at a significant competitive disadvantage. Because retail banking is such a core function for many smaller issuers, this pricing dynamic may not ultimately force smaller issuers to abandon their debit card programs. But it is possible that banks will be forced to either pass costs through to customers or operate their debit card programs as a loss leader, which many banks do today. Under the proposed rule [further reducing interchange fees], nearly one-third of bank issuers would not be able to recover even the subset of costs that factor into the interchange fee cap, let alone those debit card program costs that are disregarded in the cap.
>
> . . .
>
> . . . [S]maller debit card issuers do not exist in a vacuum. Issuers of all sizes use the same payment rails, and smaller issuers inevitably face some degree of pricing pressure, at least indirectly, from the interchange fee cap. And while the interchange fees many smaller issuers have collected since the introduction of the interchange fee cap may have remained largely stable, it is difficult to determine how this compares to the aggregate costs of processing, fraud and fraud prevention, and the many other inputs for running a debit card program. It is not clear that interchange fees have kept up for many smaller issuers, and I am concerned that even if the interchange fee cap does not directly apply, smaller issuers will continue to face ongoing fee pressure in operating debit card programs.[31]

---

[31] "Statement on Proposed Revisions to Regulation II's Interchange Fee Cap by Governor Michelle W. Bowman," October 25, 2023, accessed December 17, 2025, *available at* https://www.federalreserve.gov/newsevents/pressreleases/bowman-statement-20231025.htm.

While most of the community banks represented by the *amici* are exempt from the interchange fee cap, the indirect impact is clear. If the District Court's decision is upheld and the Board is prohibited from considering the additional costs for setting debit card interchange fees, community banks and their customers will suffer.

## II. THE DISTRICT COURT SHOULD HAVE APPLIED AN ARBITRARY-AND-CAPRICIOUS STANDARD OF REVIEW WHEN ADDRESSING THE COMPONENTS OF THE BOARD'S INTERCHANGE TRANSACTION FEE CAP.

If the Court finds that the Durbin Amendment does not limit the costs that may be considered by the Board to incremental ACS costs, then the Court need not go any further and should reverse the District Court's judgment and remand for the District Court to enter judgment in favor of the Board.

If the Court does find that the Board is limited to considering incremental ACS costs in setting a fee cap, then the Court must address whether the four challenged costs qualify as incremental ACS costs. In rejecting the Board's arguments, the District Court failed to apply the proper standard of review to the Board's inclusion of certain costs in its analysis required by the Durbin Amendment.

The District Court felt empowered to invalidate Regulation II under *Loper Bright*. The District Court erred, as *Loper Bright* did not eliminate all deference that should be applied by a court to an agency's decision. *Loper Bright* recognized that a statute may authorize an agency to exercise a degree of discretion. 603 U.S. at 394-395. Examples include statutes that empower an agency to prescribe rules to

25

"fill up the details" of a statutory scheme, or to regulate subject to limits imposed by a term or phrase that leaves agencies with flexibility, such as "appropriate" or "reasonable." *Id.*

"[W]hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard. Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven County*, 605 U.S. at 179-80. Thus, substantial deference must be given to an agency's decision that involves "fact-dependent, context-specific, and policy-laden choices." *Id.* at 182-83.

The Durbin Amendment is such a statute, given that it directs the Board to gather and find facts and set an interchange transaction fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). To stay out of discretionary policymaking left to the Board, the District Court should have fulfilled its obligations under the Administrative Procedure Act ("APA")[32] by independently identifying and respecting such delegations of authority, policing the outer statutory boundaries of those delegations, and ensuring that the Board exercised its discretion consistent with the APA. *Loper Bright*, 603 U.S. at 404.

---

[32] 5 U.S.C. §§ 551-559.

Appellate Case: 25-3000     Page: 33     Date Filed: 01/09/2026 Entry ID: 5595724

The Board properly focused on the record before it and on costs incurred with an electronic debit transaction. The Board determined, based on the information and data it gathered, that it was futile to try to label various costs as fixed, or variable, or incremental, given the various ways banks account for such costs.[33] Instead, the Board concluded that it could consider costs other than the costs prohibited by Section 920(a)(4)(B)(ii).[34] While *amici* disagrees with the Board's limited consideration of issuers' costs incurred with respect to an electronic debit transaction, and believes that the Board violated the Durbin Amendment in failing to consider *all* costs incurred by issuers with respect to an electronic debit transaction, *amici* agree that the Board properly considered costs other than those identified in Section 920(a)(4)(B)(i). For purposes of this appeal, *amici* acknowledge that the Board exercised its policy-making authority to determine that, based on the facts it gathered, four specific costs must be considered in setting the interchange transaction fee, and this decision should have been reviewed under an arbitrary-and-capricious standard.

The District Court did not engage in an arbitrary-and-capricious review. Instead, the District Court engaged in a *de novo* review and, for example, deemed

---

[33] Regulation II, 76 Fed. Reg. at 43,427.
[34] Regulation II, 76 Fed. Reg. at 43,427.

Appellate Case: 25-3000    Page: 34    Date Filed: 01/09/2026 Entry ID: 5595724

several costs (transaction-monitoring and fraud losses) as improper in part on policy grounds.  *Corner Post*, 794 F. Supp. 3d at 636.

If necessary, the District Court's rulings with respect to the four challenged costs specifically should be reversed and remanded with instructions for the District Court to apply the proper arbitrary-and-capricious standard of review.

## <u>CONCLUSION</u>

This Court should reverse the District Court's judgment and remand for the District Court to enter judgment in favor of the Board.

28

Respectfully submitted,

STINSON LLP

*/s/ George F. Verschelden*
George F. Verschelden
1201 Walnut, Suite 2900
Kansas City, MO 64106-2150
Tel. (816) 842-8600
Fax (816) 691-3495
george.verschelden@stinson.com

COUNSEL FOR AMICI CURIAE

29

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point font Times New Roman type style. This brief contains 5,940 words, excluding parts of the document exempted by Fed. R. App. P. 32(f).

The electronic version of this filing was scanned for viruses and is virus-free. *See* 8th Cir. R. 28A(h).

Dated:        January 6, 2026                          */s/ George F. Verschelden*
                                                       George F. Verschelden

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system on January 6, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated:        January 6, 2026                    /s/ *George F. Verschelden*
                                                 George F. Verschelden

31