No. 25-3000

IN THE
United States Court of Appeals
for the Eighth Circuit

_____

Corner Post, Inc.
*Plaintiff-Appellee*

v.

Board of Governors of the Federal Reserve System,
*Defendant-Appellant.*

_____

On Appeal from the United States District
Court for the District of North Dakota
No. 1:21-cv-00095-DMT-CRH

**BRIEF OF COMPETITIVE ENTERPRISE INSTITUTE
AS AMICUS CURIAE IN SUPPORT OF APPELLANT**

Soriya R. Chhe

Competitive Enterprise Institute
1310 L Street NW, 7th Floor
Washington, D.C. 20005
(202) 331-2265
soriya.chhe@cei.org

*Counsel for Amicus Curiae*

Dated: January 7, 2026

## CORPORATE DISCLOSURE STATEMENT

Amicus Curiae Competitive Enterprise Institute (CEI) is an IRC Sec.

501(c)(3) non-profit educational and research institute incorporated under District

of Columbia law, with its principal place of business in Washington, D.C.  It issues

no stock and is neither owned by nor owns any other corporate entity in part or in

whole. CEI is operated by a volunteer Board of Directors.

/s/ Soriya R. Chhe
Soriya R. Chhe
*Counsel for Amicus Curiae CEI*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT                                    I

TABLE OF CONTENTS                                                 II

TABLE OF AUTHORITIES                                             III

INTEREST OF AMICUS CURIAE                                          1

SUMMARY OF THE ARGUMENT                                            3

ARGUMENT                                                          8

I.   "Incremental Cost" Encompasses Costs Attributable to Providing the Debit Card ACS Function, Including Certain Transactions Processing Costs (a.k.a. "Fixed ACS Costs")                                          8

II.   "Fixed" ACS Costs Are Not Always Fixed                     17

CONCLUSION                                                        18

CERTIFICATE OF COMPLIANCE                                         20

CERTIFICATE OF SERVICE                                            21

Appellate Case: 25-3000     Page: 3     Date Filed: 01/09/2026 Entry ID: 5595749

# TABLE OF AUTHORITIES

**Cases**

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, No. 1:21-cv-00095, slip op. (D.N.D. Aug. 6, 2025) ........................................................ 5, 6, 9, 17, 18

*Egelhoff v. Egelhoff*, 532 U.S. 141 (2001) ...............................................11

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .............................3, 11, 12

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) . 12, 13, 15

*NACS v. Bd. Of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474 at 478 (D.C. Cir. 2014) ................................................................................................................6, 7

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825 (D.D.C. 1982), as amended (Jan. 10, 1983), aff'd, 740 F.2d 980 (D.C. Cir. 1984) ...........................13

**Statutes**

15 U.S.C. § 1693o-2.................................................................................. 4, 5, 9, 12

**Other Authorities**

3 P. Areeda & D. Turner, Antitrust Law ¶ 712 at 156 (1978) ...................................15

Baumol, William J. *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing,* 89 Yale L.J. 1, 9 n. 26 (1979).........................15

Baumol, William J., John C. Panzar, and Robert D. Willig (1982), Contestable Markets and the Theory of Industry Structure. New York: Harcourt Brace Jovanovich. .....................................................................................................3

Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 Yale L.J. 213, 252 n. 79 (1979) ........................................................................15

R. Posner, Antitrust Law (1976) ............................................................................15

**Regulations**

76 Fed. Reg 43,394 (July 20, 2011)........................................... 5, 6, 7, 8, 10, 14, 18

Appellate Case: 25-3000     Page: 4     Date Filed: 01/09/2026 Entry ID: 5595749

# INTEREST OF AMICUS CURIAE[1]

Amicus Curiae Competitive Enterprise Institute (CEI) is a nonprofit educational and research institute headquartered in Washington, D.C., dedicated to promoting the principles of free markets and limited government. Since its founding in 1984, the institute has focused on raising public understanding of the problems of overregulation through policy analysis, commentary, and litigation. CEI also pursues public-interest litigation to ensure that federal agencies act within the constraints of the United States Constitution, the Administrative Procedures Act, and its enabling statutes. CEI's mission is to develop and advocate for policies that advance the right to freedom, fairness, property, and prosperity for Americans.

CEI's Center for Economic Freedom ("the Center") studies how public policy affects access to capital, entrepreneurship, and investments made by the public and business community alike. In recent years, the Center has studied the consequences of financial reform efforts passed by Congress like the Sarbanes-Oxley Act, the government's response to the 2008 financial crisis including the Dodd-Frank Act, the placement of Fannie Mae and Freddie Mac into conservatorship, and the rise of cryptocurrency. CEI's Director of Finance Policy,

---

[1] Undersigned counsel obtained consent from all parties to the filing of this amici curiae brief. Amicus affirms that no counsel for a party authored this brief in whole or in part, that no person other than amicus and its counsel made a monetary contribution to the preparation or submission of this brief, and that all parties consented to the submission of this amicus brief.

1

John Berlau, has testified on the impact of financial regulation before the House Committee on Financial Services and the House Committee on Energy and Commerce.

In this brief, CEI offers its expertise in the principles of economics to assist the Court on the technical -- but significant -- issue of interpreting the phrase "incremental costs" as it relates to "fixed ACS costs" in the context of 15 U.S.C. § 1693o-2(a)(4)(B).

Appellate Case: 25-3000    Page: 6    Date Filed: 01/09/2026 Entry ID: 5595749

## SUMMARY OF THE ARGUMENT

This amicus addresses the technical, but important issue of whether the district court properly barred the Board from considering "Fixed ACS Costs" in establishing interchange fee standards. Amicus CEI submits that the district court erred in excluding "Fixed ACS Costs" from its interpretation of incremental costs because the commonly used economic definition of "incremental cost" includes fixed and variable costs.[2] The district court's error arises from its failure to engage in the legal and technical analysis required under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). As such, assuming this Court upholds the district court's interpretation of the Durbin Amendment to only allow for bifurcated cost categories, the Board's inclusion of fixed ACS costs as incremental costs should still be affirmed because incremental costs by definition include fixed costs.

---

[2] *See* Baumol, William J., John C. Panzar, and Robert D. Willig (1982), Contestable Markets and the Theory of Industry Structure. New York: Harcourt Brace Jovanovich. Incremental costs include any fixed or variable costs that are specific to the additional service or production of goods that would be avoided if the additional service or goods were not produced at all.

Appellate Case: 25-3000   Page: 7   Date Filed: 01/09/2026 Entry ID: 5595749

# BACKGROUND

In 2010, Congress passed the Durbin Amendment to the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010 to limit interchange fees for processing debit card transactions paid by merchants to midsize-to-large banks and credit unions[3] that issue debit cards ("issuing banks"). *See* 15 U.S.C. § 1693o-2(a)(6)(A). The law required interchange fees to be "reasonable and proportional" to the costs incurred by the issuing banks for debit transaction. *Id.* at (a)(2). The law defined an interchange transaction fee to be "any fee established, charged or received by a payment card network for the purpose of compensating an [issuing bank] for its involvement in an electronic debit transaction." 15 USC § 1693o-2(c)(8)

To implement these requirements, Congress directed the Board of Governors of the Federal Reserve System ("the Board") to issue regulations to "establish standards for assessing" whether the interchange transaction fee is reasonable and proportional to the bank's costs with respect to the debit transaction *Id.* at (a)(3)(A). In establishing the regulations, Congress required the Board to

> (A) consider the functional similarity between—
>> (i) electronic debit transactions; and
>> (ii) checking transactions that are required within the Federal Reserve bank system to clear at par;
> (B) distinguish between—

---

[3] Banks and credit unions with $10 billion or more in assets.

(i) the *incremental* cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

(ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)….

15 USC § 1693o-2(a)(4) (emphasis added). After a period of notice and comment, the Board adopted Regulation II, which caps the interchange transaction fee at 21 cents with a 0.05% *ad valorem* component, reducing the pre-Rule average of 44 cents per transaction by about 50%. *See* 2011 Final Rule, 76 Fed. Reg 43,394 at 43,422 and 43,397 (July 20, 2011).

Plaintiff-Appellee Corner Post argues Regulation II is contrary to law because

(1) the Board improperly interpreted the Durbin Amendment's language to include the "third category" of costs in the fee standard and (2) the Board included four prohibited costs in the fee standard: fixed ACS costs, network processing fees, transaction-monitoring costs; and fraud losses; and (3) the Board established a universal fee cap instead of tailoring the fee to each issuer and transaction."

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, No. 1:21-cv-00095, slip op. at 14 (D.N.D. Aug. 6, 2025). Corner Post also contends that Regulation II is arbitrary and capricious for similar reasons. *Id.*

The district court interpreted 15 U.S.C. § 1693o-2(a)(4)(B)'s structure and plain language to "clearly evidence a bifurcated cost system" that only allows the Boad to consider "Incremental Costs." *Corner Post, Inc. v. Bd. of Governors of the*

5

*Fed. Rsrv. Sys.*, No. 1:21-cv-00095, slip op. at 24-28. (D.N.D. Aug. 6, 2025). Under this bifurcated cost system, the district court found the Board's inclusion of "Fixed ACS Costs" ran afoul of the Durbin Amendment because "Fixed ACS costs are not, by definition, 'incremental [ACS] cost[s].'" *Id.* at 32 quoting 15 U.S.C. § 1693o-2(a)(4)(B)(i). The district court understood "Fixed ACS Costs" to be costs for "equipment, hardware, software, and associated labor." *Id.* The Board refers to these costs as *transactions processing* in its Rulemaking. *See* 2011 Final Rule, 76 Fed. Reg. at 43,429.

Transactions processing costs are a necessary cost that issuers must incur to process debit card ACS transactions. *Id.* Consumers trigger the ACS process when they make a purchase with their debit card. *Id*. at 43,496. This causes an electronic transmittal of the consumer cardholder's information and the transaction amount to the merchant's bank ("the acquirer"). *Id.* The acquirer then sends an authorization request through the payment card network to the consumer's bank ("the issuer"). *Id.* The issuer reviews the request to determine whether it may be fraudulent and checks to see if the consumer has sufficient funds in their account. *Id.* The "authorization request" is either approved or denied over the network in real-time. *Id.* If approved, the acquirer sends a "formal request of payment" to the issuer. *NACS v. Bd. Of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474 at 478 (D.C. Cir. 2014). The network tallies the clearances in one day, then calculates and communicates to each issuer

6

and acquirer its net debit or credit position for settlement. *Id.* The funds are then transferred between the various institutions. *See* 2011 Final Rule, 76 Fed. Reg. at 43,396.

During this process, the issuer incurs multiple categories of fees and costs, including *transactions processing costs* (a.k.a. "Fixed ACS Costs") - costs for "equipment, hardware, software, and associated labor." *Id. Transactions processing costs* are necessary because "issuers must maintain and use computer equipment that can process each authorization request… [and] employ staff to operate and maintain the computer equipment involved in transaction processing." 2011 Final Rule, 76 Fed. Reg. at 43,430. Without these costs, issuers cannot process any ACS transactions. *Id.* These costs, however, are oftentimes shared with the issuer's other lines of business, such as the issuer's credit card program. *Id.* at 43,429. Recognizing these as "joint costs," the Board ensures that the costs "allocated to electronic debit transactions [are] on a pro rata basis." *Id.*

Depending on the relevant time horizon and volume range, the costs may appear as "fixed" or "variable" in the issuer's accounting. *Id*. at 43,427. For example, the Board explained:

> As applied to the proposed interchange fee standards, the same type of cost may appear variable in one year, but fixed in a different year. For example, if an increase in the number of transactions processed from one year to the next requires the acquisition of additional equipment in the second year, hardware costs that would be considered fixed in the first year would be variable in the second year.

7

*Id.* The cost categorization may also vary, depending on whether the work is outsourced. *Id.* ("[Nearly] any cost that could be defined as fixed if incurred by an issuer that performs its transactions processing in-house could be considered as variable if the issuer were to outsource its debit card operations to a third-party processor that charged … a per-transaction fee based on its entire cost….")

For reasons explained below, *transactions processing costs* (or "Fixed ACS Costs" according to the district court), should be included as incremental costs because they are necessary to effectuate the ACS debit transaction business line.

## ARGUMENT

### I. "Incremental Cost" Encompasses Costs Attributable to Providing the Debit Card ACS Function, Including Certain Transactions Processing Costs (a.k.a. "Fixed ACS Costs")

The Durbin Amendment directs the Board to distinguish between "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction" and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693o-2(a)(4)(B). For purposes of this argument, CEI accepts the district court's conclusion that this language establishes a bifurcated cost framework in which only incremental costs may be considered in setting interchange fee standards.

8

The question presented here is not whether Congress authorized the Board to consider all issuer costs, or whether the Board's rule optimally implements the statute. It is whether costs necessary to operate the authorization, clearance, and settlement ("ACS") function—commonly described as transaction-processing or "Fixed ACS Costs"—may qualify as incremental costs within the meaning of § 1693o-2(a)(4)(B)(i).

In ruling against the Board on "Fixed ACS Costs," the district court erroneously found that "Fixed ACS costs are not, by definition, "incremental [ACS] cost[s]." *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, No. 1:21-cv-00095, slip op. at 32. (D.N.D. Aug. 6, 2025). The district court reasoned that in a bifurcated cost system, where Congress has only authorized one category of cost be considered, fixed ACS costs must be excluded because "they do not fit the bill" as incremental costs. *Id.* at 33. In support of its reasoning, the district court relied on the Board's admission that fixed ACS costs are not "incremental [ACS] cost[s] associated with 'a particular electronic debit transaction" and the Black's Law Dictionary definition of Fixed Cost, which defines it as a "cost whose value does not fluctuate with changes in output or business activity; esp., overhead expenses such as rent, salaries, and depreciation." *Id.* quoting 15 U.S. Code § 1693o-2(a)(4)(B).

9

The district court's reasoning ignores the more common definition of "incremental costs" in economics, a more reasonable interpretation raised by commenters in response to the Board's Proposed Rules and relied upon by Courts in other Circuits. In its Final Rule, the Board noted that:

> Several commenters urged defining "incremental cost" as the difference between cost incurred by a firm if it produces a particular quantity of a good and the cost incurred by the firm if it does not produce the good at all. This definition would include any fixed or variable costs that are specific to the entire production run of the good and would be avoided if the good were not produced at all. Another definition of "incremental costs" suggested by the commenters was the cost of producing some increment of output greater than a single unit, but less than the entire production run.

*Id*. at 43,426-43,427 (citing to Baumol, William J., John C. Panzar, and Robert D. Willig (1982), Contestable Markets and the Theory of Industry Structure. New York: Harcourt Brace Jovanovich). Under this definition, "Fixed ACS Costs" should count as incremental costs because they are costs that may be avoided if issuers did not offer a debit card business line.

Courts in other circuits have often relied upon the economic definition of incremental costs to determine what the reasonable costs are in rate-setting cases. Yet, when charged with determining what the reasonable costs were to the issuer, the district court never considered or addressed the definition of "incremental cost" under economic principles. One may argue that the district court need not consider this because the Board declined to adopt this definition. However, the Board's

10

inaction does not excuse the district court from its duties under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024) (the Court "need not and under the APA may not defer to an agency interpretation of the law…."). Rather than relying on Black's Law Dictionary, the district court should have considered the economic definition of "incremental cost" when interpreting the law. *Id.* at 402 ("[W]hen an ambiguity happens to implicate a technical matter, … Congress expects courts to handle technical statutory questions.") "[M]any statutory cases call upon courts [to] interpret the mass of technical detail that is the ordinary diet of the law." *Id.* quoting *Egelhoff v. Egelhoff*, 532 U.S. 141, 161 (2001) (Breyer, J., dissenting) (internal citations omitted). Indeed, "Courts, after all, do not decide such questions blindly. The parties and *amici* in such cases are steeped in the subject matter, and reviewing courts have the benefit of their perspectives." *Id.* In this case, industry experts offered their expertise on the definition of incremental costs in the comments to the Rulemaking. Despite having reviewed the comments, the district court failed to consult them in its analysis. In doing so, the district court failed to meet its obligations under *Loper Bright. Id.* at 394.

In *Loper Bright,* the Supreme Court provided:

> The APA … incorporates the traditional understanding of the judicial function, under which courts must exercise *independent judgment* in determining the meaning of statutory provisions. In exercising such judgment, though, courts may … seek aid from the interpretations of those responsible for implementing particular statutes."

Appellate Case: 25-3000     Page: 15     Date Filed: 01/09/2026 Entry ID: 5595749

*Id.* at 394 (emphasis added). "*But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.*" *Id.* at 413 (emphasis added). This is because "to the extent that Congress and the Executive Branch may disagree with how the courts have performed that job in a particular case, they are of course always free to act by revising the statute." *Id.* at 403. Here, the district court should have engaged in a technical analysis of the phrase "incremental costs" under economic principles despite the Board's position, which are available in not only the comments to the rules, but also federal cases concerning predatory pricing.

Although this is not an anti-trust matter, the holdings in those cases are instructive here because "antitrust laws are designed to encourage vigorous competition, as well as to promote economic efficiency and maximize consumer welfare…." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1113 (7th Cir. 1983). Like antitrust laws, the Durbin Amendment is meant to promote consumer welfare, while also balancing economic efficiency by requiring interchange fees to "be *reasonable and proportional* to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a) (emphasis added).

In establishing the cost standard in predatory pricing cases, the Seventh Circuit observed that "incremental costs … represent the average cost of adding an

12

entire new service or product rather than merely the last unit of production." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1115 (7th Cir. 1983). Incremental costs "... refer[s] to the average additional cost of a finite and possibly a large change in production or sales." *Id.* quoting 1 A. Kahn, The Economics of Regulation 66 (1970) (emphasis in original) (internal quotations omitted). "Long run or average incremental costs thus include certain items of long term expense that are typically considered fixed and would generally be excluded from a calculation of average variable cost, such as the cost of plant and equipment, as well as the cost of capital." *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 922 (D.D.C. 1982), as amended (Jan. 10, 1983), aff'd, 740 F.2d 980 (D.C. Cir. 1984). "For a single product firm, average total cost can be easily defined as the sum of all costs, both fixed and variable, divided by the total units of output produced by the firm. Such simple concepts of average total cost, however, lose their meaning when one considers a multi-service firm…. It is therefore necessary, in the multiproduct context, to determine what costs are *caused* by which products and services, and this requires some sort of differential (*e.g.,* incremental) methodology." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1116 (7th Cir. 1983).

As applied in this case, one must look at costs that are caused by the ACS debit transaction. If an issuer has a single debit card business line, the causal

factor is indisputable. If there are no debit card transactions, there would be no need for labor to review the authorization requests for fraud and sufficiency or adjust the balance to the accounts, once payment is made. Transactions processing costs must still count as incremental costs for businesses with comingled costs across multiple lines of business because the Board was careful to ensure that joint costs are apportioned to account for debit card transactions on a pro-rata basis. 2011 Final Rule, 76 Fed. Reg. at 43,429. Transactions processing costs are required because "issuers must maintain and use computer equipment that can process each authorization request… [and] employ staff to operate and maintain the computer equipment involved in transaction processing." *Id.* at 43,430. Without transactions processing costs, issuers cannot perform their role as an issuer in debit card transactions.

Notably, the Board appropriately excluded other shared costs that are not caused by the ACS debit process. For example, the Board excluded costs for corporate overhead, establishing and maintaining an account relationship, general debit card program costs such as card production, marketing expenditures, and research and development. *See* 2011 Final Rule, 76 Fed. Reg. at 43,427. The Board's exclusion of these costs is consistent with the economic definition incremental costs because ACS debit transactions do not trigger these costs. For example, a bank incurs costs to issue its customer a debit card, but if the customer

14

never uses the debit card, the ACS debit transaction will never be triggered. As such, card production costs are properly excluded.

"[L]ong-run incremental cost has been approved as an economically relevant measure of average total cost for one product produced by a multiproduct firm." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1117 (7th Cir. 1983). According to Professor Baumol, average total cost cannot reasonably mean fully allocated cost because it would be based on arbitrary calculations. *Id.* quoting Baumol, *Quasi-Permanence of Price Reductions: A Policy for Prevention of Predatory Pricing,* 89 Yale L.J. 1, 9 n. 26 (1979). Incremental cost must therefore "mean the average incremental cost of the product *including any fixed* cost outlays required by the item." *Id.* (emphasis added). Economic Professors Joskow and Klevorick agree: "In the … multiproduct context, we are using 'average total cost' to signify the average incremental cost of the commodity of concern and not any arbitrary 'fully allocated cost measure.'" *Id.* at 1118 (citing Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 Yale L.J. 213, 252 n. 79 (1979)). "Since all costs are variable in the long run it is long-run incremental costs (including return on investment) which most closely measure anticipated average total." *Id.* (citing  3 P. Areeda & D. Turner, Antitrust Law ¶ 712 at 156 (1978) and R. Posner, Antitrust Law at 190 (1976).

The economic definition of "incremental cost" is preferable because it makes sense in the real world. "[A] business - be it a retailer or a bank - would likely not engage in many "particular transactions" if such transactions could not help defray operational costs…."[4]  The adverse effects on consumers that resulted from the costs that have already been cut are evident in studies that follow the Board's promulgation of Regulation II. "Even at the 21-cent level set in 2011, the Fed's implementation resulted in banks sharply reducing free checking for low balance accounts and in debit card rewards virtually disappearing, as the bulk of the costs of processing debit cards shifted from retailers to consumers. And academic studies showed that little if any of the retailers' savings from the price controls were passed on to consumers."[5] The district court's interpretation of incremental costs will further cut the rates set by the Board and may result in even more harm to consumers, banks, and credit unions.

Under the principles of economics and common sense, incremental costs must include *transactions processing costs* (or "Fixed ACS Costs") to meet the

_____

[4] Comment Letter, Debit Card Interchange Fees and Routing, Docket No. R—1818, RIN 7100-AG67, Competitive Enterprise Institute (May 12, 2024).
[5] *Id.* citing John Berlau, "Don't Save Restaurants by Shafting Consumers," Competitive Enterprise institute blog, March 20, 2020, https://cei.org/blog/dont-save-restaurants-by-shafting-consumers/; Todd J. Zywicki, Geoffrey A Manne, and Julian Morris, "Price Controls on Payment Card Interchange Fees: the U.S. Experience," George Mason University Law and Economics Research Paper Series, No. 14-18, https://www.law.gmu.edu/assets/files/publications/working_papers/1418.pdf

16

"reasonable and proportionate" requirements under the statute. CEI therefore submits that even under a bifurcated costs framework, which Appellee Corner Post advocates for and the district court affirmed, *transactions processing costs* (or "Fixed ACS Costs" must be included as part of the interchange fee standards because their role in ACS debit transactions are consistent with costs that are included under economic definition of incremental costs. As such, the district's court's decision on "Fixed ACS Costs" must be reversed.

## II.    "Fixed" ACS Costs Are Not Always Fixed

The district court's ruling on "Fixed ACS costs" should also be reversed because its rationale is unsupported by the facts in this case.   The district court ruled that fixed ACS costs must be excluded because "they do not fit the bill" as incremental costs. *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, No. 1:21-cv-00095, slip op. at 33 (D.N.D. Aug. 6, 2025). The district court considered these costs to be fixed, in a manner that is presumably consistent with the Black's Law Dictionary definition of Fixed Cost - "cost whose value does not fluctuate with changes in output or business activity…." *Id.* quoting 15 USC (4)(B).

In doing so, the district court ignores the Board's extensive discussion about how this cost may be variable for some issuers. Indeed, the Board went through great lengths to explained that this category of costs, depending on the relevant time horizon and volume range, may appear as "fixed" or "variable." *See* 2011

17

Final Rule, 76 Fed. Reg. at 43,427. As discussed above, "the same type of cost may appear variable in one year, but fixed in a different year … if an increase in the number of transactions processed from one year to the next requires the acquisition of additional equipment in the second year…." *Id.* The Board also explained that the costs may go from fixed to variable depending on whether the labor is performed in-house or by a third-party. *Id.* Indeed, the district court acknowledged that "issuers have categorized certain costs as "fixed" and "variable" when responding to the Board's data requests." *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, No. 1:21-cv-00095, slip op. at 33. (D.N.D. Aug. 6, 2025). Yet, the district court decided to cherry pick the term "fixed" and exclude the costs in its entirety, notwithstanding the fact that some of these costs do not fit the Black's Law Dictionary definition of "fixed costs." *Id.* Therefore, the district court's exclusion of the costs should also be reversed because its reasons for finding why they are "fixed" is simply unsupported by facts.

## CONCLUSION

For the foregoing reasons, amici curiae respectfully urge this court to reverse the district court's decision excluding "Fixed ACS Costs" from the meaning of incremental costs under Regulation II.

Dated: January 7, 2026        By: <u>/s/ Soriya R. Chhe</u>

Soriya R. Chhe
Competitive Enterprise Institute
1310 L Street NW, 7th Floor
Washington, D.C. 20005
(202) 331-2265
soriya.chhe@cei.org
*Counsel for Amicus Curiae*

19

**CERTIFICATE OF COMPLIANCE**

1.    This document complies with the word limit of FRAP 32(a)(7)(B) and 8th Cir. R. 32(a) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 4,150 words.

2.    This document complies with the typeface requirements of FRAP 32(a)(5) and (6).

3.    This document has been scanned for viruses and is virus-free.

January 7, 2026                    /s/ Soriya R. Chhe
                                     Soriya R. Chhe
                                     *Counsel for Amicus Curiae CEI*

Appellate Case: 25-3000    Page: 24    Date Filed: 01/09/2026 Entry ID: 5595749

**CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2026, a true and accurate copy of the foregoing Brief of Competitive Enterprise Institute As Amicus Curiae In Support of Appellant was served via the Courts ECFS system via electronic filing.

January 7, 2026

/s/ Soriya R. Chhe
Soriya R. Chhe
*Counsel for Amicus Curiae CEI*

Appellate Case: 25-3000    Page: 25    Date Filed: 01/09/2026 Entry ID: 5595749