# In the United States Court of Appeals for the Eighth Circuit

---

CORNER POST, INC.,
*Plaintiff-Appellee,*

v.

BOARD OF GOVERNORS OF THE FEDERAL
RESERVE SYSTEM,
*Defendant-Appellant,*

---

On Appeal from the United States District Court
for the District of North Dakota
(No. 1:21-cv-00095) (The Hon. Daniel M. Traynor)

---

## BRIEF FOR BANK POLICY INSTITUTE AND THE CLEARING HOUSE ASSOCIATION L.L.C. AS AMICI CURIAE SUPPORTING APPELLANT

---

JEFFREY B. WALL
JUDSON O. LITTLETON
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
Telephone: (202) 956-7500

*Counsel for Bank Policy Institute and
The Clearing House Association L.L.C.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Bank Policy Institute and The Clearing House Association L.L.C., by counsel, make the following disclosures:

Bank Policy Institute is not a publicly traded corporation, has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

The Clearing House Association L.L.C. is not a publicly traded corporation, has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Appellate Case: 25-3000    Page: 2    Date Filed: 01/09/2026 Entry ID: 5595762

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .......................................... i

INTEREST OF AMICI CURIAE ...................................................... 1

INTRODUCTION ......................................................................... 2

ARGUMENT ............................................................................... 5

I.   The Durbin Amendment Does Not Restrict The Board To
     Considering Only Incremental ACS Costs ..................................... 5

     A.   The Durbin Amendment Requires The Board To
          Consider All Transaction-Related Costs And Provide
          A Reasonable Return ......................................................... 5

     B.   The District Court Misinterpreted The Durbin
          Amendment's Requirements ............................................... 11

          1.   The district court erred by tying the fee cap only
               to incremental ACS costs .......................................... 11

          2.   The district court erred by not addressing
               whether issuers may receive a reasonable return ... 19

II.  The Durbin Amendment Does Not Prohibit Consideration
     Of The Four Challenged Costs ..................................................... 22

     A.   The Board Correctly Considered Transaction-
          Monitoring Costs ............................................................. 22

     B.   The Board Correctly Considered Fraud-Loss Costs ......... 24

     C.   The Board Correctly Considered Network-
          Processing Costs ............................................................. 26

     D.   The Board Correctly Considered Fixed ACS Costs .......... 29

Appellate Case: 25-3000     Page: 3     Date Filed: 01/09/2026 Entry ID: 5595762

III.  The Durbin Amendment Does Not Mandate An Issuer-
      Specific And Transaction-Specific Interchange-Fee Cap ............32

CONCLUSION ............................................................................35

Appellate Case: 25-3000    Page: 4    Date Filed: 01/09/2026 Entry ID: 5595762

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Aetna Cas. & Sur. Co.* v. *Comm'r of Ins.*,
   263 N.E.2d 698 (Mass. 1970) ...................................................................11

*American Bus. Ass'n* v. *Slater*,
   231 F.3d 1 (D.C. Cir. 2000) ...................................................................35

*Bath Iron Works Corp.* v. *Dir., Off. of Workers'*
   *Comp. Programs*,
   506 U.S. 153 (1993) ...................................................................18

*Brooks-Scanlon Co.* v. *R.R. Comm'n*,
   251 U.S. 396 (1920) ...................................................................22

*Calfarm Ins. Co.* v. *Deukmejian*,
   771 P.2d 1247 (Cal. 1989) ...................................................................11

*Chrysler Corp.* v. *Brown*,
   441 U.S. 281 (1979) ...................................................................18

*City of Charlottesville* v. *FERC*,
   774 F.2d 1205 (D.C. Cir. 1985) ...................................................................10

*Corner Post, Inc.* v. *Bd. of Governors of the Fed.*
   *Res. Sys.*,
   794 F. Supp. 3d 610 (D.N.D. 2025)...................................................................*passim*

*Duquesne Light Co.* v. *Barasch*,
   488 U.S. 299 (1989) ...................................................................11

*ExxonMobil Oil Corp.* v. *F.E.R.C.*,
   487 F.3d 945 (D.C. Cir. 2007) ...................................................................10

*FPC* v. *Hope Nat. Gas Co.*,
   320 U.S, 591 (1944) ...................................................................9, 11

iv

*Guaranty Nat'l Ins. Co.* v. *Gates,*
    916 F.2d 508 (9th Cir. 1990)......................................................10, 11

*Lamar, Archer & Cofrin, LLP* v. *Appling,*
    584 U.S. 709 (2018) ......................................................................9

*Linney's Pizza, LLC* v. *Bd. of Governors of Fed.*
    *Rsrv. Sys.,*
    — F. Supp. 3d —, 2025 WL 2645489
    (E.D. Ky. Sept. 15, 2025)......................................................*passim*

*Loper Bright Enters.* v. *Raimondo,*
    603 U.S. 369 (2024) .....................................................................21

*Loughrin* v. *United States,*
    573 U.S. 351 (2014) .....................................................................19

*Michigan Bell Tel. Co.* v. *Engler,*
    257 F.3d 587 (6th Cir. 2001)..............................................10, 11, 22

*NACS* v. *Bd. of Governors of Fed. Rsrv. Sys.,*
    746 F.3d 474 (D.C. Cir. 2014) ...............................................*passim*

*Nielsen* v. *Preap,*
    586 U.S. 392 (2019) .....................................................................35

*NLRB* v. *Noel Canning,*
    573 U.S. 513 (2014) .....................................................................36

*Solis* v. *Summit Contractors, Inc.,*
    558 F.3d 815 (8th Cir. 2009)........................................................20

*TCF Nat'l Bank* v. *Bernanke,*
    643 F.3d 1158 (8th Cir. 2011).................................................21, 22

**STATUTES AND REGULATIONS**

7 U.S.C. § 940f................................................................................11

15 U.S.C. § 1693*o*-2 ..................................................................*passim*

v

Debit Card Interchange Fees and Routing,
76 Fed. Reg. 43,394 (July 20, 2011) ..............................................*passim*

Debit Card Interchange Fees and Routing,
80 Fed. Reg. 48,684 (Aug. 14, 2015)................................................23, 25

**OTHER AUTHORITIES**

Webster's Third New International Dictionary (2002)...........................10

Appellate Case: 25-3000   Page: 7   Date Filed: 01/09/2026 Entry ID: 5595762

## INTEREST OF AMICI CURIAE

Bank Policy Institute is a nonpartisan public policy, research, and advocacy group that represents the policy interests of the nation's leading banks. The Clearing House Association L.L.C. is the nation's oldest banking association and represents the interests of its members by developing and promoting policies to support a safe, sound, and competitive banking system that serves customers, communities, and economic growth.

These Associations' members include banks that issue debit cards and receive debit interchange fees, as well as bank holding companies. They accordingly have a direct interest in this litigation challenging Regulation II, which limits interchange fees issuers may receive.[1]

---

[1] As required by Fed. R. App. P. 29(a)(2), amici have obtained the consent of all parties to the filing of this brief. Amici further affirm, as required by Fed. R. App. P. 29(a)(4)(E), that no counsel for a party authored this brief in whole or in part and that no person other than amici, their members, or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

# INTRODUCTION

Since 2011, the Federal Reserve Board has capped the amount of the interchange fees debit-card issuers may receive as compensation for enabling the reliable, efficient, and secure debit-card payments system used by tens of millions of Americans every day. That rule, known as Regulation II, implements the Durbin Amendment, a provision of the Dodd-Frank Act whereby Congress instructed the Board to set interchange-fee limits that are "reasonable and proportional to the cost incurred" by issuers in processing debit transactions. 15 U.S.C. § 1693*o*-2(a)(2), (3)(A). Statutory language requiring rates to be "reasonable" or "proportional" has a long history in government-imposed price regulations and has consistently been interpreted to ensure that businesses can recoup their costs and obtain a reasonable return on their provision of services to the public.

In Regulation II, the Board mostly adhered to this statutory command, though not entirely. It took into account the costs issuers bear to authorize, clear, and settle transactions (so-called ACS costs). But it declined to consider other transaction-related costs that issuers

2

incur.  It then set an interchange-fee cap equal to the subset of costs it considered, without ensuring that issuers receive a reasonable return.

Corner Post nonetheless contends that Regulation II's cap is too high.  It seizes on a paragraph of the statute entitled "Considerations," which directs the Board to consider incremental ACS costs and ignore costs not specific to particular debit transactions.  15 U.S.C. § 1693*o*-2(a)(4)(B)(i)-(ii).  Corner Post persuaded the district court that this paragraph "bifurcate[s]" the "entire universe of [possible] costs" the Board can consider.  *Corner Post, Inc.* v. *Bd. of Governors of the Fed. Res. Sys.*, 794 F. Supp. 3d 610, 638 (D.N.D. 2025).  The district court thus concluded that Regulation II violates the statute by considering *any* costs other than incremental ACS costs in setting the fee cap.

But Paragraph (4) says nothing about how to treat transaction-specific costs that are not incremental ACS costs.  It is *silent* on those costs.  The statute's general command in Paragraph (2), however, is not: the Board must set a fee cap "reasonable and proportional to *the cost incurred by the issuer with respect to the transaction.*"  15 U.S.C. § 1693*o*-2(a)(2) (emphasis added).  If a particular cost is

3

incurred by issuers "with respect to" debit transactions, the Board must consider it.

To be sure, the Board believes it has *discretion* to consider non-ACS transaction-related costs, while the Associations believe the overarching statutory mandate *requires* the Board to do so (and ensure a reasonable return). But the Board and Associations agree that the statute certainly does not *prohibit* consideration of those costs.

Because it misconstrued the statute, the district court also wrongly held that the Board unlawfully considered four specific categories of costs. Transaction-monitoring costs, fraud losses, network-processing fees, and so-called "fixed" ACS costs are all transaction-related costs incurred by issuers, so the Durbin Amendment requires the Board to consider them. Corner Post's contrary arguments were correctly rejected by another district court in another pending challenge, *Linney's Pizza, LLC* v. *Bd. of Governors of Fed. Rsrv. Sys.*, — F. Supp. 3d —, 2025 WL 2645489, at *9-13 (E.D. Ky. Sept. 15, 2025), and by the D.C. Circuit a decade ago. *See NACS* v. *Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474 (D.C. Cir. 2014).

4

Finally, the district court further erred by holding that the Board could not adopt a single, universal fee cap. The court's conclusion that the Board *must* set separate limits for each of the billions of transactions processed by hundreds of issuers each year is at odds with the statutory text and entirely unworkable.

This Court should reverse.

## ARGUMENT

### I. The Durbin Amendment Does Not Restrict The Board To Considering Only Incremental ACS Costs.

#### A. The Durbin Amendment Requires The Board To Consider All Transaction-Related Costs And Provide A Reasonable Return.

1. As relevant, the Durbin Amendment does four things in order. Paragraph (1) authorizes the Board to prescribe regulations regarding interchange fees. *See* 15 U.S.C. § 1693*o*-2(a)(1). Congress then established a limit on those fees in Paragraph (2): "The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be *reasonable and proportional to the cost incurred by the issuer with respect to the transaction.*" *Id.* § 1693*o*-2(a)(2) (emphasis added). That language is

5

straightforward:  for any debit transaction, the issuer may receive a fee that is "reasonable and proportional" to its costs.

Congress repeated that formulation in Paragraph (3).  It ordered the Board to prescribe rules that "establish standards for assessing whether the amount of any interchange transaction fee described in [P]aragraph (2) is *reasonable and proportional to the cost incurred by the issuer with respect to the transaction*."  15 U.S.C. § 1693*o*-2(a)(3)(A) (emphasis added).  Thus, using the same language in two separate places, the Durbin Amendment tells the Board to set a limit on interchange fees—one that is reasonable and proportional to issuers' transaction-related costs.

Notably, Congress placed only one restriction on which costs the Board may consider:  it must be "the cost incurred by the issuer *with respect to the transaction*."  15 U.S.C. §§ 1693*o*-2(a)(2), (3)(A) (emphasis added).  Issuers cannot recoup costs that are not transaction related through interchange fees.  But for costs that *are* transaction related, Congress placed nothing out of bounds.  Rather, Congress twice referred to "*the cost* incurred by the issuer with respect to the

6

transaction." *Id.* (emphasis added). For any given transaction, the Board must permit an issuer to receive a fee "reasonable and proportional" to its total transaction-related cost.

Finally, in Paragraph (4), entitled "Considerations," Congress gave the Board some guidance in establishing standards. Congress directed the Board to "distinguish between" two different kinds of costs. The first is "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under [P]aragraph (2)." 15 U.S.C. § 1693*o*-2(a)(4)(B)(i). So Congress made clear that in setting the fee limit, the Board must consider issuers' incremental costs for "the authorization, clearance, or settlement" of an electronic debit transaction. *Id.*

By contrast, Congress made equally clear that "other costs incurred by an issuer which are not specific to a particular electronic debit transaction … shall not be considered under [P]aragraph (2)." 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii). That provision aligns with the mandate to set the interchange-fee cap in proportion "to the cost incurred by the

Appellate Case: 25-3000     Page: 14     Date Filed: 01/09/2026 Entry ID: 5595762

issuer with respect to the transaction." *Id.* § 1693*o*-2(a)(2). In determining whether a cost is "with respect to a transaction," the cost must be "specific to a particular electronic debit transaction."

In this respect, the Board and Associations have different views as to what the statute requires. The Board believes that, because Paragraph (4) is silent on transaction-related costs other than ACS costs, it has discretion whether to consider those costs in setting the fee cap. The Associations' view is that the overarching directive in Paragraph (2) controls: the Board must consider *any* "cost incurred by the issuer with respect to the transaction." 15 U.S.C. §§ 1693*o*-2(a)(2), (3)(A). The Board and Associations agree, however, that the statute does not *prohibit* the consideration of such costs.

2. When Congress provided for interchange fees "reasonable and proportional" to issuers' transaction costs, it invoked language with a long history of judicial interpretation in ratemaking statutes and price regulations. *See, e.g.*, *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U.S. 709, 721-722 (2018) ("When Congress used the materially same language … it presumptively was aware of the longstanding judicial

8

interpretation of the phrase and intended for it to retain its established meaning."). Those other laws impose price limits on private businesses, but do so consistent with the Fifth Amendment's Takings Clause by ensuring that businesses can earn a reasonable return on their provision of valuable services to the public.

Courts have repeatedly interpreted statutory language requiring prices or rates to be "just" or "reasonable" as guaranteeing providers the ability to charge a fee that covers their costs plus a reasonable return. For example, in *FPC* v. *Hope Natural Gas Co.*, the Supreme Court held that a statutory requirement of "just and reasonable rates" allows a "return" that is "commensurate with returns on investments in other enterprises having corresponding risks" and "sufficient to assure confidence in the financial integrity of the enterprise." 320 U.S. 591, 603, 605 (1944); *see ExxonMobil Oil Corp.* v. *F.E.R.C.*, 487 F.3d 945, 951 (D.C. Cir. 2007) ("just and reasonable" rates means "rates [that] yield[] sufficient revenue to cover all proper costs … plus a specified return on invested capital") (quoting *City of Charlottesville* v. *FERC*, 774 F.2d 1205, 1207 (D.C. Cir. 1985)); *Michigan Bell Tel. Co.* v. *Engler*, 257 F.3d

9

587, 595-596 (6th Cir. 2001); *Guaranty Nat'l Ins. Co.* v. *Gates*, 916 F.2d 508, 515 (9th Cir. 1990).

Even without the old soil attached to the phrase "reasonable and proportional," those terms would permit issuers to earn a reasonable return. A "reasonable" fee is one that is "moderate" or "that allows a fair profit." Webster's Third New International Dictionary 1892 (2002). And "proportional" in this context means "corresponding in size, degree, or intensity" to, or "regulated or determined in size or degree with reference to," issuers' transaction costs. *Id.* at 1819. If Congress had wanted to limit issuers to recovering *only* their transaction costs (or any subset), it would have said so. *See, e.g.*, 7 U.S.C. § 940f(c)(2) ("amount of the fee … shall be equal to the modification cost").

Reading the Durbin Amendment to permit issuers to recoup their transaction costs and a reasonable return avoids constitutional concerns. The Takings Clause bars the government from imposing "confiscatory" price limits—a price so low as to be "inadequate to compensate current equity holders for the risk associated with their investments." *Duquesne Light Co.* v. *Barasch*, 488 U.S. 299, 307, 312 (1989). When the

10

government regulates prices, it must "enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed." *Hope Nat. Gas*, 320 U.S. at 605. Applying these principles, courts have repeatedly held that price-control regulations that are limited to costs—and thus fail to allow a reasonable return—are unconstitutional. *See, e.g.*, *Michigan Bell*, 257 F.3d at 595-596; *Guaranty Nat'l*, 916 F.2d at 515; *Calfarm Ins. Co.* v. *Deukmejian*, 771 P.2d 1247, 1255-1256 (Cal. 1989); *Aetna Cas. & Sur. Co.* v. *Comm'r of Ins.*, 263 N.E.2d 698, 703 (Mass. 1970).

**B.    The District Court Misinterpreted The Durbin Amendment's Requirements.**

**1. The district court erred by tying the fee cap only to incremental ACS costs.**

As explained, the plain text of the statute distinguishes between costs that are transaction related and those that are not—but draws *no* distinction between transaction-specific costs. To get around that text, Corner Post makes a clever move. Remember that in Paragraph (4), entitled "Considerations," Congress said that the Board must consider "incremental [ACS] cost" in setting the fee cap, but it may not consider "other costs incurred by an issuer which are not specific to a particular

11

electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(4)(B)(i)-(ii); *see supra*, p. 7. Corner Post argues, and the district court accepted, that Paragraph (4)(B) "bifurcate[s]" the "entire universe of [possible] costs," allowing the Board to consider *only* incremental ACS costs in setting the cap. *Corner Post*, 794 F. Supp. 3d at 631. That reading cannot be squared with the statute's text and structure, and it creates an unavoidable surplusage problem.

a. The most fundamental problem for Corner Post is that Paragraph (4)(B) says *nothing* about how to treat transaction-specific costs other than incremental ACS costs. But those costs *are* encompassed in the general command in Paragraph (2): the Board must set a fee cap "reasonable and proportional *to the cost incurred by the issuer with respect to the transaction*." 15 U.S.C. § 1693*o*-2(a)(2) (emphasis added). The only question is whether any given cost is incurred by issuers "with respect to" debit transactions.

The district court reasoned that Paragraph (4) "has primary authority" over the general command in Paragraph (2). *Corner Post*, 794 F. Supp. 3d at 630. That is a red herring. It is true that, in the

12

"Considerations" provision, Congress gave the Board guidance on how to establish the fee cap. But as explained above, Paragraph (4) is completely consistent with Paragraph (2)'s mandate. Paragraph (4) requires the Board to consider incremental ACS costs, which are a type of cost "incurred by the issuer with respect to the transaction" under Paragraph (2). 15 U.S.C. § 1693*o*-2(a)(2).

The district court's reading does not follow from the wording of Paragraph (4) itself. For starters, that provision is entitled "Considerations," and nothing about its text indicates that those "[c]onsiderations" were meant to cover the field. For instance, the Board had to "consult, as appropriate," with other financial regulators. 15 U.S.C. § 1693*o*-2(a)(4)(C). But no one would think the Board could not consult other agencies.

Turning to the particular consideration at issue, Paragraph (4)(B) instructs the Board to "distinguish between" incremental ACS costs and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(4)(B). The Board did exactly that. Incremental ACS costs were among the costs the

13

Board considered in calculating the fee cap, but costs unrelated to particular debit transactions were not.  Simply put, Regulation II satisfies the plain terms of Paragraph (4).

The district court reasoned that, by directing the Board to "distinguish between" those two types of costs, Congress "bifurcated" the universe of costs into one or the other. *Corner Post*, 794 F. Supp. 3d at 631.  In the court's view, the Board "must make a distinction between two—and only two—options." *Id.*  But "no definition of 'distinguish' inherently limits the distinguishing being done to only two entities." *Linney's Pizza*, 2025 WL 2645489, at *8.  Distinguishing between A and B does not itself mean that there is no C or D.

As an analogy, suppose that Congress mandated that an agency issue rules to advance U.S. energy independence, and then directed the agency to distinguish between domestic coal mining, which shall be supported, and other forms of energy purchased from foreign countries, which shall not be supported.  That statute obviously would not prohibit the agency from supporting domestic natural-gas production; in fact, the agency would likely be *required* to do so in order to fulfill its overarching

14

mandate. Likewise here, the Board must factor in transaction-related costs other than incremental ACS costs in order to set a cap that is "reasonable and proportional" to issuers' transaction costs.

That understanding is confirmed by the particular text here. Paragraph (4) broadly defines the category of *excludable* costs as "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii). But Congress did not use similarly expansive language when it came to incremental ACS costs. Instead, Congress simply instructed the Board to consider incremental ACS costs, *see id.* § 1693*o*-2(a)(4)(B)(i), without using any language that indicates incremental ACS costs are the only type of transaction-specific cost the Board may consider. The reasonable inference is that Congress wanted to ensure the fee cap would cover one kind of transaction-specific cost (*i.e.*, incremental ACS costs)—not that Congress silently disallowed consideration of all other transaction-specific costs.

For the same reasons, Corner Post was wrong to argue below that including one type of allowable costs in Paragraph (4)(B)—

15

*i.e.*, incremental ACS costs—implies the exclusion of all other types of costs. R. Doc. 51, at 15. The district court correctly did not adopt that *expressio unius* argument. Congress did not leave the exclusion of other costs to any negative inference. Rather, Congress explicitly addressed the category of excludable costs: "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii). In short, Congress simply said in Paragraph (4)(B) that one category of costs was in and one category of costs was out.

b. Corner Post's reading has its own critical difficulty: namely, there was no reason for Congress to direct exclusion of "other costs incurred by an issuer *which are not specific to a particular electronic debit transaction.*" 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii) (emphasis added). That latter clause was wholly unnecessary if Congress really wanted the Board to "include incremental ACS costs in the fee standard and exclude all others." *Corner Post*, 794 F. Supp. 3d at 626 (quotations and alterations omitted). Congress would simply have told the Board to exclude "other costs incurred by an issuer"—and stopped there.

16

In truth, directing the Board to consider incremental ACS costs and nothing more would have been easy to accomplish. Congress could have written Paragraph (2)'s mandate to say that the interchange-fee cap must be reasonable and proportional to issuers' incremental ACS costs. Or Congress could have written Paragraph (4) to say that the Board should consider only incremental ACS costs in setting the fee cap. Congress instead focused not once, but twice, on "the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2), (3)(A). That would be a remarkably odd way to disallow all transaction-related costs other than incremental ACS costs.[2]

The district court brushed aside the surplusage problem as inartful drafting. Normally Congress's use of "which" without a preceding comma would signify a restrictive clause: the category of

---

[2] Senator Durbin's statements cannot overcome the statute's plain text and structure. *See Corner Post*, 794 F. Supp. 3d at 632-633. As the Supreme Court has long cautioned, courts are to "give no weight to a single reference by a single Senator during floor debate." *Bath Iron Works Corp.* v. *Dir., Off. of Workers' Comp. Programs*, 506 U.S. 153, 166 (1993); *see Chrysler Corp.* v. *Brown*, 441 U.S. 281, 311 (1979). Here, Senator Durbin's remarks neither track the text of the statute that Congress ultimately enacted, nor even address any transaction costs other than ACS costs.

Appellate Case: 25-3000     Page: 24     Date Filed: 01/09/2026 Entry ID: 5595762

excludable costs is limited to those other costs that are not specific to particular transactions. But in the court's view, Congress could have intended the comma-less clause—"which are not specific to a particular electronic debit transaction"—to be descriptive rather than restrictive. In other words, Congress was describing the universe of "other costs" that stand in contrast to incremental ACS costs and that the Board could not consider in setting the fee cap. *See Corner Post*, 794 F. Supp. 3d at 627-628; *see id.* at 633. That does not work for two reasons.

First, while the use of "which" or "that" may boil down to a "style preference," grammar rules "*require* that commas set off descriptive clauses." *NACS*, 746 F.3d at 487; *Linney's Pizza*, 2025 WL 2645489, at *9. Congress followed that rule later in Paragraph (4)(B)(ii) itself, placing a comma before "which costs shall not be considered." *See Loughrin* v. *United States*, 573 U.S. 351, 358 (2014) (use of particular language in one section but not another indicates that Congress "intended a difference in meaning"). Reading the clause restrictively— *i.e.,* to define *which* other costs Congress wanted the Board to ignore—

18

is the only reading that complies with rules of grammar and Congress's own usage in the very provision at issue.

Second, even reading the clause descriptively does not cure the surplusage problem. There was still no reason for Congress to describe the "other costs incurred by an issuer" as those "which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii). If Congress had intended to "bifurcate" the universe, it still could have stopped after "other costs incurred by an issuer." Corner Post cannot avoid that its reading renders the remaining text of Paragraph (4)(B)(ii) meaningless.

## 2. The district court erred by not addressing whether issuers may receive a reasonable return.

The district court found it was not "necessary to delve into" the Associations' arguments that the Durbin Amendment requires that issuers receive a reasonable return. The court "decline[d] to consider this issue because it was raised to this court by the amici and not by the parties." *Corner Post*, 794 F. Supp. 3d at 654 (quoting *Solis* v. *Summit Contractors, Inc.*, 558 F.3d 815, 826 n.6 (8th Cir. 2009)). As a procedural matter, that was error because the Associations' motion to intervene was

19

denied in part on the ground that they could present their arguments as amici.  As a substantive matter, the district court ignored an important argument that goes to "the best reading" of the statute.  *See Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369, 400-401 (2024).  As explained earlier, Congress's use of the "reasonable and proportional" formulation confirms that it intended the Board to consider *all* transaction-related costs to ensure issuers receive a reasonable return.  *See supra* pp. 9-11.

Although it purported not to address the issue, the district court noted that this Court had "already rejected" a "facial challenge to the Durbin Amendment" at the time of the Board's original proposed rule.  *Corner Post*, 794 F. Supp. 3d at 639 (citing *TCF Nat'l Bank* v. *Bernanke*, 643 F.3d 1158 (8th Cir. 2011)).  That is true but irrelevant.  The Associations are not arguing here that the Durbin Amendment is facially unconstitutional.  The Associations' argument is that Congress used the phrase "reasonable and proportional" to incorporate longstanding judicial interpretations of similar language requiring that providers subject to price controls be allowed to obtain a reasonable return.  In other words, Congress crafted the statute to ensure it did *not* cross

20

longstanding constitutional boundaries when placing a cap on issuers' ability to pursue their business.

Any interpretation that would limit issuers to recovering less than their costs raises serious constitutional concerns. Congress did not (and could not) require issuers to give these services away. In *TCF National Bank*, 643 F.3d at 1164, this Court upheld the lower court's decision not to preliminarily enjoin implementation of the Durbin Amendment, noting that issuers might be able to make up for their losses by charging more for their other services. But courts have long recognized that the government cannot require businesses "to subsidize their regulated services … with revenues generated from unregulated services." *Michigan Bell*, 257 F.3d at 594 (citing *Brooks-Scanlon Co.* v. *R.R. Comm'n*, 251 U.S. 396 (1920)). This Court did not address that legal principle, and its decision in that preliminary posture did not purport to hold that the Durbin Amendment is free from constitutional concerns. Interpreting the statute to require the Board to set a fee cap that is reasonable and proportional to *all* issuers' transaction-related costs, thus ensuring they can earn a reasonable return, avoids those concerns.

21

## II. The Durbin Amendment Does Not Prohibit Consideration Of The Four Challenged Costs.

### A. The Board Correctly Considered Transaction-Monitoring Costs.

By flagging transactions as suspicious before issuers authorize them, transaction-monitoring systems "assist in the authorization process by providing information needed" by issuers to decide whether "to approve or decline the transaction." Debit Card Interchange Fees and Routing, 80 Fed. Reg. 48,684, 48,685 (Aug. 14, 2015). Accordingly, transaction monitoring, "[l]ike other authorization steps," is "integral to an issuer's decision to authorize a specific transaction." *Id.*; *see Linney's Pizza*, 2025 WL 2645489, at \*11. The Board thus correctly concluded that these are not only transaction-related costs that fall within Paragraph (2)'s overarching mandate, but also incremental ACS costs under Paragraph (4)(B)(i).

The district court did not disagree that these transaction-monitoring costs are incremental ACS costs. But in the court's view, because transaction monitoring is related to preventing fraud and Congress separately provided for a fraud-prevention adjustment in Paragraph (5) of the Durbin Amendment, any compensation to issuers

22

related to transaction monitoring must be "subsume[d]" by that fraud-prevention adjustment in Paragraph (5). *Corner Post*, 794 F. Supp. 3d at 634-635.

That purpose-driven interpretation ignores the fundamental distinction the statute draws between transaction-related "costs" issuers may recover under Paragraphs (2) through (4) and the broader, programmatic fraud-prevention expenditures addressed by the fraud-adjustment provision in Paragraph (5). Paragraphs (2) through (4) speak in terms of costs incurred in processing individual transactions— *i.e.*, "an electronic debit transaction," 15 U.S.C. § 1693*o*-2(a)(2), or "a particular electronic debit transaction," *id.* § 1693*o*-2(a)(4)(B)(i). By contrast, Paragraph (5) refers more broadly to "preventing fraud in relation to electronic debit transactions involving that issuer." By referring to fraud "preventi[on]" "in relation to" plural "transactions," Paragraph (5)(A) encompasses programmatic "fraud prevention costs … that are not linked to a particular transaction." 80 Fed. Reg. at 48,686. The fact that Congress separately incentivized these broader fraud-prevention efforts does not change the fact that transaction-

23

monitoring costs are an essential part of the ACS process for each individual transaction. *See Linney's Pizza*, 2025 WL 2645489, at *11.

The district court's conclusion also makes little practical sense. After all, "[m]ost costs of the authorization process … assist in preventing some type of fraud." 80 Fed. Reg. at 48,685. Under the district court's reasoning, even basic steps such as requiring a customer to enter her PIN—which prevents someone else from fraudulently using her card—must be captured by the Paragraph (5) adjustment. But all agree that Congress wanted issuers to be able to recoup the costs of the authorization process through interchange fees.

## B. The Board Correctly Considered Fraud-Loss Costs.

The Board defined allowable fraud losses as losses that result from fraudulent debit-card transactions, are "incurred by the issuer," and "are not recovered through chargebacks to merchants or debits to or collections from customers." Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394, 43,431 (July 20, 2011). Because these losses are typically "the result of the authorization, clearance, and settlement of an apparently valid transaction that the cardholder later identifies as

24

fraudulent," *id.*, the Board reasoned that they are "specific to a particular transaction."

The district court held that the Durbin Amendment prohibits the Board from considering fraud losses, but all three of its reasons were incorrect. First, the court concluded that fraud losses are not "costs" at all, reasoning that a "loss" can be considered a "cost" only if it "is the *certain* or agreed-upon up-front loss you accept to gain something." *Corner Post*, 794 F. Supp. 3d at 635-636. But there are numerous costs whose amount cannot always be known ahead of time. Payroll is indisputably a central cost of most businesses, even though the exact amount of that cost may not be calculable until a particular pay period has ended. As the Board found and every debit-card issuer knows, fraud losses are an unfortunate but unavoidable cost of doing business.

Second, the district court incorrectly held that fraud losses are not incurred by the issuer "for the role of the issuer" in the ACS process. *Corner Post*, 794 F. Supp. 3d at 635 (quoting 15 U.S.C. § 1693*o*-2(a)(4)(B)(i)). As the court saw things, because it is "possible" that "a network could determine the merchant (not the issuer) should bear the

loss" from a fraudulent transaction, issuers should not be able to recover fraud losses that "they did not cause and might not have to incur." *Id.* at 636. But as explained, the Board defined allowable fraud losses as "losses *incurred by the issuer*" and not recovered elsewhere. 76 Fed. Reg. at 43,431.

Third, as with transaction-monitoring costs, the district court believed that considering fraud losses "undermines the efficacy and purpose of the fraud prevention adjustment." *Corner Post*, 794 F. Supp. 3d at 636. Again, this misunderstands the distinction between compensating issuers for transaction-related costs pursuant to Paragraph (2)—including fraud losses—and incentivizing issuers to undertake programmatic improvements to "prevent[] fraud" pursuant to Paragraph (5). There is no overlap between the fraud losses issuers may be compensated for in the base interchange-fee cap and the separate fraud-prevention adjustment.

## C. The Board Correctly Considered Network-Processing Costs.

As the D.C. Circuit put it when addressing merchants' first challenge to the Board's consideration of network-processing fees, "this

26

is easy." *NACS*, 746 F.3d at 490. Issuers must pay these fees to the network for each transaction as part of authorizing, clearing, and settling a transaction. So the fees are both costs "incurred by the issuer with respect to" debit transactions under Paragraph (2) *and* incremental ACS costs under Paragraph (4)(B).

The district court incorrectly held that the Board still could not consider network-processing fees for two reasons. First, the court perplexingly concluded that network fees are not "incurred by an issuer for the role of the issuer" in debit transactions because they are "charged by networks" for their role in the transaction. *Corner Post*, 794 F. Supp. 3d at 636-637. But issuers have to pay those fees to process transactions because networks charge them for every transaction. Just as filing fees are lawyers' costs inherent in litigation, network fees are issuers' costs inherent in processing debit transactions.

Second, the district court pointed to the statute's separate definition of "network fee" as a fee charged by networks "other than an interchange transaction fee." *Corner Post*, 794 F. Supp. 3d at 637 (quoting 15 U.S.C. § 1693*o*-2(c)(10)). But that statutory definition has

27

nothing to do with how the Board calculates interchange fees. The district court agreed with Corner Post's argument that "a network fee cannot be a component of, yet different from, an interchange fee," *id.* (citing R. Doc. 51, at 26), but components of things are different from the things themselves. Bread is not a sandwich, but it is a component of a sandwich. Here, incremental ACS costs are not "interchange transaction fees," but everyone agrees that incremental ACS costs must be included as a component of interchange fees.

The district court also wrongly concluded that, because Paragraph (8)(B)(i) prohibits network fees from being "used to directly or indirectly compensate an issuer with respect to an electronic debit transaction," network fees could not be used to calculate the interchange-fee cap. *Corner Post*, 794 F. Supp. 3d at 637 (quoting 15 U.S.C. § 1693*o*-2(a)(8)). But Paragraph (8) gives separate authority to the Board to regulate *network fees* that networks may charge. The purpose of Paragraph (8)(B)(i) is to "prevent issuers and networks from circumventing the Board's interchange fee rules," *NACS*, 746 F.3d at 491—by, for example, charging inflated network fees and then sharing those inflated revenues

28

with issuers. 76 Fed. Reg. at 43,441-43,442. This separate regulatory authority has nothing to do with the Board's mandate under Paragraph (3) to set interchange-fee limits. As the D.C. Circuit remarked when merchants previously made this argument, they "should have left it out entirely." *NACS*, 746 F.3d at 491.

### D. The Board Correctly Considered Fixed ACS Costs.

Finally, the Board correctly considered a group of ACS-related costs that some commenters had characterized as "fixed," including costs associated with network connectivity, hardware, software, and labor. 76 Fed. Reg. at 43,429. The Board ultimately concluded that the labels of "fixed" and "variable" ACS costs were misleading because the same costs could be characterized as "fixed" or "variable" from year to year or issuer to issuer. *Id.* at 43,426-43,427. And the Board included these costs because "no electronic debit transaction can occur without incurring these costs, making them costs specific to each and every electronic debit transaction." *Id.*

The Board was correct. Issuers necessarily "incur[]" these costs "with respect to" every transaction. 15 U.S.C. § 1693*o*-2(a)(2). They cannot facilitate the ACS process for each of the billions of transactions

29

each year without having incurred the significant costs of setting up the sophisticated hardware, software, and equipment necessary to complete that process. These costs are thus "specific to" every transaction and do not fall within Paragraph (4)'s exclusion. *Id.* § 1693*o*-2(a)(4)(B)(ii).

In concluding otherwise, the district court relied entirely on the Board's initial use of the label "fixed," which the court characterized as an "admission" that the costs were not "incremental" under Paragraph (4)(B). *Corner Post*, 794 F. Supp. 3d at 633. Initially, as explained above, the statute does not limit the Board's consideration only to incremental ACS costs, *see supra* pp. 6-8, and that alone disposes of the district court's reasoning.

In any event, the Board ultimately rejected a categorical distinction between fixed and variable ACS costs because such costs are not categorically one or the other within the context of debit-card payment systems. Instead, "the meanings of fixed costs and variable costs depend on a variety of factors," including "the relevant time horizon and volume range," an issuer's accounting practices, and whether an issuer processes transactions in-house or outsources that

30

function to a third party. *Id.* at 43,427. Thus, even "the same type of cost may appear variable in one year, but fixed in a different year." *Id.*; *see NACS*, 746 F.3d at 490. In short, the Board found the district court's dichotomy was false.

In fact, even if the district court were right that the Board may consider only "incremental" ACS costs under Paragraph (4), equipment and labor costs fit that definition. As the Board explained, "incremental cost" does not have a set meaning in the debit-card industry. 76 Fed. Reg. at 43,426. That term is best understood as "the difference between the cost incurred by a firm if it produces a particular quantity of a good and the cost incurred by the firm if it does not produce the good at all." *Id.* In other words, a given cost is an incremental ACS cost if the issuer incurs it only because of the issuer's role in the ACS process. That is true of all of the so-called "fixed" ACS costs. The costs of network connectivity, software, hardware, equipment, and associated labor are some of the principal costs necessary to facilitate the ACS process. The Board was thus not merely permitted, but affirmatively required, to consider these costs.

31

## III. The Durbin Amendment Does Not Mandate An Issuer-Specific And Transaction-Specific Interchange-Fee Cap.

Finally, in deciding how to "establish standards for assessing" whether interchange fees are "reasonable and proportional to the cost incurred by the issuer," 15 U.S.C. § 1693*o*-2(a)(3)(A), the Board considered two options: separate standards for each issuer based on its respective costs (*i.e.*, an issuer-specific standard), or a single cap applicable to all issuers based on the average allowable costs across the industry. The Board chose the latter. It determined that a single, universal interchange-fee cap was consistent with the overarching statutory mandate in Paragraph (2) and represented the only way to implement the mandate "without imposing undue compliance burdens on issuers or networks." 76 Fed. Reg. at 43,422-43,423.

The district court held that the statute prohibits the Board's approach and instead mandates a third approach that "none" of the thousands of commenters "argued for": an issuer-specific *and* transaction-specific standard. 76 Fed. Reg. at 43,422. According to the court, because the second half of Paragraph (2) refers to "*the* cost incurred by *the* issuer with respect to *the* transaction," 15 U.S.C

32

§ 1693*o*-2(a)(2) (emphases added), the Board must issue standards "tailored" to each individual transaction and each individual issuer. *Corner Post*, 794 F. Supp. 3d at 638.

That conclusion is wrong for several reasons. For starters, it misreads the text. Paragraph (2) imposes a limit on interchange fees "that *an* issuer may receive or charge with respect to *an* electronic debit transaction." 15 U.S.C § 1693*o*-2(a)(2). Congress's use of "a" or "an" has a "generalizing force," *American Bus. Ass'n* v. *Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000), indicating that Congress was referring to a representative issuer and representative transaction. When Congress then spoke of "the issuer" and "the transaction" in the second half of the sentence (and again in Paragraph (3)), it was simply referring back to the representative issuer and transaction. In other words, Congress used "the" in the second half of Paragraph (2) "as 'a function word … indicat[ing] that a following noun or noun equivalent is definite *or has been previously specified by context*.'" *Nielsen* v. *Preap*, 586 U.S. 392, 408 (2019) (quotation omitted, emphasis added); *see NLRB* v. *Noel Canning*, 573 U.S. 513, 527 (2014) ("[T]he word 'the' … can also refer 'to

33

a term used generically or universally.'" (quotation omitted)).  Congress did not use "the" to mandate that each individual interchange fee must be "reasonable and proportional" to each individual transaction.

Indeed, that interpretation would be virtually impossible to implement.  "[I]nterchange fees are computed at the time of the transaction," but "an issuer's costs for a specific transaction *cannot* be ascertained" at that moment.  76 Fed. Reg. at 43,422 (emphasis added).  Transaction costs vary based on "a variety of factors, including factors that may not be known to the issuer at the time it charges or receives the interchange fee."  *Id.*  There is thus no apparent way to limit an interchange fee for a particular transaction to the costs incurred by the issuer for that transaction.  At best, it would "result in an exceedingly complex matrix of interchange fees" requiring separate calculations for each of "tens of billions of electronic transactions" and a "large and growing number of covered issuers."  *Id.*  These "practical" realities confirm that "[t]ransaction-specific fees are not what was contemplated by the statutory text."  *Linney's Pizza*, 2025 WL 2645489, at *15.

Appellate Case: 25-3000     Page: 41     Date Filed: 01/09/2026 Entry ID: 5595762

The district court acknowledged—with considerable understatement—that "issuing such particularized standards will be challenging." *Corner Post*, 794 F. Supp. 3d at 638. And it agreed with Corner Post's concession that the Board may permissibly group "similarly-situated issuers and transactions" into a safe harbor cap applicable to more than one transaction. *Id.* at 639. But that concession gives away the game. Either the statute mandates a calculation tailored to the specific issuer's costs of each and every individual transaction, or it does not. The right answer is the latter. Corner Post might prefer that the Board had adopted a different approach, but that is no basis for courts to impose requirements that Congress did not.

## CONCLUSION

For the foregoing reasons, this Court should reverse and direct the district court to enter judgment for the Board.

Appellate Case: 25-3000    Page: 42    Date Filed: 01/09/2026 Entry ID: 5595762

Dated: January 6, 2026

Respectfully submitted,

/s/ *Jeffrey B. Wall*
JEFFREY B. WALL
JUDSON O. LITTLETON
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
Telephone: (202) 956-7500

*Counsel for Bank Policy*
*Institute and The Clearing*
*House Association L.L.C.*

36

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,479 words. The document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

Dated: January 6, 2026

*/s/ Jeffrey B. Wall*
JEFFREY B. WALL

*Counsel for Bank Policy Institute and The Clearing House Association L.L.C.*

37

# CERTIFICATE OF SERVICE

I certify that on January 6, 2026, the foregoing was electronically filed with the Court via the Court's appellate CM/ECF system, and a copy of the same was automatically served on all parties registered with the CM/ECF system on the same date.

Dated: January 6, 2026

/s/ Jeffrey B. Wall
JEFFREY B. WALL

*Counsel for Bank Policy Institute and The Clearing House Association L.L.C.*

Appellate Case: 25-3000    Page: 45    Date Filed: 01/09/2026 Entry ID: 5595762