No. 25-3000

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

CORNER POST, INC.,

*Plaintiff-Appellee,*

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of North Dakota, No. 1:21-cv-00095 (Traynor, J.)

## BRIEF OF APPELLEE CORNER POST, INC.

Scott K. Porsborg
SMITH PORSBORG SCHWEIGERT
ARMSTRONG MOLDENHAUER &
SMITH
122 East Broadway
Bismarck, ND 58502
(701) 258-0630
sporsborg@smithporsborg.com

Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S. Main St., 5th Fl.
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Bryan Weir
Frank H. Chang
Cody Ray Milner
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209

*Counsel for Appellee Corner Post, Inc.*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

The Board of Governors of the Federal Reserve promulgated a debit-card interchange-fee standard, Regulation II (pronounced "Regulation Eye-Eye"), under the Durbin Amendment. Corner Post, Inc. challenged that fee standard under the Administrative Procedure Act. The district court granted summary judgment to Corner Post and vacated Regulation II. It held that the statutory text draws a binary line: for the fee standard, the Board "shall" consider only incremental authorization, clearance, and settlement costs tied to a particular transaction, and "shall not" consider other costs—leaving no room for the Board to conjure a third category of costs out of statutory silence. The district court also concluded that the fee standard unlawfully includes costs the statute excludes. And the district court recognized that the rule's one-size-fits-all cap conflicts with Congress's command that fees be reasonable and proportional to costs incurred by the issuer per transaction.

Those conclusions are the best reading of the statutory text and are supported by traditional tools of statutory interpretation. The district court's judgment should therefore be affirmed. Appellee Corner Post requests 20 minutes for argument.

i

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Plaintiff-Appellee Corner Post, Inc. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Appellate Case: 25-3000    Page: 3    Date Filed: 02/13/2026 Entry ID: 5608162

# TABLE OF CONTENTS

Summary of the Case and Request for Oral Argument.................................. i

Corporate Disclosure Statement....................................................... ii

Table of Contents................................................................... iii

Table of Authorities................................................................. v

Statement of Issues..................................................................2

Statement of the Case................................................................2

    A. Congress directs the Board to regulate debit-card interchange fees ....2

        1. Debit-card interchange fees. ..............................................2

        2. Congress passes the Durbin Amendment, which directs the Board to set an interchange-fee standard........................................6

    B. The Board proposes a 12-cent cap, but issuer banks successfully lobby the Board to nearly double the fee in the Final Rule.............................8

        1. The Proposed Rule ....................................................8

        2. Regulation II .........................................................8

    C. A federal district court vacates Regulation II, but the D.C. Circuit saves it on appeal only through *Chevron* deference. ............................10

    D. The Board issues an Updated Rule..........................................12

    E. Corner Post and merchant associations sue ...........................12

Summary of the Argument ...........................................................14

Standard of Review .................................................................15

Argument...........................................................................16

I. Regulation II is contrary to law and exceeds the Board's statutory authority ...........................................................................16

    A. The Board lacks discretion to depart from Congress's commands in the Durbin Amendment .................................................................16

Appellate Case: 25-3000    Page: 4    Date Filed: 02/13/2026 Entry ID: 5608162

B. Regulation II contradicts the Durbin Amendment by creating a third category of costs out of statutory silence................................................25

   1. Congress bifurcated the universe of possible costs into only two categories...............................................................................................26

   2. The Board's counterarguments do not overcome the Durbin Amendment's text and structure........................................................43

C. Regulation II contradicts the Durbin Amendment by including prohibited costs in the fee standard ........................................................53

D. Regulation II contradicts the Durbin Amendment by setting a one-size-fits-all cap ...............................................................................................62

II. Regulation II's fee standard is arbitrary and capricious............................66

A. The Board ignored the functional similarity between debit-card and checking transactions..............................................................................67

B. The Board weighed unauthorized costs and failed to rationalize their inclusions.................................................................................................70

C. The Board bypassed issuer- and transaction-specific costs in favor of hypothetical averages for a universal cap ............................................72

Conclusion.......................................................................................................72

Certificate of Compliance...............................................................................74

Certificate of Service ......................................................................................75

iv

# TABLE OF AUTHORITIES

Cases

*3M Co. v. Comm'r of Internal Revenue,*
  154 F.4th 574 (8th Cir. 2025) ................................................................20

*Air Transport Ass'n of Am., Inc. v. USDA,*
  2021 WL 1166928 (D.D.C. Mar. 26, 2021) ...........................................25

*Air Transport Ass'n of Am., Inc. v. USDA,*
  37 F.4th 667 (D.C. Cir. 2022) ...............................................................25

*Ala. Med. Ctr. v. Sebelius,*
  572 F.3d 912 (D.C. Cir. 2009) ...............................................................25

*Alabama v. North Carolina,*
  560 U.S. 330 (2010) ...............................................................................32

*Alaska Airlines, Inc. v. Brock,*
  480 U.S. 678 (1987) ...............................................................................49

*All. for Fair Bd. Recruitment v. SEC,*
  125 F.4th 159 (5th Cir. 2024) ................................................................40

*Am. Bus Ass'n v. Slater,*
  231 F.3d 1 (D.C. Cir. 2000) ...................................................................63

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011) ...............................................................................40

*Batterton v. Francis,*
  432 U.S. 416 (1977) ...............................................................................21

*Biden v. Missouri,*
  595 U.S. 87 (2022) .................................................................................24

*Biden v. Nebraska,*
  143 S.Ct. 2355 (2023) ..............................................................37, 39, 66

*Bittner v. United States,*
  143 S.Ct. 713 (2023) ..............................................................................33

Appellate Case: 25-3000    Page: 6    Date Filed: 02/13/2026 Entry ID: 5608162

*Bridgeport Hospital v. Becerra,*
   108 F.4th 882 (D.C. Cir. 2024) ..................................................39, 63

*Brown v. Gardner,*
   513 U.S. 115 (1994) ..........................................................................25

*Bufkin v. Collins,*
   145 S.Ct. 728 (2025) ........................................................................27

*Comcast Corp. v. FCC,*
   579 F.3d 1 (D.C. Cir. 2009) ..............................................................56

*Corner Post v. Bd. of Governors of Fed. Rsrv. Sys.,*
   794 F.Supp.3d 610 (D.N.D. 2025) ................................2, 13, 14, 17, 18, 27, 28,
                                36, 42, 43, 45, 47, 50, 54,
                                55, 57, 59, 60, 62, 65, 67

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
   603 U.S. 799 (2024) ....................................................................14, 25

*Dubin v. United States,*
   143 S.Ct. 1557 (2023) ......................................................................41

*Duffner v. City of St. Peters,*
   930 F.3d 973 (8th Cir. 2019) ............................................................67

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
   575 U.S. 768 (2015) ..........................................................................38

*FCC v. Prometheus Radio Proj.,*
   141 S.Ct. 1150 (2021) ....................................................................2, 67

*Firearms Regul. Accountability Coal. v. Garland,*
   112 F.4th 507 (8th Cir. 2024) .....................................................3, 70, 72

*Flora v. United States,*
   362 U.S. 145 (1960) ..........................................................................52

*Georgia v. President of the U.S.,*
   46 F.4th 1283 (11th Cir. 2022) ........................................................24

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n,*
   594 U.S. 382 (2021) ..........................................................................32

vi

*In re Fed. Bureau of Prisons' Execution Protocol Cases,*
955 F.3d 106 (D.C. Cir. 2020) ...........................................................40

*In re Simply Essentials, LLC,*
78 F.4th 1006 (8th Cir. 2023) ...........................................................46

*Iowa v. Wright,*
154 F.4th 918 (8th Cir. 2025) ...............................2, 16, 17, 19, 23, 26

*Johnson v. Guzman Chavez,*
594 U.S. 523 (2021) ...........................................................................31

*Kentucky v. EPA,*
123 F.4th 447 (6th Cir. 2024) ...........................................................23

*King v. Burwell,*
576 U.S. 473 (2015) ...........................................................................38

*Kirtsaeng v. John Wiley & Sons, Inc.,*
568 U.S. 519 (2013) ...........................................................................48

*Loper Bright Enters. v. Raimondo,*
144 S.Ct. 2244 (2024) ...................................2, 16, 17, 18, 19, 20, 24, 27, 49, 53

*Loper Bright Enters., Inc. v. Raimondo,*
45 F.4th 359 (D.C. Cir. 2022) ...........................................................49

*Louisiana v. EPA,*
90 F.4th 461 (5th Cir. 2024) .................................................68, 69, 70

*Luna Torres v. Lynch,*
578 U.S. 452 (2016) ...........................................................................48

*McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.,*
851 F.3d 1076 (11th Cir. 2017) .........................................................51

*MCI Telecomm. Corp. v. AT&T,*
512 U.S. 218 (1994) .....................................................................20, 39

*Michigan v. EPA,*
268 F.3d 1075 (D.C. Cir. 2001) .........................................................17

vii

*Michigan v. EPA,*
   576 U.S. 743 (2015) ..................................................................67

*Missouri ex rel. Bailey v. Dep't of Interior,*
   73 F.4th 570 (8th Cir. 2023) ....................................................16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ....................................................................67

*N.D. Retail Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.,*
   55 F.4th 634 (8th Cir. 2022) ....................................................14

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.,*
   746 F.3d 474 (D.C. Cir. 2014) ("*NACS II*") ....................4, 5, 11, 12, 17, 55, 57

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.,*
   958 F.Supp.2d 85 (D.D.C. 2013) ("*NACS I*") ..........................2, 10, 11, 28, 29,
                                                                      30, 42, 53, 56

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
   583 U.S. 109 (2018) ...................................................43, 65, 66

*NFIB v. OSHA,*
   142 S.Ct. 661 (2022) .................................................................36

*Northport Health Servs. of Ark. v. Dep't of Health & Hum. Servs.,*
   14 F.4th 856 (8th Cir. 2021) ....................................................16

*Pereira v. Sessions,*
   585 U.S. 198 (2018) ..........................................................56, 64

*Polselli v. IRS,*
   598 U.S. 432 (2023) .................................................................35

*Pulsifer v. United States,*
   144 S.Ct. 718 (2024) ...............................................................48

*Qwest Corp. v. FCC,*
   258 F.3d 1191 (10th Cir. 2001) ...........................................70, 71

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639 (2012) .................................................................19

Appellate Case: 25-3000     Page: 9     Date Filed: 02/13/2026 Entry ID: 5608162

*Robinson v. Shell Oil Co.,*
  519 U.S. 337 (1997) ...........................................................................30

*Russello v. United States,*
  464 U.S. 16 (1983) .............................................................................33

*San Antonio v. United States,*
  631 F.2d 831 (D.C. Cir. 1980) ...........................................................55

*SAS Inst., Inc., v. Iancu,*
  584 U.S. 357 (2018) ...........................................................................35

*Save Jobs USA v. DHS,*
  111 F.4th 76 (D.C. Cir. 2024) ...........................................................36

*Solis v. Summit Contractors, Inc.,*
  558 F.3d 815 (8th Cir. 2009) .............................................................58

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,*
  508 U.S. 439 (1993) ...........................................................................50

*Union Pac. R.R. Co. v. Surface Transp. Bd.,*
  863 F.3d 816 (8th Cir. 2017) .............................................................51

*United States v. Balentine,*
  569 F.3d 801 (8th Cir. 2009) .............................................................32

*United States v. Becerra,*
  958 F.3d 725 (8th Cir. 2020) .............................................................35

*United States v. Bruguier,*
  735 F.3d 754 (8th Cir. 2013) .............................................................52

*United States v. Davis,*
  45 F.4th 73 (D.C. Cir. 2022) .............................................................47

*Univ. of Tex. Sw. Med. Cntr. v. Nassar,*
  570 U.S. 338 (2013) ...........................................................................32

*Voss v. Comm'r of Internal Revenue,*
  796 F.3d 1051 (9th Cir. 2015) ...........................................................24

ix

*Watt. v. GMAC Mortg. Corp.,*
   457 F.3d 781 (8th Cir. 2006) ...........................................................29

*West Virginia v. EPA,*
   142 S.Ct. 2587 (2022) ...........................................................36, 37, 38

Statutes

15 U.S.C. §1693b...............................................................................26

15 U.S.C. §1693*o*-2.........................................................2, 8, 9, 20, 21, 24, 25, 30,
                                                                              31, 32, 33, 34, 35, 36, 37, 39,
                                                                              40, 41, 42, 47, 49, 50, 51, 53,
                                                                              54, 56, 59, 61, 65, 66, 68, 69,
                                                                              71, 72, 73, 74, 75, 76, 78, 79,
                                                                              82, 84, 85, 86, 87

5 U.S.C. §706 ...............................................................18, 27, 68, 81

Regulations

12 C.F.R. §235.4(b)(1)..........................................................................57

Proposed Rule, 75 Fed. Reg. 81,722 (Dec. 28, 2010) ..............................8, 59, 60

Regulation II, 76 Fed. Reg. 43,394 (July 20, 2011)......2, 4, 5, 6, 9, 31, 38, 39, 41,
                                                                              42, 53, 56, 58, 59, 60, 61,
                                                                              63, 64, 65, 68, 69, 71, 72

Updated Rule, 80 Fed. Reg. 48,684 (Aug. 14, 2025) .........................2, 12, 54, 56

Other Authorities

156 Cong. Rec. S5925 (daily ed. July 15, 2010) (Statement of Sen. Durbin)......
                                                                                        42, 58

Antonin Scalia & Bryan Garner, *Reading Law* (2012) ....................29, 40, 41, 42,
                                                                                        44, 51, 64

Bd. of Governors of the Fed. Rsrv. Sys., *2009 Interchange Revenue, Covered
   Issuer Cost, and Covered Issuer and Merchant Fraud Loss Related to Debit
   Card Transactions* (June 2011) ...........................................................37

x

Bd. of Governors of the Fed. Rsrv. Sys., *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* (Dec. 2025).............................................................3, 37

Between, *New Oxford Am. Dictionary* (3d ed. 2010)..........................................27

Cost, *Black's Law Dictionary* (9th ed. 2009) ........................................................59

Distinguish, *Black's Law Dictionary* (9th ed. 2009)............................................27

Distinguish, *Webster's New Coll. Dictionary* (2008)..........................................27

Fixed Cost, *Black's Law Dictionary* (9th ed. 2009)............................................54

Loss, *Black's Law Dictionary* (9th ed. 2009) ......................................................59

Other, *Concise Oxford English Dictionary* (12th ed. 2011)................................29

Other, *New Oxford Am. Dictionary* (3d ed. 2010) ..............................................29

Other, *Webster's New Coll. Dictionary* (2007) ....................................................29

Particular, *New Oxford Am. Dictionary* (3d ed. 2010) .......................................63

Particular, *Shorter Oxford English Dictionary* (6th ed. 2007) ...........................63

Zabek & Levinger, *Credit or Debit*, Fed. Rsrv. Bank of Boston at 9 (2011)......6

Appellate Case: 25-3000    Page: 12    Date Filed: 02/13/2026 Entry ID: 5608162

## JURISDICTIONAL STATEMENT

Invoking the APA, Corner Post, Inc. challenged a regulation that governs debit-card interchange fees—promulgated by the Board of Governors of the Federal Reserve System—as contrary to law, exceeding statutory authority, and arbitrary and capricious. On August 6, 2025, the U.S. District Court for the District of North Dakota granted summary judgment to Corner Post and denied the Board's cross-motion for summary judgment. The district court had jurisdiction under 28 U.S.C. §1331.

After the district court entered an order vacating the entirety of Regulation II, the Board moved to amend the judgment to vacate only the challenged transaction-fee-standard portion of Regulation II. While that motion was pending, the Board filed a notice of appeal on October 6, 2025. Corner Post agreed to the Board's motion to amend the judgment, and the district court granted that motion on October 27, 2025. The Board amended its notice of appeal the next day. This Court has jurisdiction under 28 U.S.C. §1291.

Appellate Case: 25-3000    Page: 13    Date Filed: 02/13/2026 Entry ID: 5608162

## STATEMENT OF ISSUES

Whether Regulation II, the Board's debit-card transaction-fee standard, *see* 76 Fed. Reg. 43,394 (July 20, 2011) and Updated Rule, 80 Fed. Reg. 48,684 (Aug. 14, 2025), is:

(1) contrary to, or in excess of, the statutory authority that Congress granted to the Board in 15 U.S.C. §1693*o*-2;

   *See* 15 U.S.C. §1693*o*-2; *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244 (2024); *Iowa v. Wright*, 154 F.4th 918 (8th Cir. 2025); *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 958 F.Supp.2d 85 (D.D.C. 2013); *Corner Post v. Bd. of Governors of Fed. Rsrv. Sys.*, 794 F.Supp.3d 610 (D.N.D. 2025).

or

(2) arbitrary, capricious, or otherwise an abuse of discretion.

   *See* 15 U.S.C. §1693*o*-2; *FCC v. Prometheus Radio Proj.*, 141 S.Ct. 1150 (2021); *Firearms Regul. Accountability Coal. v. Garland*, 112 F.4th 507 (8th Cir. 2024).

## STATEMENT OF THE CASE

**A.  Congress directs the Board to regulate debit-card interchange fees.**

### 1.  Debit-card interchange fees.

American consumers use debit cards to pay for goods and services hundreds of millions of times every day. In 2009, when Congress enacted the Durbin Amendment, debit-card payments accounted for 37.6 billion

2

transactions involving $1.4 trillion in value. *See* Regulation II, App. 234. That figure has only increased since then—in 2023, debit-card payments grew to 100.7 billion transactions involving $4.7 trillion in value. *See* Bd. of Governors of the Fed. Rsrv. Sys., *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* 1 (Dec. 2025), perma.cc/XEK4-VBQ6. On average, that's 275 million debit transactions each day. This ever-growing consumer demand gives merchants no practical choice: They must accept debit-card payments.

Each debit-card swipe triggers a process to move money from the customer's checking account to the merchant's account. That process involves three other players: the issuer (the customer's bank), the acquirer (the merchant's bank), and the card network (such as Visa or Mastercard), which provides infrastructure and software to facilitate each transaction. *See id.* This process consists of three steps known as authorization, clearance, and settlement. Authorization "begins when the cardholder swipes her debit card, which sends an electronic 'authorization request' to the acquirer conveying the cardholder's account information and the transaction's

Appellate Case: 25-3000     Page: 15     Date Filed: 02/13/2026 Entry ID: 5608162

value." *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 478 (D.C. Cir. 2014) ("*NACS II*") . The issuer then determines "whether the cardholder has sufficient funds in her account to complete the transaction and whether the transaction appears fraudulent," and either approves or rejects the transaction. *Id.* If the issuer approves, the transaction still must be cleared and settled before money changes hands. Clearance is "a formal request for payment sent from the merchant on the network to the issuer." *Id.* Settlement "involves the actual transfer of funds from the issuer to the acquirer," after which "the transaction has concluded." *Id.*

Fees arise at each stage. The largest of those fees is called an interchange fee; it compensates issuers (the customer's bank) for their role. *See* Regulation II, App. 235. The merchant's bank initially pays the interchange fees, but they are ultimately assessed to and borne by the merchant. *See id.* Before 2010, interchange fees were *not* regulated or set via negotiation between the issuers (who charged them) and merchants (who paid them). *Id.* Instead, the card networks themselves set the interchange fees. *Id.* Networks then competed for issuers' business by offering the

4

highest interchange fees possible (at merchants' expense). Merchants like Corner Post were forced to accept whatever interchange fees the networks set. This typified a broken market: Networks had no incentive to lower interchange fees—and issuers had every incentive to drive up transaction volume—because neither party paid that fee. Merchants did.

Unsurprisingly, debit-card interchange fees exploded, growing 234 percent from 1998 to 2006. *See* App. 159. In 2009, the average interchange fee for all debit-card transactions reached as high as 44 cents per transaction, totaling $16.2 billion. *See* Regulation II, App. 236. Compare that to the issuer's cost (at that time) of facilitating the transaction—8 cents per transaction for PIN debit transactions and 13 cents for signature debit transactions. *Id.* at 236 n.27. In other words, issuers profited between 238% and 450% in over one hundred million transactions per day, making interchange fees a multi-billion-dollar annual profit center for banks. *Id.*

For merchants and consumers, however, those fees were devastating. For small businesses like Corner Post, debit-card fees constituted one of their largest operating expenses. In 2010, interchange fees cost the convenience-

5

store industry alone $8.9 billion in fees. *See* App. 207. And since debit cards are used disproportionately by lower-income consumers, interchange fees are most burdensome for those who can least afford them. *See* Zabek & Levinger, *Credit or Debit*, Fed. Rsrv. Bank of Boston at 9 (2011), perma.cc/244C-UPC4.

> **2.** **Congress passes the Durbin Amendment, which directs the Board to set an interchange-fee standard.**

Congress deemed such runaway growth in interchange fees unacceptable. Congress recognized that higher interchange fees led to higher prices, lower wages, loss of ready access to goods and services, and lost jobs. Am. Compl., App. 17-18, R. Doc. 19 at 4-5. Congress therefore enacted the "Durbin Amendment" as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. The Durbin Amendment instructs the Federal Reserve Board to regulate the interchange fees charged by issuers with respect to debit-card transactions. *See* Regulation II, App. 233. This fee regulation applies only to the largest issuers—those with at least $10 billion in assets. *Id.*

The Durbin Amendment instructs the Board to impose fee limits that are "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693*o*-2(a)(2). Relatedly, Congress instructed the Board to adopt rules that set standards for assessing whether an interchange fee is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* §1693*o*-2(a)(3)(A).

Congress also specifically told the Board *how* to set that standard. Congress told the Board to "consider the functional similarity between—(i) electronic debit transactions; and (ii) checking transactions that are required to … clear at par." *Id.* §1693*o*-2(a)(4)(A). Congress then required the Board to "distinguish between" two types of costs when determining what fees are "reasonable and proportional." *Id.* §1693*o*-2(a)(2), (4)(B). *First*, the Board "shall" consider "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." *Id.* §1693*o*-2(a)(4)(B)(i). *Conversely*, as to "other costs incurred by the issuer which are not specific to a particular electronic

7

debit transaction," such costs "shall not be considered." *Id.* §1693*o*-2(a)(4)(B)(ii).

## B. The Board proposes a 12-cent cap, but issuer banks successfully lobby the Board to nearly double the fee in the Final Rule.

### 1. The Proposed Rule.

The Board initiated a rulemaking in 2010. *See* Proposed Rule, App. 102. The proposed rule hewed to the Durbin Amendment's statutory text; it included "only those costs that are specifically mentioned … in the statute." *Id.* at 114-15. The Board specifically excluded fees that were not attributable to particular transactions, such as networking-processing fees, overhead fixed costs, and fraud losses. *Id.* at 115-19, 135, 140; Am. Compl., App. 31, R. Doc. 19 at 18. The proposed rule outlined two alternative standards for implementing the "reasonable and proportional" standard. Both would have capped the interchange fee at 12 cents per transaction. Proposed Rule, App. 117-18.

### 2. Regulation II.

Sensing the imminent demise of a multi-billion-dollar profit center, the large issuers subject to the proposed rule attacked the fee standards set out

8

in the proposed rule. *See* Regulation II, App. 259. Their pressure campaign worked and caused the Board to venture beyond the boundaries Congress laid down. Rather than hewing to the two cost categories in §1693*o*-2(a)(4)(B)(i)-(ii), the final rule inferred a third category of unwritten costs—those "that are not encompassed in either the set of costs the Board must consider under Section 920(a)(4)(B)(i), or the set of costs the Board may not consider under Section 920(a)(4)(B)(ii)." *Id.* at 265. The Board suggested that the Durbin Amendment was "ambiguous" and "silent" on costs "that are specific to a particular electronic debit transaction but that are not incremental costs related to the issuer's role in authorization, clearance, and settlement." *Id.* Thus, the Board concluded that "all costs related to a particular transaction may be considered." *Id.* at 266.

Under that reasoning, Regulation II permits issuing banks to recoup not only the statutorily mandated incremental ACS costs, but also four other distinct costs: (1) fixed ACS costs, (2) transaction-monitoring costs, (3) an allowance for an issuer's fraud losses, and (4) network-processing fees. *Id.* at 272-73. Regulation II thus sets an interchange fee of 21 cents per

9

transaction—roughly twice the maximum interchange fee of 12 cents per transaction from the Proposed Rule—plus a 0.05% ad valorem charge. *Id.*

## C. A federal district court vacates Regulation II, but the D.C. Circuit saves it on appeal only through *Chevron* deference.

After Regulation II became final, some merchants and trade associations challenged its interchange-fee standard in the U.S. District Court for the District of Columbia. *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 958 F.Supp.2d 85 (D.D.C. 2013) ("*NACS I*"). The district court agreed with the NACS plaintiffs, holding that the Board's fee standard was unlawful. *Id.* at 99-109. The district court recognized that Congress had plainly "bifurcate[d] the entire universe of costs associated with interchange fees" into two categories: "incremental ACS costs relating to a particular transaction," which costs may be considered; and "other costs," which the Board "shall not consider." *Id.* at 100-01. The district court held that the Board's announcement of a third category of costs in the fee standard was "utterly indefensible and "irreconcilable with" the Durbin Amendment. *Id.* at 105-06. "[I]t is quite clear that the statute did not allow the Board to consider the additional fixed costs factored into the interchange fee

10

standard—i.e., (1) fixed ACS costs, (2) transaction monitoring costs, (3) an allowance for an issuer's fraud losses, and (4) network-processing fees." *Id.* at 107.

On appeal, the D.C. Circuit applied the now-defunct doctrine of *Chevron* deference, holding that Regulation II "generally rest[ed] on reasonable constructions of the statute." *NACS II v*, 746 F.3d at 477. Accordingly, the D.C. Circuit upheld most of Regulation II, including its novel "third category of costs," on the theory that it reflected an "implicit" legislative delegation as to a purported "ambiguity." *Id.* at 488-89 (quoting *Chevron, U.S.A. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984)). Even under its application of the agency-friendly *Chevron* standard, however, the D.C. Circuit recognized that the Board had failed to "articulate a reasonable justification for determining that transactions-monitoring costs properly fall outside the fraud-prevention adjustment." *Id.* at 493. Rather than vacate the fee standard, the court remanded the rule to the Board to further explain its reasons for including transaction-monitoring costs. *Id.* at 493.

**D.     The Board issues an Updated Rule.**

Responding to *NACS II*, the Board issued an Updated Rule in 2015. Its reasoning doubled down on the "[t]he same rationale" for the cost determination that the Board employed in Regulation II. Updated Rule, App. 316. Invoking that same interpretative framework, the Board added explanations for why it included transaction-monitoring costs in the fee standard. *Id.* It said that "[t]ransactions-monitoring systems … assist in the authorization process by providing information needed by the issuer in deciding whether the issuer should authorize the transaction," thus, and therefore fell within the universe of allowable costs, including "any cost that is incurred in effecting any electronic debit transaction." *Id.*

**E.     Corner Post and merchant associations sue.**

In 2021, the North Dakota Retail Association and the North Dakota Petroleum Marketers Association challenged Regulation II in this APA lawsuit on behalf of their members. *See* Am. Compl., App. 14-51, R. Doc. 19. Corner Post, Inc., served as the associations' standing member in the original complaint. It formally joined the suit as a named plaintiff through an

Appellate Case: 25-3000     Page: 24     Date Filed: 02/13/2026 Entry ID: 5608162

amended complaint a few months later. *See* Am. Compl., App. 22, R. Doc. 19, at 9.

Corner Post is a truck stop and convenience store in Watford City, North Dakota. *See Corner Post v. Bd. of Governors of Fed. Rsrv. Sys.*, 794 F.Supp.3d 610, 620 (D.N.D. 2025). It opened for business in March 2018, three years after the Board promulgated the Updated Rule. *Id.* Corner Post accepts debit cards from its customers and pays interchange fees for debit-card transactions subject to Regulation II's fee standard. *Id.* Corner Post alleged that Regulation II's fee standard, as confirmed by the Updated Rule, is unlawful, arbitrary, and capricious. *Id.* at 621.

The district court granted the Board's motion to dismiss the First Amended Complaint as untimely, and this Court affirmed. *See N.D. Retail Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 55 F.4th 634, 643 (8th Cir. 2022). The Supreme Court reversed, holding that an APA claim does not accrue until the plaintiff is injured by the final agency action. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 825 (2024). On remand, the district court granted Corner Post's motion for summary judgment, denied the

13

Board's cross-motion for summary judgment, and vacated Regulation II's unlawful fee standard. *Corner Post*, 794 F.Supp.3d at 615. The district court stayed its vacatur order pending the outcome of this appeal. *Id.* at 640.

## SUMMARY OF THE ARGUMENT

The district court correctly held that Regulation II's transaction fee standard contradicts the Durbin Amendment and exceeds the Board's authority.

**1.** The Durbin Amendment grants the Board discretion to implement a "reasonable and proportional" interchange-fee standard—but only within statutory limits. The Board no longer gets *Chevron* deference or its equivalent by invoking vague notions of "discretion." Congress did not give the Board a free-floating license to decide which costs matter. It required the Board to consider incremental ACS costs tied to a particular transaction and to exclude other costs.

**2.** The interchange-fee standard exceeds the Board's statutory authority and conflicts with the Durbin Amendment. The statute's text and structure require the Board to "distinguish between" two—and only two—

14

categories of costs. The Board's contrary reading disregards that bifurcation, treats silence as a residual source of authority, and renders key statutory terms meaningless. Furthermore, nothing in the Durbin Amendment authorizes the Board to include fixed ACS costs, transaction-monitoring costs, issuer fraud losses, or network-processing fees. Nor does the statute permit the Board to impose a uniform, issuer-agnostic fee cap. The district court properly vacated Regulation II on that basis.

**3.** Regulation II is also arbitrary and capricious, and the Court can affirm on this alternative basis.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's summary judgment decision, including a decision on whether an agency violated the APA. *Missouri ex rel. Bailey v. Dep't of Interior*, 73 F.4th 570, 576 (8th Cir. 2023); *Northport Health Servs. of Ark. v. Dep't of Health & Hum. Servs.*, 14 F.4th 856, 866 (8th Cir. 2021).

15

**ARGUMENT**

## I. Regulation II is contrary to law and exceeds the Board's statutory authority.

The APA instructs this Court to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(C). APA claims require the Court to "exercise [its] independent judgment" and see "whether an agency has acted within its statutory authority." *Iowa v. Wright*, 154 F.4th 918, 942 (8th Cir. 2025) (quoting *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024)). If an agency exceeds statutory authority, "its action is plainly contrary to law and cannot stand." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001).

### A. The Board lacks discretion to depart from Congress's commands in the Durbin Amendment.

The Board's defense of Regulation II rests on an outdated premise of judicial deference to agency action. If Corner Post had moved for summary judgment before 2024, the legal questions presented here would have been "subject to the mire of *Chevron* deference." *Corner Post*, 794 F.Supp.3d at 623. That doctrine "required courts to defer to 'permissible' agency

16

interpretations of statutes," *Loper Bright*, 144 S.Ct. at 2254, as the D.C. Circuit sought to do in *NACS II*.

But "*Chevron* is overruled." *Loper Bright*, 144 S.Ct. at 2273. Courts no longer ask whether an agency construction is "permissible" or "reasonable." Instead, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Iowa*, 154 F.4th at 942 (quoting *Loper Bright*, 144 S.Ct. at 2273). Section 706 of the APA makes clear that "agency interpretations of statutes are *not* entitled to deference." *Id.* (cleaned up). Accordingly, the district court explained that the Board's interpretation of the Durbin Amendment "is not subject to deferential review." *Corner Post*, 794 F.Supp.3d at 623.

Yet the Board claims that Congress "delegated substantial discretion" to "fill up the details" of the Durbin Amendment, and that this delegated discretion requires deference to the Board's "construction of the Durbin Amendment." Board-Br.20-24 (cleaned up). The Board reads Congress's general directive to establish standards for "reasonable and proportional" transaction fees, 15 U.S.C. §1693*o*-2(a)(3)(A), as delegating plenary

17

"discretionary authority" to the Board as to the meaning of Congress's more specific command to "distinguish between" those "cost[s]" which "shall be considered" and those which "shall not be considered." *Id.* §1693*o*-2(a)(4)(B)(i)-(ii); *see* Board-Br.21-24 (quoting *Loper Bright*, 144 S.Ct. at 2266). But as the district court correctly acknowledged, this argument simply "repackage[s] the defunct-*Chevron* deference under a different name." *Corner Post*, 794 F.Supp.3d at 623.

To be sure, words like "reasonable" or "appropriate" can signal that Congress empowered agencies to "exercise a degree of discretion." *Loper Bright*, 144 S.Ct. at 2263. Even then, it remains this Court's duty to "interpret the statute" and "fix[] the boundaries of the delegated authority." *Id.* (cleaned up). And this Court must ensure that the agency acts "*within* those boundaries." *Id.* (emphasis added). Put another way, Congress's specific instruction that the Board "shall" consider certain costs and "shall not" consider other costs in fixing reasonable and proportional fee standards limits the agency's more general authority to establish fees that are reasonable and proportional.

Appellate Case: 25-3000   Page: 30   Date Filed: 02/13/2026 Entry ID: 5608162

Where a "general authorization and a more limited, specific authorization exist side-by-side," the "terms of the specific authorization must be complied with" to avoid "the superfluity of a specific provision that is swallowed by the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). After all, agencies are "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *Iowa*, 154 F.4th at 942 (quoting *MCI Telecomm. Corp. v. AT&T*, 512 U.S. 218, 231 (1994)). Thus, an agency's authority begins and ends with specific limits Congress imposed.

Agency deference-seeking is an endemic problem. The Board is not the first agency to seek interpretative deference from this Court based on inherent "discretion." When *Chevron* was good law, the IRS relied on statutory "[s]ilence" to "fish for [*Chevron*] deference" for its preferred interpretation. *3M Co. v. Comm'r of Internal Revenue*, 154 F.4th 574, 581-82 (8th Cir. 2025). Even after *Chevron* was overruled, the IRS claimed that its "delegat[ed] discretionary authority" accomplished "the same thing" even

19

without *Chevron* deference. *Id.* (quoting *Loper Bright*, 144 S.Ct. at 2262). But this Court correctly "declined" to "defer" to the agency's interpretation; instead, it asked who had the "better reading" of the statute. *Id.* (cleaned up). Here, the Court should likewise decline the Board's plea for deference-to-discretion; this Court bears the duty to "exercise [its] independent judgment" and "determine the best reading of the statute." *Loper Bright*, 144 S.Ct. at 2266, 2269.

The Board points to the pre-*Chevron* opinion in *Batterton v. Francis*, 432 U.S. 416 (1977), to support its assertion that grants of general discretion give agencies flexibility over statutory terms. *See* Board-Br.22. But the statute in *Batterton* flatly instructed the agency to prescribe "standards" for determining whether a parent was unemployed, without any accompanying statutory instructions about how to devise such standards. *See* 432 U.S. at 419, 425-26.

The Durbin Amendment is different. After directing the Board to set a "reasonable" and "proportional" interchange fee, it specifically tells the Board what it must consider when doing so. Among other things, Congress

20

instructed the Board to "distinguish between" (i) certain "incremental" costs which "shall be considered," and (ii) "other costs … which are not specific to a particular electronic debit transaction, *which costs shall not be considered*." 15 U.S.C. §1693*o*-2(a)(4)(B) (emphasis added). Congress also told the Board to "consider the functional similarity between (i) electronic debit transactions; and (ii) checking transactions that are required … to clear at par." *Id.* §1693*o*-2(a)(4)(A). Beyond that, Congress prohibited the use of network fees to compensate an issuer. *Id.* §1693*o*-2(a)(8). And Congress required that issuers receive adjustments to interchange fees only after implementing the Board's regulations relating to fraud prevention. *Id.* §1693*o*-2(a)(5). In short, after directing the Board to set a "reasonable and proportional" interchange fee, Congress listed a series of specific instructions limiting the Board's discretion. Defining those limits on the Board's discretion is a question of law for this Court.

The Board also protests that if this Court does not defer to its interpretation of its own authority, the Board will be reduced to a "mere calculator" occupying a "purely ministerial" role. Board-Br.22 (cleaned up).

That is mistaken. The Board retains discretion to determine what fee is "reasonable and proportional" after considering all the *correct* factors, 15 U.S.C. §1693*o*-2(a)(2), (4). But whether 15 U.S.C. §1693*o*-2 splits the universe of relevant costs into *two* categories (mandatory and prohibited), as Corner Post argues, or into *three* categories (mandatory, prohibited, and discretionary), as the Board argues, is a "pure question of law" that this Court must review "without giving [the agency] deference." *Kentucky v. EPA*, 123 F.4th 447, 467 (6th Cir. 2024). Having judges resolve that question does not vitiate the Board's discretion to determine a "reasonable and proportional" fee. To the contrary, the Board's argument for deference invites this Court to disregard Congress's specific categorical command about which costs "shall" or "shall not" be considered. And it would prevent this Court from meeting its obligation to ensure that the Board "possess[es] only the authority that Congress has provided." *Iowa*, 154 F.4th at 941 (cleaned up).

The Board also claims that the Dodd-Frank Act itself calls for deferential review. *See* Board-Br.23. But this argument is a red herring. The

Dodd-Frank Act states that "[n]o provision of this title may be construed as altering, limiting, or otherwise affecting the deference that a court affords to … the Board in making determinations regarding the meaning or interpretation of section 1693*o*-2." 15 U.S.C. §1693b(e)(2). That provision merely confirms that Dodd-Frank doesn't "alter" any preexisting "deference that a court" could give "the Board." *Loper Bright* leaves no doubt—the APA directs courts to "decide all relevant questions of law," 5 U.S.C. §706, so there is no longer any background "deference" for the Board to rely on, *see* 144 S.Ct. at 2261, 2269-70. And the Dodd-Frank Act doesn't purport to displace the APA or *Loper Bright*'s rule.

Finally, the Board asks for deference to its "longstanding," "consistent" and "roughly contemporaneous" interpretation. Board-Br.24 (cleaned up). That argument is misplaced. The Board's interpretation in Regulation II is not a longstanding one deserving any deference. Here, Regulation II is the "only pronouncement" of the Board's interpretation of the Durbin Amendment—hardly evidence of the Board's "consistent position" throughout the years. *Voss v. Comm'r of Internal Revenue*, 796 F.3d

23

1051, 1066 (9th Cir. 2015). "[T]hat single [regulation] falls far short of establishing the kind of 'longstanding practice' that might" warrant respect. *Georgia v. President of the U.S.*, 46 F.4th 1283, 1301 (11th Cir. 2022) (quoting *Biden v. Missouri*, 595 U.S. 87, 94 (2022)). Nor does the passage of 14 years since Regulation II's issuance show that the Board's interpretation is longstanding. "Courts have considered agency interpretations to be longstanding when they have been in place *for decades*." *Air Transport Ass'n of Am., Inc. v. USDA*, 2021 WL 1166928, at *13 (D.D.C. Mar. 26, 2021) (emphasis added), *rev'd in part on other grounds*, 37 F.4th 667, 673 (D.C. Cir. 2022).

Besides, the Board's erroneous interpretation cannot be said to have "'aged nicely,'" *Brown v. Gardner*, 513 U.S. 115, 122 (1994), because Regulation II went unchallenged for many years thanks only to the (incorrect) prevailing wisdom that any challenges to Regulation II after 2017 would have been time-barred. *But see Corner Post*, 603 U.S. at 806. "'The length of such regulation['s] unscrutinized and unscrutinizable existence' could not alone, therefore, enhance any claim to deference" or respect.

24

*Brown*, 513 U.S. at 122. In any event, "[a] regulation's age is no antidote to clear inconsistency with a statute." *Id.* And "no amount of historical consistency can transmute an unreasoned statutory interpretation into a reasoned one." *Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009).

Ultimately, the Board itself admits that any discretion it has is limited by "express limits in the statute's text." Board-Br.24. That's the whole point of this case: Corner Post contends that the Board, in devising interchange fee caps, inappropriately considered various "other costs incurred by an issuer which are not specific to a particular electronic debit transaction" even though the statute said that such "costs *shall not be considered*." 15 U.S.C. §1693*o*-2(a)(4)(B) (emphasis added). Without question, that expressly limits the Board's authority. This Court must determine for itself the scope of that limitation without deference to the Board's views. *See Iowa*, 154 F.4th at 942-43.

### B. Regulation II contradicts the Durbin Amendment by creating a third category of costs out of statutory silence.

The central interpretative question here is whether the Durbin Amendment creates only two categories of costs—mandatory and

prohibited, as Corner Post argues—or whether statutory silence authorizes the Board to recognize a third, discretionary category of costs, as the Board argues. The district court correctly concluded that the Board's unlawfully invented "third category" contravenes the Durbin Amendment's "express mandate" and that the statute "prohibits the inclusion of any cost in the interchange fee standards other than the incremental ACS cost of a transaction." *Corner Post*, 794 F.Supp.3d at 626-27. The "traditional tools of statutory construction" confirm that Corner Post has the "best reading of the statute." *Loper Bright*, 144 S.Ct. at 2264, 2266 (cleaned up).

### 1. Congress bifurcated the universe of possible costs into only two categories.

The inquiry "start[s], as always, with the text." *Bufkin v. Collins*, 145 S.Ct. 728, 737 (2025). The Durbin Amendment unambiguously bifurcates the entire universe of interchange-fee costs by requiring that the Board "shall … distinguish between" two categories of costs: (1) allowable "incremental cost[s] incurred by the issuer" for its role "in the authorization, clearance, and settlement of a particular electronic debit transaction, which cost[s] shall be considered"; and (2) prohibited "other costs which are not specific to a

26

particular electronic debit transaction, which costs shall not be considered." 15 U.S.C. §1693*o*-2(a)(4)(B)(i)-(ii). Several textual clues confirm this plain text conclusion.

**a.** To begin, the word "'[s]hall' means 'must,'" and "imposes a mandatory command." *Bufkin*, 145 S.Ct. at 737. So, the Board *must* "distinguish between" the two categories of costs listed in §1693*o*-2(a)(4)(B). To "distinguish," in turn, means to "'separate into different categories' or to 'make a distinction.'" *NACS I*, 958 F.Supp.2d at 100 & n.27 (first quoting Distinguish, *Webster's New Coll. Dictionary* (2008), then quoting Distinguish, *Black's Law Dictionary* (9th ed. 2009)). And "between" "typically refers to 'two' options" or categories, *Corner Post*, 794 F.Supp.3d at 631; *see also* Between, *New Oxford Am. Dictionary* (3d ed. 2010). The Durbin Amendment's structure itself further buttresses the conclusion that Congress intended "between" to bear its ordinary meaning of denoting only two categories of costs; after all, the Durbin Amendment lists "two—and only two—options," *Corner Post*, 794 F.Supp.3d at 631. In short, the statute's plain text requires the Board to "separate" the universe of costs "into different categories,"

27

*NACS I*, 958 F.Supp.2d at 100 & n.27, and Congress's "strategic[] plac[ement]" of "shall consider" and "shall not consider"—immediately following the requirement to "distinguish between" the costs—confirms the bifurcation of all costs into only *two* categories, *id.* at 101.

Further evidence comes from the words Congress used to describe the categories of costs themselves—"incremental cost" and "other costs." Congress authorized the Board to "consider" only the "incremental" costs incurred "for the role of the issuer in the authorization, clearance, or settlement of a *particular* electronic debit transaction." *Id*. §1693*o*-2(a)(4)(B)(i) (emphasis added). That's it. The Durbin Amendment doesn't identify any other allowable costs. "[T]he expression of one thing"—here, incremental ACS costs—"excludes others not expressed." *Watt. v. GMAC Mortg. Corp.*, 457 F.3d 781, 783 (8th Cir. 2006); *see also* Antonin Scalia & Bryan Garner, *Reading Law* 107 (2012). The Durbin Amendment thus contemplates no other allowable costs in the fee standard beyond the incremental ACS costs.

The next subsection eliminates any doubt. There, Congress specified that "other costs"—everything "other" than incremental ACS costs—"shall

28

not be considered" in setting the fee standard. 15 U.S.C. §1693*o*-2(a)(4)(B)(ii). The word "other" "subsume[s] *all* costs not explicitly addressed in the first, permissible category of costs." *NACS I*, 958 F.Supp.2d at 101. "Other" means "being the remaining one or ones of two or more; different or distinct from that or those referred to or implied." Other, *Webster's New Coll. Dictionary* (2007); *see also* Other, *New Oxford Am. Dictionary* (3d ed. 2010); Other, *Concise Oxford English Dictionary* (12th ed. 2011). To know what the term "other costs" means, there must be a reference point—other *than what*? Here, that reference is "the incremental [ACS] cost." 15 U.S.C. §1693*o*-2(a)(4)(B)(i). So the term "other costs" naturally includes all "remaining" costs that are *not* the incremental cost and are "different from" the incremental ACS costs. *NACS I*, 958 F.Supp.2d at 101.

"[T]he specific context in which" §1693*o*-2(a)(4)(B)'s "language is used" makes the upshot of the statute's plain text clear. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Congress required the Board to "distinguish between" two (not three) categories of costs, told the Board to consider one category of costs (incremental ACS costs), and prohibited the Board from

29

considering "other costs." Given the statute's command to "distinguish between" those two categories, *id.* §1693*o*-2(a)(4)(B), the Board should have (1) defined what costs are "incremental" ACS costs as a baseline, (2) "considered" those costs in the fee standard, *id.* §1693*o*-2(a)(4)(B)(i), and (3) excluded all "other costs" from the fee standard, *id.* §1693*o*-2(a)(4)(B)(ii). Instead, the Board refused even to define what costs are incremental ACS costs, claimed the discretion to consider any and all costs, and included prohibited costs—fixed ACS costs, transaction-monitoring costs, fraud losses, and network-processing fees—in the fee standard. As the district court properly found, that was error.

**b.** Beyond the plain text itself, "[t]he statutory structure confirms" this reading. *Johnson v. Guzman Chavez*, 594 U.S. 523, 542 (2021). Congress ordered the Board to "distinguish between" certain categories of costs and told the Board how to treat those categories: It *must* include the first category in the fee cap, and *must not* include the second.

The Board's contrary interpretation implies a third, permissive category—neither mandatory nor prohibited—from statutory silence. If the

30

Board's view were correct, this imagined third category would rewrite the

Durbin Amendment to read something like this:

> [T]he Board shall ... distinguish between—
>
>> (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under [§1693*o*-2(a)(2)]; and
>>
>> (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under [§1693*o*-2(a)(2)]; *and*
>>
>> *(iii) any other costs incurred by an issuer which are "not incremental costs related to the issuer's role in authorization, clearance, and settlement" but which are still "specific to a particular electronic debit transaction," which costs may or may not be considered as the Board finds appropriate.*

*See* Regulation II, App. 265. The Board's proposed third category not only

lacks a basis in the statutory text, but also contradicts Congress's choice to

build §1693*o*-2(a)(4)(B)'s command around two discrete subparagraphs

embodying strictly mandatory and prohibitory terms. "Just as Congress'

choice of words is presumed to be deliberate, so too are its structural

choices." *Univ. of Tex. Sw. Med. Cntr. v. Nassar*, 570 U.S. 338, 353 (2013).

What's more, the Court cannot agree with the Board and approve the

imagined third category of costs without "effectively … read[ing] words into

31

the statute." *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 393 n.1 (2021). But courts "cannot" "add provisions to a federal statute," *Alabama v. North Carolina*, 560 U.S. 330, 352 (2010), and must "refrain from embellishing statutes by inserting language that Congress has opted to omit," *United States v. Balentine*, 569 F.3d 801, 803 (8th Cir. 2009) (cleaned up). The deliberate two-subparagraph structure of §1693*o*-2(a)(4)(B) confirms the text's plain meaning: Congress bifurcated the universe of costs into mandatory and prohibited categories and assigned specific costs to each category.

**c.** The *expressio unius* canon further forecloses the Board's attempt to conjure a third category of costs from silence. Congress knew how to grant free-ranging discretion and did so explicitly elsewhere in the same statute. "When Congress includes particular language in one section of a statute but omits it from a neighbor," *Bittner v. United States*, 143 S.Ct. 713, 720 (2023), courts "presume[] that Congress act[ed] intentionally and purposely" in that "exclusion," *Russello v. United States*, 464 U.S. 16, 23 (1983).

Appellate Case: 25-3000    Page: 44    Date Filed: 02/13/2026 Entry ID: 5608162

Here, the core of the Board's argument is that even though §1693*o*-2(a)(4)(b) specifies just two clear categories of costs, the statute's text does "not bar consideration of costs 'that are specific to a particular electronic debit transaction but that are not incremental [ACS] costs.'" Board-Br.25 (quoting App. 265). And the Board believes that Congress granted it the "discretion" to "consider" those costs, *id.* at 24, as it deems "appropriate to fulfill the purposes of the statute," *id.* at 31 n.10. In other words, the Board's interpretation of §1693*o*-2(a)(4)(B) treats congressional silence as implying a third category that functions as a "catchall" or "residual clause," under which the Board can consider whatever other costs the Board thinks appropriate.

But *elsewhere* in the Durbin Amendment, Congress explicitly used the exact kind of catchall residual provision that the Board now claims can be inferred from the silence of §1693*o*-2(a)(4)(B). In §1693*o*-2(a)(5)(A), a neighboring subsection, Congress authorized the Board to make "adjustments" to the default fee standard "to make allowance for costs incurred by the issuer in preventing fraud." For this fraud-prevention

33

adjustment, Congress ordered the Board to consider six specific factors. *See id.* §1693*o*-2(a)(5)(B)(ii)(I)-(VI). Congress then added one more provision—granting the Board the power to *also* consider "such other factors as the Board considers appropriate." *Id.* §1693*o*-2(a)(5)(B)(ii)(VII).

In both form and substance, this residual clause in §1693*o*-2(a)(5)(B)(ii)(V)—permitting "such other factors as the Board considers appropriate"—grants the same type of discretionary authority that the Board now insists can be derived from silence in §1693*o*-2(a)(4)(B). But this neighboring explicit delegation of authority to consider other things not listed makes clear that "[h]ad Congress wanted to include" a residual clause in §1693*o*-2(a)(4)(B) permitting the Board to consider any other costs it deemed appropriate, "it certainly knew how to do so." *Polselli v. IRS*, 598 U.S. 432, 439 (2023); *United States v. Becerra*, 958 F.3d 725, 731 (8th Cir. 2020).

This dichotomy between §1693*o*-2(a)(4)(B) and §1693*o*-2(a)(5)(B) confirms that when Congress wanted the Board to have the power to consider "such other factors" as it deemed "appropriate," Congress delegated that power explicitly. "But Congress didn't choose to pursue that

34

known and readily available approach here," and its decision to not include a residual cost-consideration provision "must be given effect rather than disregarded." *SAS Inst., Inc., v. Iancu*, 584 U.S. 357, 365 (2018).

**d.** The major questions doctrine also confirms Corner Post's interpretation of §1693*o*-2(a)(4)(B). Here, the district court did not reach Corner Post's major questions doctrine arguments when rejecting the Board's interpretation. *Corner Post*, 794 F.Supp.3d at 639. But it's an additional reason to reject the Board's reading. Just "[l]ike a dictionary, or expressio unius, or the extraterritoriality canon, the major questions doctrine is a tool of statutory interpretation." *Save Jobs USA v. DHS*, 111 F.4th 76, 80 (D.C. Cir. 2024). Regardless of whether the doctrine is viewed as "a linguistic canon, or a substantive canon with a constitutional basis safeguarding the separation of powers, or both," the major question doctrine "function[s]" as one more way "to help courts figure out what a statute means." *Id.*

The major questions doctrine requires agencies claiming important powers to point to clear authority from Congress authorizing their use. Under this doctrine, courts "expect Congress to speak clearly if it wishes to

Appellate Case: 25-3000    Page: 47    Date Filed: 02/13/2026 Entry ID: 5608162

assign to an agency decisions of vast economic and political significance."
*West Virginia v. EPA*, 142 S.Ct. 2587, 2605 (2022) (cleaned up). Some jurists
view the doctrine as a substantive canon rooted in separation-of-powers
principles. *See NFIB v. OSHA*, 142 S.Ct. 661, 667-70 (2022) (Gorsuch, J.,
concurring). Others view it as a linguistic canon that draws on "context" to
help "discern[]" the "text's most natural interpretation." *Biden v. Nebraska*,
143 S.Ct. 2355, 2376-84 (2023) (Barrett, J., concurring). Either way, all agree
that the major questions doctrine operates as a clear-statement doctrine,
requiring "clear congressional authorization" and something "more than a
merely plausible textual basis" for any "transformative ... regulatory
authority." *West Virginia*, 142 S.Ct. at 2609-10 (cleaned up).

Regulation II implicates the major-questions doctrine. Debit-card
transactions affect far more than "a significant portion of the American
economy." *West Virginia*, 142 S.Ct. at 2608 (cleaned up). In 2009 alone, there
were "37.6 billion debit and prepaid card transactions … with an aggregate
value of more than $1.4 trillion." Bd. of Governors of the Fed. Rsrv. Sys., *2009
Interchange Revenue, Covered Issuer Cost, and Covered Issuer and Merchant Fraud*

36

*Loss Related to Debit Card Transactions* 6 (June 2011). Interchange fees that year totaled $16.2 billion. *Id.* at 7. And the significance of this issue has only grown since Congress enacted the Durbin Amendment—in 2023, the most recent year with data on file, interchange fees totaled $34.1 billion. *See 2023 Interchange Fee Revenue, supra*, at 2. Here, the Board's decision to include additional categories of costs drove it to raise the interchange-fee cap by 9 cents per transaction from its Proposed Rule, thus enabling the transfer of billions of dollars per year from millions of consumers and merchants to a few large issuer banks. That undisputedly "vast" "economic … significance" squarely places this case within the major-questions doctrine. *See King v. Burwell*, 576 U.S. 473, 485-86 (2015) (tax credits "involving billions of dollars in spending each year and affecting the price of health insurance for millions of people" presented "a question of deep 'economic and political significance' that is central to [the] statutory scheme").

Because the fee standard implicates a major question, the Board must show that Congress "clearly" wanted to include the third category of costs upon which the Board based Regulation II's fee standard. *West Virginia*, 142

S.Ct. at 2605. The Board cannot do so. Indeed, the Board has asserted that the Durbin Amendment is "silent" on how to treat those costs. Regulation II, App. 265. By definition, silence is not a clear statement; it's silence. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). Vague terms, subtle devices, and implications from statutory silence cannot clearly "authorize 'basic and fundamental changes in the scheme' designed by Congress." *Nebraska*, 143 S.Ct. at 2368 (quoting *MCI Telecommunications*, 512 U.S. at 225).

Here, in the Durbin Amendment, Congress carefully crafted a detailed scheme for creating a debit-card fee standard. That scheme intentionally bifurcates costs between required "incremental cost[s]" and prohibited "other costs." 15 U.S.C. §1693*o*-2(a)(4)(B). But after deciding that it wasn't "necessary to determine whether costs are 'incremental,'" Regulation II, App. 266, the Board refused to define those terms and invented a third category in order "to override" the "statutory command" about considering incremental costs and not considering other costs. *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 889 (D.C. Cir. 2024). The Board's interpretation of §1693*o*-2(a)(A)(B) thus "eviscerate[s] ... significant aspects of the statutory text" and

38

accomplishes a "severe restructuring of" Congress's scheme. *Id.* at 888-89 (cleaned up). The major questions doctrine prevents agencies from using statutory silence to "abolish[]" congressional requirements and "supplant[] them with a new regime entirely." *Nebraska*, 143 S.Ct. at 2369.

**e.** Besides classic textual clues, the Durbin Amendment's purpose further confirms Corner Post's reading that the Durbin Amendment bifurcates the universe of costs and permits the Board to consider only incremental ACS costs. This "overarching purpose" is "evident" from both "the text," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011), and the historical context, *All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 169 (5th Cir. 2024) (en banc) (examining the law's "history" to evaluate an agency's interpretation). While purpose cannot be used to contradict the text itself, "statutory purpose, as reflected in 'the language and design of the statute as a whole,' can help determine textual meaning." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 121 n.8 (D.C. Cir. 2020) (Katsas, J., concurring); *see also* Scalia & Garner, *supra*, at 56-57.

39

Here, the Durbin Amendment's stated purpose was reducing the amount of an issuer's interchange fee to a "reasonable and proportional" amount. 15 U.S.C. §1693*o*-2(a)(2). In doing so, Congress sought to make covered debit-card transactions look as much as possible like "checking transactions," which "clear at par" (that is, without any fee imposed by the payor bank)—thus the Durbin Amendment's requirement that the Board "consider the functional similarity" between the two. *Id.* §1693*o*-2(a)(4)(A). To that end, just like checking transactions, debit-card transactions should move *toward* clearing at par, not away from it.

Historical context confirms as much. Congress was responding to a market failure that had allowed the average interchange fee to soar to 44 cents per transaction, resulting in a severe economic burden for merchants and consumers. Regulation II, App. 236. Allowing the Board to disregard the clear bifurcation of allowed and prohibited costs, and blessing its claim to discretion to consider *any and all* costs that aren't the incremental ACS costs, would vitiate the Durbin Amendment's purpose of reducing the interchange

40

fee and making debit transactions more like checking transactions. *See* 15 U.S.C. §1693*o*-2(a)(2); *id.* §1693*o*-2(a)(4)(A).

**f.** And "[t]hose who find legislative history helpful will find yet further support" for Corner Post's interpretation. *Dubin v. United States*, 143 S.Ct. 1557, 1569 n.7 (2023); *accord* Scalia & Garner, *supra*, at 388. Legislative history from the Durbin Amendment's enactment "further confirm[s]" that "the Board may only consider incremental ACS costs when setting the interchange fee standard." *Corner Post*, 794 F.Supp.3d at 632.

During a floor speech, Senator Durbin—the statute's principal author and namesake—explained that "the cost to be considered by the Board in conducting its reasonable and proportional analysis is the incremental [ACS] cost," "as opposed to other costs incurred by an issuer which are not specific to the authorization, clearance, or settlement of a particular electronic debit transaction." 156 Cong. Rec. S5925 (daily ed. July 15, 2010) (Statement of Sen. Durbin). When first litigating this question in 2013, the Board "admit[ted]" that this "statement ... divide[s] the universe of costs into two categories." *NACS I*, 958 F.Supp.2d at 102. Yet despite that concession, the Board

41

admittedly refused even to define "the incremental cost" Senator Durbin referred to. *See* Regulation II, App. 266. That means the Board necessarily failed to "distinguish" between the different categories of costs identified in the Durbin Amendment's text despite the statute's clear command that the Board "shall" distinguish between incremental ACS costs and other costs. 15 U.S.C. § 1693*o*-2(a)(4)(B).

The Board now claims that "the district court incorrectly suggested" that "floor statements" can "*trump* th[e] plain language of the statute." Board-Br.34 n.12 (emphasis added). Not so. Both parties here agree that "legislative history cannot trump clear statutory language." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 132 n.9 (2018) (cleaned up). But legislative history can still show that "a particular word or phrase is capable of bearing a particular meaning." Scalia & Garner, *supra*, at 388. The district court, for its part, stated that legislative history can do no more than "confirm" (or "put the cherry on top" of) what is "most important[]"—"the law's words on paper." *Corner Post*, 794 F.Supp.3d at 632-33. Here, the district court correctly determined that "best interpretation" of the plain text is that the

42

Durbin Amendment "established a bifurcated system," and "confirm[ed]" that reading with legislative history showing that Congress "clearly prohibit[ed] the consideration of any cost except for incremental ACS costs in the Board's reasonable and proportional fee analysis." *Id.* at 628, 632-33.

### 2. The Board's counterarguments do not overcome the Durbin Amendment's text and structure.

The Board contests the district court's conclusion with three counterarguments. Each fails to override the statute's plain text and the unambiguous meaning evidenced by ordinary interpretive tools.

**a.** The Board starts by invoking the presumption against superfluity and arguing that only its reading of §1693*o*-2(a)(B)(4) "gives meaning to all of the statute's terms." Board-Br.26 (capitalization removed). It claims that the district court treated the phrase "reasonable and proportional" as "mere surplusage," and argues that "there would be no need to require the fee standard to be 'reasonable and proportional'" if the Board's only role were considering the incremental ACS costs. *Id.* at 27-28 (cleaned up). This argument founders on multiple grounds.

43

*First*, the Board effectively argues that the general "reasonable and proportional" command must be given superseding force over any later, more specific statutory provisions. As Corner Post already explained, *see supra* 13-14, this position contravenes classic interpretive tools such as the general/specific canon, *see* Scalia & Garner, *supra*, at 183 (when there is a "conflict between a general provision and a specific provision, the specific provision prevails"), and the harmony canon, *see id.* at 180 ("provisions of a text should be interpreted in a way that renders them compatible, not contrary"). The district court correctly recognized that Congress used a general grant of authority when it ordered the Board to craft a "reasonable and proportional" fee standard, but then "noticeably narrowed" that grant of authority by specifying exactly *how* the Board should determine what was reasonable and proportional. *Corner Post*, 794 F.Supp.3d at 629-30. Congress's use of specific provisions to narrow a general provision is not "surplusage."

*Second*, the Board's claim here rests on a strained notion of surplusage, since the phrase "reasonable and proportional" retains meaning under *any*

interpretation of §1693*o*-2(a)(4)(B). As the Board acknowledged elsewhere, its authority under the Durbin Amendment goes no further than the "express limits in the statute's text." *See supra* 18. In this context, this means that the Board has authority to determine what is "reasonable and proportional" *compared to* whatever specific inputs Congress has authorized—be that only incremental ACS costs (Corner Post's interpretation) or both incremental ACS costs and "other costs that are specific to" particular transactions (the Board's interpretation). Either way, "reasonable and proportional" retains independent meaning no matter how many inputs Congress authorized the Board to consider.

*Third*, the "canon against surplusage is not an absolute rule." *In re Simply Essentials, LLC*, 78 F.4th 1006, 1009 (8th Cir. 2023). That is particularly true when enforcing the surplusage canon would, itself, create even more surplusage. If the Court agrees here that the Board's broad reading of "reasonable and proportional" trumps the limits in the specific cost-consideration provisions, it would render the Durbin Amendment's

45

bifurcation of costs ineffective by making *even more* terms (e.g., "distinguish between," "other" costs, "shall," and "shall not") entirely superfluous.

**b.** Next, the Board points to differences between §1693*o*-2(a)(4)(B)'s subsections and claims that the district court ignored the statute's "non-interlocking language." Board-Br.29-34. Congress identified allowable costs as "the incremental cost incurred by the issuer for the role of the issuer in the authorization, clearance, or settlement in a particular electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B)(i). Congress identified prohibited costs as "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* §1693*o*-2(a)(4)(B)(ii). Based on these differences, the Board argues that since Congress used "different words," it must have "intended a different meaning"—thus the two categories are not mutually exclusive and leave room for a third category. Board-Br.29.

The district court correctly rejected this argument. *See Corner Post*, 794 F.Supp.3d at 632. The Board *assumes* that (1) the "incremental cost" related to "the authorization, clearance, or settlement of a particular transaction"

46

and (2) the costs that are "not specific to a particular transaction" are not simply two different ways of describing the inverse sides of the same dichotomy. But this sort of "assumption" is "unwarranted because words sometimes express overlapping meaning, as indicated by context." *United States v. Davis*, 45 F.4th 73, 79 (D.C. Cir. 2022). There is no "canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013). Given the context in the rest of the statute, the better reading is that Congress sought to clearly articulate the distinction between mandatory costs and prohibited costs by providing two overlapping definitions.

In any event, courts "do not demand (or in truth expect) that Congress draft in the most translucent way possible." *Pulsifer v. United States*, 144 S.Ct. 718, 729 (2024). Litigants can always posit all manner of ways Congress *could have* crafted a statute differently or better. But that offers little insight into the best meaning of the statute that Congress *did* craft. *See id.* at 728-29 (rejecting this mode of argument). Courts therefore "'routinely construed

47

statutes to have a particular meaning even as [they] acknowledged that Congress could have expressed itself more clearly.'" *Id.* at 729 (quoting *Luna Torres v. Lynch*, 578 U.S. 452, 472 (2016)). The question for this Court is not "[c]ould Congress have" written "in more crystalline fashion," but rather, "[i]s that the right and fair reading of the statute before us?" *Luna Torres*, 578 U.S. at 472-73.

But even if the Board were correct that the language is "non-interlocking," the Board would still lose. Even if the Durbin Amendment's text left some gap, the Board would be trying to ground its rule in perceived statutory silence. Yet "Congress's silence on a given issue does not automatically ... give an agency carte blanche to speak in Congress's place." *Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359, 374 (D.C. Cir. 2022) (Walker, J., dissenting), *maj. rev'd by* 144 S.Ct. at 2270. Congress's "silence is just that—silence." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). So when "all else [is] equal, silence indicates a lack of authority." *Loper Bright*, 45 F.4th at 374 (Walker, J., dissenting). Thus, if the Board were correct that the perceived non-interlocking language implies (through statutory silence)

48

a gap the Board can fill, the Board lacks authority to use that silence to upend the rest of the statute. *See supra* 25-26, 28-29.

**c.** Finally, the Board fixates on the lack of a comma before the first "which" in §1693*o*-2(a)(4)(B)(ii). It argues that this supposedly missing comma transforms that provision from a *descriptive* clause into a *restrictive* clause that authorizes the Board to create its implied third category of costs. In the Board's view, "had Congress intended 'which are not specific to a particular electronic debit transaction' merely to describe—but not restrict— 'other costs,' it would have set the 'which' clause off with a comma or parentheses." Board-Br.35-36.

The district court correctly rejected this argument and declined to give controlling weight to the mere absence of a comma. *Corner Post*, 794 F.Supp.3d at 627-29. "[C]ommas and articles are not reliable tools for chiseling away at the statute's meaning." *Id.* at 629. To be sure, punctuation can offer some insight into a statute's meaning. But courts have also said "[o]ver and over" that "punctuation alone" is not a "reliable guide for discovery of a statute's meaning." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents*

49

*of Am., Inc.*, 508 U.S. 439, 455 (1993). Statutory interpretation "is a holistic endeavor," and a "purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *Id.* at 454-55 (cleaned up). Punctuation is "not an absolute and can assuredly be overcome by other indicia of meaning." *Union Pac. R.R. Co. v. Surface Transp. Bd.*, 863 F.3d 816, 825 (8th Cir. 2017) (cleaned up).

So even though Congress did not set off §1693*o*-2(a)(4)(B)(ii)'s first "which" clause with a comma, "commas are not necessary." *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1088 (11th Cir. 2017) (en banc) (rejecting argument that a clause was restrictive because it was "not set off by commas"). It is also well-settled that "which" clauses can bear a nonrestrictive meaning without a comma. For example, the phrase "Republicans oppose new taxes which are unnecessary" could have the non-restrictive meaning that "all new taxes are anathema." Scalia & Garner, *supra*, 142. And placing decisive weight on a comma, as the Board does, is ultimately "a weak basis for deciding statutory meaning" given that

50

grammarians have been "unsuccessful" in establishing the convention for preferring "comma-*which* for nonrestrictive [clauses]" "as a firm rule." *Id.* More important, when interpreting statutes, punctuation—and a strict "grammarian's" approach—can be "override[n]" to "give[] effect to every word" of the statute. *Id.* at 143; *see also id.* at 165 (explaining that punctuation can be "too weak to trump" "the overwhelming evidence from the structure, language, and subject matter" of the law).

As a final salvo, the Board contends that the district court's reading—of the supposed missing comma before the first "which"—renders the phrase "which are not specific to a particular electronic debit transaction" surplusage. Board-Br.39. But as explained, the canon against surplusage is not an absolute rule and cannot override the clear meaning of the statutory text. And as before, the Board's claim of surplusage here would itself render other statutory terms—"distinguish between," "other" costs, "shall," and "shall not"—entirely superfluous. *See supra* 33.

The Board's arguments about the missing comma and the nonrestrictive "which" effectively contend that courts should always expect

perfect grammar from Congress. But courts do not "review congressional enactments as a panel of grammarians." *Flora v. United States*, 362 U.S. 145, 150 (1960). And "ungrammatical statements" can still "be unambiguous," "depending on context." *United States v. Bruguier*, 735 F.3d 754, 768 (8th Cir. 2013) (en banc) (Riley, C.J., concurring). As explained, Corner Post's interpretation is the only one that produces a coherent understanding. The Board's comma-driven interpretation vitiates the Durbin Amendment's text, context, structure, and purpose by "improperly narrowing the scope of *excluded* costs." *NACS I*, 958 F.Supp.2d at 106.

*   *   *

In the end, the Board clings to little more than purported statutory silence and a missing comma to justify inventing a third category of costs and upending the framework Congress crafted. No court should imply a new statutory provision based on such a fragile reed. The Court's role is to determine the "best reading" of existing statutory text—not to imply new text from silence. *Loper Bright*, 144 S.Ct. at 2266, 2269. Here, as the district court correctly held, the plain text leads to but one conclusion: Congress

divided costs into just two categories and limited the Board to considering only incremental ACS costs when setting interchange fees.

### C. Regulation II contradicts the Durbin Amendment by including prohibited costs in the fee standard.

Regulation II is contrary to the Durbin Amendment for a second, independent reason. The Board included in the fee standard four specific types of costs that are disallowed under the Durbin Amendment: (1) fixed ACS costs, (2) network-processing fees, (3) transaction-monitoring costs, and (4) fraud losses. *See* Regulation II, App. 265-70. The district court correctly held that the "inclusion of these four costs runs afoul of the Durbin Amendment." *Corner Post*, 794 F.Supp.3d at 633.

**1. Fixed ACS costs.** The Board improperly added "fixed" ACS costs—network connectivity, software, hardware, equipment, and associated labor—into the fee standard. Regulation II, App. 243; *see also* Updated Rule, App. 316. Again, the Durbin Amendment limits the Board to considering the "incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction," while forbidding the Board to consider "other costs

53

incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B)(i)-(ii) (emphasis added).

"Fixed ACS costs are not, by definition, incremental ACS costs." *Corner Post*, 794 F.Supp.3d at 633 (cleaned up); *see also* Fixed Cost, *Black's Law Dictionary* (9th ed. 2009) ("A cost whose value does not fluctuate with changes in output or business activity; esp., overhead expenses such as rent, salaries, and depreciation."); *San Antonio v. United States*, 631 F.2d 831, 851 n.1 (D.C. Cir. 1980) ("By definition, fixed costs are not associated with any particular traffic."). It would be "a stretch if a shoe store claimed that the rent it pays its landlord is somehow 'specific' to a 'particular' shoe sale." *NACS II*, 746 F.3d at 489. The Board attempted that precise "stretch" here. Banks' fixed ACS costs are not "specific" to any "particular" debit transaction and thus cannot anchor the fee standard. 15 U.S.C. §1693*o*-2(a)(4)(B)(ii).

The Board insists that the statute did not obligate it to "define 'fixed' costs," leaving the Board free to include fixed ACS costs in the fee standard. Board-Br.41. But "definitions matter," especially when Congress used mandatory language that costs either "shall" or "shall not" be considered.

54

*Corner Post*, 794 F.Supp.3d at 633. "[B]y the Board's own admission," fixed ACS costs are not "incremental ACS costs associated with a particular electronic debit transaction." *Id.* (cleaned up).

Yet the Board now contends that "the concepts of fixed versus variable costs are not readily severable in practice" and argues that distinguishing "fixed" and "variable" costs is simply too hard to be done. Board-Br.42; *see also NACS I*, 958 F.Supp.2d at 107 ("[T]he Board simply noted that it is administratively difficult to discern a transaction's incremental ACS cost."). But "[p]ractical considerations … do not justify departing from the statute's clear text." *Pereira v. Sessions*, 585 U.S. 198, 217 (2018); *see Comcast Corp. v. FCC*, 579 F.3d 1, 7 (D.C. Cir. 2009) ("[t]hat a problem is difficult may indicate a need to make some simplifying assumptions," "but it does not justify ignoring altogether a variable so clearly relevant and likely to affect the calculation" a rule requires). Congress forbade the Board to consider costs "which are not specific to a particular electronic debit transaction." 15 U.S.C. §1693*o*-2(a)(4)(B)(ii). Fixed costs fall outside that category. By including

55

them, the Board exceeded its "statutory jurisdiction, authority, [and] limitations." 5 U.S.C. §706(2)(C).

**2. Transaction-monitoring costs.** The Board included transaction-monitoring costs in the base fee standard. *See* Regulation II, App. 269-70. Those involve "[t]ransactions-monitoring systems, such as neural networks and fraud-risk scoring systems," that help issuers decide whether to approve a transaction. Updated Rule, App. 316. What the Board calls "transaction-monitoring costs" is essentially another name for fraud-prevention costs. *Corner Post*, 794 F.Supp.3d at 634. Indeed, the Board has long called such costs "the paradigmatic example of fraud-prevention costs." *NACS II*, 746 F.3d at 492; *see also* Regulation II, App. 236 ("The most commonly reported fraud-prevention activity was transaction monitoring.").

This means that the Board is improperly double-counting fraud-prevention-type costs in the fee standard. The Durbin Amendment already addresses fraud prevention through a separate, conditional adjustment—after the base fee is set, and only for issuers who comply with Board-established fraud standards. 15 U.S.C. §1693*o*-2(a)(5)(A)(i)-(ii). That latter

56

provision allows an adjustment to the interchange fee "if" the adjustment is "reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud" and in compliance with standards. *Id.* §1693*o*-2(a)(5)(A).

Baking transaction-monitoring costs (the most common fraud-prevention costs) into the base fee renders the separate adjustment superfluous. *See Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 823-24 (8th Cir. 2009). Worse, it undercuts the statute's incentive structure: under the Board's misconstruction, issuers automatically get reimbursed for fraud prevention without needing to meet any standards. That contradicts the conditional adjustment scheme Congress instituted to spur better fraud controls. *See* 12 C.F.R. §235.4(b)(1) (separate one-cent adjustment for compliant issuers). The Board's approach turns a carrot into an entitlement.

Legislative history confirms this point. Senator Durbin made clear that "any fraud prevention adjustment to the fee amount would occur after the base calculation of the reasonable and proportional interchange fee amount takes place." 156 Cong. Rec. 5925 (emphasis added). It "would not be

considered as part of the incremental issuer costs upon which the reasonable and proportional fee amount is based." *Id.*

Yet the Board now contends that real-time neural networks and fraud-risk scoring systems help inform transaction monitoring and approval decisions. Board-Br.43. But it still never explains how neural networks (which look for evidence of possible fraud) or fraud-risk systems are not just paradigmatic examples of fraud-prevention technology. The Board cannot repackage classic fraud-prevention measures under a different name and continue to double-count those costs in the fee.

**3. Fraud losses.** Regulation II tacked on a 5-basis-point ad valorem component for "fraud losses"—losses unrelated to nonsufficient funds and not recovered via chargebacks. Regulation II, App. 270. The district court correctly found this unlawful for three reasons.

*First*, "fraud *losses* are not '*costs*'" under the statute. *Corner Post*, 794 F.Supp.3d at 635. The Durbin Amendment covers only "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." 15 U.S.C. §1693*o*-

58

2(a)(4)(B)(i) (emphasis added). "Cost" means "[t]he amount paid or charged for something; price or expenditure." Cost, *Black's Law Dictionary* (9th ed. 2009). Fraud losses are not amounts paid or charged for the issuer's ACS role; they are the "disappearance or diminution of value" from a risk that materializes later. Loss, *Black's Law Dictionary* (9th ed. 2009). The Board acknowledged as much in the Proposed Rule: "[f]raud losses … are not includable as allowable costs." App. 140. Even in the final rule, it conceded that fraud losses "are generally the result of the authorization, clearance, and settlement of an apparently valid transaction that cardholder later identifies as fraudulent." Regulation II, App. 270. "Costs" are not an insurance policy for after-the-fact losses.

*Second*, fraud losses are not "incremental cost[s] incurred" in a *particular* transaction. 15 U.S.C. §1693*o*-2(a)(4)(B)(i) (emphasis added). The Board "conceded this reality when it explained 'the exact source of fraud often is unknown' and 'network rules allocate responsibility for fraudulent transactions.'" *Corner Post*, 794 F.Supp.3d at 636 (quoting Regulation II, App. 270). Merchants pay the 0.05% fee regardless of whether any loss ever occurs.

59

These constitute anticipatory transfers for "potential loss," not actual incurred "costs." *See* App. 270 ("[A]n issuer takes on a greater risk when approving a $100 transaction than a $5 transaction because the amount of the potential loss is greater.").

*Third*, this adjustment wrecks the statutory scheme. Congress addressed fraud through a conditional ex-post adjustment that rewards issuers who adopt strong prevention measures. *See* 15 U.S.C. §1693*o*-2(a)(5)(A). Regulation II short-circuits that incentive by letting issuers recover fraud losses automatically—making fraud a profit center for issuers. That inverts Congress's goal of encouraging fraud reduction and keeping fees "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id*. §1693*o*-2(a)(2), (5).

**4. Network-processing fees.** The Board unlawfully included network-processing fees (charged by networks like Visa and Mastercard to issuers and acquirers for processing). *See* Proposed Rule, App 115; Regulation II, App. 269. Here too, as the district court correctly found, including these fees is impermissible for three reasons.

60

*First*, the statute defines "network fee" as "any fee charged and received by a payment card network with respect to an electronic debit transaction, other than an interchange transaction fee." 15 U.S.C. §1693*o*-2(c)(10) (emphasis added). A network fee cannot simultaneously be distinct from the interchange fee and a component of it.

*Second*, the statute directs the Board to ensure that "a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction." *Id.* §1693*o*-2(a)(8)(B)(i). Regulation II does exactly that by folding network-processing fees into the interchange standard.

*Third*, network-processing fees are not "incremental cost[s] incurred by an issuer" for its role in ACS of a particular transaction. *Id.* §1693*o*-2(a)(4)(B)(i). They are costs the networks charge for their role. The Board's contention that issuers incur them to effect transactions cannot override the statute's express bar on treating network fees as interchange components or issuer compensation. *See id.* §§1693*o*-2(c)(10), (a)(8)(B)(i).

61

## D. Regulation II contradicts the Durbin Amendment by setting a one-size-fits-all cap.

The district court correctly determined that Regulation II's fee standard also contradicts the statute by imposing a "one-size-fits-all standard" that "does not comport with the Durbin Amendment's text or logic." *Corner Post*, 794 F.Supp.3d at 637, 639.

The Durbin Amendment demands that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to *the* cost incurred by *the* issuer with respect to *the* transaction." 15 U.S.C. §1693*o*-2(a)(2) (emphasis added). The definite article "the" signals limitation, not generalization. *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000) (cleaned up). And "[b]y using the definite article 'the' … Congress specified that each of these metrics has a single, definite, discernable value." *Bridgeport Hosp.*, 108 F.4th at 887. Congress thus "particulariz[ed] the subject which it precedes," *Slater*, 231 F.3d at 5 (cleaned up), tying "cost" and "transaction" to each "issuer." 15 U.S.C. §1693*o*-2(a)(2). Put simply, each issuer's recoverable fee must reflect its own *specific* costs for its own *specific*

transactions. The interchange fee thus must be issuer-specific and transaction-specific.

Other provisions reinforce this. The statute tells the Board to consider "the incremental cost by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." *Id.* §1693*o*-2(a)(4)(B)(i) (emphasis added). Again using "the," it links recoverable costs to "particular" transactions—meaning "[p]ertaining to a single definite thing or person, or set of things or persons, as distinguished from others," or "[b]elonging only to a specified person or thing; restricted to." Particular, *Shorter Oxford English Dictionary* (6th ed. 2007); *see also* Particular, *New Oxford Am. Dictionary* (3d ed. 2010). The fee must also be "proportional" to those costs. As the Board admitted, "the term 'proportional' requires a relationship between the interchange fee and the costs incurred." Regulation II, App. 262. Regulation II defies both mandates by letting every issuer charge the same—21 cents plus 0.05% per transaction—irrespective of actual per-issuer, per-transaction costs.

63

The Board now tries to justify its uniform fee standard by contending it "would be absurd" and "a practical impossibility to implement" a per-issuer, per-transaction standard. Board-Br.55. This rationale falls flat. Once again, "practical considerations … do not justify departing from the statute's clear text." *Pereira*, 585 U.S. at 217. Agencies cannot rewrite statutory commands because they are difficult. In any event, Congress gave the Board the tools it would need to calculate flexible standards. Elsewhere in the Durbin Amendment, Congress empowered the Board to "retrieve 'such information as may be necessary' from issuers and networks." *Corner Post*, 794 F.Supp.3d at 629 (quoting 15 U.S.C. §1693*o*-2(a)(3)(B)). Indeed, the Board even initially proposed "issuer-specific measurements of costs fees," requiring each issuer to "calculat[e] its allowable costs and receiv[e] an interchange fee that does not exceed its per-transaction allowable costs." Regulation II, App. 259-60; *cf.* Scalia & Garner, *supra*, at 388 ("legislative history can be consulted to refute attempted application of the absurdity doctrine" and to "establish that it is indeed thinkable that a particular word or phrase should mean precisely what it says").

The Board twisted the statute to dodge those burdens. It recast §1693*o*-2(a)(2)'s use of "an issuer" and "an electronic debit transaction" as referring to "a representative issuer" and a representative cost for that issuer. Regulation II, App. 261. The Board contends that later statutory instances of "the issuer" and "the transaction" supposedly refer to these hypotheticals, justifying an average-based, uniform cap. *Id.* This argument is baseless. A "representative" issuer and "representative" transaction are "not the words that Congress wrote." *Nat'l Ass'n of Mfrs.*, 583 U.S. at 123.

Congress specified "an issuer" and "an electronic debit card transaction." 15 U.S.C. §1693*o*-2(a)(2). The Board cannot "rewrite the statute" by inserting "representative." *Nat'l Ass'n of Mfrs.*, 583 U.S. at 123-24; *see also Nebraska*, 143 S.Ct. 2355, 2368 (2023). Worse, this approach erases "specific" and "particular" from the text. 15 U.S.C. §1693*o*-2(a)(4)(B) (allowing "the incremental cost … in … a *particular* electronic debit transaction" and prohibiting costs "which are not *specific* to a *particular* electronic debit transaction" (emphasis added)).

65

In sum, the Durbin Amendment mandates a fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* §1693*o*-2(a)(2). The Board must tie costs to actual issuers and particular transactions—not averages for hypotheticals. Its blanket, average-driven cap flouts the statute.

## II. Regulation II's fee standard is arbitrary and capricious.

Because the district court found that "Regulation II is contrary to law" and conflicts with "the Durbin Amendment's text," it did not address Corner Post's alternative argument that Regulation II is arbitrary and capricious. *Corner Post*, 794 F.Supp.3d at 639. But this Court "may affirm" a grant of summary judgment "on any ground supported by the record." *Duffner v. City of St. Peters*, 930 F.3d 973, 976 (8th Cir. 2019). The record below is sufficient for this Court to affirm on Corner Post's alternative arbitrary and capricious argument.

The APA requires agencies to engage in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (cleaned up). Courts must therefore set aside agency action that is "arbitrary," "capricious," or "an abuse of

discretion." 5 U.S.C. §706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Proj.*, 141 S.Ct. 1150, 1158 (2021). The Board's fee standard under Regulation II is arbitrary and capricious for three independent reasons.

### A. The Board ignored the functional similarity between debit-card and checking transactions.

Agency action is arbitrary and capricious when it "fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Mere "bare acknowledgement" will not suffice; the agency must offer "reasoned consideration." *Louisiana v. EPA*, 90 F.4th 461, 473 (5th Cir. 2024). That demands "adequate" engagement with "an important aspect of [the] problem." *Id.* at 470, 473.

Congress crafted the Durbin Amendment to ensure interchange fees cover issuers' incremental ACS costs while approximating as closely as possible the "functional[ly] similar[]" model of "checking transactions," which "are required within the Federal Reserve bank system to clear at par." 15 U.S.C. §1693*o*-2(a)(4)(A)(ii). Whatever "functional similarity" entails, *id.*

67

§1693*o*-2(a)(4)(A), it cannot reconcile a zero-fee par system for checks with a debit regime yielding tens of billions of dollars in annual fees.

True, the Board's background section sketches parallels and contrasts between debit and checking. *See* Regulation II, App. 237-41. But in the pivotal analytical portions, checking vanishes. The inflated final cap omits any reference to this benchmark. *See* Regulation II, App. 261-63. That oversight renders the decision arbitrary.

The Board's cost analysis briefly nods to the required "functional similarity" between debit and checking, but that's all—the Board just "move[s] on," *Louisiana*, 90 F.4th at 473. Fixed ACS costs receive no such comparison. *See* Regulation II, App. 268-69. Checks, like debit, demand "equipment, hardware, software, and associated labor." *Id.* at 269. But "a payor's bank in a check transaction (analogous to the issuer in a debit card transaction) would not recoup such costs from the payee's bank (analogous to the merchant acquirer in a debit card transaction)." *Id.* at 237; *see also id.* at 239 ("The presenting bank typically does not pay a fee to the payor's bank

in order to receive settlement for the check."). The Board offers no adequate rationale for overlooking these parallels.

Transaction-monitoring costs fare no better in addressing checking's model. *See id.* at 269-70. Neither does the fraud-loss adjustment. *See id.* at 270. Network-processing fees alone draw a checking analogy, *see id.* at 269, but inadequately: The Board includes them by likening them to paper-check processing, where "the payee's bank (the corollary to the acquirer for the merchant) typically pays all of the processing costs, while the payor's bank (the corollary of the issuer in an electronic debit transaction) typically pays no processing fees." *Id.* Even so, it acknowledges that "in electronic check collection systems, both the payee's bank and the payor's bank generally pay processing fees." *Id.* No explanation bridges this gap. Acknowledgment is not "reasoned consideration." *Louisiana*, 90 F.4th at 473.

The Board thus fell short of Congress's directive to weigh functional similarity. Regulation II's fee standard, reaffirmed in the Updated Rule, must be vacated as arbitrary and capricious.

**B.    The Board weighed unauthorized costs and failed to rationalize their inclusions.**

Arbitrariness further infects the fee standard because the Board "relied on factors which Congress has not intended it to consider." *Firearms Regul. Accountability Coal. v. Garland*, 112 F.4th 507, 519 (8th Cir. 2024) (cleaned up). Congress confined the Board to incremental ACS costs, barring all others. *See supra* 18-39; 15 U.S.C. §1693*o*-2(a)(4)(B)(i)-(ii). Defying this, the Board asserted power over "*all* costs related to a particular transaction." Regulation II, App. 266 (emphasis added).

Compounding the error, the Board refused to "define adequately key terms" and substituted "a statutory command with some other standard." *Qwest Corp. v. FCC*, 258 F.3d 1191, 1201-02 (10th Cir. 2001). Bald assertions of sufficiency cannot survive scrutiny. *Id.* at 1201. The Board declined to define core concepts like costs, deeming it unnecessary to classify them as "incremental," fixed, variable, or ACS-linked. Regulation II, App. 266. That abdication was arbitrary. *Qwest Corp.*, 258 F.3d at 1201-02.

The Durbin Amendment requires the Board to "distinguish between" issuer-specific "incremental cost incurred by an issuer for the role of the

70

issuer in the authorization, clearance, or settlement of a particular electronic debit transaction" and "other costs." 15 U.S.C. §1693*o*-2(a)(4)(B)(i)-(ii). Absent definitions of incremental or ACS costs, true distinction proves impossible. The Board instead imposed its own regime, embracing "all costs related to a particular transaction," Regulation II, App. 266, contrary to the statute's exclusive focus on incremental ACS costs, 15 U.S.C. §1693*o*-2(a)(4)(B)(i); *see supra* 18-39. This definitional void creates arbitrariness.

After all, the Board included fixed ACS costs in Regulation II but excluded corporate overhead and compliance costs. *Compare* Regulation II, App. 243 (including "network connectivity; software, hardware, equipment, and associated labor"), *with id.* at 266 (excluding "corporate overhead" and "general debit card program costs, such as card production and delivery costs"). Why bar these costs "related to debit card programs and transactions" under a purported "all costs related to a particular transaction" rubric? *Id.* at 266. Fraud losses were included as "generally the result of the authorization, clearance, and settlement" of illicit transactions, *id.* at 270, but "non-sufficient funds" losses from overdrawn authorizations were not,

71

despite parallel issuer risks, *id.* at 268. Such "internally inconsistent" choices are hallmarks of arbitrariness. *Firearms Regul. Accountability Coal.*, 112 F.4th at 524.

### C. The Board bypassed issuer- and transaction-specific costs in favor of hypothetical averages for a universal cap.

The Durbin Amendment specifies that fees "that an issuer may receive with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693*o*-2(a)(2). This language requires tailored, issuer- and transaction-specific assessments, not a blanket cap divorced from them. *See supra* 45-48. At a minimum, it precludes reliance on hypothetical averages for a generic issuer and transaction. *See id.* Yet the Board rooted its cap in precisely such abstractions. *See id.*; Regulation II, App. 261-63. By doing so, it again relied on factors Congress did not intend it to consider.

**CONCLUSION**

The fee standard in Regulation II is contrary to law, exceeds statutory authority, and is arbitrary and capricious. This Court should affirm the district court's grant of summary judgment.

72

Dated: February 12, 2026

Scott K. Porsborg
SMITH PORSBORG SCHWEIGERT
ARMSTRONG MOLDENHAUER &
SMITH
P.O. Box 460
122 East Broadway
Bismarck, ND 58502
(701) 258-0630
sporsborg@smithporsborg.com

Respectfully submitted,

/s/ Tyler R. Green
Tyler R. Green
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Bryan Weir
Frank H. Chang
Cody Ray Milner
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
bryan@consovoymccarthy.com
frank@consovoymccarthy.com
cody@consovoymccarthy.com

*Counsel for Appellee Corner Post, Inc.*

Appellate Case: 25-3000    Page: 85    Date Filed: 02/13/2026 Entry ID: 5608162

# CERTIFICATE OF COMPLIANCE

I hereby certify:

1. This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,914 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 16.103.4 for Microsoft 365 and in 14-point Palatino Linotype font.

3. This document has been scanned for viruses using SentinelOne, version 23.3.2.7123, on February 12, 2026, and is virus free.

Dated: February 12, 2026

_/s/ Tyler R. Green_
Tyler R. Green

_Counsel for Appellee Corner Post, Inc._

Appellate Case: 25-3000   Page: 86   Date Filed: 02/13/2026 Entry ID: 5608162

**CERTIFICATE OF SERVICE**

I certify that on February 12, 2026, I electronically filed this brief using the court's CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: February 12, 2026        /s/ Tyler R. Green
                                           Tyler R. Green

                                           *Counsel for Appellee Corner Post, Inc.*