# In the United States Court of Appeals for the Eighth Circuit

———

CORNER POST, INC,

*Plaintiff-Appellee,*

*v.*

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellant.*

———

On Appeal from the United States District Court
for the District of North Dakota

———

**BRIEF OF AMICI CURIAE AMERICAN ECONOMIC LIBERTIES PROJECT, AMERICANS FOR FINANCIAL REFORM EDUCATION FUND, DEMAND PROGRESS EDUCATION FUND, SIX OTHER ADVOCACY ORGANIZATIONS, AND SEVEN PROFESSORS SUPPORTING PLAINTIFF-APPELLEE AND AFFIRMANCE**

———

Drew F. Waldbeser
Danielle Kerker Goldstein
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Jonathan E. DeWitt
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Suite 700
Washington, DC 20001

Mithun Mansinghani
LEHOTSKY KELLER COHN LLP
629 W. Main Street
Oklahoma City, OK 73102
(512) 693-8350
mithun@lkcfirm.com

*Counsel for Amici Curiae*

Appellate Case: 25-3000     Page: 1     Date Filed: 02/26/2026 Entry ID: 5612392

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, American Economic Liberties Project ("AELP") certifies that it is a nonprofit organization. AELP has no parent corporation and no publicly held company has 10% or greater ownership in AELP.

Under Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Americans for Financial Reform Education Fund certifies that it is a nonprofit organization. Americans for Financial Reform has no parent corporation and no publicly held company has 10% or greater ownership in Americans for Financial Reform.

Under Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Demand Progress Education Fund ("DPEF") certifies that it is a nonprofit organization. DPEF has no parent corporation and no publicly held company has 10% or greater ownership in DPEF.

Under Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Groundwork Collaborative certifies that it is a nonprofit organization. Groundwork Collaborative has no parent corporation and no publicly held company has 10% or greater ownership in Groundwork Collaborative.

Under Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Main Street Alliance certifies that it is a nonprofit organization. Main Street Alliance has no parent corporation and no publicly held company has 10% or greater ownership in Main Street Alliance.

Under Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, the Merchants Payments Coalition certifies that it is a nonprofit organization. The Merchants Payments Coalition has no parent corporation and no publicly held company has 10% or greater ownership in the Merchants Payments Coalition.

Under Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, National Association of Consumer Advocates ("NACA") certifies that it is a nonprofit organization. NACA has no parent corporation and no publicly held company has 10% or greater ownership in NACA.

Under Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Open Markets Institute certifies that it is a nonprofit organization. Open Markets Institute has no parent corporation and no publicly held company has 10% or greater ownership in Open Markets Institute.

Under Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Small Business Majority certifies that it is a nonprofit organization. Small Business Majority has no parent corporation and no publicly held company has 10% or greater ownership in Small Business Majority.

/s/ Mithun Mansinghani
Mithun Mansinghani
*Counsel of Record for Amici Curiae*

ii

# TABLE OF CONTENTS

Page

Table of Authorities ...................................................................................... iv

Interest of Amici Curiae ..................................................................................1

Introduction and Summary of Argument .......................................................5

Argument ........................................................................................................7

    I.   Regulation II violates the Durbin Amendment by permitting debit card issuers to charge unreasonable and disproportional interchange fees. ........................................................7

        A.  The Durbin Amendment limits recoverable debit swipe fees to costs incurred for particular transactions. ..........................7

        B.  Regulation II unlawfully allows debit card issuers to recover for costs not specific to a particular transaction. .............9

    II.  The Final Rule's allowance for unreasonable, disproportionate, and extra-statutory debit interchange fees harm consumers and hamper the economy. ......................................14

        A.  Excessive debit interchange fees are passed on to consumers. ...................................................................................14

        B.  Exorbitant debit interchange fees also impose significant macroeconomic harms. ..............................................19

        C.  Regulation II disincentivizes banks to fight debit card fraud. ......................................................................................21

Conclusion .....................................................................................................22

Certificate of Service .....................................................................................24

Certificates of Compliance .............................................................................24

Appellate Case: 25-3000    Page: 4    Date Filed: 02/26/2026 Entry ID: 5612392

**Page(s)**

**Cases**

*Bostock v. Clayton Cnty., Georgia,*
  590 U.S. 644 (2020)............................................................................13

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024)............................................................................12

*Westerfeld v. Indep. Processing, LLC,*
  621 F.3d 819 (8th Cir. 2010)............................................................11

**Statutes**

15 U.S.C. § 1693g ................................................................................21

15 U.S.C. § 1693*o*-2 .......................................................................*passim*

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, 124 Stat. 1376 (2010)....................................7

**Other Authorities**

75 Fed. Reg. 81,722 (Dec. 28, 2010)..............................................9, 12

76 Fed. Reg. 43,394 (July 20, 2011) .........................................*passim*

88 Fed. Reg. 78,100 (Nov. 14, 2023).........................................8, 10, 14

Oxford English Dictionary, https://perma.cc/EJ9F-DP7A ............11

Board of Governors of the Federal Reserve, *2013 Interchange Fee
  Revenue, Covered Issuer Costs, and Covered Issuer and Merchant
  Fraud Losses Related to Debit Card Transactions* (Sept. 18, 2014),
  https://perma.cc/RCA8-B4Z5 ........................................................18

Appellate Case: 25-3000    Page: 5    Date Filed: 02/26/2026 Entry ID: 5612392

Board of Governors of the Federal Reserve, *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* (Dec. 2025), https://perma.cc/D6SX-DBQW.................................................*passim*

*Breaking the Visa-Mastercard Duopoly: Bringing Competition and Lower Fees to the Credit Card System: Hearing Before the S. Comm. on the Judiciary*, 118th Cong. (2024) (Doug Kantor, Gen. Couns., Nat'l Ass'n of Convenience Stores), https://perma.cc/8KB3-RAFC.....................................................................15

*Breaking the Visa-Mastercard Duopoly: Bringing Competition and Lower Fees to the Credit Card System: Hearing Before the S. Comm. on the Judiciary*, 118th Cong. (2024) (Roger P. Alford, Professor, Notre Dame L. School), https://perma.cc/FLF8-H7CV..................................................................................................15

*Central Banks and Payments in the Digital Era*, in BIS Annual Economic Report (June 30, 2020), https://perma.cc/H3HN-QF9R.......................................................................................................19

*Check Payments*, Federal Reserve History (Sept. 28, 2023), https://perma.cc/E3ET-V88V .....................................................19

CMSPI, *Global Review of Interchange Fee Regulation* (Nov. 2020), https://perma.cc/YUN6-2UED .....................................................17

*Durbin Statement on His Debit Card Swipe Fee Amendment* (May 13, 2010), https://perma.cc/6BKH-7CGT.......................................8

Jonathan Weil, "*Are Megabanks Next in Trump's Crackdown on Stock Buybacks?*" Wall Street Journal (Jan. 19, 2026), https://perma.cc/7YZ7-EGQF .....................................................15

Appellate Case: 25-3000    Page: 6    Date Filed: 02/26/2026 Entry ID: 5612392

Marie-Hélène Felt, Fumiko Hayashi, Joanna Stavins & Angelika Welte, *Distributional Effects of Payment Card Pricing and Merchant Cost Pass-through in the United States and Canada*, Fed. Rsrv. Bank of Bos. Working Paper No. 20-13 (Dec. 2020) .................17

New York University, Margins by Sector (Jan. 2024), https://perma.cc/V3XQ-6BMB..................................................................15

New York University, Margins by Sector (US) (data as of Jan. 2026), https://perma.cc/42T9-JPN8 ...............................................15

Orzechowski & Walker, *Debit Card Fraud: The Impact of Proposed Regulations on the Food Retailing Industry* (Feb. 2012), https://perma.cc/7K6V-LHJX................................................................22

*QuickFacts United States*, Census.gov, https://perma.cc/7C4Q-7BSJ..................................................................................................16

Reform of Australia's Payments System Preliminary Conclusions of the 2007/08 Review (April 2008), https://perma.cc/NL9X-PUVS .......................................................18

Robert J. Shapiro, *The Costs and Benefits of Half a Loaf: The Economic Effects of Recent Regulation of Debit Card Interchange Fees*, SSRN (Oct. 1, 2013), https://perma.cc/6VD2-55AA..........16, 17, 18, 20

Robert J. Shapiro and Jiwon Vellucci, *The Costs of Charging It in America: Assessing the Economic Impact of Interchange Fees for Credit Card and Debit Card Transactions* (Feb. 2010), https://perma.cc/W9RP-MR58..................................................................20

Small Business Majority, *Voice of Main Street: Entrepreneurs struggle to access funding, support policies increase availability of responsible capital* (April 29, 2025), https://perma.cc/XMZ9-WGXH................................................................16

Appellate Case: 25-3000    Page: 7    Date Filed: 02/26/2026 Entry ID: 5612392

Tim Mead, et al., *The Role of Interchange Fees on Debit and Credit Card Transactions in the Payments System*, Federal Reserve Bank of Richmond (May 2011), https://perma.cc/68QG-EC3X ...................7

Appellate Case: 25-3000     Page: 8     Date Filed: 02/26/2026 Entry ID: 5612392

# INTEREST OF AMICI CURIAE[1]

Amicus curiae American Economic Liberties Project ("AELP") is an independent nonprofit organization that works to promote competition, combat monopolistic corporations, and advance economic liberty for all. It advocates for policies that address today's crisis of concentration through legislative efforts and public policy debates. AELP is non-profit and non-partisan and does not accept any funding from corporations.

Amicus curiae Americans for Financial Reform Education Fund is a nonpartisan and nonprofit 501(c)(3) organization formed in the wake of the 2008 financial crisis by a coalition of more than 200 civil rights, consumer, labor, small business, investor, faith-based, civic, and community groups dedicated to advocating policies that shape a fair and stable financial sector that serves workers, communities and the real economy, and provide a foundation for advancing economic and racial justice.

Amicus curiae Demand Progress Education Fund is a 501(c)(3) charitable organization that educates and mobilizes its members and the general public about matters pertaining to the democratic nature of our nation's communications and governance structures, and the impacts of corporate power over our economy and democracy.

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than amici curiae, their members, and their counsel made a monetary contribution to fund the preparation or submission of this brief. See Fed. R. App. P. 29(a)(4)(E).

Amicus curiae Groundwork Collaborative is an economic policy think tank that works to advance an economic vision for strong, broadly shared prosperity and true opportunity for all.

Amicus curiae Main Street Alliance is a national network of 30,000 small business owners organizing to reclaim economic and political power for local communities. Main Street Alliance knows what's really happening in our neighborhoods because its members live it every day. Together, Main Street Alliance's members drive the economic conversation too often dominated by massive corporations, winning policies that let small businesses thrive, and plugging entrepreneurs back into civic life that's excluded them.

Amicus curiae Merchants Payments Coalition ("MPC") is a group of retailers, supermarkets, restaurants, drug stores, convenience stores, gas stations, online merchants, hotels, and other businesses focused on reforming the U.S. payments system to make it more transparent and competitive. MPC's members pay significant interchange fees in order to accept payment from debit and credit cards. For many merchants, and small merchants in particular, aggregate interchange fees exceed all operating costs except labor costs. Many of these retailers pay more money in card fees each year than they make in pre-tax profits. Given this massive expense, many merchants are then forced to raise prices, which harms consumers. The mission of the MPC is to lower interchange fee costs and drive innovation.

2

Amicus curiae the National Association of Consumer Advocates ("NACA") is a nonprofit association of more than 1,600 attorneys and consumer advocates committed to representing consumers' interests. NACA's members are private and public sector attorneys, legal services attorneys, law professors, and law students whose primary focus is the protection and representation of consumers. They have represented hundreds of thousands of consumers in small-damages actions and consumer class actions. As a national organization fully committed to promoting justice for consumers, with an emphasis on those of modest means or those who are otherwise especially vulnerable, NACA's members have also long advocated to ensure that consumers have a remedy and means of redress for injuries caused by unfair practices.

Amicus curiae the Open Markets Institute is a nonprofit organization dedicated to promoting fair and competitive markets. It does not accept any funding or donations from for-profit corporations. Its mission is to safeguard our political economy from concentrations of private power that undermine fair competition and threaten liberty, democracy, and prosperity. The Open Markets Institute regularly provides expertise on antitrust law and competition policy to Congress, federal agencies, courts, journalists, and members of the public.

Amicus curiae Small Business Majority is a national small business organization that empowers America's diverse entrepreneurs to build a thriving and equitable economy. Small Business Majority informs its work

3

through its network of more than 85,000 small businesses and 1,500 business and community organizations to deliver resources to entrepreneurs and advocate for public policy solutions that promote inclusive small business growth.

The following professors have also joined as amici curiae because they work or research in related fields:

- Brian Shearer, Director of Competition and Regulatory Policy, Vanderbilt Policy Accelerator
- Ben Dinovelli, Academic Fellow, Vanderbilt Policy Accelerator
- Hal Singer, Professor of Economics, University of Utah
- Todd Phillips, Assistant Professor, Robinson College of Business, Georgia State University
- Arthur E. Wilmarth, Jr., Professor Emeritus of Law, George Washington University Law School
- Mark E. Budnitz, Bobby Lee Cook Professor of Law Emeritus, Georgia State University College of Law
- Kathleen Engel, Research Professor of Law, Suffolk University

4

## INTRODUCTION AND SUMMARY OF ARGUMENT

Regulation II violates the Durbin Amendment. Consumers pay the price. The Durbin Amendment prohibits debit card interchange fees for costs "not specific to a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii). But Regulation II unlawfully allows debit card issuers to charge interchange fees to recoup costs that are not attributable to any specific transaction. Based on that misinterpretation of the statute, Regulation II sets a debit card swipe fee cap of 21 cents per transaction, over *five times* the current average per transaction processing cost. As a result, banks bring in tens of billions of dollars in *profit* from debit card swipe fees every year. That is not "reasonable and proportional to the cost incurred by the issuer with respect to the transaction," as the Durbin Amendment requires. 15 U.S.C. § 1693*o*-2(a)(2).

American consumers ultimately pay the price for this violation of the Durbin Amendment. "Merchants often end up bearing the brunt of most costs incurred along the [interchange] process, which they generally pass along to consumers." Addendum to Appellant's Br. ("Add.") at 4. Although retailers pay interchange fees in the first instance, they operate with razor thin profit margins. Retailers therefore must pass much of the interchange fees on to customers in the form of higher prices. In 2023, Americans paid $34.12 billion in debit card swipe fees, which means each American family paid approximately $265 in higher prices because of debit card interchange fees.

5

Appellate Case: 25-3000    Page: 13    Date Filed: 02/26/2026 Entry ID: 5612392

Regulation II has produced broader economic harms, too. High debit interchange fees hamper job growth by siphoning money away from consumers and businesses. A 12-cent debit swipe fee cap would produce tens of thousands of new jobs a year, and a lower cap would be even more impactful. In addition, Regulation II's cap is so high that, when it was enacted in 2011, it actually *raised* the interchange fees for transactions below $15. That could not have been what Congress meant when it enacted the Durbin Amendment. Regulation II thereby offered especially illusory relief for industries that rely on small purchases, like conveniences stores, coffee shops, gas stations, and pharmacies.

Finally, Regulation II disincentivizes banks from combatting growing debit card fraud. Banks have been increasingly shifting the losses from fraudulent transactions onto retailers, and Regulation II furthers that effort by permitting banks to include in the base interchange fee costs for fraud losses. Banks can thus favor fraud-prone debit cards, like signature-based cards that do not require PINs, because they profit more from interchange fees and pass fraud losses on to others.

The district court's decision promises to bring meaningful price relief for American consumers. A debit interchange fee cap that allowed banks to recover only for costs specific to particular debit transactions would save consumers *billions* of dollars per year. In 2013, a study estimated that reducing the debit swipe fee cap from 21 cents to 12 cents would save consumers an estimated $3 billion per year. If the same cap were adopted

6

Appellate Case: 25-3000    Page: 14    Date Filed: 02/26/2026 Entry ID: 5612392

today, the savings would be approximately three times higher. And if the debit swipe fee cap were reduced to 4.1 cents, which is the average per-transaction processing cost for debit card, consumers would likely receive nearly twenty billion dollars in annual savings.

In short, by failing to fully implement the Durbin Amendment, Regulation II harms consumers and obstructs economic growth. This Court should affirm.

## ARGUMENT

## I. Regulation II violates the Durbin Amendment by permitting debit card issuers to charge unreasonable and disproportional interchange fees.

Regulation II permits debit card issuers to charge interchange fees that Congress expressly prohibited.

### A. The Durbin Amendment limits recoverable debit swipe fees to costs incurred for particular transactions.

Congress enacted the Durbin Amendment to rein in soaring debit card interchange fees. *See* Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (2010), codified at 15 U.S.C. § 1693*o*-2. During the preceding decade, debit card payments had "grown more than any other form of noncash payment." Tim Mead, et al., *The Role of Interchange Fees on Debit and Credit Card Transactions in the Payments System* at 4-5, Federal Reserve Bank of Richmond (May 2011), https://perma.cc/68QG-EC3X. Debit card interchange fees also saw a "race

7

to the top," which "resulted in the average interchange fee reaching 44 cents per debit card swipe in 2009," about "1.15% of the average debit transaction." Add. at 4. "As one would expect, issuing banks benefitted while merchants and consumers suffered as profits tightened and prices increased." Add. at 4.

That average interchange fee was nearly pure profit for debit card issuers. In 2009, when the average interchange fee was 44 cents, the "transaction-weighted average of per-transaction base component costs across covered issuers" was only 7.7 cents. 88 Fed. Reg. 78,100, 78,105 (Nov. 14, 2023). "[S]mall businesses and merchants" thus "always g[o]t shortchanged when they accept[ed] a debit card for a sale." *Durbin Statement on His Debit Card Swipe Fee Amendment* (May 13, 2010), https://perma.cc/6BKH-7CGT. And much of those fees were passed along to consumers in the form of higher prices.

The Durbin Amendment addressed this problem by requiring that debit interchange fees be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(2). It directed the Board of Governors of the Federal Reserve System (the "Board") to promulgate regulations establishing "standards" governing whether a given interchange transaction fee was "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* § 1693*o*-2(a)(3)(A).

"The Durbin Amendment was enacted to rein-in big banks' ballooning interchange fees, so Congress was naturally cautious in detailing what 'shall'

Appellate Case: 25-3000     Page: 16     Date Filed: 02/26/2026 Entry ID: 5612392

and 'shall not' be included when regulating said fees." Add. at 29-30. A reasonable and proportional debit interchange fee *shall* reflect "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." *Id.* § 1693*o*-2(a)(4)(B)(i). The Board *may* also "allow for an adjustment to the [permitted] fee amount" as "reasonably necessary" to account "for costs incurred by the issuer in *preventing* fraud." *Id.* § 1693*o*-2(a)(5)(A) (emphasis added). (The Durbin Amendment says nothing about recovery of fraud *losses*.) And the statute states that "reasonable and proportional" fees *shall not* include "other costs incurred by an issuer which are not *specific to a particular electronic debit transaction*." *Id.* § 1693*o*-2(a)(4)(B)(ii) (emphasis added). Finally, the amendment directed the Board to "consider the functional similarity between . . . checking transactions" (which involve no interchange fees) and "electronic debit transactions" in promulgating those regulations. *Id.* § 1693*o*-2(a)(4)(A).

## B. Regulation II unlawfully allows debit card issuers to recover for costs not specific to a particular transaction.

Regulation II flatly ignores this plain text. The proposed rule correctly recognized that "fixed costs," which are "common to all debit card transactions and could never be attributed to any particular transaction," must be excluded from debit interchange fee calculations. 75 Fed. Reg. 81,722, 81,736 (Dec. 28, 2010). But the Final Rule proposed to exclude only "costs that are not incurred in the course of effecting *any* electronic debit

9

transaction." 76 Fed. Reg. 43,394, 43,426 (July 20, 2011) (emphasis added). Regulation II thus allows debit card issuers to recover for fixed "authorization, clearance, and settlement costs," "network processing fees," transaction monitoring costs, and fraud losses. *Id.* at 43,429-31.

Even more egregiously, Regulation II allows banks to add a 5-basis-point allowance for fraud losses to each transaction. *Id.* at 43,434. But Congress was very clear that the Board has authority only to authorize a swipe fee adjustment to cover costs to "prevent[] fraud," 15 U.S.C. § 1693*o*-2(a)(5)(A)(i), and reiterated explicitly that the Board's standards must "be designed to ensure that any fraud-related adjustment of the issuer is limited to the [costs to prevent fraud]." *Id.* § 1693*o*-2(a)(5)(A)(ii)(I). Banks incur fraud prevention costs *before* a fraud attempt. Yet Regulation II unlawfully allows banks to charge for costs from fraud *losses*, which by definition come *after* fraud occurs.

Based on those costs, the Final Rule capped the "base component" of debit interchange fees "at 21 cents per transaction." 76 Fed. Reg. at 43,434. The Final Rule also permitted an additional five basis point (.05%) "allowance for fraud losses," *id.*, in addition to the separate "fraud-prevention adjustment," *id.* at 43,435. That cap permitted debit card issuers to recover interchange fees that were four times the median per transaction processing cost at the time (5.1 cents). *See* 88 Fed. Reg. at 78,105. And because transaction-weighted average per-transaction base component costs have dropped to only 4.1 cents in the intervening years, debit card issuers today

10

can charge interchange fees over five times the per-transaction processing cost, at 21 cents. Board of Governors of the Federal Reserve, *2023 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* at 3 (Dec. 2025), https://perma.cc/D6SX-DBQW.

Under the plain text of the statute, fees that are both "reasonable and proportional to the cost incurred by the issuer with respect to the transaction" include only those costs "specific to a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(2), (a)(4)(B)(ii). In addition, while the Board may add an additional adjustment to the fee to cover fraud *prevention* costs, that would not include the cost of fraud that is not prevented (*i.e.*, fraud losses). *See id.* § 1693*o*-2(a)(5)(A). The Board must "give effect to all of the words used by Congress" in interpreting that language. *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 824 (8th Cir. 2010).

The Final Rule makes little attempt to do so. Again, it interprets the Durbin Amendment's reference to costs that "are not specific to a *particular* electronic debit transaction" to mean "costs that are not incurred in the course of effecting *any* electronic debit transaction." 76 Fed. Reg. at 43,426 (emphasis added). There is no defensible basis for replacing "particular" with "any." The words are opposites. *See Any*, Oxford English Dictionary, https://perma.cc/EJ9F-DP7A (last visited Feb. 12, 2026) ("used to refer to an unspecified number or quantity of a thing or things, no matter how much or how many; some"); *Particular*, Oxford English Dictionary,

11

Appellate Case: 25-3000     Page: 19     Date Filed: 02/26/2026 Entry ID: 5612392

https://perma.cc/36VP-MQFN (last visited Feb. 12, 2026) ("a unit or one among a number; taken or considered as an individual, apart from the rest; single; distinct, individual, specific").

The Final Rule offers only three sentences in defense of its statutory misinterpretation, but none justifies the result it reaches. The Board contends that 15 U.S.C. § 1693*o*-2(a)(4)(B) is "ambiguous." 76 Fed. Reg. at 43,426. But it does not pinpoint any ambiguity in the phrase "specific to a particular electronic debit transaction," which unambiguously excludes "costs that are common to all debit card transactions and could never be attributed to any particular transaction." 75 Fed. Reg. at 81,736. And even if there were ambiguity, agencies and courts must adopt the "best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

The Board also relies on policy arguments. It protests that excluding "all costs that are not able to be specifically identified to a given transaction would appear to exclude almost all costs related to electronic debit transactions because very few costs could be specifically assigned to a given transaction." 76 Fed. Reg. at 43,426. The Board also frets that "operational constraints make the determination of which in-house costs an issuer incurs in executing any particular transaction virtually impossible in practice." *Id.* The Board cites nothing for these propositions. And the Board's ability to separately calculate the transaction-specific costs in developing a debit swipe fee cap suggests this concern is misplaced. *See* Board of Governors of the Federal Reserve, *2023 Interchange Fee Revenue*, *supra*, at 3.

Appellate Case: 25-3000    Page: 20    Date Filed: 02/26/2026 Entry ID: 5612392

But even if true, Congress chose differently. There is nothing irrational about Congress's policy choices. Banks have other ways to make revenue including consumer fees, revenue from lent deposits, and other means. So even if fixed costs cannot be covered in the interchange fee, that does not mean banks are forced to operate at a loss. The Board might disagree, but "[t]he place to make new legislation, or address unwanted consequences of old legislation, lies in Congress." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 680-81 (2020). The Board's "naked policy appeal[]" is a dead giveaway for a "fail[ed] statutory interpretation argument." *Id.* at 680.

Regulation II thus does violence to the statutory language. Congress expressly limited debit interchange fees to those necessary to cover costs "specific to a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(2), (a)(4)(B). And to the extent that the Board can make adjustments to that baseline for fraud, it only has authority to do so for fraud prevention, not fraud losses. *Id.* § 1693*o*-2(a)(5)(A)(i). The Durbin Amendment forbids issuers from recovering additional costs, *id*. § 1693*o*-2(a)(4)(B)(ii), "particularly when those additional costs would benefit banks at the expense of merchants and consumers," Add. at 30. By allowing debit card issuers to charge interchange fees for any cost "incurred in the course of effecting *any* electronic debit transaction," and for including fraud losses, Regulation II unlawfully permits debit interchange fees that are five times what Congress intended. 76 Fed. Reg. at 43,426 (emphasis added).

13

## II. The Final Rule's allowance for unreasonable, disproportionate, and extra-statutory debit interchange fees harm consumers and hamper the economy.

The unlawful debit interchange fees permitted by the Final Rule harm consumers and undermine the U.S. economy. Merchants, and especially small merchants, are often economically obligated to incorporate swipe fees into retail prices. That raises prices for everyone. In addition, the billions of dollars in interchange fees that flow to debit card issuers every year drive down economic activity. Consumers have less to spend on goods and services, and employers have less ability to hire new employees. Affirming the district court would thus produce broad-ranging economic benefits, including much needed relief for low-income families that are already dealing with severe inflationary pressures.

### A. Excessive debit interchange fees are passed on to consumers.

**1.** The Final Rule perpetuates already excessive swipe fees. As mentioned, the Final Rule sets debit card swipe fees at a flat 21 cents per transaction. 76 Fed. Reg. 43,394, 43,434 (July 20, 2011). Because the average per-transaction processing cost was only 5.1 cents when the rule was issued, that cap allowed banks to significantly profit from their interchange fees. 88 Fed. Reg. at 78,105. The 21-cent cap thus allowed debit card issuers a regulated net profit rate of 76%. And their profit margins have only grown. Today, the average cost of processing a debit transaction is a mere 4.1 cents. Board of Governors of the Federal Reserve, *2023 Interchange Fee Revenue*,

Appellate Case: 25-3000     Page: 22     Date Filed: 02/26/2026 Entry ID: 5612392

*supra*, at 3. Regulation II thus allows debit card issuers to recover a base interchange rate of 512% of cost, with a net profit rate of 81%. This profit is a substantial sum: Interchange fees from debit cards and general-use prepaid cards totaled over $34 billion in 2023. *Id*. at 2. Transaction fees thus contribute significantly to the large profit margins banks enjoy. New York University, Margins by Sector (US) (data as of Jan. 2026), https://perma.cc/42T9-JPN8 (showing Regional Bank net profit margins at 27.49%). Banks earned so much extra money in the last 10 years that just the largest four banks spent $500 billion in stock buybacks. Jonathan Weil, "*Are Megabanks Next in Trump's Crackdown on Stock Buybacks?*" Wall Street Journal (Jan. 19, 2026), https://perma.cc/7YZ7-EGQF.

Merchants, by contrast, operate with much lower profit margins. In 2024, "[n]et profit margins [were] approximately 3 percent for general retailers and just over 1 percent for grocers and other food retailers." *Breaking the Visa-Mastercard Duopoly: Bringing Competition and Lower Fees to the Credit Card System: Hearing Before the S. Comm. on the Judiciary*, 118th Cong. at 6 (2024) (Roger P. Alford, Professor, Notre Dame L. School) ("Alford Testimony"), https://perma.cc/FLF8-H7CV (citing New York University, Margins by Sector, (Jan. 2024), https://perma.cc/V3XQ-6BMB (dataset under "Operating and Net Margins by Industry," dated 1/24)). Those narrow profit margins reflect "fierce price competition" among retailers, *id.*, meaning retailers often must pass along the costs of swipe fees in the form of higher prices for consumers, *Breaking the Visa-Mastercard Duopoly: Bringing Competition and*

*Lower Fees to the Credit Card System: Hearing Before the S. Comm. on the Judiciary*, 118th Cong. at 19 (2024) (Doug Kantor, Gen. Couns., Nat'l Ass'n of Convenience Stores) ("Kantor Testimony"), https://perma.cc/8KB3-RAFC. And swipe fees are especially burdensome for small merchants. According to national polling conducted by Small Business Majority, over 70% of small businesses want policymakers to act to lower the cost of interchange and swipe fees, which are often passed down to individual merchants and their customers. Small Business Majority, *Voice of Main Street: Entrepreneurs struggle to access funding, support policies increase availability of responsible capital* at 8 (April 29, 2025), https://perma.cc/XMZ9-WGXH.

The higher prices that come from swipe fees have become "a surprisingly large part of consumer expenditures." Alford Testimony, *supra*, at 2. In 2023, the average American family paid approximately $265 in higher prices because of debit card interchange fees. *See* Board of Governors of the Federal Reserve, *2023 Interchange Fee Revenue*, *supra*, at 2 (debit interchange fees totaled $34.12 billion); *QuickFacts United States*, Census.gov, https://perma.cc/7C4Q-7BSJ (estimating 129,227,000 households in the United States).

Making matters worse, Regulation II functionally "raised interchange fees on transactions of $15 or less." Robert J. Shapiro, *The Costs and Benefits of Half a Loaf: The Economic Effects of Recent Regulation of Debit Card Interchange Fees* at 2, SSRN (Oct. 1, 2013), https://perma.cc/6VD2-55AA. For those transactions, the flat 21-cent cap allows for higher debit interchange fees as

16

a percentage of the transaction than the pre-Regulation II regime. In fact, "under Regulation II, the fee on the average small transaction of $7.50, as a share of the transaction, *exceeds the profit margins*" on the transaction for those industries. *Id.* (emphasis added). Regulation II thus offers illusory relief for industries that "depend on small purchases, including supermarkets, groceries, convenience stores, gas stations and pharmacies." *Id.*

**2.** High interchange fees harms consumers. It is impossible for consumers to avoid these higher prices. Merchants "typically do not differentiate prices at checkout based on the payment method," often because card issuers have historically prohibited merchants from surcharging consumers that use cards with particularly high interchange fees. Marie-Hélène Felt, Fumiko Hayashi, Joanna Stavins & Angelika Welte, *Distributional Effects of Payment Card Pricing and Merchant Cost Pass-through in the United States and Canada*, Fed. Rsrv. Bank of Bos. Working Paper No. 20-13, at 1-2 (Dec. 2020).

Lower debit interchange fees would bring much-needed price relief for consumers. When interchange fees drop, consumers benefit because "merchants pass on interchange fee savings in the form of lower prices on merchandise." CMSPI, *Global Review of Interchange Fee Regulation*, at 35 (Nov. 2020), https://perma.cc/YUN6-2UED (finding European merchants passed 72% of interchange savings to consumers and U.S. merchants passed 69% of these savings to consumers). For instance, Regulation II's cap, which reduced debit interchange fees from 44 cents to 21 cents, produced about

17

$8.5 billion in savings for merchants, and $5.87 billion of that savings "was passed along to consumers in lower prices." Shapiro, *Costs and Benefits*, *supra*, at 2. The same study estimated that reducing the swipe fee cap to 12 cents would have saved merchants an additional $4.04 billion. *Id.* at 2.

That research has been borne out by interchange fee reform in other countries. For instance, Australia limited the average interchange fee for debit cards to 12 cents per transactions in 2005. Reform of Australia's Payments System Preliminary Conclusions of the 2007/08 Review at 7 (April 2008), https://perma.cc/NL9X-PUVS. The Reserve Bank found that "the bulk of these savings have been, or will eventually be, passed through into savings to consumers." *Id.* at 23. It estimated that, in 2008 alone, those cost savings to consumers amounted to approximately $1.1 billion. *Id.*

These data points confirm that a lower cap for debit swipe fees would bring significant savings for merchants and consumers. In 2023, debit interchange fees totaled $34.12 billion, which is approximately double the total debit interchange fees in 2013. *See* Board of Governors of the Federal Reserve, *2023 Interchange Fee Revenue*, *supra*, at 2; Board of Governors of the Federal Reserve, *2013 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions* at 2 (Sept. 18, 2014), https://perma.cc/RCA8-B4Z5. If the debit swipe fee cap were reduced from 21 cents to 12 cents, that would reduce total interchange by 57%. Annual fees would drop to approximately $19.44 billion, making for an annual savings of $14.68 billion. Merchants typically pass about 70% of

Appellate Case: 25-3000     Page: 26     Date Filed: 02/26/2026 Entry ID: 5612392

swipe fee savings on to consumers, *see supra* pp. 16-17, so consumers would save approximately $10 billion a year. If the debit swipe fee cap were reduced to 4.1 cents, which is the current average per-transaction processing cost for debit card, consumers would likely receive nearly $20 billion in annual savings. A 4.1 cent cap would reduce the current cap by 81%. Annual fees would thus drop to approximately $6.66 billion—$27.46 in annual savings. If merchants pass on 70% of those savings to consumers, American families would save $19.22 billion per year.

It is not "reasonable" for consumers to fund banks' excess profits. 15 U.S.C. § 1693*o*-2(a)(2). But Regulation II permits debit card issuers to wildly profit from unlawful debit interchange fees that low-income families bear the brunt of. This Court should affirm the district court's ruling that Regulation II unlawful.

## B. Exorbitant debit interchange fees also impose significant macroeconomic harms.

Regulation II also unnecessarily weighs down the American economy. A low-cost interchange system "facilitates economic activity and supports long-run economic growth." *Central Banks and Payments in the Digital Era*, in BIS Annual Economic Report, at 67 (June 30, 2020), https://perma.cc/H3HN-QF9R. That is why the Federal Reserve Act of 1913 required most banks to process paper checks at par (without exchange fees, the equivalent of electronic swipe fees). *Check Payments*, Federal Reserve History (Sept. 28, 2023), https://perma.cc/E3ET-V88V. But although the Durbin Amendment

19

specifically instructed the Board to strive for "functional similarity" between debit transactions and personal checks, 15 U.S.C. § 1693*o*-2(a)(4)(A), excessive debit interchange fees continue to plague the economy.

Out-of-control interchange fees stunt business growth and reduce hiring. A study conducted in 2010 estimated that if interchange fees were eliminated, American consumers and business would have "an additional $26.9 billion to spend or save." Robert J. Shapiro and Jiwon Vellucci, *The Costs of Charging It in America: Assessing the Economic Impact of Interchange Fees for Credit Card and Debit Card Transactions* at 13 (Feb. 2010), https://perma.cc/W9RP-MR58. That economic stimulus for American consumers and businesses would have likely generated "almost 242,000 new jobs." *Id.*

The interchange fee cap in 2011 produced some of these benefits, but the "savings and job gains could and should have been substantially larger." Shapiro, *Costs and Benefits*, *supra*, at 2. A 2013 study estimated that Regulation II's 21 cent cap creates 37,501 new jobs annually. *Id.* But if the cap had been set at 12 cents, as the Board initially proposed, there would have been "55,316 new jobs in 2012 alone." *Id.* If debit interchange fees were reduced to the current average per-transaction processing cost for debit cards (4.1 cents), there would be even more substantial job creation.

20

## C. Regulation II disincentivizes banks to fight debit card fraud.

Regulation II also contributes to growing debit card fraud. In 2023, debit card fraud accounted for $17.63 per $10,000 in transaction value. *See* Board of Governors of the Federal Reserve, *2023 Interchange Fee Revenue*, *supra*, at 2. Debit card fraud losses have more than doubled since 2011. *Id.* But banks have little incentive to push anti-fraud measures. This is in part because Regulation II unlawfully allows debit card issuers to recover "transaction monitoring costs"—which are "essentially another name for fraud prevention costs"—*and* "fraud losses" as part of the base interchange fee, Add. at 33-36, in addition to a separate "fraud-prevention adjustment," 76 Fed. Reg. at 43,435. Regulation II thus allows banks to charge merchants *three times* for expenses related to fraudulent transactions.

Those charges aid an ongoing effort by banks to shift the losses from fraudulent transactions onto merchants. In 2011, bank issuers absorbed 59.8% of debit card fraud losses. Board of Governors of the Federal Reserve, *2023 Interchange Fee Revenue*, *supra*, at 2. But by 2023, that figure fell to 28.3%. *Id.* at 2-3. Consumers eat 21.8% of fraud losses directly. *Id.* at 3. And they indirectly pay for another 49.9% in the form of higher prices passed long by merchants. *Id.* All this is despite Congress's attempt to limit the extent to which banks can hold consumers liable for losses associated with fraudulent transactions because banks are best situated to absorb the loss and prevent fraud. *See* 15 U.S.C. § 1693g(a).

Appellate Case: 25-3000    Page: 29    Date Filed: 02/26/2026 Entry ID: 5612392

Regulation II thus allows banks to boost their profits by charging merchants for fraud losses that merchants and consumers are already predominantly responsible for. And, worse, it incentivizes banks to issue fraud-prone debit cards, like signature-based cards that do not require PINs, because they profit more from interchange fees than they pay in fraud losses. *See* Orzechowski & Walker, *Debit Card Fraud: The Impact of Proposed Regulations on the Food Retailing Industry* at 3-4 (Feb. 2012), https://perma.cc/7K6V-LHJX (summarizing the financial incentives that lead banks to "encourage Signature debit," which "makes reducing debit card fraud difficult").

In short, Regulation II includes multiple different factors in its calculation of allowable debit card interchange fees that were simply prohibited by Congress in the Durbin Amendment. The result is debit card fees amounting to rent-seeking from issuers that is obstructing economic growth.

## CONCLUSION

The Court should affirm.

Respectfully submitted.

/s/ *Mithun Mansinghani*

Drew F. Waldbeser
Danielle Kerker Goldstein
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Mithun Mansinghani
LEHOTSKY KELLER COHN LLP
629 W. Main St.
Oklahoma City, OK 73102

22

Jonathan E. DeWitt
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Suite 700
Washington, DC 20001

*Counsel for Amici Curiae*

23

## CERTIFICATE OF SERVICE

I certify that on February 20, 2026, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ *Mithun Mansinghani*
Mithun Mansinghani

## CERTIFICATES OF COMPLIANCE

I certify that this brief: (1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,066 words, excluding the parts of the brief exempted by Rule 32(f); and (2) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

I further certify that the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses in compliance with Eighth Circuit Rule 28A(h)(2).

/s/ *Mithun Mansinghani*
Mithun Mansinghani

Appellate Case: 25-3000   Page: 32   Date Filed: 02/26/2026 Entry ID: 5612392