No. 25-3000

# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

CORNER POST, INC.,

*Plaintiff-Appellee,*

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendant-Appellant.*

On Appeal from the United States District Court for
the District of North Dakota
No. 1:21-cv-00095-DMT-CRH

# REPLY BRIEF FOR APPELLANT FEDERAL RESERVE BOARD

Joshua P. Chadwick
Assistant General Counsel
Yvonne F. Mizusawa
Yonatan Gelblum
Monika Moore
Senior Counsels
Board of Governors of the
 Federal Reserve System
20th Street and Constitution
 Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835

*Attorneys for Defendant-Appellant*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION .............................................................................. 1

ARGUMENT .................................................................................... 1

I.  The Board Acted Under the Best Reading of the Statute and Within the Bounds of Delegated Discretion .................................... 1

    A.  Corner Post's Arguments Concerning Delegation and Discretion Are Misplaced ........................................................ 1

    B.  The Board Respected the Limits of Congressionally Delegated Discretion .............................................................. 6

        1.  Congress Did Not Limit the Board's Discretion to Include Costs That Were Neither Expressly Included nor Excluded ............................................................... 6

        2.  Corner Post's Reading Fails to Give Separate Significance to Congress's Overall Mandate of Reasonableness and Proportionality ........................... 13

        3.  The Board Was Permitted to Include Four Cost Categories That the District Court Found to Be "Prohibited" ........................................................... 15

        4.  The Board Permissibly Adopted Uniform Fee Standards Based on the Cost of a Representative Transaction ......................................................... 21

II.  Supposed Procedural Irregularities Do Not Provide an Independent Basis for Affirming the District Court's Order ........ 28

i

A. The Board Engaged in Reasoned Rulemaking in Compliance With All Procedural Requirements ................... 28

B. Any Purely Procedural Flaws Would Not Have Warranted Vacatur ............................................................. 32

CONCLUSION ................................................................................. 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**Cases**

*Bailey v. Maine Commission on Government Ethics and
Election Practices,*
 900 F. Supp. 2d 75 (D. Me. 2012) ...................................................31

*Central South Dakota Cooperative Grazing District v. Secretary of U.S.
Dep't of Agriculture,*
 266 F.3d 889 (8th Cir. 2001) ..........................................................30

*Christopherson v. Cinema Entertainment Corp.,*
 161 F.4th 525 (8th Cir. 2025)..........................................................10

*Corner Post v. Board of Governors of the Federal Reserve System,*
 794 F. Supp. 3d 610 (D.N.D. 2025) .............................................8, 14

*Custom Communications Inc. v. FTC,*
 142 F.4th 1060 (8th Cir. 2025)........................................................33

*Draper v. Colvin,*
 779 F.3d 556 (8th Cir. 2015) .............................................................5

*Draper v. Colvin,*
 2013 WL 3477272 (D.S.D. July 10, 2013).........................................5

*EPA v. Calumet Shreveport Refining, LLC,*
 605 U.S. 627 (2025) ........................................................................24

*Florida Power & Light Co. v. Lorion,*
 470 U.S. 729 (1985) ........................................................................32

*Georgia v. President of the United States,*
 46 F.4th 1283 (11th Cir. 2022).........................................................4

*Heartland Regional Medical Center v. Sebelius,*
566 F.3d 193 (D.C. Cir. 2009) ........................................................32

*In re Simply Essentials, LLC,*
78 F.4th 1006 (8th Cir. 2023)................................................14, 15

*Iowa v. Wright,*
154 F.4th 918 (8th Cir. 2025)....................................3, 9, 15, 18, 32

*Iowa Public Service Co. v. ICC,*
643 F.2d 542 (8th Cir. 1981) ..................................................23, 25

*Kirtsaeng v. John Wiley & Sons, Inc.,*
568 U.S. 519 (2013) ........................................................................11

*Liljeberg v. Health Services Acquisition Corp.,*
486 U.S. 847 (1988) ........................................................................24

*Linney's Pizza, LLC v. Board of Governors of the Federal Reserve
System,* No. 22-71, 2025 WL 2645489
(E.D. Ky. Sept. 15, 2025) ..........................................................9, 14

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024) ......................................................................2, 4

*Missouri ex rel. Bailey v. U.S. Dep't of Interior,*
73 F.4th 570 (8th Cir. 2023)................................................29, 30

*NACS v. Board of Governors of the Federal Reserve System,*
746 F.3d 474 (D.C. Cir. 2014) ...................8, 9, 10, 12, 13, 14, 16, 20

*NACS v. Board of Governors of the Federal Reserve System,*
958 F. Supp. 2d 85 (D.D.C. 2013) ..................................................8

*Pharmaceutical Care Management Association v. Gerhart,*
852 F.3d 722 (8th Cir. 2017) ........................................................13

*Pulsifer v. United States,*
601 U.S. 124 (2024) ......................................................11, 15

*Reno v. Bossier Parish School Board,*
528 U.S. 320 (2000) ...........................................................27

*Seven County Infrastructure Coalition v. Eagle County,*
605 U.S. 168 (2025) ......................................................17, 22

*South Dakota v. Ubbelohde,*
330 F.3d 1014 (8th Cir. 2003) ...........................................30

*South Dakota v. U.S. Dep't of Interior,*
423 F.3d 790 (8th Cir. 2005) .............................................30

*Torres v. Lynch,*
578 U.S. 452 (2016) ...........................................................11

*U.S. Steel Corp. v. EPA,*
649 F.2d 572 (8th Cir. 1981) .......................................32, 33

*Water Supply District No. 3 of Laclede County v. City of Lebanon,*
605 F.3d 511 (8th Cir. 2010) .............................................12

*Watt v. GMAC Mortgage Corp.,*
457 F.3d 781 (8th Cir. 2006) .............................................10

*West Virginia v. EPA,*
597 U.S. 697 (2022) .........................................................5, 6

*Zimmer Radio of Mid-Missouri, Inc. v. FCC,*
145 F.4th 828 (8th Cir. 2025) ......................4, 12, 17, 22

**Statutes**

1 U.S.C. § 1 .....................................................................24, 25

15 U.S.C. § 1693*o*-2(a)(2) .............................................7, 13, 23

15 U.S.C. § 1693*o*-2(a)(3)(A).......................................................7, 13, 23

15 U.S.C. § 1693*o*-2(a)(4)(A)............................................................29

15 U.S.C. § 1693*o*-2(a)(4)(B)....................................................9, 23, 26

15 U.S.C. § 1693*o*-2(a)(4)(B)(i) .................................................7, 10, 14

15 U.S.C. § 1693*o*-2(a)(4)(B)(ii) ................................................7, 11, 16

15 U.S.C. § 1693*o*-2(a)(5)(A)(i)-(ii) ...................................................17

15 U.S.C. § 1693*o*-2(a)(8)(B)............................................................21

49 U.S.C. § 10704(a)(2) (1982) ...........................................................23

Electronic Fund Transfer Act of 1978 (as amended) § 920,
(codified at 15 U.S.C. § 1693*o*-2)...........................................*passim*

## Regulations and Regulatory Materials

12 C.F.R. § 235.6(a)-(b)....................................................................21

Debit Card Interchange Fees and Routing (Clarification)
80 Fed. Reg. 48,684 (Aug. 14, 2015) .............................................18

Debit Card Interchange Fees and Routing (Final Rule),
76 Fed. Reg. 43,394 (July 20, 2011).......................................*passim*

## Other Authorities

*The Merriam Webster Dictionary* (2009) ..............................................19

# INTRODUCTION

In its opening brief, the Board showed that it has the best reading of the Durbin Amendment and properly exercised delegated authority in implementing the statute in accordance with Congress's directives. The Board considered those costs that the statute required it to consider, along with other costs the statute allowed it to consider, and appropriately chose to adopt uniform fee standards based on industry-wide data. Board Br. 25-66. Corner Post's brief refutes none of this and fails to demonstrate that the Durbin Amendment imposes any restrictions that Regulation II transgresses. And Corner Post's additional arguments that purported procedural errors in promulgating the Rule justify vacatur lack legal and factual support. This Court should reverse.

# ARGUMENT

## I. The Board Acted Under the Best Reading of the Statute and Within the Bounds of Delegated Discretion

### A. Corner Post's Arguments Concerning Delegation and Discretion Are Misplaced

The Board's opening brief demonstrated that multiple provisions of the Durbin Amendment use language that delegates substantial discretion. Board Br. 20-23. The Board further explained that, subject

1

to certain statutory guardrails, Congress expected the Board to exercise discretion to ensure a "reasonable and proportional" fee. *Id.* at 23-24. And it showed that the "best reading" of the statute—without any deference to the agency—is that the statute does not restrict the Board's discretion in the manner Corner Post contends. *See generally id.* at 25-65.

Corner Post's brief fails to demonstrate otherwise. It falsely asserts that the Board "treats silence as a residual source of authority" and relies "on an outdated premise of judicial deference to agency action." CP Br. 15-16. And it remarkably tries to invoke the Major Questions Doctrine, which limits agencies' discretion to *expand* their regulatory footprint, to support its argument that Regulation II results in impermissible *underregulation. Id.* at 35-38.

Contrary to Corner Post's assertions, the Board is not claiming that statutory silence granted it authority. Instead, the Board explained that the Durbin Amendment's "best reading" is that it *expressly* "delegates a degree of discretion" to "fill up the details," using language courts consider particularly broad. Board Br. 20-23 (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), and other authorities).

As the Board explained, agencies may exercise such delegated discretion except where statutory language expressly bars them from doing so in a particular manner. Board Br. 23-24; *see also Iowa v. Wright*, 154 F.4th 918, 947 (8th Cir. 2025) ("This court will not impose 'limits on an agency's discretion that are not supported by the text' [because] 'absent provisions cannot be supplied by the courts.'"). Corner Post's assertions about "statutory silence" thus miss the mark. Congress's election not to *affirmatively restrict* delegated authority, while not itself effecting a delegation, precludes implying limits on statutory provisions that affirmatively delegate authority. Thus, for example, where a statute delegates discretion to fix a value and "does not prohibit [the agency] from considering" a particular factor, the agency may consider this factor when fixing the value. *Wright*, 154 F.4th at 947. As explained in Part I.B.1 below, this is precisely what the Board did by considering costs that were neither mandated nor prohibited by the statute. *See also* Board Br. 25-39.

Moreover, in explaining why these limitations do not render Regulation II *ultra vires*, the Board—which has expressly acknowledged that its own understanding of these limitations is "in no way

controlling," Board Br. 24—did not rely on "outdated notions of deference." Instead, the Board explained that, under ordinary canons of construction, the best reading of the Durbin Amendment is that it does not limit the Board's discretion in the manner Corner Post suggests. *See, e.g.*, Board Br. 27-28 (canon against surplusage), *id.* at 27 (grammar canon), *id.* at 29, 58 (presumption of consistent usage), *id.* at 59 (absurdity canon).

Separately, the Board noted that its consistent administrative interpretation of the Durbin Amendment since the year of its enactment provides additional persuasive support under this Court's precedents. Board Br. 24; *see also Loper Bright*, 603 U.S. at 385-86 (agency interpretation adopted "roughly contemporaneously with enactment of the statute" is entitled to "very great respect," particularly because it has "remained consistent over time"), *cited in Zimmer Radio of Mid-Missouri, Inc. v. FCC,* 145 F.4th 828, 845 (8th Cir. 2025). Corner Post argues otherwise based on out-of-circuit cases finding agency interpretations that were not sufficiently "longstanding" unpersuasive, but these cases are readily distinguishable. *E.g.*, *Georgia v. President of the United States*, 46 F.4th 1283, 1301 (11th Cir. 2022) ("single

4

executive order" issued six years earlier and 64 years post-enactment that was only "remotely" relevant was unpersuasive). In contrast, this Court described an administrative interpretation in a single agency manual no older than the Board's interpretation of the Durbin Amendment today as a "relatively long-standing and consistent interpretation" and therefore "relatively strong" in its persuasive force. *Draper v. Colvin*, 779 F.3d 556, 561 (8th Cir. 2015).[1]

Corner Post's attempt to raise the Major Questions Doctrine's limitations on agency discretion as an alternate basis for affirmance is also misplaced. The doctrine precludes agencies from invoking "rarely . . . used" statutes to assert "unheralded . . . 'regulatory authority,'" *West Virginia v. EPA*, 597 U.S. 697, 724 (2022), but this case presents the exact opposite circumstance. Regulation II reflects the Board's longstanding position since close to the Durbin Amendment's enactment, and Corner Post asserts the Board is *underregulating* rather than wielding excessive regulatory power. Corner Post wrongly argues that Regulation II implicates the doctrine because it governs

---

[1] The legislative and administrative background in *Draper* is described in the district court's ruling. *Draper v. Colvin*, No. CIV. 12-4091-KES, 2013 WL 3477272 (D.S.D. July 10, 2013).

transactions representing a "significant portion of the American economy." CP Br. 36 (citing *West Virginia*, 597 U.S. at 722). But *Congress's* decision to regulate such matters isn't an "[agency]'s claim of 'unheralded' regulatory power.'" *West Virginia*, 597 U.S. at 722. And Corner Post's argument that Regulation II "enable[s] the transfer of billions of dollars," CP Br. 37, proves too much. Such transfers occurred before Regulation II, which limited their magnitude, but Corner Post complains it doesn't limit them *enough* and is thus *insufficiently transformative.* However, the doctrine serves to prevent a "transformative *expansion* [of] regulatory authority," *West Virginia*, 597 U.S. 724, not as a means to force *additional* regulation. This is simply not a Major Questions case.

### B. The Board Respected the Limits of Congressionally Delegated Discretion

#### 1. Congress Did Not Limit the Board's Discretion to Include Costs That Were Neither Expressly Included nor Excluded

Contrary to Corner Post's argument, under ordinary principles of statutory construction, Congress did not limit the Board's discretion to consider and include in the fee standards costs the Board was not expressly precluded from considering under section 920(a)(4)(B)(ii).

Board Br. 25-39; 76 Fed. Reg. at 43,426-427. The Board's discretion is apparent not only from Congress's overall mandate that the Board establish "standards for assessing" whether the amount of any interchange fee is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction," 15 U.S.C. § 1693*o*-2(a)(2), (a)(3)(A), but also from the text of sections 920(a)(4)(B)(i) and (ii), which use *different language* to describe costs the Board must consider from the costs that the Board may not consider. *See* Board Br. 29-34; 76 Fed. Reg. at 43,426 ("[T]here exist costs that are not encompassed in either the set of costs the Board must consider under [s]ection 920(a)(4)(B)(i), or the set of costs the Board may not consider under Section 920(a)(4)(B)(ii) . . . . These costs . . . are specific to a particular electronic debit transaction but . . . are not incremental [ACS].").

As explained, the use of non-interlocking language, and inclusion of the restrictive clause "which are not specific to a particular electronic debit transaction," which is not set off by commas, make plain that Congress did not intend the included and excluded costs provisions to occupy the entire universe of issuer costs. Board Br. 29-39; 76 Fed. Reg. at 43,426. Those provisions do not preclude the Board from considering

costs other than incremental ACS if they are specific to a particular transaction. *Id.*; *see also* 76 Fed. Reg. at 43,426 ("Although Section 920(a) does not specifically instruct the Board on how these [non-ACS] costs [specific to a particular transaction] should be considered . . . , [it] does not prohibit their consideration."). Corner Post's argument that the statute "unambiguously bifurcates the entire universe of interchange-fee costs" into only "two categories of costs" ignores this non-interlocking language, disregards critical language including the overall mandate of reasonableness and proportionality to "the cost" incurred, as well as the "which" clause, and is contrary to the language, grammar, and punctuation of the statute. CP Br. 26.

Leaning heavily on the overruled district court decision in *NACS*, 958 F. Supp. 2d 85, 100-01 (D.D.C. 2013), *rev'd*, 746 F.3d 474 (D.C. Cir. 2014), and on the decision below, *Corner Post*, 794 F. Supp. 3d at 631 (holding that "'between' typically refers to two options while 'among' expands the list of choices"), Corner Post argues that the command that the Board "distinguish between" incremental ACS, which "shall be considered," and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction," which shall not be

considered, limits the Board to considering only these two categories. CP Br. 27; *see also id.* at 28-29. This argument ignores the non-interlocking language of the included and excluded costs provisions, and the restrictive "which" clause, and instead gives definitive weight to the prefatory phrase, "distinguish between," and is not the best reading. Congress's instruction that the Board "distinguish between" the two identified cost categories in no way negates the existence of a third. *NACS v. Bd. of Governors of the Fed. Res. Sys.*, 746 F.3d 474, 487-88 (D.C. Cir. 2014) ("the terms 'distinguish between' and 'other costs' hardly compel the conclusion that the Board must interpret section 920(a)(4)(B) as encompassing all costs that issuers incur"); *Linney's Pizza, LLC v. Bd. of Governors of the Fed. Res. Sys.*, No. 22-71, 2025 WL 2645489, at *8 (E.D. Ky. Sept. 15, 2025) ("no definition of 'distinguish' inherently limits the distinguishing being done to only two entities").

Moreover, Corner Post's reading glosses over well-settled Supreme Court and Eighth Circuit caselaw holding that Congress's use of different language—as in the included and excluded cost provisions—presumes that Congress *intended* different meanings. Board Br. 29-30; *see also Wright*, 154 F.4th at 944 ("[t]he different language [used] in

[two statutory sections] shows that they have different meanings"). If Congress had wanted to limit the Board to considering only two categories of costs, it easily could have done so in any number of straightforward ways. Board Br. 29-30; *Christopherson v. Cinema Ent. Corp.*, 161 F.4th 525, 528 (8th Cir. 2025) (rejecting interpretation disregarding important statutory terms because, "[i]f Congress had something else in mind, it could [easily] have said so").

Rather, the *NACS* court found the statute to be "more easily" read "to qualify the language of section 920(a)(4)(B)(i) such that it encompasses a subset of costs specific to a particular transaction, leaving other costs specific to a particular transaction unmentioned." *NACS*, 746 F.3d at 484. Here, the one case cited by Corner Post for the proposition that "'the expression of one thing"—here, incremental ACS costs—'excludes others not expressed,'" did not involve Congress's use of different language in two statutory provisions and the resulting presumption that Congress intended a different meaning. CP Br. 28 (citing *Watt. v. GMAC Mortg. Corp.*, 457 F.3d 781, 783 (8th Cir. 2006) (holding under the canon of *expressio unius est exclusio alterius* that Congress did not intend to preclude mortgage servicers from charging a

10

fee for payoff statements that were not specifically enumerated in a list of excluded fees)).

Corner Post's argument that "[t]here is no 'canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing'" is equally unavailing. CP Br. 47 (quoting *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013)). None of the cases cited by Corner Post involve inclusion of language in one section of a statute and its omission in another, and they are of little help here.[2] Similarly, Corner Post's argument that "the next subsection eliminates any doubt" because, "[t]here, Congress specified that 'other costs'—everything 'other' than incremental ACS costs— 'shall not be considered,'" should be rejected because it disregards important statutory language. CP Br. 28-29 (quoting 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii)). Corner Post tries to downplay the fact

---

[2] *See* CP Br. 47-48 (citing, e.g., *Pulsifer v. United States*, 601 U.S. 124, 137-38 (2024) (explaining that Congress could have drafted a criminal sentencing safety valve provision more clearly by using "or" rather than "and" in a checklist, but "we doubt that substituting 'or' for 'and' would have delivered us from interpretive controversy"); *Torres v. Lynch*, 578 U.S. 452, 460 (2016) (case turning on "well-established background principle distinguishing between substantive and jurisdictional elements in federal criminal statutes")).

that "other costs incurred by an issuer" is modified by the restrictive "which" clause not set off by commas. *See* Board Br. 35-39. In Corner Post's view, this entire phrase, expressed in different language than the preceding included costs provision, means nothing more than "all 'remaining' costs that are *not* the . . . incremental ACS costs." CP Br. 29.

But as the Board explained, Corner Post's reading of "other costs incurred by an issuer which are not specific to a particular electronic debit transaction" to mean simply "other costs" renders most of the language of section 920(a)(4)(B)(ii) a nullity, ignores its punctuation, and is not the best construction. Board Br. 35-39 (citing authorities); *NACS*, 746 F.3d at 487 ("the absence of commas matters"); *Zimmer Radio*, 145 F.4th at 844 ("Interpretation of a word or phrase depends upon reading the whole statutory text."); *Water Supply District No. 3 of Laclede County v. City of Lebanon*, 605 F.3d 511, 517 & n.5 (8th Cir. 2010) (rejecting statutory construction that "would nullify [a] limiting phrase" because "'statutes [are] to be construed in a manner that gives effect to all of their provisions'").

Corner Post argues that "the Board fixates on the lack of a comma" to demonstrate that the clause is restrictive. CP Br. 49. But, as

the Board explained (Board Br. 35-37), and the *NACS* court held, "elsewhere in the Durbin Amendment Congress demonstrated that it is among those writers who ignore the distinction between descriptive 'which' and restrictive 'that.'" 746 F.3d at 487 (providing examples). As the *NACS* court concluded, "in the Durbin Amendment Congress set aside *every* clearly descriptive clause with commas." *Id.* Thus, in the context of the Durbin Amendment, "stuffing punctuation to the bottom of the interpretive toolbox would run the risk of distorting the meaning" of the statute. *Id.* at 486; *see also Pharm. Care Mgmt. Ass'n v. Gerhart*, 852 F.3d 722, 728 (8th Cir. 2017) ("we may not look only at an isolated provision of a statute to construe its meaning").

### 2. Corner Post's Reading Fails to Give Separate Significance to Congress's Overall Mandate of Reasonableness and Proportionality

The Court should also reject Corner Post's and the district court's interpretation because it renders superfluous Congress's overarching command that fees be "reasonable and proportional" to issuer costs. 15 U.S.C. § 1693*o*-2(a)(2), (a)(3)(A); *see* Board Br. 26-28. In Corner Post's view, this overall mandate carries no independent weight because Congress "'noticeably narrowed' [the Board's] grant of authority by

specifying exactly *how* the Board should determine what is reasonable and proportional" and permitting consideration of "only incremental ACS costs." CP Br. 44 (quoting district court opinion, 794 F. Supp. 3d at 629-30), 45.

This view renders superfluous Congress's overall directive that fees be reasonable and proportional to issuer costs, however, which is *not* limited to incremental ACS. There would be no reason for Congress to have included the overall mandate if the Board's only task was to mechanically sift costs into one bucket or another. Board Br. 27-28; *Linney's Pizza,* 2025 WL 2645489, at *9 (under the district court's reading, "there would be no need to require the fee standard to be 'reasonable and proportional.' Instead, the fee standard would merely equal the incremental ACS costs required to be considered under (a)(4)(B)(i)"); *see also NACS,* 746 F.3d at 485 ("had Congress wanted to allow issuers to recover only incremental ACS costs, it could have done so directly").

Recognizing the fragility of its position, Corner Post backpedals, arguing that "the 'canon against surplusage is not an absolute rule.'" CP Br. 45 (quoting *In re Simply Essentials, LLC*, 78 F.4th 1006, 1009 (8th

Cir. 2023)); *see also id.* at 51. But the Supreme Court and Eighth Circuit have made clear that this canon "'applies with special force'" when a construction would render 'an entire subparagraph meaningless," as Corner Post's interpretation would. *Wright*, 154 F.4th at 943 (quoting *Pulsifer*, 601 U.S. at 143).[3]

### 3. The Board Was Permitted to Include Four Cost Categories That the District Court Found to Be "Prohibited"

Contrary to Corner Post's arguments, CP Br. 53-61, the Board properly considered, and included, four specific costs in the fee standards. Board Br. 40-54.

a. **Fixed ACS:** The Board properly included ACS costs incurred in effecting specific debit transactions, including both "fixed" and "variable" ACS. Board Br. 40-43. As the Board explained, "no electronic debit transaction can occur without incurring [ACS] costs, making them costs specific to each and every electronic debit

---

[3] Moreover, the Eighth Circuit in *Simply Essentials* cautioned that the canon against surplusage "is not . . . absolute" "so long as there is no 'positive repugnancy,'" 78 F.4th at 1009, which Corner Post's interpretation would create, and that redundancies are "particularly likely when . . . [a] statute was edited over time to add specificity," *id.* at 1009-10, which is not the case here.

transaction," 76 Fed. Reg. at 43,427, and they are not excluded from consideration by section 920(a)(4)(B)(ii). Corner Post argues that "the Durbin Amendment limits the Board to considering" incremental ACS, and argues that fixed ACS costs are not, by definition, incremental. CP Br. 53-54. But the statute does not use the terms "fixed" or "variable," nor does it require exclusion of fixed ACS costs. Rather, "[u]nder the framework established by the statute, all costs related to a particular transaction may be considered, and some—the incremental costs incurred by the issuer for its role in [ACS]—must be considered." 76 Fed. Reg. at 43,427.

While Corner Post proposes a dictionary definition of "fixed" costs, CP Br. 54, the Board explained that attempts to pigeonhole a separate category of fixed ACS is not readily "appl[ied] in practice" and depends on various factors including the relevant time horizon and the structure of an issuer's operations. 76 Fed. Reg. at 43,427; *accord NACS*, 746 F.3d at 489-90 (the distinction between "fixed" and "variable" costs "depends entirely on whether, on an issuer-by-issuer basis, certain costs happen to vary based on transaction volume in a particular year"). Moreover, as explained below (at 22-23), recent binding precedent holds that agencies

16

have broad latitude in making such granular "line-drawing" distinctions that, as here, often require consideration of technical measurement or classification challenges. *See Seven Cty. Infrastructure Coal v. Eagle Cty.*, 605 U.S. 168, 183 (2025) ("Courts should afford substantial deference and should not micromanage those agency [technical line-drawing] choices so long as they fall within a broad zone of reasonableness."); *Zimmer Radio,* 145 F.4th at 846 ("line drawing" is "appropriately delegated" to the responsible agency).

b. **Transaction-Monitoring Costs:** The Board also properly considered, and included, transaction-monitoring costs, which are "integral to transaction authorization." 76 Fed. Reg. at 43,430; Board Br. 43-47. They "assist in the authorization process by providing information to the issuer before the issuer decides to approve or decline the transaction." 76 Fed. Reg. at 43,430.

Corner Post erroneously argues that transaction-monitoring costs are "essentially another name for fraud-prevention," and that "the Board is improperly double-counting" because fraud prevention is "already addresse[d]" in the separate fraud prevention adjustment of 15 U.S.C. § 1693*o*-2(a)(5)(A)(i)-(ii). CP Br. 56.

But as explained in the 2015 Clarification, unlike transaction-monitoring costs, which "assist in the authorization process," 80 Fed. Reg. at 48,685, the "fraud-prevention costs that the Board used to calculate the separate fraud prevention adjustment . . . were not necessary to effect a particular transaction and were not part of [ACS]." *Id.* Rather, they include costs incurred over a broad spectrum of transactions such as "researching and developing new fraud prevention technologies and data security." *Id.* at 48,686. Thus, the Board is in no way double counting because the separate costs taken into account under section 920(a)(5) are different and "not linked to a particular transaction." *Id.* Moreover, the Board's interpretation flows from the differing language of section 920(a)(5), and is the best interpretation. *Id.*; Board Br. 45-46; *see Wright*, 154 F.4th at 944 (interpretation giving "different language in [two statutory subsections] . . . different meanings" is the best reading).

**c.** **Fraud losses:** Corner Post's argument that the Board improperly included a portion of an issuer's fraud losses as the *ad valorem* (percentage of the value of the transaction) component fails for similar reasons. CP Br. 58-60. As the Board determined, fraud losses

are "specific to a particular transaction" because they are "generally the result of the authorization, clearance, and settlement of an apparently valid transaction that the cardholder later identifies as fraudulent." 76 Fed. Reg. at 43,431; *see* Board Br. 47-50.

Corner Post quibbles with the Board's categorization of "fraud" losses as "costs," CP Br. 58-59, but the dictionary defines costs to include a "loss or penalty involved in gaining something." *The Merriam Webster Dictionary* 90 (2009). Moreover, as the Board explained, fraud losses are logically classified as costs. Not only are they incurred by the issuer as a result of ACS of a particular transaction that later turns out to be fraudulent, but they are quintessentially specific to particular transactions. Board Br. 48-49; 76 Fed. Reg. at 43,431.

Corner Post objects that fraud losses "constitute anticipatory transfers for 'potential losses'" and could disincentivize fraud prevention, CP Br. 60, but the Board appropriately determined that "[p]ermitting issuers to recover at least some fraud losses through interchange fees is reasonable given that the source of fraud could be any participant in an electronic debit transaction and . . . the exact source of fraud often is unknown." 76 Fed. Reg. at 43,431. This reasoned

approach hardly "wrecks the statutory scheme." CP Br. 60. Moreover, interchange fee rates are established by a network in advance of any transaction before the cost of a particular transaction is known. *See* Board Br. 49. Looking to the costs of past transactions is therefore wholly appropriate and consistent with the statutory language and its entire framework.

     **d.    Network Processing Fees:** Finally, the Board appropriately considered, and included, network processing fees, which are paid by the issuer to the network and are "specific to a particular transaction and incurred for the issuer's role in [ACS]." 76 Fed. Reg. at 43,430; *see* Board Br. 51-54.

     Corner Post argues that network processing fees are "costs the network charge for their role" and cites to the statute's definition of "network fees." CP Br. 61. But this definition carves out interchange transaction fees and has nothing to do with how the Board calculates those fees. Network processing fees are paid by an issuer to the network for each electronic debit transaction the issuer effects, and thus are necessarily incurred "for the role of the issuer," specific to particular transactions, and properly considered. *NACS*, 746 F.3d at 490 ("This is

easy. Network processing fees, which issuers pay on a per-transaction basis, are obviously specific to particular transactions," and the statute does not "prevent issuers from recovering reasonable network processing fees through the interchange fee.").

As to Corner Post's claim that including network processing ("switch") fees runs afoul of Congress's separate provision permitting the Board to prescribe rules ensuring that "network fees" are not used to "directly or indirectly compensate an issuer" or "circumvent or evade . . . restrictions," 15 U.S.C. § 1693*o*-2(a)(8)(B), this provision, which the Board implemented at 12 C.F.R. § 235.6(a)-(b), addresses fees or other amounts *received by an issuer from a payment card network*," *id.* § 235.6(b) (emphasis added), which are the subject in part of section 920(a)(8) and distinct from network processing fees *an issuer pays to a network* as part of ACS. *See, e.g.*, 76 Fed. Reg. at 43,430.

### 4. The Board Permissibly Adopted Uniform Fee Standards Based on the Cost of a Representative Transaction

Corner Post contends the Board improperly adopted uniform fee standards based on industrywide data, although it is unclear whether it claims a transaction-specific (varying for each transaction), or issuer-

21

specific (based on aggregate transaction data at the issuer level) standard is required instead. *Compare, e.g.*, CP Br. 63 (asserting the fee "must be issuer-specific and transaction-specific"), *with id.* at 27 (castigating the Board for adopting an "issuer-agnostic fee cap"). Corner Post is wrong either way. It entirely fails to address this Court's holding allowing use of a uniform value in comparable circumstances and precedents recognizing broad agency discretion with respect to line-drawing, a factual finding of impossibility during the rulemaking rendering a transaction-specific reading absurd, and precedents that foreclose mandating an issuer-specific standard.

The Board's brief cited binding precedents holding that agencies have "broad latitude" in making line-drawing decisions, which are generally considered to involve technical policy considerations rather than "legal interpretation." Board Br. 55-56 (quoting *Seven Cty.*, 605 U.S. at 182; *Zimmer Radio,* 145 F.4th at 846). Corner Post does not address how its attempt to dictate whether the Board must draw the line at the industry, issuer, or transaction level comports with these precedents.

More specifically, as the Board explained, this Court (like other

appellate courts) has declined to "second-guess [an agency]'s approach" of using a uniform industry-wide rate to proxy individual business' costs when setting caps on permissible charges. Board Br. 65 (quoting *Iowa Pub. Serv. Co. v. ICC*, 643 F.2d 542, 547 (8th Cir. 1981), and citing other authorities). The relevant statute in *Iowa Public Service Co.*, like the Durbin Amendment, used the definite article before "business" just as the Durbin Amendment's cap-setting provision does before "issuer" and "transaction." *Compare id.* at 65 (explaining that the statute at issue required the agency to allow a "reasonable and economic profit or return . . . on capital employed in the business") (quoting 49 U.S.C. § 10704(a)(2) (1982)),[4] *with* 15 U.S.C. § 1693*o*-2(a)(2) (requiring the Board to set a fee that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction").

But although Corner Post argues that use of the definite article in section 1693*o*-2(a)(2) requires an issuer- and transaction-specific standard, CP Br. 61-62, it makes no attempt to reconcile this assertion with *Iowa Public Service Co.'s* holding (not to mention other authorities

---

[4] Unlike section 10704(a)(2), the Durbin Amendment expressly requires consideration of costs but does not refer to "profit" or "return." 15 U.S.C. § 1693*o*-2(a)(2), (a)(3)(A), (a)(4)(B).

making clear that definite articles need not refer to an individual entity, *see* Board Br. 64 (citing *EPA v. Calumet Shreveport Ref., LLC*, 605 U.S. 627, 641-42 (2025); 1 U.S.C. § 1)).

Moreover, to the extent Corner Post wants a "transaction-specific" cap varying based on each transaction's cost, reading the Durbin Amendment in this manner produces an absurd result. The Board made a factual finding during the rulemaking that such a standard would be impossible to implement due, *inter alia*, to nonexistence of necessary information, consistent with a comment from one of the two main debit card networks and the fact that even commenters who wanted a more granular standard uniformly proposed aggregation at the issuer level. Board Br. 56-58. A reading requiring a transaction-specific approach would therefore violate the absurdity cannon. *Id.* at 55, 59.

Corner Post fails to demonstrate otherwise. Its retort that "difficult[y]" does not imply absurdity, CP Br. 64, ignores that the issue was not difficulty but rather *impossibility*, Board Br. 57 (citing 76 Fed. Reg. at 43,422), which implicates the absurdity canon. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 861 (1988) (interpretation making compliance impossible is absurd). And Corner

Post's contention that the Durbin Amendment solved the problem by *legally* "empower[ing]" the Board to collect information, CP Br. 64, ignores the factual finding that it was *practically* impossible to do so because, *inter alia*, the information *does not exist* when the fee is calculated. Board Br. 56-57 (citing 76 Fed. Reg. at 43,422).

Corner Post also argues that use of "the issuer" and "the transaction" precludes a uniform cap tied to industrywide figures because a "'representative' issuer and 'representative' transaction are 'not the words that Congress wrote.'" CP. Br. 65. It further argues that a fee based on aggregate data cannot be "proportional" to costs of individual issuers or transactions. But as the Board explained, *Congress* has expressly created a presumption "that use of the singular . . . also refers to the plural." Board Br. 64 (citing 1 U.S.C. § 1). Under such a reading, the Board's fee standards, which require proportionality to the collective industrywide cost of *transactions*, do precisely what the statute requires, while avoiding an absurd result. Corner Post did not address this statutory provision, nor this Court's ruling in *Iowa Public Service Co.* that did not treat a comparable use of the definite article before "business" as mandating a business-specific fee standard. *See*

*supra* at 23.

Corner Post's reliance on statutory provisions concerning required and prohibited costs, which reference "an issuer," "the issuer," and costs "specific to a particular . . . transaction," to make the same point about use of the singular, CP Br. 63, 65 (quoting 15 U.S.C. § 1693*o*-2(a)(4)(B)(i)-(ii)), runs into the same problem (and is an even weaker argument, given use of the indefinite article before "transaction"). Moreover, this assertion, and Corner Post's reliance on "specific" and "particular," is especially irrelevant because the prefatory language preceding this subsection makes clear that it serves to require that the Board "distinguish" between mandatory and prohibited costs, 15 U.S.C. § 1693*o*-2(a)(4)(B). In this context, "particular" and "specific" distinguish costs like general overhead not specifically incurred to effect a "particular" transaction from incremental costs "specific" to effecting a "particular" transaction, and thus merely address *what* costs must be considered or excluded, rather than how to measure them. Corner Post therefore fails to demonstrate that the Durbin Amendment compels a per-transaction standard.

Lastly, to the extent what Corner Post actually demands is an

issuer-specific fee cap varying based on the aggregate costs of each issuer's collective transactions, *cf., e.g.*, CP Br. 64 (arguing the Board's assertions of impossibility are belied by its initial consideration of an "issuer-specific" standard), it fares no better. Besides contradicting Corner Posts' own arguments about when statutory language compels granularity, any demand for an issuer-specific but not transaction-specific approach is precluded by basic principles of statutory construction. As the Board explained in ultimately rejecting this approach, it did not comport with parallel use of "the issuer" and "the transaction" in the same sentence. Board Br. 57 (citing 76 Fed. Reg. at 43,423); *accord Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 329 (2000) ("we refuse to adopt a construction that would attribute different meanings to the same phrase in the same sentence"). And even if this approach were somehow permissible, Corner Post has not explained why the Board lacked discretion to draw the line at the industry level rather than the issuer level given controlling precedents recognizing broad agency discretion in line drawing. *See supra* at 22-23. The Durbin Amendment therefore does not compel an issuer- and transaction-specific approach nor an issuer-specific approach.

## II. Supposed Procedural Irregularities Do Not Provide an Independent Basis for Affirming the District Court's Order

As an alternate basis for affirmance, Corner Post claims Regulation II is procedurally flawed due to a purported failure to address similarities with checking transactions and "define adequately key terms." CP Br. 67-70. But the record shows the Board considered all required matters and defined all necessary terms. Moreover, such purely procedural matters would not justify affirming the vacatur order below rather than remanding without vacatur, which would be needlessly wasteful and unnecessary, and Corner Post cannot claim prejudice from such remand.

### A. The Board Engaged in Reasoned Rulemaking in Compliance With All Procedural Requirements

Corner Post asks the Court to affirm the ruling below on the alternative basis that the Rule is arbitrary and capricious. CP Br. 66-72. But Corner Post cannot meet its burden, which requires it to show that the Board:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Missouri ex rel. Bailey v. U.S. Dep't of Interior*, 73 F.4th 570, 576-77 (8th Cir. 2023).

Corner Post argues the Board "ignored" Congress's directive to "consider the functional similarity between . . . electronic debit transactions; and . . . checking transactions," 15 U.S.C. § 1693*o*-2(a)(4)(A); *see* CP Br. 67, but this is incorrect. The Board not only analyzed the overall similarities with, and differences between, debit and checking, as Corner Post concedes, CP Br. 68; *see* 76 Fed. Reg. at 43,398-401, but it considered such similarities and differences when deciding whether to include or exclude specific costs. *See, e.g.*, 76 Fed. Reg. at 43,428 (excluding costs of debit card production and delivery, marketing, R&D and compliance because, among other reasons, "analogous costs incurred by a payor's bank for its check service are not reimbursed by the payee's bank"); *id.* at 43,429 (excluding customer inquiry costs in part because "[p]ayor's banks . . . do not receive reimbursement for these costs from the payee's bank"); *id.* at 43,430 (including network processing fees because, *inter alia*, "such an arrangement would be similar to traditional paper-check processing").

Thus, the Board did not entirely fail to consider an important

aspect of the problem. CP Br. 68-69; *see Cent. S.D. Coop. Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*, 266 F.3d 889, 898 (8th Cir. 2001) ("When an agency has considered relevant evidence and arrived at a rational result, a party's mere dissatisfaction with the agency's decision does not entitle it to relief."); *South Dakota v. U.S. Dep't of Interior,* 423 F.3d 790, 801 (8th Cir. 2005) (agency's decision was not arbitrary and capricious where it "reasonably and appropriately evaluated the relevant factors" and the Court does not "require precise explanations that respond to every contention").

Corner Post's further claim that the fee standards are arbitrary and capricious because the Board did not limit its consideration *only* to incremental ACS also lacks merit. CP Br. 70-71. As explained, Congress did not limit the Board to considering *only* incremental ACS, and did not prohibit the Board from considering other costs provided they are "specific to particular electronic debit transactions." 76 Fed. Reg. at 43,427; *see also supra* at 6-13; Board Br. 25-39. Thus, the Board did not "rel[y] on factors which Congress has not intended it to consider," *Missouri*, 73 F.4th at 576, and it provided a rational explanation. *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1032 (8th Cir. 2003) ("a court may

find an action to be arbitrary and capricious only when there is no rational basis for the policy choice").

Finally, the Rule is not arbitrary and capricious due to purported failure "to define core concepts" such as "incremental," "fixed," and "variable." CP Br. 70. As previously explained, the Durbin Amendment notably does not use the terms "fixed" or "variable," and the meanings of those terms vary significantly depending on each issuer's cost accounting systems and other factors. 76 Fed. Reg. at 43,427; *see also supra* at 15-16; Board Br. 41-42.

Likewise, the Board did not act arbitrarily and capriciously by not defining "incremental." CP Br. 70-71. As the Board explained, there is "'no single generally-accepted definition of the 'incremental cost,'" 76 Fed. Reg. at 43,426, and the Board fulfilled Congress's mandate in section 920(a)(4)(B)(i) to consider, and include, incremental ACS costs "[b]y considering all costs for which it had data other than prohibited costs." 76 Fed. Reg. at 43,427; *see also* Board Br. 41 n.16; *Bailey v. Maine Comm'n on Gov't Ethics and Election Pracs.*, 900 F. Supp. 2d 75, 90 (D. Me. 2012) ("Agencies are not required to promulgate rules defining every statutory term that might be called into question.").

### B. Any Purely Procedural Flaws Would Not Have Warranted Vacatur

In the district court, Corner Post had sought vacatur along with a stay "while the Board devises new regulations," R. Doc. 51, at 35, and now raises its procedural arguments as an alternate basis for affirming the ruling below, which granted vacatur. CP. Br. 66. But in the event Corner Post were to prevail on purely procedural grounds, the appropriate remedy would be remand without vacatur because a new rulemaking may not be required. "If . . . the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course . . . is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Remand without vacatur is warranted "[w]hen an agency may be able readily to cure a defect in its explanation" and the "disruptive effect of vacatur" is high. *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009). This Court has therefore remanded without vacatur when sustaining a challenge to agency action "on procedural grounds." *U.S. Steel Corp. v. EPA*, 649 F.2d 572, 577 (8th Cir. 1981); *see also Wright*, 154 F.4th at 953 (distinguishing between

substantive defects requiring vacatur and purely procedural defects that may only require remand as in *U.S. Steel*).

Because the Board could remedy any of the purported procedural flaws Corner Post raises without promulgating a new rule by issuing a supplemental statement as it did after the *NACS* ruling, remand without vacatur would avoid waste of resources from an unnecessary rulemaking. And while remand without vacatur can be denied on grounds of prejudice, *Custom Commc'ns, Inc. v. FTC*, 142 F.4th 1060, 1075 (8th Cir. 2025), Corner Post cannot claim prejudice from leaving the rule in place pending corrective action because it sought a stay of any vacatur order pending a new rulemaking, which would presumably take longer. Therefore, should the Court identify any procedural concerns, it should remand for any necessary corrective action without vacating the regulation.

## CONCLUSION

The Court should reverse the judgment below.

Dated: March 20, 2026

Respectfully submitted,

/s/ Joshua P. Chadwick
Joshua P. Chadwick
Assistant General Counsel
Yvonne F. Mizusawa
Yonatan Gelblum
Monika Moore
Senior Counsels
Board of Governors of the
    Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
joshua.p.chadwick@frb.gov
(202) 263-4835

*Attorneys for Defendant-Appellant Board of Governors of the Federal Reserve System*

# CERTIFICATE OF COMPLIANCE

I hereby certify:

1.      This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 6478 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

3. This brief has been scanned for viruses using FireEye EX 5600, version 11.0.0, content release 1659.128, and is virus free.

/s/ Joshua P. Chadwick
Joshua P. Chadwick

*Attorney for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2026, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Joshua P. Chadwick
Joshua P. Chadwick

*Attorney for Defendant-Appellant*