# United States Court of Appeals
## For the Eighth Circuit

---

No. 25-3000

---

Corner Post, Inc.

*Plaintiff - Appellee*

v.

Board of Governors, of the Federal Reserve System

*Defendant - Appellant*

------------------------------

Advancing American Freedom; Frontline Policy Council; Charlie Gerow; Jay D. Homnick, Senior Fellow, Project Sentinel; Jenny Beth Martin, Honorary Chairman, Tea Party Patriots Action; Men and Women for a Representative Democracy in America, Inc.; National Center for Public Policy Research; New York State Conservative Party; Pro-Life Wisconsin; Rio Grande Foundation; Taxpayers Protection Alliance; Tea Party Express; Women for Democracy in America, Inc.; Electronic Payments Coalition; Southwest Public Policy Institute; James Madison Institute; Consumer Action for a Strong Economy; Institute for Policy Innovation; 60 Plus Association; Center for Individual Freedom; Center for a Free Economy; Competitive Enterprise Institute; American Bankers Association; America's Credit Unions; Association of Military Banks of America; Consumer Bankers Association; Defense Credit Union Council; Independent Community Bankers of America; National Bankers Association; Missouri Bankers Association; Arkansas Bankers Association; Iowa Bankers Association; Minnesota Bankers Association; Nebraska Bankers Association; North Dakota Bankers Association; South Dakota Bankers Association; Hal S. Scott; The Clearing House Association L.L.C.; The Bank Policy Institute; Americans for Liberty and Security; Americans for Limited Government; Center for American Rights; Frontiers of Freedom

*Amici on Behalf of Appellant(s)*

Retail Litigation Center, Inc.; Food Marketplace, Inc., doing business as FMI, The Food Industry Association; Merchant Advisory Group; National Association of Convenience Stores; National Federation of Independent Business Small Business Legal Center; The Restaurant Law Center; Arkansas Retailers Association; Iowa Retail Federation; Kentucky Retail Federation; Michigan Retailers Association; Minnesota Retailers Association; Missouri Retailers Association; American Economic Liberties Project; Americans for Financial Reform Education Fund; Demand Progress Education Fund; Six Other Advocacy Organizations; Seven Professors; Richard J. Durbin, United States Senator

*Amici on Behalf of Appellee(s)*

---

Appeal from United States District Court
for the District of North Dakota - Western

---

Submitted: May 13, 2026
Filed: October 26, 2026

---

Before L.R. SMITH, BENTON, and STRAS, Circuit Judges.

---

STRAS, Circuit Judge.

Banks charge fees every time a customer swipes a debit card. The question here is how high they can be. Congress said it depends on the "incremental cost" of the transaction, 15 U.S.C. § 1693o-2(a)(4)(B)(i), so we affirm the decision vacating the 21-cent cap set by the Federal Reserve.

I.

Cash might once have been king, but not anymore. In 2023 alone, American consumers used debit cards over 100 billion times, in transactions totaling $4.7 trillion.

Their popularity comes from convenience. Using them avoids trips to the bank, carrying cash or a checkbook, and digging for exact change. All consumers have to do is carry a flat piece of plastic and swipe it when making purchases.

What they do not see is the work that happens behind the scenes. It starts when the merchant's bank sends an "authorization" request to the cardholder's bank, which checks for sufficient funds and potential fraud. If the transaction does not raise any red flags on either front, it moves to the "clearance" stage, which requires the merchant's bank to send a formal request for payment. The final step is "settlement," which involves the bank-to-bank transfer of funds. This three-step process happens almost instantly, without anyone giving it much thought.

The convenience, however, comes at a cost. To persuade the cardholder's bank to jump through these hoops, the merchant's bank sends along compensation in the form of "interchange fees." These days, digital-payment networks set them and provide the infrastructure to make the system work. They process transactions quickly because, with the help of Congress and the Federal Reserve, both banks know the fees ahead of time.

Preset fees were not always the norm. To the contrary, networks and banks once freely negotiated them. As fees grew, however, so did Congress's interest. Passed as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Durbin Amendment authorized the Board of Governors of the Federal Reserve to "prescribe regulations" and "establish standards" to keep them "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(3)(A).

In doing so, however, Congress instructed the Federal Reserve to "distinguish" between two types of costs: (1) "incremental cost incurred . . . in the authorization, clearance, or settlement of a particular electronic debit transaction" and (2) "other[s] . . . which are not specific to a particular electronic debit transaction." *Id.* § 1693o-2(a)(4)(B). The former "*shall* be considered," the latter

"*shall not* be." *Id.* (emphases added). Congress wanted interchange fees limited, but in a particular way.

The Federal Reserve went to work. After a lengthy notice-and-comment period, the Board of Governors issued Regulation II, which set a per-transaction cap of 21 cents, plus .05% of the transaction's value to cover fraud losses. Cardholder banks that followed fraud-prevention standards could charge a penny more.[1]

Getting to a one-size-fits-all solution involved a regulatory two-step. First, the Federal Reserve thought it could consider *all* costs "specific to a particular electronic debit transaction." *Id.* § 1693o-2(a)(4)(B)(ii). Second, it viewed the statutory phrase as "ambiguous," which allowed it to include fixed costs "incurred in the course of effecting any electronic debit transaction." Regulation II, 76 Fed. Reg. 43,394, 43,426 (July 20, 2011); *see Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("[A] court may not substitute its own construction of a statutory provis[i]on for a reasonable interpretation made by the administrator of an agency."), *overruled by Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). It no longer needed to define "incremental cost," the one variable it was supposed to "consider[]." 15 U.S.C. § 1693o-2(a)(4)(B)(i). As the Federal Reserve candidly admitted during oral argument, there was disagreement about what it included. Oral Argument at 2:18–50.

In at least one merchant's eyes, the 21-cent cap still allowed cardholder banks to charge too much. Corner Post, Inc., a truck stop and convenience store in North Dakota, sued the Federal Reserve under the Administrative Procedure Act for

[1]The Federal Reserve has since proposed, but not adopted, an updated cap of 14.4 cents per transaction, plus .04% of the transaction's value and a potential 1.3-cent fraud-prevention adjustment. *See* Debit Card Interchange Fees and Routing, 88 Fed. Reg. 78,100, 78,101 (proposed Nov. 14, 2023). As an ongoing rulemaking, it does not affect our assessment of the legality of the current rule. *See Am. Petroleum Inst. v. EPA*, 906 F.2d 729, 739–40 (D.C. Cir. 1990) (per curiam) ("If the possibility of . . . amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely.").

adopting a regulation that, in its view, was "not in accordance with law" and "in excess of [the agency's] statutory . . . authority." 5 U.S.C. § 706(2)(A), (C). A battle over whether Corner Post missed the statute of limitations worked its way up to the Supreme Court, which concluded that its challenge had come in time. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 809 (2024) ("An APA plaintiff does not have a . . . cause of action until she suffers an injury from final agency action . . . .").

On remand, the district court[2] took the first crack at the merits. It concluded on summary judgment that the Federal Reserve did what the statute prohibited: consider "costs . . . which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693o-2(a)(4)(B)(ii). Among the non-transaction-specific costs it included were (1) fixed costs related to authorization, clearance, and settlement; (2) network processing fees; (3) transaction-monitoring costs for fraud prevention; and (4) fraud losses. The clearest sign of regulatory drift was the flat 21-cent cap because it applied to every transaction, no matter its cost. The court ordered vacatur but stayed its decision pending the outcome of this appeal, which we review de novo. *See Johnson v. Exide Techs., Inc.*, 137 F.4th 676, 679 (8th Cir. 2025); *see also 3M Co. v. Comm'r*, 154 F.4th 574, 577 (8th Cir. 2025) (reviewing a post-*Loper Bright* challenge de novo).

## II.

Congress passes statutes, courts interpret them, and agencies implement them. Each plays its own unique role, and ours is "to 'fix[] the boundaries of [an agency's] delegated authority' based on the statute's text." *3M*, 154 F.4th at 582 (first alteration in original) (quoting *Loper Bright*, 603 U.S. at 395). Deferring to an agency's interpretation, like the Federal Reserve wants us to do here, ended with *Loper Bright*. 603 U.S. at 406 ("[T]he APA[] demand[s] that courts exercise

---

[2]The Honorable Daniel Mack Traynor, then United States District Court Judge for the District of North Dakota, now United States Circuit Judge for the Eighth Circuit.

independent judgment in construing statutes administered by agencies."). *We* say "what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

The express delegation to the agency to "prescribe regulations" and "establish standards" just allows it to color within the lines of the statute. 15 U.S.C. § 1693o-2(a)(3)(A). In passing the Durbin Amendment, Congress could hardly have been clearer. It does not "alter[], limit[], or otherwise affect[] the deference that a court affords to . . . the [Federal Reserve] Board in making determinations regarding the meaning or interpretation of [the interchange-fee provision]." *Id.* § 1693b(e). Zero deference from the Administrative Procedure Act, plus zero deference under the statute we are interpreting, still adds up to nothing.[3]

## A.

What matters in regulating interchange fees, as Congress has told us, is "incremental cost." *Id.* § 1693o-2(a)(4)(B)(i). The Federal Reserve never decided what it is, opting instead for a 21-cent per-transaction cap. The only adjustments are based on the transaction's value and compliance with fraud-prevention standards. Together, these components form the core of Regulation II.

Missing is any definition of "incremental cost." The Federal Reserve "shall . . . consider[]" it, *id.*, but it appears to have been pushed to the side. In exercising our "independent judgment," *Loper Bright*, 603 U.S. at 412, *we* cannot skip it because it tells us whether the agency's actions were "in accordance with law," 5 U.S.C. § 706(2)(A). After all, ignoring what it was supposed to consider and considering what it was supposed to ignore would place the agency on the wrong side of its "statutory . . . authority." *Id.* § 706(2)(C).

---

[3]Nor, for the reasons to follow, is the regulation entitled to *Skidmore* deference. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see 3M*, 154 F.4th at 582 (declining to afford deference because "the agency [had] recently invented [its interpretation] and the statute ha[d] another 'be[tter] reading'" (fourth alteration in original) (quoting *Loper Bright*, 603 U.S. at 400)).

We can start with what the statute says the Federal Reserve "shall . . . consider[]": "incremental cost incurred . . . in the authorization, clearance, or settlement of a particular electronic debit transaction." 15 U.S.C. § 1693o-2(a)(4)(B)(i). Fortunately, "incremental cost" has a well-understood definition in economics that has become part of everyday usage, leaving its "ordinary" and "technical" meanings "intertwined." *United States v. Torres*, 920 F.3d 1215, 1216 (8th Cir. 2019) (emphasis omitted). *Both* the "relevant professional literature" and the indicators of common usage point toward "marginal cost." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 571–72 (2012) (interpreting a statutory term in line with "both the ordinary and technical meanings"); *see, e.g.*, Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 244 (9th ed. 2018) (explaining that "[m]arginal cost" is "sometimes called incremental cost" (emphases omitted)); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 735b3 (5th ed. 2022 & Supp. 2026) (using the terms interchangeably); *see also Webster's Third New International Dictionary* 1146 (2002) (defining "increment" as "one of a series of minute additions").

As a leading economics textbook puts it, "[m]arginal cost tells us the increase in total cost that arises from producing an additional unit of output." N. Gregory Mankiw, *Principles of Economics* 256 (8th ed. 2018) (emphasis omitted); *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 560 n.2 (1980) ("'Marginal cost' has been defined as the 'extra or incremental cost of producing an extra unit of output.'" (emphases omitted) (quoting Paul A. Samuelson, *Economics* 463 (10th ed. 1976))); Areeda & Hovenkamp, *supra*, § 735b3 (defining it as "the increment to total cost that results from producing an additional increment of output"). Here, it is the amount added to the cardholder bank's total cost by one "additional" electronic debit transaction, the "unit of output" the statute covers. Mankiw, *supra*, at 256 (emphases omitted); *see* Pindyck & Rubinfeld, *supra*, at 244; Areeda & Hovenkamp, *supra*, § 735b3. The "cost" of that "incremental" unit is what "shall be considered" in the Federal Reserve's regulation of interchange fees. 15 U.S.C. § 1693o-2(a)(4)(B)(i).



Appellate Case: 25-3000 Page: 7 Date Filed: 10/26/2026 Entry ID: 5698472

It makes no difference that economists sometimes use "incremental cost" in a broader sense. Rather than a unit-by-unit inquiry, it has been described in some sources as the *total* "additional cost of producing an increase in output, regardless of whether the increase is a single unit *or* a firm's total output." Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209, 250 n.129 (1986) (emphasis added); *see* Mark Hirschey et al., *Managerial Economics* 42, 291 (15th ed. 2019) (explaining that "incremental" is a "generalization of . . . marginal" that *can* "involve multiple units of output"). But even under this broader definition, context shows the focus remains on marginal cost, what it takes to produce a single unit more. *See 3M*, 154 F.4th at 580 (explaining that courts look to "the specific context in which language is used" (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014))).

Consider the surrounding words in the statute, which instruct the Federal Reserve to account for "the incremental cost . . . of *a particular* electronic debit transaction" in "prescrib[ing] regulations" and "establish[ing] standard[s]" for interchange fees. 15 U.S.C. § 1693o-2(a) (emphasis added). "[P]articular," the adjective modifying "electronic debit transaction," *id.*, refers to "a *single* definite person or thing as distinguished from some or all others" or "a unit among a number," *Webster's Third*, *supra*, at 1646–47 (emphasis added). Placing the word "a" in front of it confirms that the "incremental cost" discussed in the statute is for a single "electronic debit transaction," not multiples of them or total output. *See Niz-Chavez v. Garland*, 593 U.S. 155, 162–63 (2021) (explaining that the "ordinary meaning" of "a" before a countable noun is to indicate a "single" thing); Rodney Huddleston & Geoffrey K. Pullum, *The Cambridge Grammar of the English Language* 339, 371 (2010) (noting that, "[i]n general, *a* selects a count singular noun" and "[i]ts incompatibility with plurals is due to its historical origin as an unstressed form of the numeral *one*"). In other words, "marginal cost." Mankiw, *supra*, at 256.

Zooming out further points in the same direction. The statute requires the Federal Reserve, in regulating interchange fees, to "distinguish between" a single



Appellate Case: 25-3000 Page: 8 Date Filed: 10/26/2026 Entry ID: 5698472

transaction's "incremental cost" and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693o-2(a)(4)(B). By defining the costs that "shall *not* be considered" in that way, the statute is referencing fixed costs. *Id.* § 1693o-2(a)(4)(B)(ii) (emphasis added); *see* Mankiw, *supra*, at 255 (defining "fixed costs" as those that "do not vary with the quantity of output produced"); Pindyck & Rubinfeld, *supra*, at 241 (same). It does not take much detective work to figure out that the Federal Reserve "shall . . . consider[]" marginal costs in setting debit-card interchange fees, but not fixed costs. 15 U.S.C. § 1693o-2(a)(4)(B)(i).

B.

They are the other problem with Regulation II. During the rulemaking, the Federal Reserve admitted that some fixed costs factored into the interchange-fee cap, even though they are not "specific to a particular electronic debit transaction." *See* Regulation II, 76 Fed. Reg. at 43,429.

An example illustrates the problem. Suppose a bank purchases computer software to spot and prevent fraudulent debit-card transactions. It pays a one-time upfront fee, regardless of whether it processes one transaction or millions. The cost is "fixed" because it "do[es] not vary with the quantity of output produced." Mankiw, *supra*, at 255; *see* Pindyck & Rubinfeld, *supra*, at 241. Hardware, software, labor, and network-connectivity costs can be just as fixed for some banks as the fraud-detection software in the hypothetical. Under the statute, the Federal Reserve cannot "consider[]" any of them in setting reasonable interchange fees. 15 U.S.C. § 1693o-2(a)(4)(B)(ii); *see id.* § 1693o-2(a)(2) (requiring "any interchange transaction fee" to "be reasonable and proportional" to a cardholder bank's cost "with respect to the transaction").

It is true that certain expenses can be fixed for some banks and incremental for others. *See NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 489–90 (D.C. Cir. 2014) (describing the same argument). To return to the example, instead

of handling fraud detection in-house, another bank might outsource it and pay on a per-transaction basis. One can reasonably question whether the statute *should* treat these two scenarios differently, but not whether it *does*. *See* 15 U.S.C. § 1693o-2(a)(4)(B)(ii) (mandating that "costs . . . not specific to a particular electronic debit transaction . . . shall not be considered"). No matter how much some banks and payment networks disagree with approaching the problem this way, the Federal Reserve does not get to revise Congress's work. *See Christopherson v. Cinema Ent. Corp.*, 161 F.4th 525, 528 (8th Cir. 2025) ("If Congress had something else in mind, it could have said so.").

Besides, accounting for these differences among "particular electronic debit transaction[s]" appears to be the point. 15 U.S.C. § 1693o-2(a)(4)(B)(ii). The Federal Reserve is supposed to set "standard*s*," plural, not a single uniform cap like the one it imposed here. *Id.* § 1693o-2(a)(3)(A) (emphasis added). And once it does, banks can pick the profit-maximizing structure that fits best. For some, it may be maximizing marginal costs that can be passed along to merchants and their banks. For others, it may be paying upfront fixed costs that save money over time. Either way, firms will adjust to the regulatory environment, and "any" electronic-debit-transaction fee will be "reasonable and proportional to *the* cost incurred by *the* issuer with respect to *the* transaction." *Id.* (emphases added); *see Webster's Third*, *supra*, at 1819 (describing "proportional" as "corresponding in size, degree, or intensity"); *The American Heritage Dictionary of the English Language* 1413 (5th ed. 2016) (defining it as "[p]roperly related in size, degree, or other measurable characteristics; corresponding"). Exactly as the statute requires.

Make no mistake, debit-card interchange fees do not have to exactly match marginal cost. The word "proportional," after all, does not require perfection. *See American Heritage Dictionary*, *supra*, at 1413. The Federal Reserve is free to use a proxy, perhaps even average variable cost, if it bears a "reasonable" relationship to the marginal costs incurred by cardholder banks in processing debit-card transactions. 15 U.S.C. § 1693o-2(a)(3)(A); *see* Mankiw, *supra*, at 255 (specifying that "variable costs" are those "that vary with the quantity of output produced"); *cf.*

*Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 769 (1968) (explaining that agencies have authority to set rates "within a zone of reasonableness" without "evaluating the separate financial position of each member" (citation omitted)). At a minimum, however, it must sort the costs into those that are transaction-specific and those that are not. Not just pick a number and hope it is close enough for government work.

III.

We accordingly affirm the judgment of the district court, which vacates[4] the current 21-cent cap, *see* Regulation II, 76 Fed. Reg. at 43,467, and remand for the agency to come up with a fee structure that reflects the statute Congress wrote.[5]

---

[4]We have not addressed Corner Post's other arguments given that we are setting aside the rule. *See Iowa v. Wright*, 154 F.4th 918, 952 n.10 (8th Cir. 2025) (declining to consider other reasons to vacate).

[5]Our decision "only . . . become[s] effective" when we issue our mandate, *Bailey v. Henslee*, 309 F.2d 840, 844 (8th Cir. 1962) (en banc) (per curiam), which will happen seven days after the deadline to file a petition for rehearing or an order denying one. *See* Fed. R. App. P. 41(b); *see also id.* 40(d)(1) (giving parties 45 days to seek rehearing in cases involving federal agencies).



Appellate Case: 25-3000 Page: 11 Date Filed: 10/26/2026 Entry ID: 5698472